## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Z GALLERIE, LLC, *et al.*,[1] | ) Case No. 19-10488 (LSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION SEEKING ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
## CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION
## TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully submit this motion for the relief set forth herein. In support of this motion, the Debtors submit the *Declaration of Mark Weinsten, President and Chief Executive Officer of Z Gallerie, LLC, in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Weinsten

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949). The location of the Debtors' service address is: 1855 West 139th Street, Gardena, CA 90249.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Mark Weinsten, Interim President and Chief Executive Officer of Z Gallerie, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 11, 2019 (the "Petition Date"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

Declaration"), and the *Declaration of Jason Cohen, Managing Director at Lazard Middle Market, LLC, in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Cohen Declaration"), each filed contemporaneously herewith.  In further support of this motion, the Debtors respectfully state as follows:

## Relief Requested

1.     The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"):

    a.     authorizing the Debtors to obtain senior secured postpetition financing ("Financing") of up to $28,000,000 (the "DIP Facility" and the loans made thereunder, the "DIP Loans") on the terms and conditions set forth in this Interim Order and the Secured Superpriority Debtor in Possession Credit Agreement (substantially in the form attached to the Motion as **Exhibit B**, attached hereto, and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement" together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents"), among the Debtors, KeyBank, N.A., acting as the administrative and collateral agent (in such capacities, the "DIP Agent"), and KeyBank National Association as lender (in such capacity, the "DIP Lender"), secured by the Collateral (as defined below), and authorization for each Debtor other than the Borrower to guarantee Borrower's obligations under the DIP Facility as a guarantor (collectively, with the Borrower, the "Credit Parties," as that term is defined in the DIP Credit Agreement) and for each Debtor to grant security interests in the Collateral;

b.      authorization to use the proceeds of the DIP Facility extended to the Borrower as expressly provided in the DIP Documents and consistent with the Budget (as defined below) (A) to pay costs, fees, and expenses of the DIP Agent and the DIP Lender as provided for in this Interim Order and the DIP Documents, (B) to roll up and convert the Prepetition Revolving Loans (as defined below) into DIP Loans, (C) to provide working capital for other general corporate purposes of the Debtors, and (D) to pay administration costs, fees and expenses of these Cases and claims or amounts approved by the Bankruptcy Court;

c.      authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

d.      grant to the DIP Lender and the DIP Agent in respect of the DIP Loans, for the benefit of the DIP Agent, the DIP Lender and any other parties referred to in the DIP Credit Agreement with respect to the respective DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below, and subject and subordinate to the Carve-Out (as defined below), the following:

1.      pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority allowed administrative expense claim status in the Cases;

2.      pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all assets of the Debtors, including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions and substitutes thereof, that is not subject to (i) valid, perfected and non-avoidable liens in existence as of the Petition Date or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b);

3.      pursuant to Bankruptcy Code section 364(d), a first priority, senior priming lien on and security interest in all of the Debtors' assets (other than Excluded Assets and subject (i) Permitted Liens (other than the Prepetition Liens) and (ii) the Carve Out (each as defined in the DIP Documents)), including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions and substitutions thereof, that is subject to (i) valid, perfected and non-avoidable liens in existence as of the Petition Date or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b);

e.      authorization for the DIP Agent to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) on terms specified in the Interim Order and in the DIP Credit Agreement;

f.      subject to entry of the Final Order, authorization to grant liens to the DIP Lender on the proceeds of the Debtors' claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, 549 and 550 (collectively, the "<u>Avoidance Actions</u>");

g.      authorization for the Debtors to use, among other things, in accordance with the Budget, any cash collateral (as that term is defined in Bankruptcy Code section 363(a) and described below, the "<u>Cash Collateral</u>") in which the Prepetition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Prepetition Secured Parties with respect to any diminution in value of their interests in the Prepetition Collateral (as defined below) arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay of Bankruptcy Code section 362;

h.      subject to, and only effective upon, the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to Bankruptcy Code section 506(c) or otherwise;

i.      the Court's modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

j.      the Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

k.      authorization that during the period (the "<u>Interim Period</u>") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the Maturity Date, a portion of the Commitments shall be borrowed by Borrower, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents, in an amount equal to $5,000,000; and

scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the

relief requested in this Motion on a final basis and authorizing the balance of the borrowings

under the DIP Documents on a final basis, as set forth in this Motion and the DIP Documents filed with this Court and approving the Debtors' notice with respect to this Motion.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Preliminary Statement[3]

5.      Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and maximizing the likelihood of a going-concern reorganization.  The Debtors will suffer immediate and irreparable harm absent access to additional liquidity.  Indeed, at the time of the

---

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Credit Agreement, or the Interim DIP Order, as applicable.

commencement of these cases, the Debtors have under $2 million of cash on hand—an amount insufficient to operate the Debtors' businesses or continue in the ordinary course.

6.      In anticipation of its upcoming liquidity issues beginning in March 2019, and in an effort to support a marketing and sale process, the Debtors commenced negotiations with their Prepetition Secured Lenders in January 2019.  The Debtors sought to obtain financing on an out-of-court basis.  While the Debtors had many conversations and meetings with their Prepetition Secured Lenders regarding out-of-court funding, in early March it became clear that financing would only be available in connection with the filing of these chapter 11 cases.  To that end, the Debtors, as part of their discussions with both the Prepetition Secured Lenders and the Agent for the Prepetition Credit Facility, KeyBank National Association ("KeyBank"), insisted that any chapter 11 financing support a going concern process that would be accomplished through a chapter 11 plan.

7.      These negotiations had to take into account the structure of the Debtors' existing Prepetition Credit Facility.  The Prepetition Credit Facility provides for two lines of secured credit—a $20,000,000 secured revolving loan facility, provided by KeyBank (the "Prepetition Secured Revolving Loan") with a contractual right of first recovery, and a $93,400,000 secured term loan facility, provided by the Prepetition Term Loan Lenders (the "Prepetition Secured Term Loan").  Both loans are secured by the same collateral, however, KeyBank's position is senior to the Prepetition Secured Term Loan Lenders, entitling KeyBank to receive payment on the Revolving Loans first before any payment could be made to the Prepetition Term Loan Lenders.

8.      The Prepetition Term Loan Lenders indicated they would be willing to provide postpetition financing only on terms that primed KeyBank.  They were unwilling to provide new

money subordinate to KeyBank.  While discussions were ongoing with the Prepetition Term Loan Lenders, the Debtors also engaged in negotiations with KeyBank regarding its desire to provide financing rather than be primed by the Prepetition Term Loan Lenders.  After many conversations, KeyBank agreed to provide the necessary postpetition financing on substantially similar, and in some instances better, terms than the Prepetition Term Loan Lenders, but only on the condition that they receive a roll-up of their Prepetition Secured Revolving Loan on entry of the Interim Order.  As a result of these negotiations, the Debtors were able to secure two competing DIP financing proposals from their Prepetition Secured Lenders—one from their Prepetition Term Loan Lenders that would almost certainly have required a priming fight, and one from KeyBank, conditioned on a roll-up.

9.      In addition, the Debtors, with the assistance of their advisors, solicited proposals for alternative debtor-in-possession financing from a variety of third party potential lenders, including eight financial institutions.  Although six of the potential sources indicated some interest in providing potential exit financing, no one was willing to provide the Debtors with DIP financing on any terms.

10.     As explained in the Cohen Declaration, after significant back and forth with their Prepetition Secured Lenders on the negotiation of these competing proposals, Key Bank agreed to provide $28 million in postpetition financing, including $5 million of new money during the interim period and $3 million upon entry of the Final Order, on the condition of a roll-up of their $19.25 million prepetition loans.

11.     As discussed below and in the Weinsten and Cohen Declarations, and the First Day Declaration, the provisions of the DIP Agreements and the Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facility provides the best terms presently

available to the Debtors.  The Debtors firmly believe that incurrence of the DIP Facility will maximize value for the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

<u>**Concise Statements Pursuant to**</u>
<u>**Bankruptcy Rule 4001(b) and Local Rule 4001-2**[4]</u>

**I.      Concise Statement Regarding the DIP Credit Facility.**

12.      The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Z Gallerie, LLC<br><br>*See* DIP Credit Agreement Preamble. |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | Z Gallerie Holding Company, LLC  ("<u>Holdings</u>", and together with the Borrower, collectively, the "<u>Credit Parties</u>")<br><br>*See* DIP Credit Agreement Preamble. |
| **DIP Financing Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Keybank National Association<br><br>acting as the administrative and collateral agent (in such capacities, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (in such capacity, the "<u>DIP Lender</u>").<br><br>*See* DIP Credit Agreement Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Scheduled Maturity Date.</u> The earlier of  (a) the date that is 120 days after the Effective Date, (b) the effective date of a Plan of Reorganization that (x) does not provide for indefeasible payment in full in cash of all Secured Obligations and (y) is not otherwise acceptable to the Required Lenders, (c) the date of termination of all of the DIP Lender' Commitments and the acceleration of any outstanding extensions of credit, in each case, under the Facility in accordance with terms of the DIP Credit Agreement and the other DIP Documents, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or otherwise, (e)  the earlier of the date (a) Borrower enters into (or files a motion with the Bankruptcy Court |

---

[4]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Documents and the Interim Order.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | or otherwise take action to pursuant the Bankruptcy Court approval of) a purchase agreement, unless such purchase agreement is entered into in connection with the Auction conducted pursuant to the Bidding Procedures Order and (b) the Borrower files a motion or otherwise takes action to pursue the Bankruptcy Court for approval of a sale (other than an Auction conducted pursuant to the Bidding Procedures Order), and (f) the effective date of a plan of reorganization or liquidation in the Case.<br><br>*See* DIP Credit Agreement definition of "Maturity Date." |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Commitments</u>.  As of the Closing Date, the Aggregate Term Loan Commitments are $28,000,000, comprising (z) approximately $19,250,000 to roll up and convert the Senior Secured Revolving Loans outstanding under the Prepetition Credit Agreement into DIP Loans, (b) approximately $750,000 to cash collateralize letters of credit outstanding under the Prepetition Credit Agreement, (c) $5,000,000 Interim Term Loans and (d) $3,000,000 Final Term Loans.<br><br>*See* DIP Credit Agreement, definition of "Aggregate Term Loan Commitment." |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Conditions Precedent to Effectiveness of DIP Credit Agreement.</u><br><br>• Delivery of customary closing deliverables and requisite Loan Documents, including a notice of borrowing, secretary's certificate, officer's certificate, financial statements, UCC and tax lien searches, "know your customer" and USA PATRIOT Act information, evidence of insurance naming the DIP Agent as an additional insured or loss payee, to the extent required by the Loan Documents; receipt of the Initial DIP Budget certified by an officer of the Borrower.<br><br>• The DIP Agent shall be satisfied that the Loan Documents and Order shall be effective to create in favor of the DIP Agent a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Order and the terms thereof.<br><br>• All of the representations and warranties made by each Credit Party contained in the Credit Agreement or any other Loan Document are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent that such representation or warranty expressly related to an earlier date (in which event such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date);<br><br>• The DIP Lender and the DIP Agent shall have received all fees required to be paid, and all reasonable and out-of-pocket expenses for which invoices have been presented (including the reasonable out-of-pocket fees and expenses of legal counsel), at least two (2) Business Days prior to the Effective Date; provided that all such amounts will be paid with proceeds of the Initial Term Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower to the DIP Agent on or before the Effective Date;;<br><br>• The DIP Agent shall have received all governmental and regulatory approvals necessary in connection with the closing of the DIP Credit Agreement and the transactions contemplated thereby, and any consents, permits, licenses and approvals required in accordance with applicable Requirements of Law, or in accordance with any document, agreement, instrument or arrangement to which any Credit Party is a party, in connection with the execution, delivery, performance, validity and enforceability of the DIP Credit Agreement and the other Loan Documents, each in |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | form and substance satisfactory to the Required Lenders;<br><br>• Such other assurances, documents, governmental certificates, and agreements as the DIP Agent, or any DIP Lender reasonably may require;<br><br>• No Default or Event of Default has occurred and is continuing or could reasonably be expected to result after giving effect to the funding of the Interim Term Loans on the Effective Date; and<br><br>• The Interim DIP Order is in full force and effect, and has not been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders in their sole discretion..<br><br><u>Conditions Precedent to All Borrowings</u>.<br>• Receipt of requisite notices;<br><br>• All of the representations and warranties made by each Credit Party contained in the Credit Agreement or any other Loan Document are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent that such representation or warranty expressly related to an earlier date (in which event such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date);<br><br>• No Default or Event of Default has occurred and is continuing or could reasonably be expected to result after giving effect to the funding of the Term Loans on the date of the requested borrowing.;<br><br>• Reaffirmation by each Credit Party of the granting and continuance of the DIP Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the DIP Credit Agreement; and<br><br>• The applicable DIP Order is in full force and effect and has not been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders in their sole discretion.<br><br>• The Borrower shall have paid the balance of all fees and expenses then due and payable under this Agreement.<br><br><u>Conditions Precedent to Funding on the Final Order Effective Date</u>.<br>• The conditions set forth above have been satisfied;<br><br>• The Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the date that is forty (40) days after the Petition Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders in their sole discretion; and, if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans on the Final Order Effective Date, nor the performance by the Credit Parties of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.  Such Final |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Order shall authorize and approve the Term Loans, the DIP Credit Agreement and the Loan Documents contemplated thereby.  All motions, orders and other documents to be filed with and submitted to the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Required Lenders in their sole discretion;<br><br>• Each of the DIP Lender and DIP Agent shall have received for its own account and for the account of the DIP Lender, as the case may be, all fees, costs and expenses due and payable on or prior to the date of the proposed borrowing, and under any other Loan Document, which have been invoiced (in the case of costs and expenses only) to the Borrower at least one (1) Business Day before the date of the proposed borrowing;<br><br>• Delivery of a Notice of Borrowing; and<br><br>• A representation by the Borrower that there is no unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened in writing or pending (other than the Chapter 11 Cases) and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with the DIP Credit Agreement, any other Loan Document, or any transaction contemplated thereby or (ii) which could be expected to result in a Material Adverse Effect, excluding, in each case, any proceedings challenging the DIP Credit Agreement or the DIP Orders (but only so long as, (x) prior to the Final Order Effective Date, the Interim Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders and (y) on the Final Order Effective Date, the Final Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders.<br><br>*See* DIP Credit Agreement §§ 2.1, 2.2 and 2.3 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Rates and Payment of Interest.</u><br><br>• The Obligations shall bear interest as follows: (a) if a Base Rate Loan, at a rate per annum equal to the Base Rate plus the Applicable Margin and (b) if a LIBOR Rate Loan, at a rate per annum equal to the LIBOR Rate for such Interest Period plus the Applicable Margin.   "Applicable Margin" means (a) in the case of LIBOR Rate Loans, 7.75% per annum and (b) in the case of Base Rate Loans, 4.25% per annum.<br><br>• During any Event of Default, the DIP Agent may (and shall at the direction of Required Lenders) elect to apply Default Rate interest (which is determined by adding two percent (2.0%) per annum to the rate otherwise applicable thereto).<br><br>*See* DIP Credit Agreement § 1.3 |
| **Use of DIP Financing Facility and Cash Collateral**<br>**Bankruptcy Rule 4001(b)(l)(B)(ii)**<br><br>Local Rule 4001-2(a)(ii) | <u>Use of Proceeds.</u>  The proceeds of Loans made under the DIP Credit Agreement to pay or fund (i) certain costs, fees and expenses related to the Case, (ii) amounts due and outstanding under the Prepetition Credit Agreement as permitted by the Interim Order and the Final Order, (iii) Adequate Protection Payments (as defined in the Interim Order) and (iv) the working capital needs, capital improvements and expenditures of the Borrower and the other Credit Parties during the Chapter 11 Cases in accordance with the any DIP Budget (including the Initial DIP Budget) and the Cash Management Order<br><br>Notwithstanding the foregoing, none of the proceeds of the Term Loans and none of the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Obligations, the cash collateral, the Collateral or the Carve-Out may be used for the following purposes: to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents or the Prepetition Credit Agreement, or the liens, security interests or claims granted under the Interim Order, the Final Order, the DIP Agreement, the other Loan Documents or the Prepetition Credit Agreement, (ii) investigate, initiate or prosecute any claims and defenses or causes of action against any of the DIP Agent, the DIP Lender, the Prepetition Agent, the Prepetition Secured Lenders, or their respective agents, affiliates, representatives, attorneys or advisors under or relating to the Prepetition Credit Agreement, the outstanding indebtedness under the Prepetition Credit Agreement, the Collateral (as defined in the Prepetition Credit Agreement) or the Loan Documents, (iii) prevent, hinder or otherwise delay the DIP Agent's or any DIP Lender's assertion, enforcement or realization on the cash collateral or the Collateral in accordance with the Loan Documents, (iv) seek to modify any of the rights granted to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Secured Lenders under the DIP Credit Agreement or under the Loan Documents or the Prepetition Credit Agreement, in each of the foregoing cases without such parties' prior written consent or (v) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (A) approved by an order of the Bankruptcy Court and (B) in accordance with the DIP Credit Agreement and any relevant DIP Budget; provided that, advisors to the Committee may investigate the indebtedness under the Prepetition Credit Agreement and the liens on and security interests in the Collateral (as defined in the Prepetition Credit Agreement) for a 60-day period, commencing after the date that notice of the formation of the Committee appointed under section 1102 of the Bankruptcy Code in the Chapter 11 Cases is filed on the docket of such Chapter 11 Cases, at an aggregate expense for such investigation not to exceed $50,000;.<br><br>*See* DIP Credit Agreement § 5.8 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection Liens.  Subject to and subordinate to the Carve Out as set forth in the Interim Order, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Collateral Agent, for the benefit of itself and the Prepetition Secured Parties, continuing, valid and perfected replacement security interests in and liens on the Postpetition Collateral which liens shall be junior and subordinate to (i) the DIP Liens, (ii) the Carve-Out (iii) valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens, and (iv) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b) which are entitled to priority over the Prepetition Liens (the "Adequate Protection Liens").<br><br>Retention of Liens.  The Prepetition Secured Parties will, subject to the terms of this Interim Order and the Final Order, maintain the Prepetition Liens on the Collateral, which liens shall be junior and subordinate to (i) the DIP Liens, (ii) the Carve-Out (iii) valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens, and (iv) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b) which are entitled to priority over the Prepetition Liens.<br><br>Adequate Protection Superpriority Claims.  Subject and subordinate to the Carve Out as set forth in the Interim Order, as further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Value of such interests in the Prepetition Collateral, the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Secured Superpriority Claim"). |
| | Adequate Protection Payments and Protections for Prepetition Secured Parties.  Subject to the Carve Out as set forth in the Interim Order, as further adequate protection (the "Prepetition Secured Adequate Protection Payments"), the Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, pursuant to the procedures set forth in the Interim Order, all reasonable professional fees and expenses of the Prepetition Term Loan Lenders incurred in connection with the Cases (the "Prepetition Term Loan Lenders' Professional Fees and Expenses"), including, without limitation, all reasonable fees and expenses incurred prior to the date hereof and/or the Petition Date.  The Debtors shall pay the Prepetition Term Loan Lenders' Professional Fees and Expenses within ten (10) Business Days (if no written objection is received within such ten (10) Business Days' period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses (but in any event providing reasonable detail with respect to the fees and expenses incurred); *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoices delivered simultaneously to the DIP Agent, the United States Trustee for the District of Delaware (the "U.S. Trustee"), and the official committee of unsecured creditors if appointed (the "Committee").  Written objections to payment of the Prepetition Term Loan Lenders' Professional Fees and Expenses, which may only be asserted by the Debtors, the DIP Agent, the U.S. Trustee and the Committee (if appointed), must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced.  None of the Prepetition Term Loan Lenders' Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided, however*, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute. All allowed claims payable in cash arising from the Adequate Protection Provisions must be indefeasibly paid in full in cash and satisfied on or before the effective date of any chapter 11 plan (except as may otherwise be provided in the Plan of Reorganization)<br><br>*See* Interim Order ¶ 12. |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | Mandatory Prepayments.  The outstanding Obligations shall be subject to prepayment as follows:<br><br>• If a Credit Party shall at any time or from time to time: (a) make a Disposition (other than in the case of any (x) Disposition made in connection with a Permitted Store Closing and (y) other store closure or Lease rejection conducted with the prior written approval of the Required Lenders); or (b) suffer an Event of Loss, then (A) the Borrower shall promptly notify the DIP Agent of such proposed Disposition or Event of Loss or receipt of proceeds by such Credit Party in connection with such a Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party in respect thereof) and (B) promptly upon receipt by a Credit Party of the Net Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, such excess Net Proceeds to Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | applied in accordance with <u>Section 1.8(h)</u> of the DIP Credit Agreement. <br><br> • Within three (3) Business Days of the date of the receipt by any Credit Party of the Borrower of the Net Issuance Proceeds of the issuance of debt securities for borrowed money or Equity Issuance, the Borrower shall deliver, or cause to be delivered, to DIP Agent an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with <u>Section 1.8(h) of the DIP Credit Agreement.</u> <br><br> • No later than concurrently with any Change of Control, the Borrower shall deliver, or cause to be delivered, to the DIP Agent an amount equal to all of the Obligations then outstanding. <br><br> *See* DIP Credit Agreement §1.8 <br><br> <u>Optional Prepayments</u> <br><br> • The Borrower may at any time upon at least one (1) Business Day's (or such shorter period as is acceptable to the DIP Agent) prior written notice by the Borrower to the DIP Agent, prepay the Loans in whole or in part in an amount greater than or equal to $100,000, in each instance, without penalty or premium except as provided in Section 10.4 of the DIP Credit Agreement. Optional partial prepayments of the Term Loans shall be applied in the manner directed by the Borrower or, if not specified, as set forth in <u>Section 1.8(h) of the DIP Credit Agreement</u>. Optional partial prepayments of the Term Loan in amounts less than $100,000 shall not be permitted. <br><br> • The notice of any prepayment shall not thereafter be revocable by the Borrower and Agent will promptly notify each DIP Lender thereof and of such DIP Lender's Commitment Percentage of such prepayment. The payment amount specified in such notice shall be due and payable on the date specified therein. Together with each prepayment under Section 1.7 of the DIP Credit Agreement, the Borrower shall pay any amounts required to reimburse each DIP Lender from any funding loss or expense pursuant to <u>Section 10.4 of the DIP Credit Agreement</u>. <br><br> *See* DIP Credit Agreement § 1.7 |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | <u>Unused Commitment Fee</u>. The Borrower shall pay to the DIP Agent a fee (the "<u>Unused Commitment Fee</u>") for the account of each DIP Lender with a Delayed Draw Term Loan Commitment (excluding any Non-Funding Lender) in an amount equal to (i) the Delayed Draw Term Loan Commitment of such Lender during the preceding calendar month, <u>less</u> (ii) the Delayed Draw Term Loans held by such DIP Lender during the preceding calendar month <u>multiplied by</u> (iii) two percent (2.00%) per annum. The total Unused Commitment Fee paid by the Borrower will be equal to the sum of all of the fees due to the DIP Lender (other than any Non-Funding Lender). Such Unused Commitment Fee shall be payable monthly in arrears on the last day of the first calendar month following the initial advance under the Delayed Draw Term Loan Commitment and the last day of each calendar month thereafter and on the Maturity Date. The Unused Commitment Fee provided in Section 1.9(a) of the DIP Credit Agreement shall accrue at all times from and after the date of the initial advance under the Delayed Draw Term Loan Commitment. The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days. <br><br> <u>Facility Fee</u>. The Borrower shall pay to the DIP Agent , for the account of each DIP Lender on a pro rata basis, (i) a single interim facility fee in an amount equal to 2.00% of the aggregate amount of Interim Term Loans approved by the Bankruptcy Court in the Interim Order and funded by the Lenders (excluding the total outstanding amount of the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | indebtedness under the Prepetition Credit Agreement, including amounts committed to letter of credit obligations thereunder, that may constitute Obligations under the DIP Credit Agreement) (the "Interim Facility Fee") and (ii) a single final facility fee in an amount equal to 2.00% of the aggregate amount of Delayed Draw Term Loan Commitments approved by the Bankruptcy Court in the Final Order (the "Final Facility Fee" and together with the Interim Facility Fee, collectively, the "Facility Fee").  The Interim Facility Fee is fully earned on the Effective Date and shall be paid (and once paid shall be non-refundable) on the Effective Date. The Final Facility Fee is fully earned on the Final Order Effective Date and shall be paid (and once paid shall be non-refundable) on the Final Order Effective Date. <br><br> Exit Fee.  The Borrower shall pay to the DIP Agent a non-refundable exit fee (the "Exit Fee") for the account of each DIP Lender on a pro rata basis, in an amount equal to 2% of the Term Loan Commitments of such DIP Lender (excluding the total outstanding amount of the indebtedness under the Prepetition Credit Agreement, including amounts committed to letter of credit obligations thereunder, that may constitute Obligations under the DIP Credit Agreement).  Such Exit Fee shall be payable on the date of termination of the DIP Lender' Commitments and the repayment in full of the Obligations. <br><br> *See* DIP Credit Agreement § 1.9. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) <br><br><br> **Variance Covenant** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(ii) | Initial DIP Budget.  Prior to the Effective Date, the Borrower shall have furnished to the DIP Agent and the DIP Lender a 13-week cash flow budget of anticipated and forecasted revenues and expenses and, as in effect from time to time, in form and substance reasonably satisfactory to the Required Lenders (such budget as delivered to the DIP Agent and the DIP Lender on the Effective Date, the "Initial DIP Budget") certified by an officer of the Borrower, certifying that the projections therein have been prepared in good faith based on reasonable assumptions believed by management to be reasonable in light of current conditions and facts known to the Borrower at the time delivered (it being understood that such Initial DIP Budget and assumption on which they were based, may or may not prove to be correct), and that such projections contain no statements or conclusions (and there are no omissions of information) which are based upon or include information known to the Credit Parties to be misleading in any material respect.  Commencing on the second Wednesday after the Petition Date, the Borrower shall deliver a certificate to the DIP Agent signed by an officer of the Borrower, on Wednesday of each week, certifying the cash disbursements, sales, inventory, inventory receipts and cash receipts, on a line by line basis, for the week ended (and on a cumulative basis since the Petition Date) the immediately prior Saturday, together with a variance report, on an individual line item basis and an aggregate basis, comparing such disbursements to the DIP Budget <br><br> Updates to Proposed DIP Budget.  Following the Effective Date, on Wednesday of each week, the Borrower may propose an updated budget (the "Proposed DIP Budget") which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during the next thirteen-week period, including but not limited to, collections, payroll, Capital Expenditures, Professional fees and other cash outlays, in each case, consistent in form and substance (other than dollar amounts) with the Initial DIP Budget. Each DIP Budget, including the Initial DIP Budget shall be accompanied by a certificate from the chief financial officer of the Borrower or Holdings certifying that such projections were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the preparer thereof to be reasonable at the time prepared.  The Required Lenders may approve such Proposed DIP Budget, which will then become the "DIP Budget" then in effect in their sole and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | absolute discretion. If the DIP Lender do not approve such Proposed DIP Budget, then the current DIP Budget will remain in effect.<br><br>Permitted Variances. The Borrower shall deliver a certificate to the DIP Agent signed by an officer of the Borrower on the (i) Wednesday immediately prior to the scheduled hearing date for the Final Order and (ii) Wednesday of each week, commencing on the third Wednesday after the Petition Date, in each case, demonstrating that total disbursements (excluding certain stub-rent payments) for the four-week period (or, shorter period, if any, in the case of the certificate delivered under clause (i)) ending on the Saturday immediately preceding the applicable Wednesday, are no greater than 115% of the projected amounts for total disbursements set forth in the DIP Budget for such period.<br><br>See DIP Credit Agreement § 4.1(g), (h), (j) and (l). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | Events of Default. Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, defaults related to the budget, cross-defaults to other indebtedness, attachment defaults, judgment defaults, invalidity of loan documents, change of control, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of prpostpetition loan documents, the occurrence of any number of adverse actions or consequences in any of the Chapter 11 Cases.<br><br>See DIP Credit Agreement § 7.1. |
| **Costs and Expenses: Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Costs and Expenses.<br><br>The Borrower agrees to pay or reimburse within thirty (30) days upon demand (a) DIP Agent and DIP Lender for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred by each of them or any of its Related Persons (but only to the extent DIP Agent, DIP Lender or their Affiliates are required to reimburse such Related Person), in connection with the preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of Agent and Lenders, the costs of Collateral audits and appraisals, background checks and similar expenses, (b) the DIP Agent and the DIP Lender for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred by each of them or any of their Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the reasonable and documented out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent and Lenders, respectively, for their examiners) and (c) each of the DIP Agent, DIP Lender and their Related Persons, for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided under the DIP Credit Agreement in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document or (iii) the commencement, defense, conduct, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party or Related Transactions. Notwithstanding anything to the contrary in any DIP Document, Borrower and Credit Parties' obligations as to Attorney Costs shall be limited to the fees, disbursements and other charges of one counsel to each Lender and its Related Persons and one additional counsel to the Agent and its Related Persons, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one regulatory counsel to all affected Indemnitees, taken as a |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | whole (and in the case of an actual or reasonably perceived conflict of interest, one additional counsel (and one additional local counsel in each relevant material jurisdiction and one additional regulatory counsel) to each affected Indemnitee). |
| | *See* DIP Credit Agreement § 9.5. |
| | Indemnification of Agent Indemnitees. |
| | Subject to the limitations set forth in Section 9.6 of the DIP Credit Agreement, each Credit Party agrees to indemnify, hold harmless and defend DIP Agent, each DIP Lender and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all actual Liabilities (including brokerage commissions, fees and other compensation, but not including Taxes which are addressed in Section 10.1 of the DIP Credit Agreement) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including Attorney Costs in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"). |
| | *See* DIP Credit Agreement § 9.6. |

## **Background**

## I.     **The Debtors' Prepetition Capital Structure.**

13.     As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $111.8 million.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Interest Rates | | Principal Amount Outstanding as of the Petition Date |
|---|---|---|---|---|
| Senior Secured Revolving Loans | October 8, 2020 | Libor + 4.75% | | $19,250,000 |
| | | 2% Revolving PIK Interest | | |
| Senior Secured Term Loans | October 8, 2021 | Libor + 6.50% | | $92,571,502.14 |
| | | 2% PIK Option Rate | | |
| TOTAL | | | | $111,821,502.14 |

### A.    The Secured Credit Agreement.

14.    The Debtors are parties to that certain Credit Agreement, dated as of October 8, 2014 (as amended, amended and restated, refinanced, supplemented, modified, restated, waived or otherwise modified from time to time, the "Prepetition Credit Agreement") by and among Z Gallerie, as borrower, Holdings, as a parent guarantor (together with Z Gallerie as the borrower, collectively, the "Prepetition Credit Parties"), the lenders party thereto from time to time (the "Prepetition Secured Lenders"), and KeyBank, as administrative agent and collateral agent for itself and the Prepetition Secured Lenders (in such capacities, together with its successors and assigns, the "Prepetition Agent").   The Prepetition Credit Agreement provides for (1) a $93,400,000 senior secured term loan facility, Prepetition Secured Term Loans, with a maturity date of October 8, 2021 and (2) a $20,000,000 senior secured revolving loan facility, the Prepetition Secured Revolving Loans, with a maturity date of October 8, 2020.

15.    Obligations under the Prepetition Credit Agreement are secured by substantially all assets of the Prepetition Credit Parties (subject to certain exceptions), including, without limitation, a first priority lien on the Prepetition Credit Parties' accounts (including receivables), inventory, deposit and securities accounts (subject to certain exceptions), cash, and cash equivalents, owned real property with a fair market value equal to or greater than $3,000,000,

intellectual property and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral").

16.    Additionally, the Prepetition Credit Parties have entered into deposit account control agreements in favor of the Agent with respect to their bank accounts.  Thus, substantially all of the Prepetition Credit Parties' cash is subject to a perfected security interest in favor of the Agent.  As of the Petition Date, the term loan facility is fully drawn and there is approximately $750,000[5] of availability under the revolving facility.

**II.    Alternative Sources of Financing Are Not Readily Available.**

17.    The Debtors do not have alternative sources of financing readily available.  The Debtors' Prepetition Secured Lenders assert that substantially all of the Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' capital structure, restricts the availability of, and options for, postpetition financing.  *See* Cohen Declaration ¶ 14.  The Prepetition Secured Lenders also made it clear that they would not consent to "priming" debtor-in-possession financing provided by a third party.  *See* Cohen Declaration ¶ 22.  Additionally, as described below, the Debtors' marketing process—which included outreach to eight parties for a variety of financing solutions—yielded no actionable results.  Accordingly, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

18.    While negotiating the DIP Facility with the Debtors' existing debtholders, the Debtors, with the assistance of Lazard Middle Market LLC ("Lazard"), began soliciting indications of interest from eight alternative third-party sources of asset based financing (including specialty lenders, distressed-oriented investors with experience in retail, and those that

---

[5] As of the Petition Date the Prepetition Secured Revolving Loans and Prepetition Secured Term Loans are fully drawn.

routinely provide debtor-in-possession financing), to gauge their interest in providing postpetition financing to the Debtors. *See* Cohen Declaration ¶ 12. No party provided a proposal for alternative financing, with several parties explaining that their financing proposal would require priming of the Prepetition Secured Lenders—likely resulting in expensive and distracting litigation at the critical start of these chapter 11 cases. *See id.*

19.    Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees. In contrast, the proposed DIP Facility offered by the DIP Lender allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

## Basis for Relief

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

20.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business

judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

22.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

23.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of the only two alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases through confirmation.  The Debtors negotiated the DIP Agreement and other DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective advisors.  The Debtors conducted intensive negotiations with their Prepetition Secured Lenders that resulted in two DIP financing proposals from their Prepetition Revolving Lender and the Prepetition Term Loan Lender.  Given the Debtors' capital structure and current circumstances, the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

24.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the

Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lender postpetition security interests in and liens on the Postpetition Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order:

a.   The DIP Liens securing the DIP Obligations will be senior priming liens on the Prepetition Collateral, senior in priority to all Prepetition Liens thereon and any Adequate Protection Liens thereon, except that the DIP Liens will be junior to:

i.    the Carve Out;

ii.   Permitted Liens that are valid, binding, perfected and unavoidable as of the Petition Date (other than the Prepetition Liens) and which are entitled to priority over the Prepetition Liens;

iii.  valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens; and

iv.   valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b), which are entitled to priority over the Prepetition Liens.

25.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

b.   the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

c.   the credit transaction is necessary to preserve the assets of the estate; and

d.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

26.      As described above and as set forth in the Cohen Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to the Prepetition Secured Lenders.    *See* Cohen Declaration ¶ 12.    Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing in connection with a chapter 11 filing would likely require the support of, or be provided by, the Debtors' existing lenders.  *See* Cohen Declaration ¶ 14.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases and to continue operating in the ordinary course, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

27.      In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section  503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As

described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

28.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

29.     Here the Prepetition Secured Lenders have consented to the DIP Facilities.  The Debtors submit that its provision of adequate protection as described herein is fair and reasonable, is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

30.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*

*sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

31.    As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals.  Substantially all of the Debtors' existing assets are encumbered.  *See* Cohen Declaration ¶ 21.  Moreover, the Debtors have done a thorough search for actionable alternative proposals—in this regard, the market has spoken.  There are no other options.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Weinsten Declaration ¶ 10.  Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### D.    The Proposed Repayment of Prepetition Indebtedness Should Be Approved.

32.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in

the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

33.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. Courts in this jurisdiction have approved similar DIP features on the first day of the case. *See, e.g.*, *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[6]

34.    Moreover, repayment of prepetition debt has been approved in several recent retail cases in this and other jurisdictions. *See In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. October 6, 2017) (approving on an interim basis the repayment in full of all

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

outstanding amounts under the prepetition revolving credit agreement); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

35.    As set forth above, the DIP Credit Agreement provides that the full amount outstanding under the Prepetition Revolving Loan will "roll up" into the DIP Facility upon entry of the Interim Order.  The amount to be rolled-up, approximately $19.25 million, represents roughly 17% of the Debtors' total outstanding prepetition secured debt.

36.    The repayment of the Prepetition Revolving Loan is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility and was required by the DIP Lender as a condition to their commitment to provide postpetition financing.  *See* Cohen Declaration ¶ 15.  The Debtors were unable to obtain debtor-in-possession financing on similar terms that did not provide for the repayment of prepetition amounts on these terms.  *See* Cohen Declaration ¶ 21.  Without continued access to a lending facility to fund the

Debtors' operations and the $5.25 million in incremental liquidity under the DIP Facility to fund the administration of these chapter 11 cases, the Debtors' businesses would cease and they would likely be forced to liquidate.  *See* Weinsten Declaration ¶ 5.  Maintaining the ability to continue as a going concern on the other side of a deleveraging restructuring transaction is of immense benefit to the Debtors' estates and stakeholders.  Moreover, the DIP Financing offered by the Prepetition Secured Revolver Lenders is a superior DIP facility because it eliminates the cost of litigation on the first day regarding and allows for a constructive beginning to these chapter 11 cases. Given the Debtors' liquidity concerns and the 120-day timeline in the case, that reducing litigation and entering the chapter 11 cases with collaboration between and among the Prepetition Secured Lenders is in the best interest of the estates. *See* Weinsten Declaration ¶ 9.

37.    The simple economic reality is that a peaceful, going concern transition in to chapter 11 comes at a price, which in this case the Debtors believe to be reasonable.  KeyBank is unlikely to continue to lend postpetition without some assurance regarding their prepetition claims.  Absent KeyBank's support, the first month of the Debtors' chapter 11 cases would very likely devolve into a costly priming fight.  In contrast, the roll up of the Prepetition Revolving Loans Indebtedness merely affects the timing, not the amount or certainty, of the Prepetition Term Loan Lenders recovery—the secured claims arising under the Prepetition Credit Facility are required by section 1129 of the Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have here).

38.    Given these circumstances, repayment of the Prepetition Revolving Loans Indebtedness upon entry of the Interim Order is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

II.     **The Debtors Should Be Authorized to Use the Cash Collateral.**

39.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Lenders consent to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order.

40.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

41.     As described more fully above, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral (as well as the

Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

    a.    valid and perfected replacement security interests in and liens on the Postpetition Collateral;

    b.    superpriority administrative claims under section 507(b) of the Bankruptcy Code; and

    c.    the Prepetition Term Loan Lenders' reasonable professional fees and expenses.

42.    Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral. In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Lenders are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### III.  The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lender Under the DIP Documents.

43.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lender. In particular, the Debtors have agreed to pay certain fees to the DIP Agent and DIP Lender (in accordance with the terms of the DIP Documents) consisting of the following:

    a.    an Unused Commitment Fee equal to the Delayed Draw Term Loan Commitment during the preceding calendar month minus the Delayed Draw Term Loans held by such DIP Lender during the precedent calendar month multiplied by 2.00% per annum;

   b.  a single interim Facility Fee and final Facility Fee, both equal to 2.00% of the Delayed Draw Term Loan Commitments approved by the Bankruptcy Court in the respective Interim Order and Final Order; and

   c.  a non-refundable Exit Fee in an amount equal to 2.00% of the Term Loan Commitments of the DIP Lender.

44. Under the circumstances of these cases, these fees and costs are reasonable, customary, and appropriate under the circumstances. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements *See* Cohen Declaration ¶ 19.

## IV. The Debtors Should Be Deemed Good-Faith Lenders Under Section 364(e).

45. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

46. As explained herein, in the Weinsten Declaration and the Cohen Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being

provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

47.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agents to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

48.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

49.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, including advances under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Lenders' Cash Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to the Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

51.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**Request for Final Hearing**

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after April 12, 2019 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

53.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

54.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Agent for the Debtors' prepetition secured credit facility; (d) counsel to the Agent for the Debtors' prepetition secured credit facility; (e) counsel to the DIP Financing Agent; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtors conduct business; (j) the Prepetition Secured Parties to the Debtors' prepetition secured credit facility and their counsel; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

55.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  March 11, 2019            /s/ Domenic E. Pacitti
Wilmington, Delaware              Domenic E. Pacitti (DE Bar No. 3989)
                                  Michael W. Yurkewicz (DE Bar No. 4165)
                                  **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                  919 N. Market Street, Suite 1000
                                  Wilmington, Delaware 19801
                                  Telephone:    (302) 426-1189
                                  Facsimile:    (302) 426-9193

                                  -and-

                                  Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900

                                  -and-

                                  Justin R. Bernbrock (*pro hac vice* admission pending)
                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  300 North LaSalle
                                  Chicago, Illinois 60654
                                  Telephone:    (312) 862-2000
                                  Facsimile:    (312) 862-2200

                                  *Proposed Co-Counsel for the Debtors and Debtors in Possession*