**<u>EXHIBIT B</u>**

**Form of DIP Agreement**

**SENIOR SECURED SUPERPRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT**

**Dated as of March [__], 2019**

**by and among**

**Z GALLERIE, LLC
as the Borrower**

**THE OTHER PERSONS PARTY HERETO THAT ARE
DESIGNATED AS CREDIT PARTIES,**

**KEYBANK NATIONAL ASSOCIATION
for itself, as a Lender and as Agent for all Lenders, and**

**THE LENDERS PARTY HERETO
as Lenders**

_____

# Table of Contents

**Page**

Article I THE CREDITS .................................................................................................. 8

    1.1    Amounts and Terms of Commitments ................................................... 8

    1.2    Notes ......................................................................................................... 9

    1.3    Interest ...................................................................................................... 9

    1.4    Loan Accounts ....................................................................................... 10

    1.5    Procedure for Borrowing ..................................................................... 11

    1.6    Conversion and Continuation Elections ............................................. 12

    1.7    Optional Prepayments .......................................................................... 13

    1.8    Mandatory Prepayments of Loans and Commitment Reductions .... 13

    1.9    Fees ......................................................................................................... 14

    1.10    Payments by the Borrower ................................................................ 15

    1.11    Payments by the Lenders to Agent; Settlement ............................. 16

    1.12    [Reserved] ............................................................................................ 18

    1.13    [Reserved] ............................................................................................ 18

    1.14    Tax Treatment ..................................................................................... 18

Article II CONDITIONS PRECEDENT .................................................................... 18

    2.1    Conditions Precedent to the Effective Date ....................................... 18

    2.2    Conditions to All Borrowings ............................................................... 21

    2.3    Conditions to Funding on the Final Order Effective Date ............... 22

Article III REPRESENTATIONS AND WARRANTIES ........................................ 23

    3.1    Corporate Existence and Power ........................................................... 23

    3.2    Corporate Authorization; No Contravention ..................................... 23

    3.3    Governmental Authorization ............................................................... 24

    3.4    Binding Effect ........................................................................................ 24

    3.5    Litigation ................................................................................................ 24

    3.6    [Reserved] ............................................................................................... 24

    3.7    ERISA Compliance .............................................................................. 24

    3.8    Use of Proceeds; Margin Regulations ................................................. 25

    3.9    Title to Properties; Leases .................................................................... 25

    3.10    Taxes ................................................................................................... 26

    3.11    [Reserved] ............................................................................................ 26

    3.12    Environmental Matters ...................................................................... 26

    3.13    Regulated Entities .............................................................................. 27

    3.14    [reserved] .............................................................................................. 27

| | | |
|---|---|---|
| 3.15 | Labor Relations | 27 |
| 3.16 | Intellectual Property | 27 |
| 3.17 | Status of Holdings | 27 |
| 3.18 | Insurance | 28 |
| 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock | 28 |
| 3.20 | Jurisdiction of Organization; Chief Executive Office | 28 |
| 3.21 | [Reserved] | 28 |
| 3.22 | Full Disclosure | 28 |
| 3.23 | Foreign Assets Control Regulations and Anti-Money Laundering | 29 |
| 3.24 | Patriot Act | 29 |
| 3.25 | Validity and Priority of Security Interest; Administrative Priority | 30 |
| **Article IV AFFIRMATIVE COVENANTS** | | 30 |
| 4.1 | Financial Statements | 30 |
| 4.2 | Certificates; Other Information | 32 |
| 4.3 | Notices | 33 |
| 4.4 | Preservation of Corporate Existence, Etc. | 35 |
| 4.5 | Maintenance of Property | 35 |
| 4.6 | Insurance | 36 |
| 4.7 | Payment of Obligations | 37 |
| 4.8 | Compliance with Laws | 38 |
| 4.9 | Inspection of Property and Books and Records | 38 |
| 4.10 | OFAC; Patriot Act | 38 |
| 4.11 | [Reserved] | 38 |
| 4.12 | [Reserved] | 38 |
| 4.13 | Further Assurances | 38 |
| 4.14 | Environmental Matters | 40 |
| 4.15 | Financial Consultant; CRO; Investment Banker; Lender Meetings | 40 |
| 4.16 | ERISA Compliance | 41 |
| 4.17 | [reserved] | 41 |
| 4.18 | Fiscal Year | 42 |
| 4.19 | Anti-Terrorism Laws | 42 |
| 4.20 | Compliance with Leases | 42 |
| 4.21 | Lease and Material Contract Rejection/Negotiation Procedure Motions | 42 |
| **Article V NEGATIVE COVENANTS** | | 42 |
| 5.1 | Limitation on Liens | 42 |
| 5.2 | Disposition of Assets | 45 |

5.3    Consolidations and Mergers ......................................................................................46

5.4    Loans and Investments ............................................................................................47

5.5    Limitation on Indebtedness ....................................................................................48

5.6    Employee Loans and Transactions with Affiliates ................................................50

5.7    Management Fees and Compensation .....................................................................51

5.8    Use of Proceeds ......................................................................................................51

5.9    Contingent Obligations ...........................................................................................52

5.10    [Reserved] ...............................................................................................................53

5.11    Restricted Payments ...............................................................................................53

5.12    Change in Business .................................................................................................54

5.13    [Reserved] ...............................................................................................................54

5.14    Changes in Name and Jurisdiction of Organization ...............................................54

5.15    Amendments to Subordinated Indebtedness; Amendments to Third Amendment Tranche 1 Unsecured Loan Note or Third Amendment Tranche 2 Unsecured Loan Note; Organization Documents; Leases; Material Contracts ......................................................................................54

5.16    No Negative Pledges; Restrictive Agreements ......................................................55

5.17    [Reserved] ...............................................................................................................57

5.18    [Reserved] ...............................................................................................................57

5.19    [Reserved] ...............................................................................................................57

5.20    Payments of Other Indebtedness ............................................................................57

5.21    Case Matters ...........................................................................................................57

5.22    Amendments to Orders ...........................................................................................59

5.23    Pre-Petition Indebtedness .......................................................................................59

5.24    DIP Budget .............................................................................................................59

Article VI Financial Covenants .........................................................................................59

6.1    Permitted Variances ...............................................................................................59

Article VII EVENTS OF DEFAULT ..................................................................................59

7.1    Event of Default ......................................................................................................59

7.2    Relief ......................................................................................................................62

7.3    Remedies .................................................................................................................63

7.4    Rights Not Exclusive ..............................................................................................66

Article VIII AGENT ...........................................................................................................66

8.1    Appointment and Duties .........................................................................................66

8.2    Binding Effect ........................................................................................................67

8.3    Use of Discretion ...................................................................................................67

8.4    Delegation of Rights and Duties ............................................................................68

8.5    Reliance and Liability ............................................................................................68

8.6     Agent Individually ................................................................................70
8.7     Lender Credit Decision ..........................................................................70
8.8     Expenses; Indemnities ...........................................................................71
8.9     Resignation or Termination of Agent......................................................71
8.10    Release of Collateral or Credit Parties ...................................................72
8.11    Additional Secured Parties .....................................................................73
8.12    [Reserved] ..............................................................................................73
8.13    Agent May File Proofs of Claim; Etc.....................................................73
Article IX MISCELLANEOUS ....................................................................................74
9.1     Amendments and Waivers ......................................................................74
9.2     Notices Addresses ..................................................................................76
9.3     Electronic Transmissions .......................................................................77
9.4     No Waiver; Cumulative Remedies...........................................................78
9.5     Costs and Expenses ................................................................................78
9.6     Indemnity ...............................................................................................79
9.7     Marshaling; Payments Set Aside ............................................................80
9.8     Successors and Assigns ..........................................................................80
9.9     Assignments and Participations; Binding Effect......................................80
9.10    Non-Public Information; Confidentiality ................................................84
9.11    Set-off; Sharing of Payments .................................................................85
9.12    Counterparts; Facsimile Signature .........................................................86
9.13    Severability ............................................................................................86
9.14    Captions .................................................................................................87
9.15    Independence of Provisions ...................................................................87
9.16    Interpretation .........................................................................................87
9.17    No Third Parties Benefited......................................................................87
9.18    Governing Law and Jurisdiction .............................................................87
9.19    Waiver of Jury Trial ...............................................................................88
9.20    Entire Agreement; Release; Survival ......................................................88
9.21    Patriot Act .............................................................................................89
9.22    Replacement of Lender ...........................................................................89
9.23    Joint and Several ....................................................................................90
9.24    Creditor-Debtor Relationship..................................................................90
9.25    Credit Bid ..............................................................................................90
9.26    [Reserved] ..............................................................................................90
9.27    Incorporation of DIP Orders by Reference ..............................................90

9.28      Right to Publicize and Advertise.................................................................90

Article X TAXES, YIELD PROTECTION AND ILLEGALITY ...................................91

10.1      Taxes ..........................................................................................................91

10.2      Illegality ......................................................................................................95

10.3      Increased Costs and Reduction of Return ...................................................95

10.4      Funding Losses............................................................................................97

10.5      Inability to Determine Rates .......................................................................97

10.6      Reserves on LIBOR Rate Loans .................................................................98

10.7      Certificates of Lenders ...............................................................................98

Article XI [RESERVED] ............................................................................................98

Article XII COLLATERAL..........................................................................................98

12.1      Grant of Security Interest ............................................................................98

12.2      Perfection and Protection of Security Interest............................................99

12.3      Delivery of Mortgages ..............................................................................100

12.4      Title to, Liens on, and Use of Collateral .................................................100

12.5      [Reserved] .................................................................................................101

12.6      Right to Cure .............................................................................................101

12.7      Power of Attorney .....................................................................................101

12.8      The Agent's and Lenders' Rights, Duties, and Liabilities ........................101

12.9      Site Visits, Observations, and Testing .....................................................101

12.10     Rights in Respect of Investment Property.................................................102

12.11     No Filings Required ...................................................................................103

12.12     Adequate Protection ..................................................................................103

Article XIII GUARANTY ..........................................................................................104

13.1      Guaranty; Limitation of Liability..............................................................104

13.2      Guaranty Absolute ....................................................................................104

13.3      Waivers and Acknowledgments.................................................................105

13.4      Subrogation ...............................................................................................106

13.5      Continuing Guaranty; Assignments ..........................................................107

Article XIV DEFINITIONS .......................................................................................107

14.1      Defined Terms............................................................................................107

14.2      Other Interpretive Provisions ...................................................................137

14.3      Accounting Terms and Principles .............................................................138

14.4      Payments ...................................................................................................138

14.5      Divisions ...................................................................................................138

## **SCHEDULES**

Schedule I               Cash Collateral Accounts
Schedule II              Initial DIP Budget
Schedule 1.1(a)          Term Loan Commitments
Schedule 3.5             Litigation
Schedule 3.7             ERISA
Schedule 3.9(a)          Owned Real Estate
Schedule 3.9(b)          Leased Real Estate
Schedule 3.10            Taxes
Schedule 3.12            Environmental
Schedule 3.15            Labor Relations
Schedule 3.19            Ventures, Subsidiaries and Affiliates; Outstanding Stock
Schedule 3.20            Jurisdiction of Organization; Chief Executive Office
Schedule 5.1             Liens
Schedule 5.4             Investments
Schedule 5.5             Indebtedness
Schedule 5.6             Transactions with Affiliates
Schedule 5.9             Contingent Obligations
Schedule 7.1             Milestones
Schedule 11.1(a)         Prior Indebtedness
Schedule 11.1(b)         Credit Parties on Effective Date

## **EXHIBITS**

Exhibit A                Form of Interim DIP Order
Exhibit 1.6              Form of Notice of Conversion/Continuation
Exhibit 4.15(b)          CRO Engagement Letter
Exhibit 4.15(c)          Investment Banker Engagement Letter
Exhibit 10.1(f)          Form of Tax Certificate
Exhibit 11.1(a)          Form of Assignment
Exhibit 11.1(c)          Form of Notice of Borrowing

## SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of March [__], 2019, by and among Z GALLERIE, LLC, a Delaware limited liability company (the "Borrower"), Z GALLERIE HOLDING COMPANY, LLC, a Delaware limited liability company ("Holdings"), the other Persons (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article XIV) party hereto that are designated as a "Credit Party", KEYBANK NATIONAL ASSOCIATION (in its individual capacity, "KeyBank"), as Agent for the several lenders from time to time party to this Agreement (collectively, the "Lenders" and individually each a "Lender") and for itself as a Lender, and such Lenders party hereto from time to time.

W I T N E S S E T H :

WHEREAS, on March [___], 2019 (the "Petition Date"), the Borrower and Holdings commenced Chapter 11 case numbers [___] through [__], as jointly administered for procedural purposes at Chapter 11 case number [___] (each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and have continued to operate their business as debtors-in-possession pursuant to Sections 1107 and 1108 thereof;[1]

WHEREAS, the Borrower has requested and the Lenders have agreed to make secured term loans to the Borrower consisting of a priming, super-priority debtor-in-possession secured delayed draw credit facility in an aggregate principal amount not to exceed $28,000,000 subject to this Agreement and, when entered, the Interim DIP Order, or the Final DIP Order (each as defined herein), as applicable; and

WHEREAS, the Lenders are willing to extend such credit to the Borrower under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the Interim DIP Order or the Final DIP Order, as applicable.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lenders, the Agent, the Borrower and the other Credit Parties hereto agree as follows:

## ARTICLE I

## THE CREDITS

1.1    Amounts and Terms of Commitments.

---

[1] NTD: Case numbers to be confirmed.

(a)     The Term Loans.

(i)     Interim Term Loan.  On the Effective Date, each Lender with an Interim Term Loan Commitment, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make the Interim Term Loan to and for the account of the Borrower as provided herein, in the amount of such Lender's Interim Term Loan Commitment (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable).  The Interim Term Loan shall be made in one draw on the Effective Date, but prior to the Final Order Entry Date.  Upon such Borrowing, the Interim Term Loan Commitments shall be immediately terminated, and once repaid, no part of the Interim Term Loan may be reborrowed.

(ii)     Delayed Draw Term Loans.  On and after the Final Order Effective Date to and including the Maturity Date, each Lender with a Delayed Draw Term Loan Commitment, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make Delayed Draw Term Loans to and for the account of the Borrower as provided herein, in the amount specified in the applicable Notice of Borrowing and pursuant to the DIP Budget (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable).  The Delayed Draw Term Loans may be made in multiple draws on and after the Final Order Effective Date to and including the Maturity Date, provided that (i) there shall be no more than one (1) funding of a Delayed Draw Term Loan during any calendar week and (ii) after giving effect to any Lender's Delayed Draw Term Loan advance, the aggregate amount of Delayed Draw Term Loans from such Lender shall not exceed such Lender's Delayed Draw Term Loan Commitment.  Upon any such borrowing, the amount of such borrowing of Delayed Draw Term Loan Commitments shall be immediately terminated, and once repaid, no part of any Delayed Draw Term Loan may be reborrowed.

(iii)     The proceeds of borrowings under the Interim Term Loan and the Delayed Draw Term Loan shall be used as set forth in Section 5.8.

1.2     Notes.

(a)     Subject to Section 1.4, the Term Loan made by each Lender with a Term Loan Commitment shall be evidenced by this Agreement and, if requested by such Lender, a Term Note payable to such Lender in an amount equal to such Lender's Term Loan Commitment.

1.3     Interest.

(a)     Subject to subsections 1.3(c) and 1.3(d), the Interim Term Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the LIBOR or the Base Rate, as the case may be, plus the Applicable Margin and each Delayed Draw Term Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the Base Rate plus the Applicable Margin. Each determination of an interest rate by Agent shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  All computations of interest and fees payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed;

provided, however, notwithstanding the foregoing, with respect to Base Rate Loans, all computations of interest payable under this Agreement shall be made on the basis of a 365/366-day year and actual days elapsed.  Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)     Interest on each Loan shall be paid in cash in arrears on each Interest Payment Date.

(c)     After the occurrence and during the continuation of any Event of Default, all outstanding Obligations shall bear interest at a rate per annum which is determined by adding two percent (2.0%) per annum to the rate otherwise applicable thereto (or, in the event there is no applicable rate, two percent (2.0%) per annum in excess of the rate otherwise applicable to Base Rate Loans from time to time), which rate (the "Default Rate") shall be effective, in all cases, beginning on the first date of the applicable Event of Default and ending on the date that such Event of Default is waived in accordance with the terms of this Agreement.

(d)     Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrower shall pay such Lender interest at the highest rate permitted by applicable law ("Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Effective Date as otherwise provided in this Agreement.

1.4     Loan Accounts.

(a)     Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)     Agent, acting as a non-fiduciary agent of the Borrower solely for tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify the Borrower) (A) a record of ownership (the "Register") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent and each Lender in the Term Loan, each of their obligations under this Agreement to participate in

each Loan, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, and for LIBOR Rate Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid and (5) any other payment received by Agent from the Borrower and its application to the Obligations.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans) are registered obligations, the right, title and interest of the Lenders and their assignees in and to such Loans shall be transferable in accordance with the terms herein and only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This Section 1.4 and Section 9.9 shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     The Credit Parties, Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement.  Information contained in the Register with respect to any Lender shall be available for access by the Borrower, Agent or such Lender during normal business hours and from time to time upon reasonable prior notice.  No Lender shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender unless otherwise agreed by Agent.

1.5     <u>Procedure for Borrowing</u>.

(a)     Each Borrowing of a Loan shall be made upon the Borrower's irrevocable (subject to <u>Section 10.5</u>) written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form reasonably acceptable to Agent, which notice must be received by Agent prior to 1:00 p.m. (Cleveland, Ohio time) (i) on the date of the requested Borrowing date of each Base Rate Loan and (ii) except in connection with the Interim Term Loans, on the day which is three (3) Business Days prior to the requested Borrowing date in the case of each LIBOR Rate Loan.  Such Notice of Borrowing shall specify:

(i)     whether the Borrowing is to be comprised of Interim Term Loans or Delayed Draw Term Loans;

(ii)     the requested Borrowing date, which shall be a Business Day;

(iii)     whether the Borrowing is to be comprised of LIBOR Rate Loans or Base Rate Loans as permitted herein; and

(iv)     if the Borrowing is to be LIBOR Rate Loans, the Interest Period applicable to such Loans.

(b)     Upon receipt of a Notice of Borrowing, Agent will promptly notify each Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c)    Unless Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Borrowing after the Effective Date will be made available to the Borrower by Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions specified on the signature page hereto, as such wire transfer instructions may be updated from time to time by written notice from Borrower to Agent.

1.6    <u>Conversion and Continuation Elections</u>.

(a)    The Borrower shall have the option to (i) request that the Interim Term Loan be made as a LIBOR Rate Loan, (ii) subject to the terms set forth in this Agreement, convert at any time all or any part of outstanding Loans from Base Rate Loans to LIBOR Rate Loans, (iii) convert any LIBOR Rate Loan to a Base Rate Loan, subject to <u>Section 10.4</u> if such conversion is made prior to the expiration of the Interest Period applicable thereto, or (iv) continue all or any portion of any Loan as a LIBOR Rate Loan upon the expiration of the applicable Interest Period.  Any Loan or group of Loans having the same proposed Interest Period to be made or continued as, or converted into, a LIBOR Rate Loan must be in a minimum amount of $250,000 and multiples of $100,000 in excess thereof.  Any such election must be made by the Borrower by 1:00 p.m. (Cleveland, Ohio time) on the 3rd Business Day prior to (1) the date of any proposed Loan which is to bear interest at LIBOR, (2) the end of each Interest Period with respect to any LIBOR Rate Loans to be continued as such, or (3) the date on which the Borrower wishes to convert any Base Rate Loan to a LIBOR Rate Loan for an Interest Period designated by the Borrower in such election.  If no election is received with respect to a LIBOR Rate Loan by 1:00 p.m. (Cleveland, Ohio time) on the 3rd Business Day prior to the end of the Interest Period with respect thereto, that LIBOR Rate Loan shall be converted to a Base Rate Loan at the end of its Interest Period.  Borrower must make such election by notice to Agent in writing, by fax, overnight courier or Electronic Transmission.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "<u>Notice of Conversion/Continuation</u>") substantially in the form of <u>Exhibit 1.6</u> or in a writing in any other form reasonably acceptable to Agent.  No Loan shall be made, converted into or continued as a LIBOR Rate Loan at the end of the relevant Interest Period, if (x) an Event of Default has occurred and is continuing and Agent or Required Lenders have provided written notice to the Borrower that it or they have determined not to make or continue any Loan as a LIBOR Rate Loan as a result thereof or (y) an Event of Default has occurred and is continuing under <u>subsection 7.1(a)</u>.

(b)    Upon receipt of a Notice of Conversion/Continuation, Agent will promptly notify each applicable Lender thereof.  In addition, Agent will, with reasonable promptness, notify the Borrower and the Lenders of each determination of LIBOR; <u>provided</u> that any failure to do so shall not relieve the Borrower of any liability hereunder or provide the basis for any claim against Agent.  All conversions and continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c)    Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation or conversion of any Loans, there shall not be more than six (6) different Interest Periods in effect.

1.7     Optional Prepayments.

(a)     The Borrower may at any time upon at least one (1) Business Day's (or such shorter period as is acceptable to Agent) prior written notice by the Borrower to Agent, prepay the Loans in whole or in part in an amount greater than or equal to $100,000, in each instance, without penalty or premium except as provided in Section 10.4.  Optional partial prepayments of the Term Loan shall be applied in the manner directed by the Borrower or, if not specified, as set forth in subsection 1.8(h).  Optional partial prepayments of the Term Loan in amounts less than $100,000 shall not be permitted.

(b)     The notice of any prepayment shall not thereafter be revocable by the Borrower and Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment.  The payment amount specified in such notice shall be due and payable on the date specified therein.  Together with each prepayment under this Section 1.7, the Borrower shall pay any amounts required pursuant to Section 10.4.

1.8     Mandatory Prepayments of Loans and Commitment Reductions.

(a)     [Reserved].

(b)     [Reserved].

(c)     Asset Dispositions.  If a Credit Party shall at any time or from time to time:

(i)     make a Disposition (other than in the case of any (x) Disposition made in connection with a Permitted Store Closing and (y) other store closure or Lease rejection conducted with the prior written approval of the Required Lenders); or

(ii)     suffer an Event of Loss;

then (A) the Borrower shall promptly notify Agent of such proposed Disposition or Event of Loss or receipt of proceeds by such Credit Party in connection with such a Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party in respect thereof) and (B) promptly upon receipt by a Credit Party of the Net Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, such excess Net Proceeds to Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with subsection 1.8(h) hereof.

(d)     Issuance of Debt Securities or Equity Issuance.  Within three (3) Business Days of the date of the receipt by any Credit Party of the Borrower of the Net Issuance Proceeds of the issuance of debt securities for borrowed money or Equity Issuance, the Borrower shall deliver, or cause to be delivered, to Agent an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with subsection 1.8(h).

(e)     [Reserved].

(f)    <u>Change of Control</u>.    No later than concurrently with any Change of Control, the Borrower shall deliver, or cause to be delivered, to Agent an amount equal to all of the Obligations then outstanding.

(g)    <u>Declining Lender</u>.    The Borrower shall notify Agent in writing or by telephone (confirmed in writing) of any mandatory prepayment hereunder not later than 11:00 a.m. (Cleveland, Ohio time) six (6) Business Days before the date of prepayment.  Each such notice of mandatory prepayment hereunder shall include detail regarding the type of mandatory prepayment involved, the amount of the expected prepayment, supporting details and calculations, and shall specify the anticipated prepayment date.  Upon receipt of a notice of a mandatory prepayment, the Agent will promptly (but in any event within one (1) Business Day following receipt of such notice by the Agent) notify each Lender in writing of the contents of any such prepayment notice and of such Lender's pro rata share of the amount of the mandatory prepayment.  Any Lender (each a "<u>Declining Lender</u>") may elect, by delivering not less than one (1) Business Day prior to the proposed prepayment date, a written notice that such mandatory prepayment otherwise required to be made pursuant to <u>Sections 1.8(c)</u>, <u>1.8(d)</u> or <u>1.8(f)</u> with respect to the Loans held by such Lender not be made.  Any prepayment amount declined by a Declining Lender (the "<u>Declined Proceeds</u>") may be retained by the Borrower.  Notwithstanding any other provisions hereof, to the extent the times specified herein for notices would result in all required notices not being capable of being made prior to the date any prepayment under <u>Section 1.8(b)</u> in respect of an Event of Loss would be required to be made, the required date for such prepayment shall be deferred until the earlier of (a) the Business Day immediately following the day all such notices have been made and (b) the date that is five (5) Business Days after the date the prepayment is required to be made pursuant to <u>Section 1.8(b)</u>.

(h)    <u>Application of Prepayments</u>.

(i)    Any prepayments of the Term Loan pursuant to <u>Section 1.7</u> and any prepayments pursuant to <u>subsection 1.8(c)</u> or <u>1.8(d)</u>, shall be applied to prepay the Term Loans on a pro rata basis.  To the extent permitted by the foregoing sentence, amounts prepaid shall be applied first to any Base Rate Loans then outstanding and then to outstanding LIBOR Rate Loans with the shortest Interest Periods remaining.

(ii)    [Reserved].

(iii)    Together with each prepayment under this <u>Section 1.8</u>, the Borrower shall pay any amounts required pursuant to <u>Section 10.4</u> hereof.

(i)    <u>No Implied Consent</u>.    Provisions contained in this <u>Section 1.8</u> for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.9    <u>Fees</u>.

(a)    <u>Unused Commitment Fee</u>.    The Borrower shall pay to Agent a fee (the "<u>Unused Commitment Fee</u>") for the account of each Lender with a Delayed Draw Term Loan Commitment (excluding any Non-Funding Lender) in an amount equal to (i) the Delayed Draw

Term Loan Commitment of such Lender during the preceding calendar month, less (ii) the Delayed Draw Term Loans held by such Lender during the preceding calendar month multiplied by (iii) two percent (2.00%) per annum.  The total Unused Commitment Fee paid by the Borrower will be equal to the sum of all of the fees due to the Lenders (other than any Non-Funding Lender).  Such Unused Commitment Fee shall be payable monthly in arrears on the last day of the first calendar month following the initial advance under the Delayed Draw Term Loan Commitment and the last day of each calendar month thereafter and on the Maturity Date.  The Unused Commitment Fee provided in this subsection 1.9(a) shall accrue at all times from and after the date of the initial advance under the Delayed Draw Term Loan Commitment.  The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(b)    Facility Fee.  The Borrower shall pay to Agent , for the account of each Lender on a pro rata basis, (i) a single interim facility fee in an amount equal to 2.00% of the aggregate amount of Interim Term Loans approved by the Bankruptcy Court in the Interim DIP Order and funded by the Lenders (excluding the total outstanding amount of the Pre-Petition Indebtedness, including amounts committed to letter of credit obligations thereunder, that may constitute Obligations hereunder)  (the "*Interim Facility Fee*") and (ii) a single final facility fee in an amount equal to 2.00% of the aggregate amount of Delayed Draw Term Loan Commitments approved by the Bankruptcy Court in the Final DIP Order (the "*Final Facility Fee*" and together with the Interim Facility Fee, collectively, the "***Facility Fee***").  The Interim Facility Fee is fully earned on the Effective Date and shall be paid (and once paid shall be non-refundable) on the Effective Date. The Final Facility Fee is fully earned on the Final Order Effective Date and shall be paid (and once paid shall be non-refundable) on the Final Order Effective Date..

(c)    Exit Fee.  The Borrower shall pay to Agent a non-refundable exit fee (the "Exit Fee") for the account of each Lender on a pro rata basis, in an amount equal to 2% of the Term Loan Commitments of such Lender (excluding the total outstanding amount of the Pre-Petition Indebtedness, including amounts committed to letter of credit obligations thereunder, that may constitute Obligations hereunder).  Such Exit Fee shall be payable on the date of termination of the Lenders' Commitments and the repayment in full of the Obligations.

1.10    Payments by the Borrower.

(a)    All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds, no later than noon (Cleveland, Ohio time) on the date due.  Any payment which is received by Agent later than noon (Cleveland, Ohio time) shall be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue provided, that for the avoidance of doubt, any payment which is received by the Agent later than noon (Cleveland, Ohio time) on the applicable due date shall not constitute an Event of Default hereunder so long as such payment is received by the

Agent prior to 4:00 p.m. (Cleveland, Ohio time) on such due date.  The Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation made with proceeds from the exercise of remedies against Collateral.

(b)     Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

1.11     Payments by the Lenders to Agent; Settlement.

(a)     Agent may, on behalf of Lenders, disburse funds to the Borrower for Loans requested.  Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to the Borrower.  If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to the Borrower, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by the Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than noon (Cleveland, Ohio time) on such scheduled Borrowing date.  Nothing in this subsection 1.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 1.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent, any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)     At least once each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and Fees paid for the benefit of Lenders with respect to each applicable Loan.  Provided that each Lender has funded all payments required to be made by it and funded all purchases of participations required to be funded by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Commitment Percentage of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it; provided, however, that in the case of any payment of principal received by Agent from Borrower in respect of the Term Loan prior to noon (Cleveland, Ohio time) on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on such Business Day, and, in the case of any payment of principal received by Agent from Borrower in respect of the Term Loan later than noon (Cleveland, Ohio time) on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on the next Business Day.  Except as provided in the preceding proviso with respect to the Term Loan payments, such payments shall be made by wire transfer to such Lender not later than 1:00 p.m. (Cleveland, Ohio time) on the next Business Day following each Settlement Date.  Agent shall be entitled to set off the funding shortfall against any Non-Funding

Lender's Commitment Percentage of all payments received from the Borrower, after making payment in full of the Aggregate Excess Funding Amount to the funding Lenders thereof, and hold, in a non-interest bearing account, all remaining portions of any payments received by Agent for the benefit of any Non-Funding Lender pursuant to this Agreement as cash collateral for any unfunded reimbursement obligations of such Non-Funding Lender until the Obligations are paid in full in cash and all Commitments have been terminated, and upon such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender.  Any amounts owing by a Non-Funding Lender to Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to Loans that are Base Rate Loans.

(c)    Availability of Lender's Commitment Percentage.  Agent may assume that each Lender will make its Commitment Percentage of each Loan available to Agent on each Borrowing date.  If such Commitment Percentage is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind.  If any Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify the Borrower and the Borrower shall immediately repay such amount to Agent.  Nothing in this subsection 1.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.  Without limiting the provisions of subsection 1.11(b), to the extent that Agent advances funds to the Borrower on behalf of any Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Lender.

(d)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to the Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)    <u>Non-Funding Lenders</u>.  The failure of any Non-Funding Lender to make any Term Loan or any payment required by it hereunder, or to fund any purchase of any participation to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "Other Lender") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither Agent nor, other than as expressly set forth herein, any Other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender of the type described in clause (a) of the definition thereof (until such Lender cures its funding default) shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders" or "Lenders directly affected" pursuant to <u>Section 9.1</u>) for any voting or consent rights under or with respect to any Loan Document.  Moreover, for the purposes of determining Required Lenders, the Loans and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(f)    <u>Procedures</u>.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.

1.12    <u>[Reserved]</u>.

1.13    <u>[Reserved]</u>.

1.14    <u>Tax Treatment</u>.  The Borrower, Agent and Lenders agree (i) to treat the Loans as debt for U.S. federal income tax purposes, (ii) that the Loans are not governed by the rules set out in Treasury Regulations Section 1.1275-4, and (iii) not to file any tax return, report or declaration inconsistent with the foregoing unless otherwise required by a change in applicable law.  The inclusion of this <u>Section 1.14</u> is not an admission by any Lender that it is subject to United States taxation.

ARTICLE II

CONDITIONS PRECEDENT

2.1    <u>Conditions Precedent to the Effective Date</u>.  As a condition to the effectiveness of this Agreement and the availability of the Interim Term Loan Commitment, each of the following documents (each in form and substance satisfactory to the Required Lenders) shall have been delivered to the Agent and Lenders, and the following conditions shall have been satisfied or waived by the Agent:

(a)    <u>Interim DIP Order and First Day Motions.</u>  The Agent and Lenders shall have received a copy of the Interim DIP Order, which Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the Effective Date and (ii) shall be in

full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders in their sole discretion; and, if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of the Interim Term Loans, nor the performance by the Credit Parties of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal. Such Interim DIP Order shall authorize and approve the Term Loans, this Agreement and the Loan Documents contemplated hereby and thereby;

(b)    <u>Cases</u>.  The Credit Parties shall have filed voluntary petitions with the Bankruptcy Court commencing the cases and all motions, orders (including "first day orders") and other documents to be filed and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders;

(c)    <u>Initial DIP Budget</u>.  Agent and Lenders shall have received the Initial DIP Budget certified by an officer of the Borrower, certifying that the projections therein have been prepared in good faith based on reasonable assumptions believed by management to be reasonable in light of current conditions and facts known to the Borrower at the time delivered (it being understood that such Initial DIP Budget and assumption on which they were based, may or may not prove to be correct), and that such projections contain no statements or conclusions (and there are no omissions of information) which are based upon or include information known to the Credit Parties to be misleading in any material respect;

(d)    <u>Bidding Procedures Orders</u>.  The Credit Parties shall have filed a motion seeking entry of an order in form and substance acceptable to the Required Lenders (the "<u>Bidding Procedures Order</u>") approving the Sale Process;

(e)    <u>Lease and Material Contract Rejection Motion</u>.  The Credit Parties shall have filed a motion seeking entry of an order in form and substance acceptable to the Required Lenders (the "<u>Lease and Material Contract Rejection Motion</u>") rejecting certain Leases and Material Contracts identified to the Agent and Lenders prior to the Effective Date;

(f)    <u>Investment Banker and Restructuring Advisor Motion</u>.  The Credit Parties shall have filed one or more motions seeking entry of an order in form and substance acceptable to the Required Lenders (the "<u>Investment Banker and CRO Motion</u>") approving the engagement of Lazard and BRG in their capacities as Investment Banker and Restructuring Advisor, respectively;

(g)    <u>Plan of Reorganization</u>.  The Credit Parties shall have filed a Plan of Reorganization in form and substance satisfactory to the Required Lenders, and which shall incorporate the motions set forth in clauses (d) and (e) above, with the Bankruptcy Court;

(h)    <u>Loan Documents; Deliverables</u>.  Agent and Lenders shall have received on or before the Effective Date all of the applicable Loan Documents, including the following:

(i)    a Notice of Borrowing (it being understood that such Notice of Borrowing may delivered on the Effective Date);

(ii)    a certificate of the secretary or assistant secretary of each Credit Party dated as of the Effective Date certifying as to the accuracy of (together with attachments as exhibits):  (A) Organization Documents of such Credit Party, (B) resolutions of the Board of Directors (or equivalent governing body) of such Credit Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party, (C) the incumbency of authorized signatories executing any Loan Document or other document delivered in connection therewith on behalf of such Credit Party and (D) good standing certificates (including verification of tax status) in the State of Incorporation/formation of each Credit Party;

(iii)    an officer's certificate certifying as of the Effective Date that the conditions precedent set forth in this Section 2.1 have been satisfied or waived;

(iv)    [reserved];

(v)    [reserved];

(vi)    all governmental and regulatory approvals necessary in connection with the closing of this Agreement and the transactions contemplated hereby and such approvals shall have been received and be in full force and effect;

(vii)    all financing statements to the extent required by the Agent or the Lenders to evidence the first-priority security interests in all of the Credit Parties' assets have been granted to the Agent for the benefit of the Secured Parties pursuant to the Loan Documents; and

(viii)    such other documents, governmental certificates, and agreements as the Agent or any Lender may reasonably request;

(i)    [Reserved];

(j)    Fees.  The Lenders and Agent shall have received all fees required to be paid, and all reasonable and out-of-pocket expenses for which invoices have been presented (including the reasonable out-of-pocket fees and expenses of legal counsel), at least two (2) Business Days prior to the Effective Date.  All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower to the Agent on or before the Effective Date;

(k)    Lien Searches.  The Agent and the Lenders shall have received results of searches or other evidence satisfactory to the Required Lenders (in each case dated as of a date satisfactory to the Required Lenders) indicating the absence of Liens on the assets of the Credit Parties, except for Permitted Liens and liens for which termination statements and releases satisfactory to the Required Lenders are being tendered concurrently with the establishment of the Term Loan facility hereunder;

(l)    Insurance.  The Agent shall be satisfied with the Credit Parties' insurance arrangements and shall have received insurance summaries, insurance certificates in connection with such insurance including, documentation naming the Agent as "loss payee" or "additional insured", as applicable, under each policy;

(m)    Consents.  Each Credit Party shall have received any consents, permits, licenses and approvals required in accordance with applicable Requirements of Law, or in accordance with any document, agreement, instrument or arrangement to which any Credit Party is a party, in connection with the execution, delivery, performance, validity and enforceability of this Agreement and the other Loan Documents, each in form and substance satisfactory to the Required Lenders.  In addition, each Credit Party and their Subsidiaries shall have all such material consents, licenses and approvals required in connection with their continued operation, and such approvals shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement and the actions contemplated here;

(n)    Other Proceedings.    No unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened in writing or pending (other than the Cases) and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby or (ii) which could be expected to result in a Material Adverse Effect, excluding, in each case, any proceedings challenging this Agreement or the DIP Orders (but only so long as, (x) prior to the Final Order Effective Date, the Interim DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders and (y) on and after the Final Order Effective Date, the Final DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders); and

(o)    KYC.  So long as requested at least two Business Days prior to the Effective Date, Agent and Lenders shall have received at least one day prior to the Effective Date all documentation and other information with respect to the Borrower and each other Credit Party that the Agent and Lenders reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

2.2    Conditions to All Borrowings.  Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Loan, in each instance:

(a)    if, as of the date thereof, any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date);

(b)    if, as of the date thereof, any Default or Event of Default has occurred and is continuing or could reasonably be expected to result after giving effect to any Loan; or

(c)      if, as of the date thereof, the applicable DIP Order is not in full force and effect or has been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders in their sole discretion.

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by the Borrower that the conditions in this <u>Section 2.2</u> have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to this Agreement.

2.3      <u>Conditions to Funding on the Final Order Effective Date</u>. As a condition to the availability of the Delayed Draw Term Loan Commitments on the Final Order Effective Date and thereafter, the following conditions shall have been satisfied or waived by the Agent and each of the following documents (each in form and substance satisfactory to the Required Lenders) shall have been delivered to the Agent and Lenders:

(a)      the conditions set forth in Sections 2.1 and 2.2 shall have been satisfied;

(b)      the Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the date that is forty (40) days after the Petition Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders in their sole discretion; and, if the Final DIP Order is the subject of a pending appeal in any respect, neither the making of the Loans on the Final Order Effective Date, nor the performance by the Credit Parties of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.  Such Final DIP Order shall authorize and approve the Term Loans, this Agreement and the Loan Documents contemplated hereby and thereby.  All motions, orders and other documents to be filed with and submitted to the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Required Lenders in their sole discretion;

(c)      each of the Lenders and Agent shall have received for its own account and for the account of the Lenders, as the case may be, all fees, costs and expenses due and payable on or prior to the date of the proposed borrowing hereunder, and under any other Loan Document, which have been invoiced (in the case of costs and expenses only) to the Borrower at least one (1) Business Day before the date of the proposed borrowing;

(d)      Agent shall have received a Notice of Borrowing no less than two (2) Business Days prior to the proposed Term Loan funding date; and

(e)      no unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened in writing or pending (other than the Cases) and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby o thereby or (ii) which could be expected to result in a Material Adverse

Effect, excluding, in each case, any proceedings challenging this Agreement or the DIP Orders (but only so long as, (x) prior to the Final Order Effective Date, the Interim DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders and (y) on the Final Order Effective Date, the Final DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Required Lenders.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent and each Lender that the following are, and after giving the effect to the Related Transactions will be, true, correct and complete:

3.1     Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a)     is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)     (i) has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets and carry on its business and (ii) has the power and authority and all governmental licenses, authorizations, Permits consents and approvals to execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)     is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)     is in compliance with all Requirements of Law and the terms of such Person's Organization Documents;

except, in each case referred to in clause (b)(i), clause (c) or clause (d), to the extent that the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2     Corporate Authorization; No Contravention.  Subject to the entry of the DIP Orders, the execution, delivery and performance by each of the Credit Parties of this Agreement and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is party, subject to the entry of the DIP Orders, have been duly authorized by all necessary action, and do not and will not:

(a)     contravene the terms of any of that Person's Organization Documents;

(b)    conflict with or result in any material breach or contravention of, or result in the creation of any Lien (other than Permitted Liens) under, any Material Contract to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject; or

(c)    violate any Requirement of Law, except to the extent that the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.3    <u>Governmental Authorization</u>.  Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement, any other Loan Document except (a) for recordings and filings in connection with the Liens granted to Agent hereunder, (b) those obtained or made on or prior to the Effective Date and (c) those which, if not obtained or made, could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.4    <u>Binding Effect</u>.  Subject to the entry of the DIP Orders, this Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law).

3.5    <u>Litigation</u>.  Except as specifically disclosed in <u>Schedule 3.5</u>, there are no material actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)    adversely affects, purports to adversely affect or is reasonably expected to adversely affect this Agreement, any other Loan Document, or any of the transactions contemplated hereby or thereby; or

(b)    could reasonably be expected to result in a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.

3.6    [Reserved].

3.7    <u>ERISA Compliance</u>.  <u>Schedule 3.7</u> sets forth, as of the Effective Date, a complete and correct list of (a) all Title IV Plans, (b) all Multiemployer Plans and (c) any other material Benefit Plan.  Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt

status under Section 401 or 501 of the Code or other Requirements of Law so qualifies. (x) Except as could not, in the aggregate, have a Material Adverse Effect, each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan and (z) no ERISA Event could reasonably be expected to occur.  No ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding, except as could not reasonably be expected to have a Material Adverse Effect.

3.8     Use of Proceeds; Margin Regulations.

(a)     The proceeds of the Term Loans are intended to be and shall be used solely for the purposes set forth in Section 5.8.

(b)     No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  Proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock for any purpose that violates the provisions of the regulations of the Federal Reserve Board.

3.9     Title to Properties; Leases.

(a)     As of the Effective Date, the Real Estate listed in Schedule 3.9(a) constitutes all of the owned Real Estate of each Credit Party and each of their respective Subsidiaries.  As of the Effective Date, the Real Estate listed in Schedule 3.9(b) constitutes all of the leasehold interests in Real Estate of each Credit Party and each of their respective Subsidiaries.  Subject to Permitted Liens, each of the Credit Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all material Real Estate, and good and valid title to all of its material owned personal property and valid leasehold interests in all of its material leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses and except as could not, individually, or in the aggregate, reasonably be expected to have a Material Adverse Effect. None of the Property of any Credit Party or any Subsidiary of any Credit Party is subject to any Liens other than Permitted Liens.

(b)     Except for the Leases set forth on Schedule 3.9, no party is in payment default under any Lease (other than with respect to Permitted Store Closing once any going out of business sales are completed), other than for the non-payment of rent for March 2019, as contemplated by the DIP Budget.  Except with respect to the Leases set forth on Schedule 3.9, the Credit Parties have not received any written notice of cancellation of any Lease (other than with respect to Permitted Store Closing once any going out of business sales are completed), other than as a result of the non-payment of rent for March 2019, as contemplated by the DIP Budget. Each Credit Party hereby authorizes the Agent at any time and from time to time after the occurrence, and during the continuance, of an Event of Default to contact any of the Credit Party's landlords in order to confirm the Credit Party's continued compliance with the terms and

conditions of the Lease(s) between such Credit Party and that landlord and to discuss such issues, concerning the Credit Party's occupancy under such Lease(s), as the Agent may determine.

3.10    Taxes.  Except with respect to matters set forth on Schedule 3.10, all federal, state, local and foreign income and all other material tax returns, reports and statements (collectively, the "Tax Returns") required to be filed by the Credit Parties have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all material taxes, assessments and other governmental charges and impositions reflected therein or otherwise due and payable by a Tax Affiliate have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP.  Except as disclosed on Schedule 3.10, to the knowledge of any Credit Party, no Tax Return is under audit or examination by any Governmental Authority and no notice of any audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority.  Each Credit Party has materially complied with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the applicable Governmental Authorities.

3.11    [Reserved].

3.12    Environmental Matters.  Except as set forth in Schedule 3.12 or except as could not reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law or to Hazardous Materials, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Real Estate currently owned by any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Real Estate, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate or at any other location to which Hazardous Materials were sent by any Credit Party or any of their Subsidiaries for re-use or recycling or for treatment, storage, or disposal, (e) all Real Estate currently owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is free of contamination by any Hazardous Materials, (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant of any Credit Party or any of their Subsidiaries to engage in, operations or (ii) knows of any facts, circumstances or conditions, including receipt of any information request or notice of potential responsibility under the Comprehensive

Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) or similar Environmental Laws, that, for each of clauses (i) and (ii) could reasonably be expected to result in Environmental Liabilities to the Credit Parties and their Subsidiaries, and (g) no Credit Party and no Subsidiary of any Credit Party has expressly assumed or retained any liabilities or obligations of any other Person under Environmental Law or relating to Hazardous Materials.

3.13   <u>Regulated Entities</u>.  None of any Credit Party, any Person directly controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.14   [reserved].

3.15   <u>Labor Relations</u>.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 3.15</u>, as of the Effective Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) to the knowledge of any Credit Party, no such representative is seeking certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16   <u>Intellectual Property</u>.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property owned or licensed by such Credit Party or Subsidiary of such Credit Party, other than, in each case, as would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17   <u>Status of Holdings</u>.  Holdings shall not engage in any business activities other than those (a) incidental to (i) ownership of Qualified Stock in Borrower and Stock Equivalents in respect of Qualified Stock in Borrower or making capital contributions to Borrower, (ii) the maintenance of its corporate existence and performance under the Loan Documents and any other ancillary or related agreements or under any employment agreements and any documents related thereto, (iii) [reserved], (v) the appointment of directors and officers and the compensation thereof in accordance with the terms of this Agreement, (vi) payments permitted by <u>Section 5.7</u>, (vii) using the proceeds of Restricted Payments permitted by <u>Section 5.11</u> as

contemplated by Section 5.11 (including, without limitation, making Restricted Payments to the extent permitted by Section 5.11), or (b) transactions expressly described herein as involving Holdings and permitted under this Agreement or permitted by the immediately following proviso; provided, that Holdings shall not incur any Indebtedness (other than guarantees of Indebtedness permitted hereunder and for the avoidance of doubt, notwithstanding anything contained herein to the contrary, Holdings shall be permitted to enter into guaranty the obligations of Borrower and any of its Subsidiaries under real estate leases), make any Investment or own any Stock in any Person (other than Stock in the Borrower and Investments permitted to be made by Holdings hereunder), or grant any Lien (other than Liens securing the Obligations pursuant to the Loan Documents and Pre-Petition Liens securing the Pre-Petition Indebtedness pursuant to the Pre-Petition Indebtedness Documents).

3.18   Insurance.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles covering such risks as are customarily carried by companies engaged in similar businesses of a similar size and similar character as the business of the Credit Parties and, to the extent relevant, owning similar Properties in localities where such Person operates.  A true and complete listing of such insurance, including issuers, coverages and deductibles, has been provided to Agent and Lenders.

3.19   Ventures, Subsidiaries and Affiliates; Outstanding Stock.

Except as set forth in Schedule 3.19, no Credit Party and no Subsidiary of any Credit Party has any Subsidiaries or is engaged in any joint venture or partnership with any other Person.  All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are, to the extent such terms are applicable, duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, (i) those in favor of Agent, for the benefit of the Secured Parties, (ii) the Pre-Petition Liens and (iii) in the case of Stock and Stock Equivalents that do not constitute Collateral, other Permitted Liens.  All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  All of the issued and outstanding Stock of each Credit Party (other than Holdings), each Subsidiary of each Credit Party and, as of the Effective Date, Holdings, is owned by each of the Persons and in the amounts set forth in Schedule 3.19.  Except as set forth in Schedule 3.19, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries.

3.20   Jurisdiction of Organization; Chief Executive Office.  Schedule 3.20 lists each Credit Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business, in each case as of the Effective Date.

3.21   [Reserved].

3.22   Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and

warranties are made or deemed made, and none of the statements about the Sponsor made prior to the Effective Date or about any Credit Party or any of their Subsidiaries, in each case, contained in each exhibit, report, statement or certificate (other than any statement which constitutes projections, forward-looking statements, budgets, estimates or general market data) furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to Agent or the Lenders prior to the Effective Date and, in such case, as supplemented prior to the Effective Date and excluding information of a general or industry-specific in nature), when taken as a whole, contains any materially untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered (other than any general industry information, budgets or projections delivered to Agent and/or the Lenders in accordance with the terms hereof, it being recognized by Agent and the Lenders that any projections, budgets and forecasts are based on good faith estimates and assumptions believed by the Credit Parties to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projects, budgets and forecasts may materially differ from projected, budgeted or forecasted results).

3.23    Foreign Assets Control Regulations and Anti-Money Laundering.  To the knowledge of each Credit Party, each Credit Party and each Subsidiary of each Credit Party is not subject to the limitations or prohibitions under any U.S. economic sanctions laws, Executive Orders or implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), or all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  To the knowledge of each Credit Party, no Credit Party and no Subsidiary of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

3.24    Patriot Act.  To the knowledge of the Credit Parties, the Credit Parties, and each of their Subsidiaries are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to *"know your customer"* and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.25    Validity and Priority of Security Interest; Administrative Priority.

(a)    The provisions of this Agreement and the other Loan Documents create Liens upon the Collateral in favor of the Agent and the Lenders, which shall be deemed valid and perfected as of the Petition Date by entry of the DIP Orders with respect to each Credit Party and each of its Subsidiaries, and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral (except the Carve-Out), securing all the Obligations.  The Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, the DIP Orders or any other Loan Document.

(b)    Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Credit Parties and each of their Subsidiaries shall at all times constitute allowed senior administrative expenses against each of the Credit Parties and each of their Subsidiaries in the Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations) and all other claims against each of the Credit Parties and each of their Subsidiaries, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Credit Parties and each of their Subsidiaries and their estates and all proceeds thereof, including, without limitation, all avoidance actions and any proceeds of avoidance actions, subject, as to priority, only to the Carve-Out.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in writing) shall remain unpaid or unsatisfied:

4.1    Financial Statements.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Borrower shall

deliver to Agent (copies of which shall be delivered or otherwise made available by Agent to each Lender) by Electronic Transmission and in detail reasonably satisfactory to the Required Lenders the following items at the dates set forth below:

(a)     as soon as available, but not later than one hundred twenty (120) days after the end of each Fiscal Year or, if such delivery date is not a Business Day, the next succeeding Business Day, (1) a copy of the unaudited consolidated balance sheets of Holdings and each of its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, and (2) setting forth in each case in comparative form the figures for the previous Fiscal Year;

(b)     as soon as available, but not later than forty five (45) days after the end of each Fiscal Quarter, a copy of the unaudited consolidated balance sheets of Holdings and each of its Subsidiaries, and the related consolidated statements of income, shareholders' equity and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures, together with a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and discussing the reasons for any significant variations (it being understood and agreed that such comparative form figures described in the immediately preceding clause may consist, in whole or in part, of financial statements of Borrower and its Subsidiaries (rather than Holdings and its Subsidiaries) to the extent that such comparative form figures are not available for Holdings and its Subsidiaries at such time);

(c)     [reserved];

(d)     [reserved];

(e)     [reserved];

(f)     [reserved];

(g)     the Borrower shall deliver to the Lenders each Wednesday, commencing Wednesday, [_____ __], 2019, and upon Agent's request on or after the date of any store closing, to the extent not previously delivered, all sales information and other information (including such documents and instruments prepared by the liquidators) reasonably requested by Agent in connection with any Permitted Store Closing;

(h)     the Borrower shall deliver a certificate to the Agent signed by an officer of the Borrower, on Wednesday of each week, commencing on the second Wednesday after the Petition Date, certifying the cash disbursements, sales, inventory, inventory receipts and cash receipts, on a line by line basis, for the week ended (and on a cumulative basis since the Petition Date) the immediately prior Saturday, together with a variance report, on an individual line item basis and an aggregate basis, comparing such disbursements to the DIP Budget;

(i)     [reserved];

(j)      the Borrower shall deliver a certificate to the Agent signed by an officer of the Borrower on the (i) Wednesday immediately prior to the scheduled hearing date for the Final DIP Order and (ii) Wednesday of each week, commencing on the third Wednesday after the Petition Date, in each case, demonstrating that total disbursements (excluding any stub-rent payments paid prior to the week ending [_____ __], 2019) for the four-week period (or, shorter period, if any, in the case of the certificate delivered under clause (i)) ending on the Saturday immediately preceding the applicable Wednesday, are no greater than 115% of the projected amounts for total disbursements set forth in the DIP Budget for such period;

(k)      [reserved]; and

(l)      on Wednesday of each week, the Borrower may propose an updated budget (the "Proposed DIP Budget") which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during the next thirteen-week period, including but not limited to, collections, payroll, Capital Expenditures, Professional fees and other cash outlays, in each case, consistent in form and substance (other than dollar amounts) with the Initial DIP Budget. Each DIP Budget, including the Initial DIP Budget shall be accompanied by a certificate from the chief financial officer of the Borrower or Holdings certifying that such projections were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the preparer thereof to be reasonable at the time prepared.  The Required Lenders may approve such Proposed DIP Budget, which will then become the "DIP Budget" then in effect in their sole and absolute discretion.  If the Lenders do not approve such Proposed DIP Budget, then the current DIP Budget will remain in effect.

4.2      Certificates; Other Information.  The Borrower shall furnish to Agent (copies of which shall be delivered or otherwise made available to the Lenders by Agent to each Lender by Electronic Transmission):

(a)      together with each delivery of financial statements pursuant to subsections 4.1(a) and 4.1(b) above, (i) a list of all new Leases, termination of Leases and amendments to existing Leases that have occurred since the last such list was delivered, along with occupancy rates, locations and expiration date of all leases of Borrower and its Subsidiaries, (ii) details on delayed deliveries (including amount of orders (in aggregate dollar amount and number) that are delayed and the average delay in days), (iii) same-store-sales analysis (including gross profit) and (iii) total dollar amount of customer returns inventory (at sales price and book value on the balance sheet of Holdings and its Subsidiaries);

(b)      [reserved];

(c)      [reserved];

(d)      [reserved];

(e)      [reserved];

(f)      [reserved];

(g)       [reserved];

(h)       from time to time, if Agent or the Lenders determines in good faith that obtaining appraisals is reasonably necessary in order for Agent or any Lender to comply with applicable laws or regulations (including any appraisals required to comply with FIRREA), and at any time if an Event of Default shall have occurred and be continuing, Agent or Lenders may, or may require the Borrower to, in either case at the Borrower's expense, obtain appraisals in form and substance (it being understood that "substance" shall not include the value of the collateral being appraised, which value shall not be subject to satisfaction of Agent or any Lender) and from appraisers reasonably satisfactory to Required Lenders stating the then current fair market value of all or any portion of the personal property of any Credit Party or any Subsidiary of any Credit Party and the fair market value of any material Real Estate owned in fee simple by any Credit Party or any Subsidiary of any Credit Party;

(i)       promptly, such additional business, financial, corporate affairs, perfection certificates and other information as Agent or Lenders may from time to time reasonably request, but in any event excluding information that is otherwise privileged to the extent such privilege would be destroyed by providing such information to Agent or Lenders;

(j)       [reserved]; and

(k)       promptly upon the receipt by any Credit Party of any written notice from any lessor of such lessor's intention to terminate any Lease (other than with respect to Permitted Store Closing once any going out of business sales are completed), a copy of all such written notices of intended termination from the lessors thereunder.

4.3     <u>Notices</u>.  The Borrower shall notify promptly Agent and each Lender of each of the following (and in no event later than the shorter of (i) five (5) Business Days after a Responsible Officer of any Credit Party becoming aware thereof and (ii) the other period indicated below in such provision):

(a)       the occurrence or existence of any Default or Event of Default;

(b)       any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, in each case, which could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c)       any dispute that is material, litigation, investigation, proceeding or suspension which may exist at any time hereafter, or the commencement of, or any material development in, any litigation or proceeding by or before any Governmental Authority (i) against any Credit Party or any Subsidiary of any Credit Party that could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, (ii) with respect to any Loan Document or (iii) with respect to any Applicable Customs Law relating thereto but excluding information that is otherwise privileged to the extent such privilege would be destroyed by providing such information to Agent or Lenders, unless Agent or Lenders have

entered into an information sharing agreement or other arrangement which would preserve such privilege and is, in either case, reasonably satisfactory to Borrower;

        (d)     [Reserved];

        (e)     (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law or the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand or dispute alleging a violation of, or Environmental Liabilities under, any Environmental Law or relating to Hazardous Materials, (ii) the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, Release or threatened Release of any Hazardous Material on, at, under or from any Real Estate which in the case of clauses (i) and (ii) above, in the aggregate for all such clauses, could reasonably be expected to result in a Material Adverse Effect, (iii) the receipt by any Credit Party of notification that any Real Estate currently owned by any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities that could reasonably be expected to have a Material Adverse Effect, and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease could reasonably be expected to have a Material Adverse Effect relating to Environmental Laws or Hazardous Materials;

        (f)     (i) any filing by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA or intent to terminate any Title IV Plan, a copy of such notice, (ii) the filing of a request for a minimum funding waiver under Section 412 of the Code with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, (iii) the occurrence or expected occurrence of an ERISA Event, a notice describing such ERISA Event, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto and (iv) promptly following receipt by a Credit Party or ERISA Affiliate thereof, copies of any documents described in (A) Sections 101(f) or (j) of ERISA with respect to a Title IV Plan and (B) Sections 101(f), (k) or (l) of ERISA that any Credit Party or ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Credit Parties or any ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Agent or Lenders, the Credit Parties and/or the ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and a Responsible Officer shall provide copies of such documents and notices to the Agent promptly after receipt thereof;

        (g)     any Material Adverse Effect subsequent to the date of the most recent audited financial statements delivered to Agent and Lenders pursuant to this Agreement;

        (h)     any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

        (i)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party

or any Subsidiary of any Credit Party if the same could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(j)    the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent (other than issuances by Holdings of Stock or Stock Equivalents not requiring a mandatory prepayment hereunder); and

(k)    (i) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any material income, franchise or other material taxes with respect to any Tax Affiliate and (ii) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any material adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise.

Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer of the Borrower, setting forth details of the occurrence referred to therein, and stating what action the Borrower or other Person proposes to take with respect thereto and at what time.  Each notice under subsection 4.3(a) shall describe with reasonable particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4    Preservation of Corporate Existence, Etc..  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)    preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 5.3;

(b)    preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.3 and sales of assets permitted by Section 5.2 and except as could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)    preserve or renew all of its registered trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(d)    conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any respect and shall comply in all respects with the terms of its IP Licenses, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

4.5    Maintenance of Property.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which in its or the applicable Subsidiary's reasonable business judgment is used or useful in its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted and shall make all

necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6     Insurance.  (a) Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties and such Subsidiaries (including policies of fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance (other than workers' compensation insurance, directors and officers insurance and employee health and welfare insurance) relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate.  All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance reasonably acceptable to Required Lenders, showing loss payable to Agent (Form CP 1218 or equivalent) and extra expense and business interruption endorsements.  Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will endeavor to give Agent at least 30 (10 days in the case of non-payment) days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of the Credit Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage.  Each Credit Party shall direct all present and future insurers under its "All Risk" policies of property insurance to pay all proceeds payable thereunder directly to Agent, subject to the Borrower's rights under Subsection 1.8(c) hereof (and the Agent agrees that it shall provide any necessary endorsement to any check or other instrument representing the payment of insurance proceeds such that the Borrower may reinvest the proceeds thereof subject to and in accordance with the provisions of Subsection 1.8(c)).  If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash, subject to the Borrower's rights under Subsection 1.8(c) hereof (and the Agent agrees that it shall provide any necessary endorsement to check or other instrument representing the payment of insurance proceeds such that the Borrower may reinvest the proceeds thereof subject to and in accordance with the provisions of Subsection 1.8(c)).  Each of Agent and Lenders reserves the right at any time, upon review of each Credit Party's risk profile, if it determines in good faith that there has been a material increase in such risk profile from that in effect on the Effective Date, to require additional forms and limits of insurance that are sufficient and customary and commercially reasonably available based on such profile, it being understood that the Agent and Lenders have reviewed the Credit Parties' policies of insurance in effect on the Effective Date and that such insurance is satisfactory.  Notwithstanding the requirement in subsection (i) above, Federal Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program or (z) Real Estate not included as Collateral, provided, that, in the case of (y) the Agent or Lenders may require private Flood Insurance if such private Flood Insurance is available.

(b)    Unless the Credit Parties provide Agent and Lenders with evidence of the insurance coverage required by this Agreement, Agent or Lenders may, upon prior written notice to Borrower, purchase insurance at the Credit Parties' expense to protect Agent's and Lenders' interests, including interests in the Credit Parties' and their Subsidiaries' properties.    This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.    The coverage that Agent or Lenders purchases may or may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.    The Borrower may later cancel any insurance purchased by Agent or Lenders, but only after providing Agent and Lenders with evidence that there has been obtained insurance as required by this Agreement.    If Agent or Lenders purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other reasonable charges Agent or Lenders may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations.    The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on their own.

4.7    <u>Payment of Obligations</u>.    Such Credit Party shall, and shall cause each of its Subsidiaries to pay, discharge and perform, as the same shall become due and payable or required to be performed, all their respective obligations and liabilities, in each case solely to the extent arising post-petition, including:

(a)    all material tax liabilities, assessments and governmental charges or levies upon it or upon its income or profits in respect of its Property, unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the filing or enforcement of any related Lien and for which adequate reserves in accordance with GAAP are being maintained;

(b)    all material lawful claims which, if unpaid, would by law become a Lien (other than Permitted Liens) upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)    all Indebtedness, as and when due and payable, but subject to the Automatic Stay and any subordination provisions contained herein, in any other Loan Documents and/or in any instrument or agreement evidencing such Indebtedness, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect;

(d)    the performance in all material respects of all obligations under any Contractual Obligation to which such Credit Party or any of its Subsidiaries is bound, or to which it or any of its Property is subject, except where the failure to perform could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)    payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of any underfunded Benefit Plan.

4.8     <u>Compliance with Laws</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except (a)(i) as such may be contested in good faith by appropriate proceedings and (ii) for which appropriate reserves as required by GAAP have been established on such Borrower's financial statements or (b) where the failure to comply could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     <u>Inspection of Property and Books and Records</u>.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which materially full, true and correct entries sufficient to permit the preparation of financial statements of the type required in <u>subsections 4.1(a)</u> and 4.1(b) in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property:  (a) provide access to such property to Lenders (or Agent with prior notice to Lenders) and any of its Related Persons, as frequently as Lenders (or Agent with prior notice to Lenders) reasonably determine to be appropriate; and (b) permit Lenders (or Agent with prior notice to Lenders) and any of their Related Persons to conduct field examinations, audit, inspect, and make extracts and copies (or take originals if reasonably necessary for the purpose of realizing upon Collateral during the continuance of an Event of Default) from all of such Credit Party's books and records, and evaluate and make physical verifications and appraisals of the Inventory and other Collateral in any manner and through any medium that Lenders (or Agent with prior notice to Lenders) consider advisable, in each instance, at the Credit Parties' expense and subject to the requirements set forth in <u>Section 12.9</u>.

4.10    <u>OFAC; Patriot Act</u>.  Each Credit Party shall, and each Credit Party shall require its Subsidiaries to comply with the laws, regulations and executive orders referred to in <u>Section 3.23</u> and <u>Section 3.24</u>.

4.11    <u>[Reserved]</u>.

4.12    <u>[Reserved]</u>.

4.13    <u>Further Assurances</u>.

(a)     Each Credit Party shall ensure that all written information, exhibits and reports (other than any statement which constitutes, projections, forward looking statements, budget estimates or general market data) furnished to Agent or the Lenders do not and will not, when taken as a whole at the time so furnished, contain any untrue statement of a material fact and do not and will not, when taken as a whole at the time so furnished, omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof; <u>provided</u>, that because any projections furnished to the Agent and the Lenders are subject to significant uncertainties and contingencies which may be beyond the Credit Parties' and their Subsidiaries' control, no assurance is given by

the Credit Parties and their Subsidiaries that such projections will be realized and the actual results may differ from such projections and such differences may be material.

(b)     Promptly upon reasonable request by Agent or Lenders, the Credit Parties shall (and, subject to the limitations hereinafter set forth or otherwise set forth herein, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Agent or Lenders may reasonably require from time to time in order (i) to subject to the Liens created by this Agreement, any of the Properties, rights or interests covered by this Agreement (subject to the limitations herein) and the DIP Orders, (ii) to perfect and maintain the validity, effectiveness and priority of this Agreement and the Liens intended to be created hereby (subject to the limitations herein and Liens permitted under Section 5.1) and by the DIP Orders, and (iii) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document (subject to the limitations herein and Liens permitted under Section 5.1) and the DIP Orders.

(c)     No Credit Party or Subsidiary thereof shall form or acquire any Subsidiary, whether direct or indirect, after the Effective Date. Promptly, without limiting the generality of the foregoing and except as otherwise approved in writing by Required Lenders, the Credit Parties shall cause each of their Subsidiaries (i) to guaranty the Obligations pursuant to the Guaranty Agreement, (ii) to grant to Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's Property to secure such guaranty and (iii) to pledge all of the Stock and Stock Equivalents owned by it in each of its directly-owned Subsidiaries; provided, that any such security interest or pledge of Stock or Stock Equivalents (x) of an Excluded Subsidiary shall be limited to (A) sixty-five percent (65%) of such Excluded Subsidiary's outstanding voting interests in its Stock and Stock Equivalents, (B) any interests in the Stock and Stock Equivalents of any Subsidiary of an Excluded Subsidiary, and (C) one hundred percent (100%) of an Excluded Subsidiary's outstanding non-voting interests in its Stock and Stock Equivalents, and shall not be required in the event such security interest or pledge of Stock or Stock Equivalents would violate applicable law, rule, regulation or contractual obligation or agreements in effect on the Effective Date. In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank. In the event any Credit Party (other than any excluded Subsidiary) owns or acquires fee simple title to, or a leasehold interest in, any Real Estate located in the United States, at the request of Agent, such Person shall, as soon as reasonably practicable but in any event within sixty (60) days after such request (or such later date as the Required Lenders may agree), execute and/or deliver, or cause to be executed and/or delivered, to Agent, (u) if requested by Agent or Lenders, an appraisal complying with FIRREA, (v) within forty-five (45) days of receipt of notice from Agent that such Real Estate is located in a Special Flood Hazard Area, Flood Insurance as required by subsection 4.6(a), (w) a fully executed Mortgage, in form and substance reasonably satisfactory to Required Lenders together with an A.L.T.A. lender's title insurance policy issued by a title insurer reasonably satisfactory to Required Lenders, in form and substance and in an amount reasonably satisfactory to Required Lenders insuring that the Mortgage is a valid and enforceable first priority Lien on the respective property, free and clear of all defects, encumbrances and Liens (other than Permitted Liens), (x) then current A.L.T.A. surveys, certified to Agent by a licensed surveyor sufficient to allow

the issuer of the lender's title insurance policy to issue such policy without a survey exception and to issue all available survey-related endorsements, (y) if requested in writing by Agent or Lenders, a Phase I environmental site assessment for such Real Estate prepared by a qualified firm reasonably acceptable to Required Lenders, and (z) an opinion of local counsel related to the Mortgage referred to above, in form and substance reasonably satisfactory to the Required Lenders.  In addition to the obligations set forth in subsections 4.6(a) and 4.13(c)(v), within forty-five (45) days (or such longer period as Agent or Lenders may agree in their sole discretion) after written notice from Agent to the Credit Parties that any Real Estate subject to a Mortgage is located in a Special Flood Hazard Area, the Credit Parties shall satisfy the Flood Insurance requirements of subsection 4.6(a).

     4.14   Environmental Matters.  Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws, (ii) promptly comply with all orders and directives of all Governmental Authorities relating to Environmental Laws or Hazardous Materials (including by implementing any Remedial Action necessary to achieve such compliance) and (iii) maintain the Real Estate free of Releases of Hazardous Materials that would form the basis for Environmental Liabilities, except in each case of (i), (ii), and (iii) above where the failure to do so could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.  Without limiting the foregoing, if (x) an Event of Default is continuing or if Agent or Lenders at any time have a reasonable basis to believe that an Event of Default will occur, or (y) if Agent or Lenders at any time have a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities that in each case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, then each Credit Party shall, promptly upon receipt of a written request from Agent or Lenders, cause the performance of, and allow Agent, Lenders and their Related Persons access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater where applicable and recommended, and cause the preparation of such reports, in each case as Agent or Lenders may reasonably request.  Such audits, assessments and reports, to the extent not conducted by Agent, Lenders or any of their Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Lenders.

     4.15   Financial Consultant; CRO; Investment Banker; Lender Meetings.

     (a)   Counsel to the Lenders has engaged Huron Consulting Group ("Huron") to provide financial advisory services in connection with the Cases and this Agreement.  The Borrower shall promptly reimburse Lenders (or their counsel) for all professional fees charged by Huron in accordance with the procedures set forth in the Interim DIP Order and/or the Final DIP Order.  Huron's work and work product shall solely be for the benefit of counsel to the Lenders, the Lenders, counsel to the Agent, the Agent, counsel to the Lenders, the Lenders, and such other parties with whom counsel to the Lenders and the Lenders may choose to share such work and work product, and shall not be for the benefit of any other party, including, without limitation, the Credit Parties.  Each Credit Party shall at all times:  (i) cooperate with all reasonable due diligence requests, information requests and investigations that Huron may desire to conduct with respect to the Credit Parties and their business and assets, (ii) upon Huron's

reasonable request, make its officers, employees, executives, agents and other representatives and personnel available to Huron for discussions regarding the financial condition, operations, prospects and cash management of the Credit Parties at normal business hours and with reasonable advance notice, the reasonable and documented out-of-pocket cost and expense of all of which shall in each case be borne by the Credit Parties, (iii) upon Huron's reasonable request, provide Huron access to all books, records, contracts, leases, title documents and other data regarding the Credit Parties and their business and assets, the reasonable and documented out-of-pocket cost and expense of all of which shall in each case be borne by the Borrower, and (iv) otherwise cooperate with Huron in all reasonable ways in furtherance of Huron's engagement as contemplated by this paragraph; provided, that, notwithstanding anything to the contrary contained in this paragraph, no Credit Party shall provide any information that is privileged attorney-client information or work product to the extent such privilege would be destroyed by providing such information to Huron.

(b)    A restructuring advisor acceptable to the Lenders (the "<u>CRO</u>") will continue to be engaged, with such engagement approved by the Bankruptcy Court, with a scope of duties acceptable to the Lenders and the Borrower.  The initial restructuring advisor shall be BRG and their scope of duties shall be as described in the engagement letter attached hereto as Exhibit 4.15(b) (the "<u>CRO Engagement Letter</u>") and any order of the Bankruptcy Court approving BRG's retention.  Any changes to the identity of the CRO or to the CRO Engagement Letter must be acceptable to all Lenders.  The Credit Parties shall cause the CRO to provide regular updates, no less frequently than once in every two-week period, to the Lenders and be available for calls and meetings with the Lenders at their reasonable request, including regarding the Milestones.

(c)    An investment banker acceptable to the Lenders (the "<u>Investment Banker</u>") will continue to be engaged, subject to Bankruptcy Court approval, with a scope of duties acceptable to the Lenders and the Borrower.  The initial Investment Banker shall be Lazard, whose scope of duties is described in the engagement letter attached hereto as Exhibit 4.15(c) (the "<u>Investment Banker Engagement Letter</u>").  Any changes to the identity of the Investment Banker or to the Investment Banker Engagement Letter must be acceptable to all Lenders.  The Credit Parties shall cause the Investment Banker to provide regular updates, no less frequently than once in every two-week period, to the Lenders and be available for calls and meetings with the Lenders at their reasonable request, including regarding the Milestones.

In addition to the obligations set forth in clauses (b) and (c) above, the Credit Parties shall be available, and cause the CRO and Investment Banker to be available, for calls and meetings with the Lenders at their reasonable request, and in any event no less frequently than once in every two-week period, at which such meetings the Financial Consultant may be present.

4.16   <u>ERISA Compliance</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, cause each ERISA Affiliate to make all payments to the extent necessary to avoid the imposition of a Lien on the assets of a Credit Party, or the involuntary termination of any underfunded Benefit Plan that would result in a Material Adverse Effect.

4.17   <u>[reserved]</u>.

4.18    Fiscal Year.  Each Credit Party shall, and shall cause each of its Subsidiaries to, maintain its Fiscal Year and method for determining Fiscal Quarters as in effect on the Effective Date.

4.19    Anti-Terrorism Laws.  The Credit Parties shall, and shall cause their respective Subsidiaries to, refrain from being (i) a Person with whom any Lender is restricted from doing business under Executive Order No. 13224 or any other Anti-Terrorism Law, (ii) engaged in any business involved in making or receiving any contribution of funds, goods or services to or for the benefit of such a Person or in any transaction that evades or avoids, or has the purpose of evading or avoiding, the prohibitions set forth in any Anti-Terrorism Law, or (iii) otherwise in violation of any Anti-Terrorism Law.

4.20    Compliance with Leases.  Except With respect to the Leases set forth on Schedule 3.9 and as otherwise expressly permitted hereunder, each Credit Party shall, and shall cause each of its Subsidiaries to (a) make all payments and otherwise perform all obligations in respect of all Leases (other than for the non-payment of rent for March 2019 as contemplated by the DIP Budget) and keep such Leases in full force and effect, (b) not allow Leases to lapse or be terminated, or any rights to renew any Leases to be forfeited or cancelled (except in connection with Permitted Store Closing once any going out of business sales are completed) or in the Ordinary Course of Business and (c) notify the Agent of any default by any party with respect to any Leases (other than with respect to Permitted Store Closing once any going out of business sales are completed), other than for the non-payment of rent for March 2019, as contemplated by the DIP Budget, and cooperate with the Agent in all respects to cure any such default.

4.21    Lease and Material Contract Rejection/Negotiation Procedure Motions.  In addition to the Lease and Material Contract Motion filed on the Petition Date, with the prior written consent, or at the direction, of the Required Lenders, the Credit Parties shall file motions seeking entry of an order, in form and substance acceptable to the Required Lenders, approving procedures for the rejection or negotiation, as applicable, of certain Leases and Material Contracts, which such motions may not be amended or otherwise modified without the prior written consent of the Required Lenders.

## ARTICLE V

## NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

5.1    Limitation on Liens.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)     any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Effective Date securing Indebtedness outstanding on such date and permitted by <u>subsection 5.5(c)</u>;

(b)     any Lien created under any Loan Document, including any Lien granted to secure the Obligations;

(c)     Liens for taxes, fees, assessments or other governmental charges including, for the avoidance of doubt, such Liens imposed by ERISA, (i) which are not delinquent or remain payable without penalty, (ii) the non-payment of which is permitted by <u>Section 4.7(a)</u> and (iii) to the extent being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of such Liens and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(d)     [reserved];

(e)     Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f)     [reserved];

(g)     easements, encroachments, covenants, equitable servitudes, rights-of-way, zoning, land use, building and other restrictions, minor defects or other irregularities in title, and other similar encumbrances, in each case, incurred in the Ordinary Course of Business which, either individually or in the aggregate do not in any case interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)     [reserved];

(i)     Liens    securing    Capital    Lease    Obligations    permitted    under <u>subsection 5.5(d)</u>;

(j)     any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(k)     [reserved];

(l)     non-exclusive licenses and sublicenses of Intellectual Property granted by a Credit Party or any Subsidiary of a Credit Party and leases and subleases (by a Credit Party or any Subsidiary of a Credit Party as lessor or sublessor) to third parties in the Ordinary Course of Business not interfering in any material respect with the business of the Credit Parties or any of their Subsidiaries; provided, however, that any such licenses and sublicenses of Intellectual

Property described in this clause (l) shall be permitted to be exclusive with respect to geographic scope in jurisdictions outside of the United States;

(m)     (i) Liens in favor of collecting banks arising under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC and customary rights of setoff, revocation, refund or chargeback under deposit agreements or under the UCC of banks or other financial institutions or with respect to Foreign Subsidiaries, under the relevant applicable law or (ii) rights of setoff against credit balances of Holdings or any of its Subsidiaries with credit card issuers or credit card processors to Holdings or any of its Subsidiaries in the Ordinary Course of Business;

(n)     Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by a Credit Party or any Subsidiary of a Credit Party in the Ordinary Course of Business;

(p)     Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(q)     [reserved].

(r)     [reserved];

(s)     Liens deemed to exist in connection with repurchase agreements and other similar Investments to the extent such Investments are permitted under Section 5.4;

(t)     other Liens incurred with respect to obligations that do not in the aggregate exceed $250,000 at any time outstanding;

(u)     Liens of Secured Swap Providers on (i) to the extent provided in the Loan Documents, the Collateral and (ii) deposits posted pursuant to Rate Contracts to secure obligations thereunder to the extent such Rate Contracts are permitted hereunder;

(v)     [reserved];

(w)     [reserved];

(x)     Liens on property of any Subsidiary of Holdings that is not a Credit Party, which Liens secure Indebtedness or other obligations of such Subsidiary not prohibited under this Agreement (other than Indebtedness of any Credit Party);

(y)     Pre-Petition Liens, subject to the priorities set forth in the DIP Orders; and

(z)    any "adequate protection liens" expressly provided by the DIP Orders, including but not limited to the Adequate Protection Liens granted to the Pre-Petition Secured Parties;

provided, however, that such Permitted Liens (other than the Carve-Out), while any portion of the Obligations or the Adequate Protection Obligations remain outstanding, shall at all times be junior and subordinate to the Liens under the Loan Documents and the DIP Orders, and to the Adequate Protection Liens.  The prohibition provided for in this Section 5.1 specifically restricts, without limitation, any Credit Party, the Committee, or any other party-in-interest in the Cases or any successor case, from priming or creating claims, Liens or interests *pari passu* with any claims, Liens or interests of the Agent, the Lenders and the Pre-Petition Secured Parties, any Lien (other than for the Carve-Out) irrespective of whether such claims, Liens or interests may be "adequately protected" (unless the Obligations and Adequate Protection Obligations will be paid in full in cash upon the granting of any such Lien and the Commitments terminated).

5.2    Disposition of Assets.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse), except:

(a)    dispositions of Inventory in the Ordinary Course of Business;

(b)    [reserved];

(c)    dispositions of Cash Equivalents in the Ordinary Course of Business;

(d)    transfers to the extent constituting a Permitted Lien;

(e)    non-exclusive licenses or sublicenses to Intellectual Property, leases or other subleases granted to third parties in the Ordinary Course of Business and not interfering in any material respect with the business of the Credit Parties or any of their Subsidiaries; provided, however, that any such licenses and sublicenses of Intellectual Property described in this clause (e) shall be permitted to be exclusive with respect to geographic scope in jurisdictions outside of the United States;

(f)    transfers of assets (i) by Holdings, any other Credit Party or any Subsidiary of Holdings to any Credit Party (other than Holdings), and (ii) by any Subsidiary of Holdings that is not a Credit Party to any other Subsidiary of Holdings that is not a Credit Party; so long as such transfer is in the Ordinary Course of Business, and, as appropriate, in accordance with the Cash Management Order;

(g)    [reserved];

(h)    [reserved];

(i)    [reserved];

(j)      dispositions constituting an Investment or Restricted Payment permitted under this Agreement or any Loan Document or a transaction permitted under Section 5.3;

(k)      dispositions resulting from Events of Loss;

(l)      dispositions or sales of a *de minimis* amount of Stock of a Subsidiary in order to qualify members of the governing body of such Subsidiary pursuant to Requirements of Law;

(m)      dispositions contemplated by the DIP Budget currently in effect;

(n)      [reserved];

(o)      [reserved];

(p)      [reserved];

(q)      dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or other Property used or useful to the business, (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property or other property used or useful to the business or (iii) such Property is a trade-in of equipment in exchange for other equipment, in each case, in the Ordinary Course of Business;

(r)      [reserved];

(s)      (i) disposition of Real Estate to a Governmental Authority as a result of a condemnation or eminent domain of such Real Estate or transfer in lieu thereof or (ii) a disposition consisting of or subsequent to a total loss or constructive total loss of property;

(t)      [reserved];

(u)      the unwinding or terminating of any Rate Contract pursuant to its terms;

(v)      [reserved];

(w)      dispositions in connection with the settlement of claims or disputes and the settlement, release or surrender of tort or other litigation claims upon terms and conditions determined by Borrower in consultation with the Required Lenders; and

(x)      dispositions made in connection with (i) a Permitted Store Closing or (ii) any other store closure or Lease rejection conducted with the prior written approval of the Required Lenders or the approval of the Bankruptcy Court.

5.3      Consolidations and Mergers.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, divide, undergo a business combination or consolidate with or into, dissolve, liquidate, or convey, transfer, lease or otherwise dispose of

(whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

5.4    <u>Loans and Investments</u>.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or purchase any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including a Credit Party, any Affiliate of a Credit Party or any Subsidiary of a Credit Party (the items described in clauses (i), (ii) and (iii) are referred to as "<u>Investments</u>"), except for:

(a)    Investments in cash and Cash Equivalents in the Ordinary Course of Business;

(b)    [reserved];

(c)    [reserved];

(d)    [reserved];

(e)    Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(f)    [reserved];

(g)    Investments existing on the Effective Date;

(h)    [reserved];

(i)    [reserved];

(j)    to the extent constituting Investments, (x) earnest money deposits made in connection with the acquisitions of Property in the Ordinary Course of Business not prohibited hereunder and (y) deposits made in the Ordinary Course of Business securing Contractual Obligations of a Credit Party to the extent constituting a Permitted Lien;

(k)    to the extent constituting Investments, Contingent Obligations expressly permitted hereunder;

(l)    Investments that otherwise would be permitted to be made as a Restricted Payment pursuant to <u>Section 5.11</u> hereof; <u>provided</u>, that, except as otherwise provided herein, at the reasonable request of Agent or Lenders, to the extent such Investment constitutes Indebtedness, such Investment shall be evidenced by promissory notes having subordination terms reasonably satisfactory to Lenders, the sole originally executed counterparts of which, if

held by a Credit Party, shall be pledged and delivered to Agent, for the benefit of the Secured Parties, as security for the Obligations; provided, further that such Investment shall be subject to all of the terms, conditions and restrictions applicable to such Restricted Payments as set forth in Section 5.11 (including, for the avoidance of doubt, a dollar-for-dollar reduction in the amount otherwise available for such Restricted Payments pursuant to Section 5.11 based on the amount of Investments made pursuant to this Section 5.4(l));

(m)    Investments consisting of Rate Contracts otherwise permitted hereunder; and

(n)    to the extent constituting Investments, deposit and securities accounts maintained in the Ordinary Course of Business and in compliance with the provisions of the Loan Documents.

In determining the amount of Investments permitted under this Section 5.4, the amount of any Investment not constituting Indebtedness outstanding at any time shall be the aggregate cash Investment by the applicable Person, less all dividends or other distributions on equity or returns of capital (but, in each case, only to the extent received in cash) received by such Person with respect to that particular Investment.

Notwithstanding anything herein to the contrary, during the occurrence and continuance of an Event of Default, no Credit Party shall, nor shall it permit any of its Subsidiaries to, make any direct or indirect Investment, including any Investment that would otherwise be permitted under the above terms of this Section 5.4, other than those set forth in clause (g) above.

5.5    Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness consisting of Contingent Obligations described in clause (a) of the definition thereof and permitted pursuant to Section 5.9;

(c)    Indebtedness existing on the Effective Date;

(d)    Indebtedness not to exceed $500,000 in the aggregate at any time outstanding consisting of Capital Lease Obligations incurred after the Petition Date in the Ordinary Course of Business of such Credit Party or Subsidiary, or in accordance with the Cash Management Order and the DIP Orders;

(e)    unsecured    intercompany    Indebtedness    permitted    pursuant    to subsection 5.4(e) or 5.4(l);

(f)    [reserved];

(g)    [reserved];

(h)     Indebtedness consisting of financing of insurance premiums in the Ordinary Course of Business;

(i)     [reserved];

(j)     [reserved];

(k)     Indebtedness of the type described in <u>clause (h)</u> of the definition thereof related to Stock or Stock Equivalents held by officers, directors and employees required to be purchased upon termination of employment to the extent that payment in respect of any such purchase obligation is made or to be made solely from the proceeds of any insurance policy maintained by a Credit Party for such purpose;

(l)     Indebtedness (i) in respect of netting services, overdraft protection and similar arrangements in connection with deposit accounts in the Ordinary Course of Business and (ii) arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the Ordinary Course of Business;

(m)    Indebtedness permitted pursuant to <u>Section 5.4</u>;

(n)     [Reserved];

(o)     [Reserved];

(p)     [Reserved];

(q)     Indebtedness under (x) Rate Contracts or other swap agreements related to foreign currency exchange rates or commodity prices, in each case, not entered into for speculative purposes; <u>provided</u> that any Rate Contract entered into by such Credit Party (i) relates to payment obligations on Indebtedness permitted to be incurred hereunder and (ii) the notional principal amount of such Rate Contracts at the time incurred does not exceed the principal amount of the Indebtedness to which such Rate Contract relates and (y) Rate Contracts required pursuant to <u>Section 4.17</u> ;

(r)     Liens of counterparties attaching solely to cash earnest money deposits made by the Credit Parties or any of their respective Subsidiaries in connection with any letter of intent or purchase agreement entered into with respect to Capital Expenditures otherwise permitted hereunder;

(s)     [reserved];

(t)     [reserved];

(u)     the Third Amendment Tranche 1 Unsecured Loan, in an amount not to exceed the aggregate amount outstanding immediately prior to the Petition Date plus any paid in kind interest thereon that continues to accrue after the Petition Date per the terms thereof;

(v)    the Third Amendment Tranche 2 Unsecured Loan, in an amount not to exceed the aggregate amount outstanding immediately prior to the Petition Date plus any paid in kind interest thereon that continues to accrue after the Petition Date per the terms thereof; and

(w)    Pre-Petition Indebtedness.

Notwithstanding anything herein to the contrary, (1) during the occurrence and continuance of an Event of Default has occurred and is continuing, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create, assume, incur, or in any manner become liable, directly, indirectly, or contingently in respect of, any Indebtedness, including any Indebtedness that would otherwise be permitted under the above terms of this Section 5.5, except Indebtedness arising under Sections 5.5(a), (c) or (w), and (2) except with respect to the Carve-Out, no Indebtedness under subclauses (a) through (w) shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the super priority administrative expense claims of the Agent and the Lenders or the Adequate Protection Superpriority Claims as set forth herein and in the DIP Orders.

5.6    <u>Employee Loans and Transactions with Affiliates</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Credit Party or any other Subsidiary of the Borrower (other than between or among one or more Credit Parties other than Holdings), other than on terms and conditions, taken as a whole, not materially less favorable to such Credit Party or Subsidiary as could reasonably be obtained by such Credit Party or Subsidiary at that time in a comparable arm's-length transaction with a person other than an Affiliate, except:

(a)    as expressly permitted by this Agreement;

(b)    [reserved];

(c)    [reserved];

(d)    transactions solely between or among the Credit Parties not prohibited hereunder;

(e)    transactions solely between or among non-Credit Party Subsidiaries not prohibited hereunder;

(f)    as expressly set forth on <u>Schedule 5.6</u> and, with respect to the Management Agreement, any amendment or modifications to the Management Agreement permitted pursuant to <u>Section 5.15</u>;

(g)    a transaction between or among (i) the Credit Parties; (ii) Subsidiaries that are not Credit Parties; or (iii) Subsidiaries of the Credit Parties (whether or not such Subsidiaries are Credit Parties), in each case, in the Ordinary Course of Business, so long as, if a Credit Party is party thereto, such Credit Party is the party receiving the more favorable terms;

(h)    [reserved];

(i)      [reserved];

(j)      non-exclusive licenses of any of the Credit Parties' or their Subsidiaries' Intellectual Property and business systems by the Credit Parties to Subsidiaries that are not Credit Parties; provided, however, that any such licenses and sublicenses of Intellectual Property described in this clause (j) shall be permitted to be exclusive with respect to geographic scope in jurisdictions outside of the United States;

(k)      [reserved];

(l)      payment of compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business;

(m)      payment of reasonable and customary directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings;

(n)      [reserved]; and

(o)      [reserved].

Notwithstanding anything herein to the contrary, during the occurrence and continuance of an Event of Default, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into any transaction or series of transactions (including, but not limited to, the purchase, disposition, lease or exchange of property, the making of any investment, the giving of any guaranty, the assumption of any obligation or the rendering of any service) with any of their Affiliates which are not Credit Parties including any transaction that would otherwise be permitted under the above terms of this Section 5.6.

5.7      Management Fees and Compensation.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party except:

(a)      payment of directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings not to exceed in the aggregate, with respect to all such items, $500,000 in any Fiscal Year of Holdings and payment of customary indemnities to directors, officers and employees of Parent (or its direct or indirect parent company) or its Subsidiaries; and

(b)      the accrual, but not payment in cash, of the financial advisory, transaction, monitoring, oversight and similar fees pursuant to and to the extent required under the terms of the Management Agreement as in effect on the Effective Date (or as amended after the Effective Date in accordance with Section 5.15).

5.8      Use of Proceeds.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use the proceeds of the Loans for any purposes other than to pay or fund (i) certain costs, fees and expenses related to the Case, (ii) amounts due and outstanding under the Pre-Petition Credit Agreement as permitted by the Interim DIP Order and the Final

DIP Order, (iii) Adequate Protection Payments (as defined in the Interim DIP Order and the Final Dip Order and (iv) the working capital needs, capital improvements and expenditures of the Borrower and the other Credit Parties during the Case (including, for the avoidance of doubt, any Restricted Payments required under Section 5.11 of this Agreement), in each case in accordance with the any DIP Budget (including the Initial DIP Budget) and the Cash Management Order; provided, however, that none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve-Out may be used for the following purposes: to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents, the Pre-Petition Facility or the Pre-Petition Indebtedness Documents, or the liens, security interests or claims granted under the Interim DIP Order, the Final DIP Order, this Agreement, the other Loan Documents or the Pre-Petition Indebtedness Documents, (ii) investigate, initiate or prosecute any claims and defenses or causes of action against any of the Agent, the Lenders, the Pre-Petition Lender, the Pre-Petition Secured Parties, or their respective agents, affiliates, representatives, attorneys or advisors under or relating to the Pre-Petition Facility, the Outstanding Pre-Petition Facility Indebtedness, the Pre-Petition Indebtedness, the Pre-Petition Indebtedness Documents, the Pre-Petition Collateral or the Loan Documents, (iii) prevent, hinder or otherwise delay the Agent's or any Lender's assertion, enforcement or realization on the cash collateral or the Collateral in accordance with the Loan Documents, (iv) seek to modify any of the rights granted to the Agent, the Lenders, the Pre-Petition Lender or the Pre-Petition Secured Parties hereunder or under the Loan Documents or the Pre-Petition Indebtedness Documents, in each of the foregoing cases without such parties' prior written consent or (v) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (A) approved by an order of the Bankruptcy Court and (B) in accordance with this Agreement and any relevant DIP Budget; provided that, advisors to the Committee may investigate the Pre-Petition Indebtedness and the liens on and security interests in the Pre-Petition Collateral for a 60-day period, commencing after the date that notice of the formation of the Committee appointed under section 1102 of the Bankruptcy Code in the Cases is filed on the docket of such Cases, at an aggregate expense for such investigation not to exceed $50,000.

5.9     Contingent Obligations.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except:

(a)     endorsements for collection or deposit (including endorsements of instruments or other payment items for deposit) in the Ordinary Course of Business;

(b)     Rate Contracts entered into in the Ordinary Course of Business for bona fide hedging purposes and not for speculation or otherwise with Agent's prior written consent;

(c)     Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Effective Date and listed in Schedule 5.9;

(d)     Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to Agent title insurance policies;

(e)     [reserved];

(f)      [reserved];

(g)      Contingent Obligations arising under guarantees made in the Ordinary Course of Business of obligations of any Credit Party (other than Holdings), which obligations are otherwise permitted hereunder; provided that if such obligation is subordinated to the Obligations, such guarantee shall be subordinated to the same extent;

(h)      [reserved];

(i)      Contingent Obligations consisting of guarantees by Holdings or any Credit Party of Indebtedness incurred by any Credit Party which is otherwise permitted hereunder;

(j)      [reserved]; and

(k)      Contingent Obligations consisting of obligations or liabilities under the Acquisition Side Letter.

Notwithstanding anything herein to the contrary, during the occurrence and continuance of an Event of Default, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations (except in respect of the Obligations) that would otherwise be permitted under the above terms of this Section 5.9.

5.10    [Reserved].

5.11    Restricted Payments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of such Credit Party's or Subsidiary's Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any of such Credit Party's or Subsidiary's Stock or Stock Equivalent now or hereafter outstanding (the items described in clauses (i) and (ii) above are referred to as "Restricted Payments"), except:

(a)      [reserved];

(b)      [reserved];

(c)      Permitted Tax Distributions;

(d)      [reserved];

(e)      [reserved];

(f)      [reserved]; and

(g)      Restricted Payments to enable any Credit Party or any of its Subsidiaries to make the payments described in Sections 5.6 and 5.7.

Notwithstanding anything herein to the contrary, during any continuance of an Event of Default, no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, make any

Restricted Payments, including any Restricted Payments that would otherwise be permitted under the above terms of this Section 5.11 (other than any Permitted Tax Distributions made pursuant to Section 5.11(c)).

5.12    Change in Business.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any material line of business substantially different from those lines of business carried on by it on the date hereof or reasonably related, corollary, complementary or ancillary thereto.

(b)    Holdings shall not engage in any business activities other than those (i) incidental to (a) ownership of Qualified Stock in Borrower (and Stock Equivalents in respect of Qualified Stock in Borrower) or making capital contributions to Borrower, (b) the maintenance of its corporate existence and performance under the Loan Documents and any other ancillary or related agreements or under any employment agreements and any documents related thereto, (c) [reserved], (d) the appointment of directors and officers and the compensation thereof in accordance with the terms of this Agreement, (e) payments permitted by Section 5.7 and (f) using the proceeds of Restricted Payments permitted by Section 5.11 as contemplated by Section 5.11 (including, without limitation, making Restricted Payments to the extent permitted by Section 5.11), or (ii) transactions expressly described herein as involving Holdings and permitted under this Agreement or permitted by the immediately following proviso; provided that Holdings shall not incur any Indebtedness (other than guarantees of Indebtedness permitted hereunder and for the avoidance of doubt, notwithstanding anything contained herein to the contrary, Holdings shall be permitted to guaranty the obligations of Borrower and any of its Subsidiaries under real estate leases), make any Investment or own any Stock in any Person (other than Stock in the Borrower and Investments permitted to be made by Holdings hereunder), or grant any Lien (other than the Pre-petition Liens and Liens securing the Obligations pursuant to the Loan Documents).

5.13    [Reserved].

5.14    Changes in Name and Jurisdiction of Organization.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) change a Credit Party's legal name as it appears in official filings in its jurisdiction of organization or (iv) change a Credit Party's jurisdiction of organization.

5.15    Amendments to Subordinated Indebtedness; Amendments to Third Amendment Tranche 1 Unsecured Loan Note or Third Amendment Tranche 2 Unsecured Loan Note; Organization Documents; Leases; Material Contracts.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend or otherwise modify the terms of any Subordinated Indebtedness.

(b)      No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend or otherwise modify the terms of any Third Amendment Tranche 1 Unsecured Loan Note, any Third Amendment Tranche 2 Unsecured Loan Note or any other document or instrument evidencing the Third Amendment Tranche 1 Unsecured Loan or Third Amendment Tranche 2 Unsecured Loan.

(c)      No Credit Party shall amend, modify or change any provision of any Management Agreement.

(d)      No Credit Party shall amend, supplement, waive or otherwise modify any provision of any Organization Document.

(e)      No Credit Party shall amend, supplement, waive or otherwise modify any provision of any Lease without the prior written consent of the Required Lenders.  No Credit Party may assume, assume and assign, amend, or reject any Lease without the prior written consent of the Required Lenders.

(f)      No Credit Party shall amend, supplement, waive or otherwise modify any provision of any Material Contract without the prior written consent of the Required Lenders.  No Credit Party may assume, assume and assign, amend, or reject any Material Contract without the prior written consent of the Required Lenders.

5.16    No Negative Pledges; Restrictive Agreements.

(a)      No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of the Borrower or any of its Subsidiaries to pay dividends or make any other distribution on any of the Borrower or such Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to a Credit Party, other than:

(i)      applicable Requirements of Law,

(ii)     to the extent existing as of the date hereof,

(iii)    to the extent otherwise permitted under this Agreement,

(iv)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary of the Borrower or license or sublicense of a Subsidiary of the Borrower entered into in the Ordinary Course of Business;

(v)      customary provisions restricting assignment of any agreement entered into by a Subsidiary of the Borrower in the Ordinary Course of Business;

(vi)     any holder of a Lien permitted by Section 5.1 restricting the transfer of the property subject thereto;

(vii)    customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 5.2 pending the consummation of such sale;

(viii)    [reserved];

(ix)    without affecting the Credit Parties' obligations under Section 4.13, customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person;

(x)    restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the Ordinary Course of Business;

(xi)    any instrument governing Indebtedness assumed in connection with any Acquisition consummation prior to the Effective Date, which encumbrance or restriction is not applicable to any person, or the properties or assets of any person, other than the person or the properties or assets of the person so acquired, or

(xii)    any encumbrances or restrictions imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (iii) above.

(b)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of Agent, whether now owned or hereafter acquired, except:

(i)    to the extent such Contractual Obligation exists on the date hereof,

(ii)    to the extent otherwise permitted by this Agreement and the other Loan Documents,

(iii)    covenants in documents creating Liens permitted by Section 5.1 prohibiting further Liens on the properties encumbered thereby;

(iv)    any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Credit Party to secure the Obligations; and

(v)    any prohibition or limitation that (A) exists pursuant to applicable Requirements of Law, (B) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 5.2 pending the consummation of such sale or (C) restricts subletting or assignment of any Lease governing a leasehold interest of a Subsidiary in the Ordinary Course of Business.

5.17    [Reserved].

5.18    [Reserved].

5.19    [Reserved].

5.20    Payments of Other Indebtedness.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, make any payment of principal, interest, fees, or similar payment on, or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of (x) any Indebtedness secured by Liens ranking junior with respect to the Liens securing the Obligations, (y) any unsecured Indebtedness (including without limitation the Third Amendment Tranche 1 Unsecured Loan or Third Amendment Tranche 2 Unsecured Loan) or (z) any Subordinated Indebtedness, except as expressly permitted by the DIP Orders.

5.21    Case Matters.

(a)    All Professional Fees at any time paid by the Credit Parties, or any of them, shall be paid by the Credit Parties pursuant to procedures established by an order of the Bankruptcy Court and pursuant to the DIP Budget;

(b)    Unless all Obligations have been indefeasibly paid in full in cash on terms and conditions acceptable to the Required Lenders, and the Adequate Protection Obligations have been paid in full, no Credit Party shall assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating, disallowing, impairing or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable bankruptcy law), in each case, in whole or in part, of the Obligations, the DIP Liens or the Loan Documents;

(ii)    reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Required Lenders;

(iii)    granting priority for any administrative expense, secured claim or unsecured claim against the Borrower or any of the Guarantors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out;

(iv)    granting or imposing under Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Liens except to the extent, and only to the extent, set forth in the Final DIP Order);

(v)    permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders or this Agreement; or

(vi)    modifying, altering, or impairing in any manner any of the Secured Parties' Liens, or any of the Agent's the Lenders' or the Pre-Petition Secured Parties' rights or remedies under the DIP Orders, this Agreement, or any of the Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and Adequate Protection Obligations, as applicable, and to enforce its Liens and security interests in the Collateral and the Pre-Petition Collateral, as applicable), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Credit Party or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(c)    without the prior written consent of the Required Lenders, no Credit Party shall seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding;

(d)    the Credit Parties will not make any payments or transfer any property on account of claims asserted by any vendors of any Credit Party for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Agent or unless otherwise consented to by the Required Lenders;

(e)    the Credit Parties will not return any Inventory or other Property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Agent or unless otherwise consented to by the Required Lenders;

(f)    the Credit Parties shall promptly pay any outstanding real estate Taxes that are due and owing that would encumber the Collateral and shall promptly pay any other such real estate Taxes when due, in each case other than real estate Taxes that are being disputed in good faith; and

(g)    no Credit Party shall submit to the Bankruptcy Court a Plan of Reorganization, or withdraw, waive any conditions to, or make any modifications to any Plan of Reorganization, without the prior written consent of the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned).

5.22    <u>Amendments to Orders</u>.  For the avoidance of doubt, none of the Credit Parties shall amend, modify or waive (or make any payment consistent with an amendment, modification or waiver of), or apply to the Bankruptcy Court for authority to make any amendment, modification or waiver of, any provision of the Plan of Reorganization submitted on the Effective Date, the Interim DIP Order or the Final DIP Order, the Bidding Procedures Order, the Lease and Material Contract Rejection Motion or the Investment Banker and CRO Motion, in each case without in each case the prior written consent of the Required Lenders.

5.23    <u>Pre-Petition Indebtedness</u>.  None of the Credit Parties shall assume, reject, cancel, terminate, breach or modify (whether pursuant to Section 365 of the Bankruptcy Code or any other applicable law or otherwise), (i) any Pre-Petition Indebtedness if such assumption, rejection, cancellation, termination, breach or modification could reasonably be expected to be adverse in any material respect to the interests of the Lenders under the Loan Documents, (ii) any Lease or Material Contract in a manner not contemplated by the Lease and Material Contract Rejection Motion or the motions required to be filed pursuant to Section 4.21 or (iii) any agreement, contract, instrument or other document to which it is a party which assumption, rejection, cancellation, termination, breach or modification could reasonably be expected to result in a Material Adverse Effect.

5.24    <u>DIP Budget</u>.  Notwithstanding anything to the contrary set forth herein or in any Loan Document, the Credit Parties and their Subsidiaries may not make any disbursements other than those set forth in the DIP Budget and other de minimis disbursements.

## ARTICLE VI

## FINANCIAL COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

6.1    <u>Permitted Variances</u>.  The Credit Parties shall not permit the disbursements contemplated in <u>Section 4.1(j)</u> to exceed the Permitted Variance set forth therein.

## ARTICLE VII

## EVENTS OF DEFAULT

7.1    <u>Event of Default</u>.  The occurrence and continuance of any of the following shall constitute an "<u>Event of Default</u>":

(a)    <u>Non-Payment</u>.  Any Credit Party fails to pay when and as required to be paid herein, any amount of principal of any Loan, including at maturity of the Loans, or to pay any interest on any Loan, any fee or any other amount payable hereunder or pursuant to any other Loan Document, or under the DIP Orders (including Adequate Protection Payments); or

(b)      Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in the DIP Orders, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)      Specific Defaults.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of Section 4.1(a), 4.1(b), 4.3(a) or 4.4(a), Article V or Article VI of this Agreement or, in the DIP Orders; or

(d)      Other Defaults.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe (x) any term, covenant or agreement contained in Section 4.1(g), 4.1(h), , 4.1(j), 4.15(a) or 4.15(b) hereof, and such default shall continue unremedied for a period of five Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by Agent or Required Lenders, and (y) any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by Agent or Required Lenders; or

(e)      Cross-Default and Cross-Acceleration.      Any Credit Party or any Subsidiary of any Credit Party (i) fails to make any payment in respect of any post-petition Indebtedness (other than the Obligations) or post-petition Contingent Obligation having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), in each case or in the aggregate, of more than $5,000,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such post-petition Indebtedness or post-petition Contingent Obligation, if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such post-petition Indebtedness or beneficiary or beneficiaries of such post-petition Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such post-petition Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or such post-petition Contingent Obligation to become payable or cash collateral in respect thereof to be demanded; or (iii) any such post-petition Indebtedness or post-petition Contingent Obligation shall become or be declared to be due and payable, or be required to be prepaid, redeemed, defeased or repurchased (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(f)      [Reserved];

(g)    Default of Leases.  Except as a result of the Cases and the events leading up thereto, the occurrence of any event such that any Leases could then be terminated (except in connection with Permitted Store Closing once any going out of business sales are completed) (whether or not any or all of the subject lessors take any action on account of such occurrence), other than for the non-payment of rent for March 2019, as contemplated in the DIP Budget.

(h)    Monetary Judgments.  One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $5,000,000 or more, and the same shall remain unsatisfied, unvacated or unstayed pending appeal for a period of thirty (30) days after the entry thereof, or shall not be subject to the Automatic Stay; or

(i)    ERISA Default.  (i) An event shall have occurred that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan; (ii) an ERISA Event shall have occurred or (iii) any ERISA Affiliate shall have been notified by the sponsor of a Title IV Plan that is a multiple employer plan or by the sponsor of a Multiemployer Plan that such ERISA Affiliate has incurred or will be assessed liability under Section 4063 or Section 4201 of ERISA (as applicable) and such entity does not have reasonable grounds for contesting such liability or is not contesting such liability in a timely and appropriate manner; and in each case in clauses (i) through (iii) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect; or

(j)    Liens.  Any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid, perfected and prior to all other Liens to (other than in respect of the Carve-Out and any other Permitted Lien that is expressly permitted to have priority over the DIP Lien pursuant to the DIP Orders) or is terminated, revoked, or declared void (unless released or terminated pursuant to the terms of this Agreement; or

(k)    Ownership.  Any Change of Control shall occur; or

(l)    Trustee/Examiner.  An order with respect to any of the Cases shall be entered appointing, or any Credit Party shall file an application for an order with respect to any of the Cases seeking the appointment of, in either case without the prior written consent of the Required Lenders, (i) a trustee under Section 1104 of the Bankruptcy Code or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(m)    Chapter 7.  An order shall be entered dismissing a Case or converting a Case to a case under Chapter 7 of the Bankruptcy Code; or

(n)    DIP Order Modifications; Other Administrative Claims; Other Liens.  An order shall be entered with respect to the Case or Cases, without the prior written consent of the Required Lenders, (i) to revoke, reverse, stay, vacate or otherwise modify the DIP Orders in a manner adverse to the Lenders or in a manner inconsistent with the Loan Documents, (ii) to

permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Secured Parties in respect of the Obligations other than the Carve-Out or Permitted Liens that are senior pursuant to applicable law, (iii) terminate or deny use of cash collateral or (iv) to grant or permit the grant of a lien that is equal in priority with or senior to the liens securing the Obligations other than the Carve-Out and Permitted Liens that are senior pursuant to the DIP Orders; or

(o)    Automatic Stay.  An order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of a Credit Party with respect to any claim against any property that, when taken together with all other orders entered on the docket of the Bankruptcy Court that are not stayed pending appeal granting relief from the Automatic Stay with respect to the Credit Parties' Collateral exceeds $500,000; provided however that modifications to the Automatic Stay to permit workers compensation claims to proceed shall not count against such $500,000 limit, or

(p)    Exclusivity.  An order shall be entered terminating or reducing the Credit Parties' exclusivity period for proposing a Plan of Reorganization; or

(q)    Milestones.  Failure of the Credit Parties to meet any of the Milestones set forth on Schedule 7.1; or

(r)    [reserved]; or

(s)    Other Plans of Organizations.   An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Cases which is not the Plan of Reorganization filed by the Borrower on the Petition Date only as modified with the consent of the Required Lenders; or

(t)    Violation of DIP Orders.  A violation by any Credit Party of any of the provisions of the DIP Orders in any material respect; or

(u)    Rejection of Material Contracts; Leases.   Any Credit Party rejects a Material Contract or an unexpired Lease identified as material by the Lenders without their prior written consent.

7.2    Relief.  An Event of Default shall occur as set forth in this Agreement even if an act or circumstance which gives rise, directly or indirectly, to such Event of Default has been authorized by the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases. Neither the Agent nor any Lender shall have any obligation whatsoever to object to any relief requested by any Credit Party from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases if and because such relief would or may constitute, or would or may lead to, an Event of Default, or the Agent's or any Lender's failure to object to such relief shall not limit the Events of Default under this Agreement, constitute a waiver or release of rights and remedies under this Agreement, estop or preclude the Agent or any Lender from fully enforcing the same, or have any res judicata effect on whether an Event of Default has occurred under this Agreement. Each Credit Party shall be fully responsible for determining whether any relief it seeks from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases would or may constitute, or would or may lead to, an Event of Default under this Agreement, and

authorization for such relief shall not limit in any manner whatsoever such Credit Party's obligation to fully comply with all of the terms and conditions of this Agreement.

7.3     Remedies.

(a)     If an Event of Default exists, the Agent shall, at the written direction of the Required Lenders, at any time or times and in any order, without notice to or demand on any Credit Party, restrict the amount of or refuse to permit any Lender to make any Loan.  If an Event of Default exists, the Agent shall, at the option and the written direction of the Required Lenders, do one or more of the following, in addition to the action described in the preceding sentence, at any time or times and in any order, without notice to or demand on any Credit Party except as required by Section 7.3(d):  (A) terminate the Commitments and the other obligations of the Agent and the Lenders under this Agreement; (B) declare any or all Obligations to be immediately due and payable; and (C) pursue its other rights and remedies under the Loan Documents, the DIP Orders and/or applicable law (provided that, notwithstanding anything to the contrary herein, the Agent shall provide 5 Business Days' prior written notice prior to taking any actions pursuant to this clause (C)).  Except as otherwise provided in the DIP Orders, the foregoing remedies may be exercised without demand and without further application to or order of the Bankruptcy Court.

(b)     Each Credit Party recognizes that the Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.  Each Credit Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by a Requirement of Law, the Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal or state securities laws, even if such issuer would agree to do so.  Each Credit Party further agrees to do or cause to be done, to the extent that such Credit Party may do so under Requirements of Law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all Requirements of Law at the Credit Parties' expense.  Each Credit Party further agrees that a breach of any of the covenants contained in this Section 7.3(b) will cause irreparable injury to the Agent and the Lenders for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 7.3(b) shall be specifically enforceable against such Credit Party, and each Credit Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Credit Party's failure to perform such covenants will not cause irreparable injury to the Agent and the Lenders or (ii) the Agent or the Lenders have an adequate remedy at law in respect of such breach.  Each Credit Party further acknowledges the impossibility of ascertaining the amount of damages which

would be suffered by the Agent and the Lenders by reason of a breach of any of the covenants contained in this Section 7.3(b) and, consequently, agrees that, if such Credit Party shall breach any of such covenants and the Agent or the Lenders shall sue for damages for such breach, such Credit Party shall pay to the Agent, for the benefit of the Agent and the Lenders, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Agent shall demand compliance with this Section 7.3(b); and

(c)    If an Event of Default has occurred and is continuing, the Agent shall have for the benefit of the Lenders, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Agent shall be empowered and entitled to:  (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Credit Party's premises at any time, at no cost to the Agent or any Lender, or remove any part of it to such other place or places as the Agent may desire, or the Credit Parties shall, upon the Agent's or Required Lender's demand, at the Credit Parties' cost, assemble the Collateral and make it available to the Agent at a place reasonably convenient to the Agent; (ii) sell and deliver any Collateral at public or private sales, for cash, upon credit, or otherwise, at such prices and upon such terms as the Agent deems advisable, in its sole discretion, and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iii) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Credit Party with respect to the Collateral, whether in the name of such Credit Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Agent under the Loan Documents, (iv) employ consultants to inspect the Collateral and to assure compliance by each Credit Party of the terms and conditions of the Loan Documents and (v) take any other reasonable actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Credit Parties.  Upon demand from the Agent, the applicable Credit Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any Property to recognize and accept the Agent, for the benefit of and on behalf of the Lenders, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Credit Party and the performance of such Credit Party thereunder and, in such event, without further notice or demand and at such Credit Party's sole cost and expense, the Agent, for the benefit of and on behalf of the Lenders, may exercise all rights of such Credit Party arising under such agreements.  Without in any way requiring notice to be given in the following manner, each Credit Party agrees that any notice by the Agent of sale, disposition, or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Credit Party if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least ten (10) Business Days prior to such action to the Credit Parties' address specified in or pursuant to Section 9.2.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Agent or the Lenders receive payment, and if the buyer defaults in payment, the Agent may resell the

Collateral. In the event the Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Credit Party irrevocably waives: (A) the posting of any bond, surety, or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Agent retain possession and not dispose of any Collateral until after trial or final judgment. Each Credit Party agrees that the Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. The Agent is hereby granted a license or other right to use, without charge, each Credit Party's labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production of, advertising, or selling any Collateral, and each such Credit Party's rights under all licenses and all franchise agreements shall inure to the Agent's benefit for such purpose. The proceeds of sale shall be applied first to all expenses of sale, including reasonable attorneys' fees, and then to the Obligations. The Agent will return any excess to the applicable Credit Party and the Credit Parties shall remain liable for any deficiency.

(d)     Notwithstanding anything herein to the contrary, (i) neither the Agent nor any Lender shall take any action under this Section 7.3 (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the DIP Orders, and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Agent on account of the Obligations, from the Credit Parties and/or all amounts with respect to the proceeds of any Collateral (including, after the Agent has given the Borrower notice of the exercise of exclusive control, all amounts in the Cash Collateral Accounts, but subject to the rights of the Pre-Petition Secured Parties in the Cash Collateral Accounts) shall be (subject to the proviso below) promptly disbursed by the Agent as follows, unless otherwise agreed by the Required Lenders: (1) first, to the payment of the fees of the Agent and the costs, and expenses incurred by the Agent in the performance of its duties and the enforcement of the rights and remedies of the Agent and the Lenders under the Loan Documents, including all costs and expenses incurred under Section 9.5 hereunder, all costs and expenses of collection, reasonable attorneys' fees, court costs and other amounts required to be paid or reimbursed by the Credit Parties to the Agent or the Lenders as provided by this Agreement or any of the other Loan Documents; (2) second, to the Lenders, pro rata in accordance with their respective pro rata shares (i) to the payment of interest until interest (including interest at the Default Rate) accrued on the Advances has been paid in full and (ii) then, to the repayment of principal until principal of the Loans then due and payable (if any) has been paid in full; (3) third, to the payment of any remaining amount owed to the Lenders pursuant to the terms of this Agreement or any other Loan Document; (4) fourth, to the Agent, any remaining amount owed to the Agent, respectively, pursuant to the terms of this Agreement or any other Loan Document; (5) fifth, to the Pre-Petition Secured Parties for the Adequate Protection Obligations under the DIP Orders; and (6) lastly, to the extent the non-contingent Obligations have been paid in full, to the Borrower; provided that (x) subject to the provisions of the DIP Orders, payments in respect of the Adequate Protection Obligations shall be made, (y) with the written consent of the Required Lenders, any such amounts may instead be applied toward the payment of property Taxes, operating expenses, property capital expenditures, Indebtedness secured by Liens or other items affecting the Properties and/or the Collateral and (z) all proceeds received by the Agent and the Lenders in respect of sales of Collateral subject to the Pre-Petition Lien shall first be paid to the Pre-Petition Secured Parties, in each case, to the extent of their priority interest in such proceeds. The order of priority set forth in this

Section 7.3(d) and the related provisions of this Agreement are set forth solely to determine the rights and priorities of the Agent, the Lenders and the Pre-Petition Parties as among themselves. The order of priority set forth in this Section 7.3(d) may at any time and from time to time be changed by the Agent, the Lenders and the Pre-Petition Secured Parties without necessity of notice to or consent of or approval by any Credit Party or any other Person.

(e)     An Event of Default shall occur as set forth in this Agreement even if an act or circumstance which gives rise, directly or indirectly, to such Event of Default has been authorized by the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases. Neither the Agent nor any Lender shall have any obligation whatsoever to object to any relief requested by any Credit Party from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases if and because such relief would or may constitute, or would or may lead to, an Event of Default, or the Agent's or any Lender's failure to object to such relief shall not limit the Events of Default under this Agreement, constitute a waiver or release of rights and remedies under this Agreement, estop or preclude the Agent or any Lender from fully enforcing the same, or have any res judicata effect on whether an Event of Default has occurred under this Agreement. Each Credit Party shall be fully responsible for determining whether any relief it seeks from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases would or may constitute, or would or may lead to, an Event of Default under this Agreement, and authorization for such relief shall not limit in any manner whatsoever such Credit Party's obligation to fully comply with all of the terms and conditions of this Agreement.

7.4     <u>Rights Not Exclusive</u>.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## ARTICLE VIII

### AGENT

8.1     <u>Appointment and Duties</u>.

(a)     <u>Appointment of Agent</u>.  Each Lender hereby appoints KeyBank (together with any successor Agent pursuant to <u>Section 8.9</u>) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b)     <u>Duties as Collateral and Disbursing Agent</u>.  Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including any bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents

necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for Agent, the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)     Limited Duties.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2     Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3     Use of Discretion.

(a)     No Action without Instructions.  Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)      Right Not to Follow Certain Instructions.   Notwithstanding clause (a) above, Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against Agent or any Related Person thereof or (ii) that is, in the opinion of Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)      Exclusive Right to Enforce Rights and Remedies.   Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) [reserved], (iii) any Lender from exercising setoff rights in accordance with Section 9.11 or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (A) the Required Lenders shall have the rights otherwise ascribed to Agent pursuant to Section 7.2 and (B) in addition to the matters set forth in clauses (iii) and (iv) of the preceding proviso and subject to Section 9.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

8.4      Delegation of Rights and Duties.   Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).   Any such Person shall benefit from this Article VIII to the extent provided by Agent.

8.5      Reliance and Liability.

(a)      Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 9.9, (ii) rely on the Register to the extent set forth in Section 1.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)      None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, the Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and

agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, Agent:

(i)     shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)    shall not be responsible to any Lender or other Secured Parties for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)   makes no warranty or representation, and shall not be responsible, to any Lender or other Secured Parties for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Secured Party, Holdings and the Borrower hereby waives and agrees not to assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

(c)     Each Lender (i) acknowledges that it has performed and will continue to perform its own diligence and has made and will continue to make its own independent investigation of the operations, financial conditions and affairs of the Credit Parties and (ii) agrees that is shall not rely on any audit or other report provided by Agent or its Related Persons (an "Agent Report").  Each Lender further acknowledges that any Agent Report (i) is provided to the Lenders solely as a courtesy, without consideration, and based upon the understanding that such Lender will not rely on such Agent Report, (ii) was prepared by Agent

or its Related Persons based upon information provided by the Credit Parties solely for Agent's own internal use, (iii) may not be complete and may not reflect all information and findings obtained by Agent or its Related Persons regarding the operations and condition of the Credit Parties.  Neither Agent nor any of its Related Persons makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Persons' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any related documentation, and (iv) any work performed by Agent or Agent's Related Persons in connection with or using any Agent Report or any related documentation.

(d)     Neither Agent nor any of its Related Persons shall have any duties or obligations in connection with or as a result of any Lender receiving a copy of any Agent Report. Without limiting the generality of the forgoing, neither Agent nor any of its Related Persons shall have any responsibility for the accuracy or completeness of any Agent Report, or the appropriateness of any Agent Report for any Lender's purposes, and shall have no duty or responsibility to correct or update any Agent Report or disclose to any Lender any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report. Each Lender releases, and agrees that it will not assert, any claim against Agent or its Related Persons that in any way relates to any Agent Report or arises out of any Lender having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Persons from all claims, liabilities and expenses relating to a breach by any Lender arising out of such Lender's access to any Agent Report or any discussion of its contents.

8.6     <u>Agent Individually</u>.  Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Required Lenders.

8.7     <u>Lender Credit Decision</u>.

(a)     Each Lender acknowledges that it shall, independently and without reliance upon Agent, any Lender or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders, Agent shall not have any duty or responsibility to provide

any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

(b)     If any Lender has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates, such Lender acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties. Notwithstanding such Lender's election to abstain from receiving MNPI, such Lender acknowledges that if such Lender chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8     Expenses; Indemnities.

(a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors paid in the name of, or on behalf of, any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to its rights or responsibilities under, any Loan Document.

(b)     Each Lender further agrees to indemnify Agent, Lenders and each of their respective Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities that may be imposed on, incurred by or asserted against Agent, Lenders or any of their respective Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent, Lenders or any of their respective Related Persons under or with respect to any of the foregoing; provided, however, that no Lender shall be liable to Agent, Lenders or any of their respective Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent, Lenders or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

8.9     Resignation or Termination of Agent.

(a)     Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective.  If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower (such consent shall not be unreasonably withheld and shall not be required if an Event of Default shall have occurred and be continuing).  If, within 30 days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this clause (a) shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)     Required Lenders may terminate Agent at any time by delivering notice of such termination to the Agent, Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective.  If Required Lenders deliver any such notice, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower (such consent shall not be unreasonably withheld and shall not be required if an Event of Default shall have occurred and be continuing).Each appointment under this clause (b) shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(c)     Effective immediately upon its resignation or termination, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

8.10   <u>Release of Collateral or Credit Parties</u>   Each Lender hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)     any Subsidiary of the Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to <u>Section 4.13</u>; and

(b)     any DIP Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in

a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent) and with approval of the Bankruptcy Court (to the extent required), to the extent all DIP Liens required to be granted in such Collateral pursuant to <u>Section 4.13</u> after giving effect to such transaction have been granted, (ii) any property subject to a DIP Lien permitted hereunder in reliance upon <u>subsection 5.1(h)</u> and (iii) all of the Collateral and all Credit Parties, upon (A) payment and satisfaction in full of all DIP Loans, all Obligations under the Loan Documents and all Obligations arising under Secured Rate Contracts, that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable and (B) the Cash Collateralization of all contingent Obligations in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding Contingent Obligations as to which no claim has been asserted).

Each Lender hereby directs Agent, and Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this <u>Section 8.10</u>.

8.11    <u>Additional Secured Parties</u>. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any DIP Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) this <u>Article VIII</u>, <u>Section 9.3</u>, <u>Section 9.9</u>, <u>Section 9.10</u>, <u>Section 9.11</u>, <u>Section 9.17</u>, <u>Section 9.24</u> and <u>Section 10.1</u> and the decisions and actions of Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by <u>Section 8.8</u> only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent and the Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

8.12    [Reserved].

8.13    <u>Agent May File Proofs of Claim; Etc.</u>. In case of the pendency of any proceeding under the Bankruptcy Code or any other judicial proceeding relative to any Credit Party, Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Agent shall have made any demand on the Borrower) shall be entitled and empowered, subject to <u>Section 7.2</u>, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and Agent and their respective agents and counsel and all other amounts due the Lenders and Agent hereunder) allowed in such judicial proceeding;

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Agent and, if Agent shall consent to the making of such payments directly to the Lenders, to pay to Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Agent and its agents and counsel, and any other amounts due Agent hereunder; and

(c)     subject to the mandatory requirements of applicable law, to consent to the use by any Credit Party of any cash collateral arising in respect of the Collateral on such terms as Lenders deem reasonable and/or may sell or otherwise dispose of, or acquire by credit bid on behalf of the Lenders, all or any part of the Collateral securing the Obligations at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as Lenders shall deem appropriate.

Nothing contained herein shall be deemed to authorize Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize Agent to vote in respect of the claim of any Lender or in any such proceeding.

## ARTICLE IX

## MISCELLANEOUS

9.1     <u>Amendments and Waivers</u>.

(a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent with the consent of the Required Lenders) and the Credit Parties, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment or consent shall, unless in writing and signed by all the affected Lenders, do any of the following:

(i)     increase or extend the Commitment of any Lender; provided that only such Lenders increasing or extending their respective Commitments shall be deemed "directly and adversely affected" thereby;

(ii)     postpone, extend or delay any scheduled maturity date or other scheduled date fixed for, or reduce or waive, payment of principal or interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document;

(iii)     reduce the principal of, or the rate of interest specified herein or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document;

(iv)     as to any Lender, change any pro rata sharing and/or pro rata payment provision contained herein; provided that only any Lender declining payment or reducing a payment made to them shall be deemed "directly and adversely affected";

(v)     amend this <u>Section 9.1</u> or the definition of Required Lenders or any provision providing for consent or other action by all Lenders;

(vi)     discharge any Credit Party from its respective payment Obligations under the Loan Documents, release all or substantially all of the Collateral or subordinate the Liens granted under any Loan Document in respect of all or substantially all of the Collateral, or permit the incurrence of any Indebtedness that is *pari passu* in right of payment or security with the Obligations, other than as permitted on the Effective Date, in each case, except as otherwise may be provided in this Agreement or the other Loan Documents or through a Bankruptcy Court order, or release or reduce the values of the guarantees under Article XIII or release any "cash collateral" as defined in Section 363(a) of the federal Bankruptcy Code pursuant to cash collateral stipulations with the Credit Parties previously approved by the Required Lenders;

(vii)     [reserved];

(viii)     amend <u>Section 5.15(b)</u> or any other provision of this Agreement if the effect of such change or amendment would be to modify the terms of the Third Amendment Tranche 1 Unsecured Loan or the Third Amendment Tranche 2 Unsecured Loan; and

(ix)     amend the scope of, or terminate, the engagement of the CRO.

(b)     No amendment, waiver or consent shall, unless in writing and signed by Agent in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required Lenders or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent under this Agreement or any other Loan Document.

(c)     [Reserved].

(d)     Notwithstanding anything to the contrary contained in this <u>Section 9.1</u>, (x) Borrower may amend <u>Schedule 3.19</u> upon notice to Agent and (y) Agent and Borrower may amend or modify this Agreement and any other Loan Document to grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties or join additional Persons as Credit Parties to the extent contemplated herein.

(e)     [Reserved].

(f)     Notwithstanding anything to the contrary contained in this <u>Section 9.1</u>, (x) collateral and security documents executed by Credit Parties in connection with this Agreement may be in a form reasonably determined by Agent (at the direction of Required

Lenders) or Required Lenders and may be amended, supplemented and waived with the consent of Agent (at the direction of Required Lenders) or Required Lenders, the collateral agent and the Borrower without the need to obtain the consent of any other Person if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects or (iii) to cause such collateral and security documents to be consistent with this Agreement and the other Loan Documents and (y) if following the Effective Date, Lenders and any Credit Party shall have jointly identified an ambiguity, inconsistency, obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then Lenders and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within ten (10) Business Days following receipt of notice thereof.

9.2     <u>Notices Addresses</u>.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on <u>Schedule 9.2</u> hereto, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-code fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Borrower and Agent, to the other parties hereto and (B) in the case of all other parties, to the Borrower and Agent.  Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrower, and (z) if receipt of such transmission is acknowledged by Agent.

(a)     <u>Effectiveness</u>.  (i) All communications described in <u>clause (a)</u> above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; <u>provided</u>, <u>however</u>, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(ii)     The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Credit Party in connection with any such communication is true, correct and complete in all material respects (without

duplication of any materiality qualification contained therein) except as expressly noted in such communication or E-System.

(b)     Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3     Electronic Transmissions.

(a)     Authorization.  Subject to the provisions of subsection 9.2(a), each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     Signatures.  Subject to the provisions of subsection 9.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered during or after transmission.

(c)     Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF

AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  Each of the Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

      9.4   <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

      9.5   <u>Costs and Expenses</u>.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or any Lender, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as provided therein.  In addition, the Borrower agrees to pay or reimburse within thirty (30) days upon demand (a) Agent and Lenders for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred by each of them or any of its Related Persons (but only to the extent Agent, Lenders or their Affiliates are required to reimburse such Related Person), in connection with the preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of Agent and Lenders, the costs of Collateral audits and appraisals, background checks and similar expenses, (b) Agent and Lenders for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred by each of them or any of their Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the reasonable and documented out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent and Lenders, respectively, for their examiners) and (c) each of Agent, Lenders and their Related Persons, for all reasonable and documented out-of-pocket costs and expenses (other than taxes) incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any

Subsidiary of any Credit Party, Loan Document, Obligation or Related Transaction (or the response to and preparation for any subpoena or request for document production relating thereto), including Attorney Costs.  Notwithstanding anything to the contrary herein or in any other Loan Document, Borrower and Credit Parties' obligations as to Attorney Costs shall be limited to the reasonable fees, disbursements and other charges of one counsel to Agent and one counsel to each Lender, and, if reasonably necessary, of one local counsel in each relevant material jurisdiction and one regulatory counsel, and (x) if in connection with the preparation, execution, delivery and administration of the Loan Documents and any amendment or waiver with respect thereto, one additional counsel if a conflict of interest arises or (y) if in connection with the enforcement of the Loan Documents or protection of rights thereunder, in the case of an actual or reasonably perceived conflict of interest, one additional counsel (and one additional local counsel in each relevant material jurisdiction and one additional regulatory counsel).

      9.6    <u>Indemnity</u>.

      (a)    Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all actual Liabilities (including brokerage commissions, fees and other compensation, but not including Taxes which are addressed in Section 10.1) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including Attorney Costs in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability (x) has resulted from the gross negligence or willful misconduct of any Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order, (y) arises out of or in connection with any investigation, litigation or other proceeding that does not involve an act or omission by a Credit Party or an Affiliate thereof and that is brought by one Lender (in its capacity as such) or an Affiliate thereof against any other Lender (in its capacity as such) or an Affiliate thereof or (z) from a material breach by an Indemnitee or any Related Person of its obligations under the Loan Documents.  Furthermore, each of the Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted

against any Related Person except to the extent such right of contribution has resulted from the gross negligence or willful misconduct of such Indemnitee as determined by a final, non-appealable judgment or order of a court of competent jurisdiction. Notwithstanding anything to the contrary herein or in any other Loan Document, Borrower and Credit Parties' obligations as to Attorney Costs shall be limited to the fees, disbursements and other charges of one counsel to each Lender and its Related Persons and one additional counsel to the Agent and its Related Persons, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one regulatory counsel to all affected Indemnitees, taken as a whole (and in the case of an actual or reasonably perceived conflict of interest, one additional counsel (and one additional local counsel in each relevant material jurisdiction and one additional regulatory counsel) to each affected Indemnitee).

(b)    Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any Real Estate of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Real Estate or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Real Estate or natural resource or any real property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Real Estate of any Related Person through any foreclosure action, in each case except and to the extent such Environmental Liabilities (i) resulted from the gross negligence or willful misconduct of any Indemnitee, or (ii) (A) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (B) are attributable solely to any acts of such Indemnitee.

9.7    <u>Marshaling; Payments Set Aside</u>.  No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from the Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8    <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9, and provided further that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9    <u>Assignments and Participations; Binding Effect</u>.

(a)  <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Holdings, the Borrower, the other Credit Parties hereto (in each case except for <u>Article VIII</u>), Agent and each Lender receiving the benefits of the Loan Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in <u>Section 8.9</u>), none of Holdings, the Borrower, any other Credit Party or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)  <u>Right to Assign</u>.  Each Lender may sell, transfer, negotiate or assign (a "<u>Sale</u>") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans) to (i) any existing Lender, (ii) any Affiliate or Approved Fund of any existing Lender of (iii) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to, as long as no Event of Default is continuing, the Borrower (which acceptances of Borrower shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed Sale is delivered to Borrower); provided, that no such Sale may be made to any Credit Party or any Affiliate thereof.  Notwithstanding the foregoing, (w) such Sales do not have to be ratable between the Term Loans but must be ratable among the obligations owing to and owed by such Lender with respect to the Term Loans, (x) for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans and Commitments subject to any such Sale shall be in a minimum amount of $5,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender or a Fund Affiliate, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of the Borrower (to the extent Borrower's consent is otherwise required), (y) interest accrued, other than any interest that is payable-in-kind, prior to and through the date of any such Sale may not be assigned, and (z) such Sales by Non-Funding Lenders shall be subject to Required Lenders' (and so long as no Event of Default is continuing, Borrower's) prior written consent in all instances. Notwithstanding anything to the contrary herein or in any Loan Document, no assignment of any Loans or rights and obligations hereunder may be made to natural persons, Holdings and its Subsidiaries or any other Fund Affiliate.

(c)  <u>Procedure</u>.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent and Borrower but without requiring any indemnity or bond in connection therewith), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided that (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one

assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent). Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iv) of subsection (b) upon Required Lenders (and the Borrower, if applicable) consenting to such Assignment, from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)    Effectiveness. Subject to the recording of an Assignment by Agent in the Register pursuant to subsection 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and, subject to Section 9.20(c)(iii), be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)    Grant of Security Interests. In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board) or any other central bank, without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, without notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder; provided further, that the Borrower and Agent shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents.

(f)    Participants and SPVs. In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or the Borrower, sell participations to one or more Persons (other than any natural persons, Holdings and its Subsidiaries or any other Fund Affiliate) in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Term Loan); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of

such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X as if it were a Lender, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such Lender is required to collect pursuant to subsection 10.1(f) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation (except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof occurs after such grant or participation is made) and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) (solely with respect to reductions of interest (including any default interest)) of subsection 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of subsection 9.1(a). No party hereto shall institute (and the Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant or SPV and the principal amounts (and stated interest) of each participant or SPV's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or SPV or any information relating to a participant or SPV's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For

the avoidance of doubt, Agent (in its capacity as the administrative agent) shall have no responsibility for maintaining a Participant Register.

9.10    Non-Public Information; Confidentiality.

(a)    Non-Public Information. Agent and each Lender acknowledges and agrees that it may receive material non-public information ("MNPI") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state securities laws and regulations).

(b)    Confidential Information. Each Lender and Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document for a period of two (2) years following the date on which this Agreement terminates in accordance with the terms hereof, except that such information may be disclosed (i) with the Borrower's consent, (ii) to Related Persons of such Lender or Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof (provided that such Lender or Agent shall be responsible for its Related Person's compliance with this Section 9.10(b), (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender or Agent or any of their Related Persons, as the case may be, on a non-confidential basis, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions or other obligations of confidentiality, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements (vi)(A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties and is permitted by the immediately following paragraph, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants, direct or contractual counterparties to any Secured Rate Contracts and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) in connection with the exercise or enforcement of any right or remedy under any Loan Document (ix) in connection with any litigation or other proceeding to which such Lender or Agent or any of their Related Persons is a party or bound; provided that, in the case of this clause (ix) such Lender or Agent shall promptly notify the Borrower to the extent permitted by applicable law, and (x) to the extent permitted by the immediately following paragraph or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender or Agent or any of their Related Persons.

(c)    In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(d)　　Tombstones.  Each Credit Party consents to the publication by Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Credit Party's name, product photographs, logo or trademark.  Agent or such Lender shall provide a draft of any advertising material to the Borrower for review and comment prior to the publication thereof.

(e)　　Press Release and Related Matters.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to the Lenders or of any of their Affiliates, the Loan Documents or any transaction contemplated therein to which Agent is party without the prior consent of the Lenders except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the Lenders.

(f)　　Distribution of Materials to Lenders.  The Credit Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "Borrower Materials") may be disseminated by, or on behalf of, Agent, and made available, to the Lenders by posting such Borrower Materials on an E-System.  The Credit Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(g)　　Material Non-Public Information.  The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has publicly traded equity or debt securities in the U.S., they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of U.S. federal and state securities laws as "PUBLIC".  The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent and the Lenders shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of U.S. federal and state securities laws.  The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI:  (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Credit Parties or Agent (including, Notices of Borrowing, Notices of Conversion/Continuation and any similar requests or notices posted on or through an E-System).  Before distribution of the Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11　Set-off; Sharing of Payments.

(a)　　Right of Setoff.  Each of Agent, each Lender and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each

of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final, but excluding payroll, employee benefits, tax withholding and fiduciary accounts) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  No Lender shall exercise any such right of setoff without the prior consent of Agent or Required Lenders.  Each of Agent and each Lender agrees promptly to notify the Borrower and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  If a Non-Funding Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in subsection 1.11(b).

9.12   Counterparts; Facsimile Signature  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13   Severability.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or

impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14    Captions.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    Independence of Provisions.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation.  This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    No Third Parties Benefited.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the Lenders, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement.

(b)    Submission to Jurisdiction.  In the event the Bankruptcy Court does not have or refuses to exercise jurisdiction with respect thereto, any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of New York located in New York County, New York or the courts of the United States for the Southern District of New York and, by execution and delivery of this Agreement, the Borrower and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based

on the grounds of forum *non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)     <u>Service of Process</u>.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     <u>Non-Exclusive Jurisdiction</u>.  Nothing contained in this <u>Section 9.18</u> shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19     <u>Waiver of Jury Trial</u>.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20     <u>Entire Agreement; Release; Survival</u>.

(a)     THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE FEE LETTERS.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     Execution of this Agreement by the parties hereto constitutes a full, complete and irrevocable release of any and all claims which each such party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.  In no event shall any party hereto or any of their respective Affiliates, directors, officers, employees, advisors or agents be

liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings) as opposed to actual or direct damages. Each of the parties signatory hereto hereby waives, releases and agrees (and shall cause each of their Affiliates, directors, officers, employees, advisors and agents to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, as opposed to actual or direct damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     Any indemnification or other protection provided to any Indemnitee pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses), 9.6 (Indemnity) and 9.10 (Non-Public Information; Confidentiality), and Articles VIII (Agent) and X (Taxes, Yield Protection and Illegality), in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns and (iii) the provisions set forth in the last paragraph of Section 9.10 (Non-Public Information; Confidentiality) shall survive any permitted assignment hereunder and shall bind any assignor (as well as any assignee) for the term set forth therein.

9.21    <u>Patriot Act</u>. Each Lender that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

9.22    <u>Replacement of Lender</u>.

(a)     Within forty-five days after:  (i) receipt by the Borrower of written notice and demand from any Lender (an "<u>Affected Lender</u>") for payment of additional costs as provided in <u>Sections 10.1</u>, <u>10.3</u> and/or <u>10.6</u>; (ii) any default by a Lender in its obligation to make Loan hereunder after all conditions thereto have been satisfied or waived in accordance with the terms hereof, provided such default shall not have been cured; or (iii) any failure by any Lender to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, the Borrower may, at their option, notify Agent and such Affected Lender (or such defaulting or non-consenting Lender, as the case may be) of the Borrower' intention to obtain, at the Borrower' expense, a replacement Lender ("<u>Replacement Lender</u>") for such Affected Lender (or such defaulting or non-consenting Lender, as the case may be), which Replacement Lender shall be reasonably satisfactory to Required Lenders.  In the event the Borrower obtain a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender (or defaulting or non-consenting Lender, as the case may be) shall sell and assign its Loans and Commitments to such Replacement Lender, at par, provided that the Borrower have reimbursed such Affected Lender for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment.  In the event that a replaced Lender does not execute an Assignment pursuant to <u>Section 9.9</u> within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this <u>Section 9.22</u> and presentation to such replaced Lender of an

Assignment evidencing an assignment pursuant to this <u>Section 9.22</u>, the Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by the Borrower, the Replacement Lender and Agent, shall be effective for purposes of this <u>Section 9.22</u> and <u>Section 9.9</u>.   Notwithstanding the foregoing, with respect to a Lender that is a Non-Funding Lender or an Impacted Lender, the Borrower or Agent may obtain a Replacement Lender and execute an Assignment on behalf of such Non-Funding Lender or an Impacted Lender at any time and without prior notice to such Non-Funding Lender or an Impacted Lender and cause its Loans and Commitments to be sold and assigned at par.   Upon any such assignment and payment and compliance with the other provisions of <u>Section 9.9</u>, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such replaced Lender to indemnification hereunder shall survive as to such replaced Lender.

9.23   <u>Joint and Several</u>.  The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.

9.24   <u>Creditor-Debtor Relationship</u>.  The relationship between Agent and each Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25   <u>Credit Bid</u>.  Notwithstanding anything to the contrary in this Agreement, Agent shall make a Credit Bid of the Obligations with the prior written consent of the Required Lenders, and any such Credit Bid shall be at the direction of the Lenders providing consent thereto.

9.26   <u>[Reserved]</u>.

9.27   <u>Incorporation of DIP Orders by Reference</u>.  Each of the Credit Parties, the Agent and the Lenders agrees that any reference contained herein to (i) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (ii) the Final DIP Order shall include all terms, conditions, and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes.   To the extent there is any inconsistency between the terms of this Agreement and the terms of either the Interim DIP Order or the Final DIP Order, the terms of the Interim DIP Order and the Final DIP Order, as applicable, shall govern.

9.28   <u>Right to Publicize and Advertise</u>.  Subject to <u>Section 9.10</u> hereof, the Agent and each Lender may, without consent of any Credit Party, publicly disclose its lending relationship with the Credit Parties, the identity of the Credit Parties, the Commitments, and such other information as is publicly disclosed by any Credit Party through any filing with the Bankruptcy Court.

## ARTICLE X

## TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    <u>Taxes</u>.

(a)     Except as otherwise provided in this <u>Section 10.1</u>, each payment by any Credit Party to any Secured Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings imposed by any Governmental Authority and all penalties and interest with respect thereto imposed pursuant to an applicable Requirement of Law (and without deduction for any of them) (collectively, but excluding the taxes set forth in clauses (i) through (iv) below, the "Taxes") other than for the following imposed on any payments by a Credit Party:  (i) taxes imposed on or measured by overall net income (however denominated, including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party by the jurisdiction (or any political subdivision thereof) in which such Secured Party is organized, maintains its principal office or applicable Lending Office, or by reason of any connection between the jurisdiction imposing such tax and such Secured Party (or its applicable Lending Office) other than a connection arising solely from such Secured Party having executed, delivered or performed its obligations under, received payment under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document, (ii) U.S. federal withholding taxes that are required to be imposed or withheld on amounts payable to any Secured Party pursuant to any Requirement of Law in force at the time such Secured Party became a Secured Party under this Agreement (or designates a new Lending Office other than at the request of a Credit Party), except in each case to the extent such Secured Party is a direct or indirect assignee (other than pursuant to <u>Section 9.22</u>) of any other Secured Party that was entitled, at the time the assignment to such assignee Secured Party became effective, or such Secured Party was entitled at the time of designation of a new Lending Office, to receive additional amounts under this clause (a) or (iii) taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law after the date Agent or any Lender, as applicable, becomes a party to this Agreement or designates a new Lending Office) by Agent or any Lender to deliver the documentation required to be delivered pursuant to clause (f) below, or (iv) taxes imposed on amounts payable by any Credit Party under FATCA (such items described in clauses (i) through (iv) above, "<u>Excluded Taxes</u>").

(b)     If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this <u>Section 10.1</u>), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the applicable withholding agent shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent; provided, however, that no such increase shall be made with respect to, and no Credit Party shall

be required to indemnify any Secured Party pursuant to clause (d) below for any U.S. federal backup withholding tax required by the Code to be withheld from amounts payable to a Secured Party that is subject to backup withholding due to (A) notified payee underreporting of reportable interest or dividend payments or other reportable payments or (B) the IRS notifying Agent or the Borrower that the furnished taxpayer identification number is incorrect.

(c)     In addition, the Credit Parties agree to pay any stamp, documentary, intangible, recording, filing, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "Other Taxes").   Within 30 days after the date of any payment of Other Taxes by any Credit Party, such Credit Party shall furnish to Agent, at its address referred to in Section 10.2, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)     The Credit Parties shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts paid or payable under this Section 10.1) paid or payable by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder and delivered to the Borrower with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error.  In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

(e)     Any Lender claiming any additional amounts payable pursuant to this Section 10.1 or Section 10.3 shall, if requested by the Borrower, use its commercially reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(f)     Lender Forms.

(i)     Each Non-U.S. Lender Party, at any of the following times, shall, to the extent it is legally entitled to do so, (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two duly completed copies of each of the following, as applicable, certifying such Non-U.S. Lender Party's entitlement to a zero rate of, or a complete exemption from, U.S. federal withholding tax on all payments to such Non-U.S.

Lender Party under any Loan Document:  (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a zero rate of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that any interest payment received by such Non-U.S. Lender Party hereunder or under any other Loan Document is not effectively connected with the conduct of a trade or business in the United States and such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by applicable Requirements of Law and/or the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from, or zero rate of, U.S. withholding tax with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents.  Notwithstanding anything to the contrary in this paragraph (f), the completion, execution and submission of such documentation (other than the documentation set forth in Section 10.1(f)(i)(A), (f)(i)(B), (f)(ii) and (f)(iii)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Subject to Section 10.1(a), unless the Borrower and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to U.S. federal withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)     Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by the Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two duly completed copies of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding) or any successor form.

(iii)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Non-U.S. Lender Party were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Non-U.S. Lender Party shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Agent such documentation prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Agent as may be necessary for the Borrower and Agent to comply with their obligations under FATCA and to

determine that such Non-U.S. Lender Party has complied with such Non-U.S. Lender Party's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)     Each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Taxes (other than Excluded Taxes) attributable to such Lender (but only to the extent that any Credit Party has not already indemnified Agent for such Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.9(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to Lender from any other source against any amount due to Agent under this paragraph (g).

(h)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 10.1 (including by the payment of additional amounts pursuant to this Section 10.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     For purposes of this Section 10.1, the term "Requirement of Law" includes FATCA.

(j)     Agent and any successor thereto shall deliver to the Borrower on or prior to the date on which it becomes the Agent under this Agreement (and from time to time thereafter upon request of the Borrower) two duly executed copies of the documentation prescribed in clause (A) or (B) below, as applicable (together with all required attachments

thereto): (A) if the Agent is a U.S. Person, executed copies of IRS Form W-9 certifying that such Agent is exempt from U.S. federal backup withholding tax, or (B) if the Agent is not a U.S. Person, (I) with respect to any payments to be received on its own behalf, executed copies of IRS Form W-8ECI or W-8BEN-E, as applicable, and (II) with respect to payments received on account of any Lender, executed copies of IRS Form W-8IMY (or any successor form) together with all required attachments and backup documentation (including, without limitation, a withholding statement and all other applicable certification and any forms pursuant to this Section 10.1(j) provided by a Lender or any other person for which Agent is acting as an intermediary) reasonably required by the Borrower Representative so that the Loan Parties may comply with any applicable withholding and information reporting obligations. Agent agrees that if any form or certification it previously delivered (including documentation with respect to any Lender) pursuant to this Section 10.1(j) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative in writing of its legal inability to do.

10.2    _Illegality._  If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make LIBOR Rate Loans, then, on notice thereof by such Lender to the Borrower through Agent, the obligation of that Lender to make LIBOR Rate Loans shall be suspended until such Lender shall have notified Agent and the Borrower that the circumstances giving rise to such determination no longer exists.

(a)    Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any LIBOR Rate Loan, the Borrower shall prepay in full all LIBOR Rate Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, together with any amounts required to be paid in connection therewith pursuant to Section 10.4.

(b)    If the obligation of any Lender to make or maintain LIBOR Rate Loans has been terminated, the Borrower may elect, by giving notice to such Lender through Agent that all Loans which would otherwise be made by any such Lender as LIBOR Rate Loans shall be instead Base Rate Loans.

(c)    Before giving any notice to Agent pursuant to this Section 10.2, the affected Lender shall designate a different Lending Office with respect to its LIBOR Rate Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Lender, be illegal or otherwise disadvantageous to the Lender.

10.3    Increased Costs and Reduction of Return.

(a)    If any Lender shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any law or regulation or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not

having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any LIBOR Rate Loans, or shall subject such Lender to any taxes, levies, imposts, deductions, charges or withholdings, including any interest or penalties applicable thereto (other than (A) Taxes covered by Section 10.1 and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, then the Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender, additional amounts as are sufficient to compensate such Lender for such increased costs; provided, that the Borrower shall not be required to compensate any Lender pursuant to this subsection (a) for any increased costs incurred more than 180 days prior to the date that such Lender notifies the Borrower, in writing of the increased costs and of such Lender's intention to claim compensation therefor; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

        (b)      If any Lender shall have determined that:

            (i)      the introduction of any Capital Adequacy Regulation;

            (ii)      any change in any Capital Adequacy Regulation;

            (iii)      any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

            (iv)      compliance by such Lender (or its Lending Office) or any entity controlling the Lender, with any Capital Adequacy Regulation;

affects the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy or liquidity and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender (with a copy to Agent), the Borrower shall pay to such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender (or the entity controlling the Lender) for such increase; provided, that the Borrower shall not be required to compensate any Lender pursuant to this subsection 10.3(b) for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower, in writing of the amounts and of such Lender's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any

successor or similar authority) or the United States of America or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III, shall, in each case, be deemed to be a change in law under subsection (a) above and/or a change in a Capital Adequacy Regulation under subsection (b) above, as applicable, regardless of the date enacted, adopted or issued.

10.4     Funding Losses.  The Borrower agree to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a)     the failure of the Borrower to make any payment or mandatory prepayment of principal of any LIBOR Rate Loan (including payments made after any acceleration thereof);

(b)     the failure of the Borrower to borrow, continue or convert a Loan after the Borrower has given (or is deemed to have given) a Notice of Borrowing or a Notice of Conversion/Continuation;

(c)     the failure of the Borrower to make any prepayment after the Borrower have given a notice in accordance with Section 1.7;

(d)     the prepayment (including pursuant to Section 1.8) of a LIBOR Rate Loan on a day which is not the last day of the Interest Period with respect thereto; or

(e)     the conversion pursuant to Section 1.6 of any LIBOR Rate Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained; provided that, with respect to the expenses described in clauses (d) and (e) above, such Lender shall have notified Agent of any such expense within two (2) Business Days of the date on which such expense was incurred.  Solely for purposes of calculating amounts payable by the Borrower to the Lenders under this Section 10.4 and under subsection 10.3(a):  each LIBOR Rate Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR used in determining the interest rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan is in fact so funded.

10.5     Inability to Determine Rates.  If Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate Loan or that the LIBOR applicable pursuant to subsection 1.3(a) for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to the Lenders of funding or maintaining such Loan, Agent will forthwith give notice of such determination to the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans hereunder shall be suspended until Agent revokes such notice in writing. Upon receipt of such notice, the Borrower may revoke any Notice of Borrowing or Notice of Conversion/Continuation then submitted by it.  If the Borrower does not revoke such notice, the

Lenders shall make, convert or continue the Loans, as proposed by the Borrower, in the amount specified in the applicable notice submitted by the Borrower, but such Loans shall be made, converted or continued as Base Rate Loans.

10.6     Reserves on LIBOR Rate Loans.  The Borrower shall pay to each Lender, as long as such Lender shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional costs on the unpaid principal amount of each LIBOR Rate Loan equal to actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), payable on each date on which interest is payable on such Loan provided the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to Agent) of such additional interest from the Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest shall be payable fifteen (15) days from receipt of such notice.

10.7     Certificates of Lenders  Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to the Borrower (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

ARTICLE XI

[RESERVED]

ARTICLE XII

COLLATERAL

12.1     Grant of Security Interest.

(a)     As security for all Secured Obligations, each Credit Party hereby collaterally assigns and grants to Secured Parties, a continuing first priority (subject to the Carve-Out and subject to clause (b) below) security interest in all property and assets of such Credit Party, whether now owned or existing or hereafter acquired or arising, regardless of where located, including the following:

(i)     all accounts, other payment intangibles, chattel paper, deposit accounts, securities accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, contract rights and any supporting obligations related to any of the foregoing;

(ii)     all commercial tort claims;

(iii)     all books and records pertaining to the other property described in this Section 12.1(a);

(iv)    all property of such Credit Party held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party or as to which such Credit Party may have any right or power, including but not limited to cash and Cash Equivalents;

(v)    all other goods (including but not limited to fixtures) and personal property of such Credit Party, whether tangible or intangible and wherever located;

(vi)    all Intellectual Property;

(vii)    all Pledged Stock;

(viii)    all Real Estate and real property interests including leasehold interests and

(ix)    to the extent not otherwise included, any and all proceeds of the foregoing.

All of the foregoing is herein collectively referred to as the "Collateral."; provided that notwithstanding anything herein to the contrary, in no event shall the Collateral (or any component term thereof) include or be deemed to include any Excluded Property.

(b)    Subject to the Carve-Out, pursuant to Bankruptcy Code Section 364(c)(1), the Agent and the Secured Parties have been granted a superpriority administrative claim over any and all administrative claims of the type specified in Bankruptcy Code Section 503(b) and 507(b).  As collateral for the Loans and security for the full and timely payment and performance of all Secured Obligations when due (whether at stated maturity, by acceleration or otherwise), the Agent, for the benefit of the Secured Parties, is hereby granted (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on the Collateral that is otherwise unencumbered as of the commencement of the Credit Parties' Cases, but not including avoidance actions under Sections 544-553 of the Bankruptcy Code or the proceeds therefrom; (ii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on all Collateral of the Credit Parties (other than the assets referred to in the following clause), junior only to the valid, perfected and non-avoidable Liens on such assets as of the Petition Date and to valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected senior priming Lien on all of the Credit Parties' Collateral that is subject to the Permitted Liens.

12.2    Perfection and Protection of Security Interest.

(a)    Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Credit Party shall, as applicable, at such Credit Party's expense, perform all steps reasonably requested by the Agent or the Lenders at any time to perfect, maintain, protect, and enforce the DIP Liens, including: upon an Event of Default, delivering to the Agent (who shall hold on behalf of the other Secured Parties) (1) the originals of all certificated Investment Property, instruments,

documents, and chattel paper, and all other Collateral of which the Required Lenders reasonably determine the Agent should have physical possession in order to perfect and protect the Agent's security interest therein, duly pledged, endorsed, or assigned to the Agent without restriction and (2) certificates of title (excluding deeds for real estate) covering any portion of the Collateral for which certificates of title have been issued and (3) all letters of credit on which such Credit Party is named beneficiary.

(b)    Each Credit Party shall deliver, or cause to be delivered, Control Agreements in favor of the Agent with respect to any deposit account, securities account or commodities account (other than with respect to any Excluded Accounts) held by any Credit Party, as applicable, at the request of the Required Lenders.

(c)    To the fullest extent permitted by applicable law, the Lenders may file one or more financing statements disclosing the DIP Liens on the Collateral.

(d)    To the extent any Credit Party owns any Investment Property, such Credit Party agrees as follows with respect to such Investment Property:

(i)    All cash dividends, cash distributions, and other cash or cash equivalents in respect of such Investment Property at any time payable or deliverable to such Credit Party shall be deposited into the Cash Collateral Account.

(ii)    Such Credit Party will not acknowledge any transfer or encumbrance in respect of such Investment Property to or in favor of any Person other than the Agent or a Person designated by the Agent in writing.

(e)    In the event that a motion for dismissal from any of the Credit Parties' Cases is filed with respect to any Subsidiary and such Credit Party, and to the extent the Stock of such Subsidiary is in certificated form, such Credit Party shall deliver all certificates or instruments at any time representing or evidencing such Stock in such Subsidiary to the Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance reasonably satisfactory to the Agent.  The Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Agent or its nominee any Stock in such Subsidiary.  In addition, the Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Stock of such Subsidiaries for certificates or instruments of smaller or larger denominations.

12.3    <u>Delivery of Mortgages</u>.  Upon request from the Required Lenders, the applicable Credit Party shall deliver mortgages (including leasehold mortgages) with respect to each Property constituting Collateral in a form reasonably satisfactory to the Required Lenders necessary to create or record a Lien on the applicable Property and other real estate in the appropriate jurisdiction.

12.4    <u>Title to, Liens on, and Use of Collateral</u>.  Each Credit Party represents and warrants to the Agent and the Lenders and agrees with the Agent and the Lenders that:  (a) all of the Collateral owned by such Credit Party is and will (subject to dispositions permitted hereunder) continue to be owned by such Credit Party free and clear of all Liens whatsoever,

except for Permitted Liens, (b) the DIP Liens in the Collateral will not be junior in priority to any Lien other than the Carve-Out (to the extent, and only to the extent, set forth in the DIP Orders), and (c) such Credit Party will use, store, and maintain the Collateral owned by such Credit Party consistent with past practice.  The inclusion of proceeds in the Collateral shall not be deemed to constitute the Agent's or any Lender's consent to any sale or other disposition of the Collateral except as expressly permitted herein.

 12.5 <u>[Reserved]</u>.

 12.6 <u>Right to Cure</u>.  Upon the occurrence and during the continuance of an Event of Default, the Agent shall have the right to, at the written direction of the Required Lenders under Article 11 and upon ten (10) days' notice to the applicable Credit Party, pay any amount or do any act required of any Credit Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Advances) in order to preserve, protect, maintain, or enforce the Secured Obligations, the Collateral, or the DIP Liens therein, and which any Credit Party fails to pay or do, including payment of any judgment against any Credit Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral; provided that neither the Agent nor the Lenders shall pay any amount (i) being diligently contested by appropriate proceedings or (ii) in respect of any Permitted Lien.  All payments that the Agent makes under this Section 12.6 and all out-of-pocket costs and expenses (other than Taxes) that the Agent pays or incurs in connection with any reasonable action taken by it hereunder shall be considered part of the Secured Obligations and shall bear interest until repaid at the rate set forth in Section 1.3.  Any payment made or other action taken by the Agent under this Section 12.6 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

 12.7 <u>Power of Attorney</u>.  Upon the occurrence of and during the continuance of an Event of Default, each Credit Party hereby appoints the Agent and the Agent's designee(s) as such Credit Party's attorney to sign such Credit Party's name on any invoice, bill of lading, warehouse receipt, or other document of title relating to any Collateral, on drafts against customers, on assignments of Accounts, on notices of assignment, financing statements, and other public records and to file any such financing statements permitted under this Agreement by electronic means with or without a signature as authorized or required by applicable law or filing procedure.  Each Credit Party ratifies and approves all acts of such attorney.  This power, being coupled with an interest, is irrevocable until this Agreement has been terminated and the non-contingent Secured Obligations have been fully satisfied.

 12.8 <u>The Agent's and Lenders' Rights, Duties, and Liabilities.</u>  The Credit Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Secured Obligations shall not be affected by any failure of the Agent or any Lender to take any steps to perfect the DIP Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Credit Party from any of the Secured Obligations.

 12.9 <u>Site Visits, Observations, and Testing</u>.  In addition to the rights granted pursuant to <u>Section 4.9</u>, the Agent, the Lenders and their representatives will have the right at any

commercially reasonable time, and upon reasonable advance notice to the applicable Credit Party to enter and visit the Properties of any Credit Party constituting or containing Collateral for the purposes of observing or inspecting such Collateral. The Agent may examine, audit and make copies of any and all of the Credit Parties' books and records and the Collateral and discuss the Credit Parties' affairs with executive officers or managers of any Credit Party. No site visit, observation, or inspection by the Agent will result in a waiver of any Default or Event of Default or impose any liability on the Agent or the Lenders other than for damages incurred as a result of the gross negligence, willful misconduct, bad faith or breach of the Loan Documents by the Agent or any Lender as determined by a final, non-appealable order of a court of competent jurisdiction. The Agent will make reasonable efforts to avoid interfering with any use of such Properties or any other property in exercising any rights provided hereunder. The Lenders agree to indemnify, defend and hold harmless, pro rata, such Credit Party from any loss or liability arising from damages caused to the Properties or any personal property by the Lender's representatives' actions taken hereunder.

12.10   <u>Rights in Respect of Investment Property</u>.

(a)   During the existence of an Event of Default, subject to any order of the Bankruptcy Court and the Bankruptcy Code, (i) the Agent at the direction of the Required Lenders may, upon written notice to the relevant Credit Party, transfer or register in the name of the Agent or any of its nominees, for the benefit of the Agent and the Lenders, any or all of the Collateral consisting of Pledged Stock and  Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies, and claims of any Credit Party with respect thereto (collectively, the "<u>Pledged Collateral</u>") held by the Agent hereunder, and the Agent or its nominee may thereafter, after written notice to the applicable Credit Party, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Agent of any right, privilege, or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Agent shall have no duty to exercise any of the aforesaid rights, privileges, or options, and the Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under any requirements of law, after the Agent's giving of the notice specified in clause (i) of this Section 12.10(a), all rights of any Credit Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest, and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended  (excluding any Permitted Tax Distributions permitted under <u>Section 5.11(c)</u>) until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions, (iii) all dividends, interest, and other

distributions which are received by any Credit Party contrary to the provisions of this Section 12.10(a) shall be received in trust for the benefit of the Agent, shall be forthwith deposited into the Cash Collateral Accounts as Collateral in the same form as so received (with any necessary endorsement), and (iv) each Credit Party shall execute and deliver (or cause to be executed and delivered) to the Agent all such proxies and other instruments as the Agent or a Lender may reasonably request for the purpose of enabling the Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this Section 12.10(a) and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this Section 12.10(a).

(b)     Proxies.  Each Grantor hereby appoints the Agent as such Grantor's true and lawful attorney-in-fact, with full power of substitution, and grants to the Agent this **IRREVOCABLE PROXY**, to vote all or any part of the Pledged Stock and other Investment Property from time to time following the occurrence and during the continuance of an Event of Default, in each case in any manner the Agent deems advisable in its sole discretion for or against any or all matters submitted, or which may be submitted, to a vote of shareholders (including holders of any Stock of any Issuer), partners or members, as the case may be, and to exercise all other rights, powers, privileges and remedies to which any such shareholders (including holders of any Stock of any Issuer), partners or members would be entitled (including, without limitation, giving or withholding written consents of holders of Stock of Borrower, calling special meetings of the holders of the Stock of any Issuer and voting at such meetings). The power-of-attorney and irrevocable proxy granted hereby are effective automatically upon the occurrence and continuance of an Event of Default without the necessity that any action (including, without limitation, that any transfer of any of the Pledged Stock or other Investment Property be recorded on the books and records of the relevant Borrower) be taken by any Person (including the relevant Borrower of any Pledged Stock or other Investment Property or any officer or agent thereof), are coupled with an interest and shall be irrevocable, shall survive the bankruptcy, dissolution or winding up of any relevant Grantor, and shall terminate upon the payment in full in cash of the Secured Obligations.

12.11   No Filings Required.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Orders.  The Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Order.

12.12   Adequate Protection.  The Agent, the Lenders and the other Secured Parties have been granted adequate protection, in the form of replacement liens, in accordance with the DIP Order to the extent of any diminution in the value of the Collateral as of the Petition Date, including but not limited to any diminution in value resulting from (i) the use, sale or lease of Collateral pursuant to Bankruptcy Code Section 363(c), including for the payment of Professional Fees, (ii) the grant of the priming liens to the Lenders under Bankruptcy Code section 364(d), or (iii) the imposition of the Automatic Stay pursuant to Bankruptcy Code section 362(a), including for the continued operation of the business of the Credit Parties.

## ARTICLE XIII

## GUARANTY

13.1    <u>Guaranty; Limitation of Liability</u>.

(a)    Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Credit Party now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "Guaranteed Obligations"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel but excluding allocated costs of in-house counsel) incurred by the Agent or any Lender in enforcing any rights under this Guaranty or any other Loan Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Credit Party to the Agent or any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Credit Party.

(b)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Agent or any Lender under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Agent and the Lenders under or in respect of the Loan Documents.

13.2    <u>Guaranty Absolute</u>.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agent or any Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Credit Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Credit Party or whether the Borrower or any other Credit Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any provision under this Agreement, any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Credit Party under or in respect of the Loan Documents, or any other amendment or waiver of or any

consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Credit Party or otherwise;

(c)      any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)      any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Credit Party under the Loan Documents or any other assets of any Credit Party;

(e)      any change, restructuring or termination of the corporate structure or existence of any Credit Party;

(f)      any failure of the Agent or any Lender to disclose to any Credit Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Credit Party now or hereafter known to the Agent or such Lender, as the case may be (each Guarantor waiving any duty on the part of the Agent and the Lenders to disclose such information);

(g)      the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations; or

(h)      any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Credit Party or any other guarantor or surety, in its capacity as a guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agent or any Lender or any other Person, for whatever reason, all as though such payment had not been made.

13.3    <u>Waivers and Acknowledgments</u>.

(a)      Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)      Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Credit Party, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(c)     Each Guarantor acknowledges that the Agent may, to the extent permitted by applicable law, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Agent and the Lenders against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(d)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Credit Party or any of its Subsidiaries now or hereafter known by the Agent or such Lender, as the case may be.

(e)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 13.2 and this Section 13.3 are knowingly made in contemplation of such benefits.

13.4    Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Credit Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agent or any Lender against the Borrower or any other Credit Party, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any other Credit Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Commitments shall have expired or been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Agent and the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to the Agent of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and (iii) the Maturity Date shall have occurred, the Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

13.5    <u>Continuing Guaranty; Assignments</u>.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty and the termination or expiration of all Commitments, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agent and the Lenders and their respective successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Eligible Assignee that has been assigned or transferred all or any portion of a Lender's Advances, Commitments or rights and obligations under this Agreement in accordance with <u>Section 13.3</u>, shall thereupon become vested with all the benefits granted to such transferring Lender under this Guaranty.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Required Lenders.

ARTICLE XIV

DEFINITIONS

14.1    <u>Defined Terms</u>.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "Affected Lender" | 9.22 |
| "Agent Report" | 8.5(c) |
| "Approved Sale(s)" | Schedule 7.1 |
| "Bankruptcy Court" | Recitals |
| "Bidding Procedure Orders" | 2.1(d) |
| "Borrower" | Preamble |
| "Borrower Materials" | 9.10(d) |
| "Break-Up Fee" | Schedule II |
| "Case" | Recitals |
| "Collateral" | 12.1(a) |
| "Credit Bid" | Schedule II |
| "CRO" | 4.15 |
| "Declined Proceeds" | 1.8(g) |

| | |
|---|---|
| "Declining Lender" | 1.8(g) |
| "Event of Default" | 7.1 |
| "Excluded Taxes" | 10.1(a) |
| "Expense Reimbursement" | Schedule II |
| "Foreign Asset Sale" | 1.8(j) |
| "Guaranteed Obligations" | Section 13.1(a) |
| "Holdings" | Recitals |
| "Huron" | 4.15 |
| "Indemnified Matters" | 9.6 |
| "Indemnitee" | 9.6 |
| "Investment Banker and CRO Motion" | 2.1(f) |
| "Investments" | 5.4 |
| "Lease and Material Contract Rejection Motion" | 2.1(e) |
| "Lender" | Preamble |
| "Leverage Covenant" | 6.1 |
| "Maximum Lawful Rate" | 1.3(d) |
| "MNPI" | 9.10(a) |
| "Notice of Conversion/Continuation" | 1.6(a) |
| "OFAC" | 3.23 |
| "Other Equity" | 2.1(e) |
| "Other Lender" | 1.11(e) |

| | |
|---|---|
| "Other Taxes" | 10.1 |
| "Participant Register" | 9.9(f) |
| "Permitted Equity" | 2.1(e) |
| "Permitted Liens" | 5.1 |
| "Permitted Variances" | Definition of "DIP Budget" |
| "Petition Date" | Recitals |
| "Post-Petition Credit Bid" | Schedule 7.1 |
| "Pre-Petition Agent" | Schedule II |
| "Proposed DIP Budget" | 4.1(l) |
| "Register" | 1.4(b) |
| "Restricted Payments" | 5.11 |
| "Sale" | 9.9(b) |
| "Sale Milestone" | Schedule 7.1 |
| "SDN List" | 3.23 |
| "Settlement Date" | 1.11(b) |
| "Tax Returns" | 3.10 |
| "Tax Restructuring" | 5.3 |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"Acceptable Security Interest" means a security interest which (a) exists in favor of the Agent for its benefit and the ratable benefit of the Lenders, (b) has superpriority lien status and is superior to all other security interests (other than the Carve-Out), (c) secures the Secured Obligations, (d) is enforceable against the Credit Party which created such security interest and (e) is, proposed or intended to be, perfected.

"Account" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of Holdings and its Subsidiaries, including, without limitation, the unpaid portion of the obligation of a customer of Holdings or any of its Subsidiaries in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by Holdings or such

Subsidiary, as stated on the respective invoice of Holdings or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50.0%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of Holdings, or (c) a merger or consolidation or any other combination with another Person.

["Adequate Protection Liens" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.]

["Adequate Protection Obligations" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.]

["Adequate Protection Superpriority Claims" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.]

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of five percent (5%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to be an Affiliate of such Person. Notwithstanding the foregoing, neither Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.

"Agent" means KeyBank in its capacity as administrative and collateral agent for the Lenders hereunder, and any successor agent in such capacities.

"Aggregate Term Loan Commitment" means the combined Term Loan Commitments of the Lenders, as such amount may be increased or reduced from time to time pursuant to this Agreement.

"Anti-Terrorism Laws" means any Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Customs Law" means any of 31 U.S.C. §§ 3729-3733, 19 U.S.C. §§ 1592, 18 U.S.C. §§ 371, 1341, 1343, and any other provisions of Title 18 U.S.C. or Title 19 U.S.C. (in each case, together with any rules and regulations promulgated thereunder or in connection therewith), as well as any other Law (as defined in the Acquisition Agreement) that prescribes

criminal or civil sanctions in connection with, or otherwise governs or regulates (i) the importation of goods (including, without limitation, charges or duties, or the tariff or any other classification of imported goods, or the valuation of imported goods, or the origin, country of origin or any other marking of imported goods or the reporting requirements associated with the importation of goods) or (ii) misstatements, omissions or false filings of any kind or nature in connection with, or which could be applied to any of the matters described in clause (i) above.

"Applicable Margin" means, at any date, with respect to each Term Loan that is a (i) Base Rate Loan, 4.75% per annum and (ii) LIBOR Rate Loan, 7.75% per annum.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), substantially in the form of Exhibit 11.1(a) or any other form approved by Required Lenders.

"Attorney Costs" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"Auction" means the sale of substantially of all or substantially all of the Credit Parties' assets in accordance with the requirements for the Sale Process.

"Automatic Stay" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United State Code, 11 U.S.C. §§ 101 et seq. and any amendments or successor statute thereto.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Base Rate" means, for any day, a rate per annum equal to the highest of (a) the rate established by KeyBank from time to time (whether or not publicly announced) as its "Prime Rate" in the United States (which may or may not be the lowest rate charged by KeyBank for commercial loans or other extensions of credit) or, if unavailable, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), (b) the sum of 0.50% per annum and the Federal Funds Rate, and (c) the sum of (x) LIBOR calculated for each such day based on an Interest Period of one month determined two (2) Business Days prior to such day (but for the avoidance of doubt,

not less than one percent (1.00%) per annum), plus (y) one percent (1.00%).  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate or LIBOR for an Interest Period of one month.  Notwithstanding the foregoing, in no event shall the base Rate be less than 0%.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Borrowing" means a borrowing hereunder consisting of Loans made to or for the benefit of the Borrower on the same day by the Lenders pursuant to Article I.

"Business Day" means any day other than a Saturday, Sunday or other day on which federal reserve banks are authorized or required by law to close and, if the applicable Business Day relates to any LIBOR Rate Loan, a day on which dealings are carried on in the London interbank market.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy or liquidity of any Lender or of any corporation controlling a Lender.

"Capital Expenditures" shall generally mean the additions of, or expenditures related to, property, plant and equipment and other capital expenditures of the Borrower that are set forth in a consolidated statement of cash flows for the relevant period in accordance with GAAP including, among other items, investment in information technology, warehouse expansion, and store base expansion and shall be net of tenant improvement allowances; provided, that, Capital Expenditures shall exclude (i) up to $3,000,000 of Capital Expenditures for information technology and (ii) up to $2,000,000 million of Capital Expenditures for warehouse expansion.

"Capital Lease" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"Capital Lease Obligations" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases; provided, that, for the avoidance of doubt, Capital Lease Obligations" shall not include obligations or liabilities of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the Effective Date.

"Carve-Out" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable

"Cash Collateral Account" means, in respect of the Credit Parties a deposit account maintained with KeyBank into which Agent shall deposit an amount    equal to the aggregate

undrawn amount of all outstanding letters of credit under the Pre-Petition Credit Agreement , and such amount shall cash collateralize letter of credit obligations.

"Cash Equivalents" means (a) any securities (i) issued by, or fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any certificates of deposit, Dollar-denominated time deposit, repurchase agreements, reverse repurchase agreements, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"Cash Management Order" means an order, in form and substance acceptable to the Required Lenders, entered by the Bankruptcy Court with respect to the Credit Parties' use of a cash management system in accordance with the terms of this Agreement and the DIP Orders.

"Change of Control" means:

(i)     Holdings shall at any time cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of the Borrower,

(ii)     The Permitted Holders shall at any time and for any reason fail to own, directly or indirectly, at least a majority of both the economic and voting interests in Holdings' Stock and Stock Equivalents,

(iii)     Borrower shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of any of its Subsidiaries, or

(iv)     a "change of control" however so defined in any document governing any Subordinated Indebtedness, or, any term of similar effect, shall occur.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Documents" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Commitment" means, for each Lender, the sum of its Term Loan Commitments.

"Commitment Percentage" means, as to any Lender, the percentage equivalent of such Lender's Term Loan Commitment divided by the Aggregate Term Loan Commitment; provided that after all of the Term Loan has been funded, Commitment Percentages shall be determined for the Term Loan by reference to the outstanding principal balance thereof as of any date of determination rather than the Commitments therefor.

"Committee" means an official creditors' committee of creditors holding unsecured claims appointed by the Bankruptcy Court in respect of the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Control Agreement" means a tri-party deposit account, securities account or commodities account control agreement by and among the applicable Credit Party, Agent and the depository, securities intermediary or commodities intermediary, and each in form and substance reasonably satisfactory to Required Lenders and in any event providing to Agent "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"Controlled Investment Affiliates" means, with respect to each of Sponsor, any fund or investment vehicle that (i) is organized by such Person for the purpose of making investments in one or more companies and is controlled by such Person or (ii) has the same principal fund

advisor as such Person.  For purposes of this definition "control" means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

"Conversion Date" means any date on which the Borrower convert a Base Rate Loan to a LIBOR Rate Loan or a LIBOR Rate Loan to a Base Rate Loan.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in and to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit Parties" means Holdings, the Borrower and each other Person (i) which guaranties the Obligations (such Person, a "Credit Party"), (ii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations or (iii) which is required to guaranty the Obligations or grant a Lien on all or substantially all of its assets to secure payment of the Obligations under Section 4.13 or otherwise under the Loan Documents or the DIP Orders. A list of the Credit Parties as of the Effective Date is provided on Schedule **Error! Reference source not found.**.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Delayed Draw Term Loan" means any delayed draw term loan to be made on or after the Final Order Effective Date in the aggregate amount not to exceed the Delayed Draw Term Loan Commitment.

"Delayed Draw Term Loan Commitment" means on the Final Order Effective Date, with respect to each Lender, the commitment of such Lender to make Term Loans, which commitment is in the amount set forth opposite such Lender's name on Schedule 1.1(a) under the caption "Delayed Draw Term Loan Commitment", as amended to reflect Assignments.  The aggregate amount of the Delayed Draw Term Loan Commitments on the Final Order Effective Date shall be the lesser of (a) $3,000,000 and (b) such amount as approved by the Bankruptcy Court pursuant to the Final DIP Order.  It is understood and agreed that the Delayed Draw Term Loan Commitments are in addition to the Interim Term Loan Commitments and not a replacement or substitute therefor.

"DIP Budget" means the 13-week cash flow budget of anticipated and forecasted revenues and expenses and, as in effect from time to time, in form and substance reasonably satisfactory to the Required Lenders, including the Initial DIP Budget, as the same may be updated from time to time by the Borrower with the consent of the Required Lenders in their reasonable discretion pursuant to Section 4.1(l).  Any reference contained herein to compliance with the DIP Budget shall include any permitted variance permitted by Sections 4.1(j) and (k) (such permitted variance percentages, each a "Permitted Variance" and collectively, the "Permitted Variances").

"DIP Liens" means an Acceptable Security Interest in the Collateral granted to the Agent and each of the Lenders pursuant to this Agreement, the other Loan Documents and the DIP Orders.

"DIP Orders" means the Interim DIP Order, the Final DIP Order and any amendment, modification or supplement thereto in form and substance acceptable to the Required Lenders.

"Disposition" means (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under Section 5.2 (but the term "Dispositions" shall include dispositions under subsections 5.2(f)(ii), and 5.2(v)), and (b) the sale or transfer by Holdings, the Borrower or any Subsidiary of the Borrower of any Stock or Stock Equivalent issued by any Subsidiary of the Borrower.

"Disqualified Stock" means any Stock which, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Stock), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Stock), in whole or in part (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Stock that would constitute Disqualified Stock, in each case, prior to the date that is one hundred eighty (180) days after the Maturity Date.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

"Effective Date" means March [___], 2019.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"Environmental Laws" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of occupational health and safety, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes. Environmental Laws shall include the Federal Insecticide, Fungicide and Rodenticide Act, Resource Conservation & Recovery Act, Clean Water Act, Oil Pollution Act, Safe Drinking Water Act, Atomic Energy Act, Occupational Safety and Health Act, Toxic Substances Control

Act, Clean Air Act, Comprehensive Environmental Response, Compensation and Liability Act, Emergency Planning and Community Right-to-Know Act, Hazardous Materials Transportation Act and all analogous or related federal, state, local, or foreign laws, each as amended.

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and Attorneys' Costs) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any Release of Hazardous Materials and resulting from the ownership, lease, sublease or other operation or occupation of Real Estate by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"Equity Issuance" means any issuance or sale by Holdings (or any direct or indirect parent of Holdings if the cash proceeds of such Equity Issuance are contributed to Holdings), the Borrower or any of their respective Subsidiaries of any Stock of Holdings (or any direct or indirect parent of Holdings if the cash proceeds of such Equity Issuance are contributed to Holdings), the Borrower or any such Subsidiary, as applicable, except in each case for (a) any issuance or sale by any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings, (b) any issuance of directors' qualifying shares, (c) sales or issuances of Qualified Stock of Holdings (or any direct or indirect parent of Holdings) to management or employees of Holdings, the Borrower or any Subsidiary under any employee stock option or stock purchase plan or employee benefit plan in existence from time to time, (d) sales or issuances in connection with any Investment, (e) sales or issuances, the proceeds of which are used to fund Capital Expenditures, (f) sales or issuances of Qualified Stock of Holdings (or any direct or indirect parent of Holdings if the cash proceeds of such Equity Issuance are contributed to Holdings) to management of Holdings, the Borrower or any of its Subsidiaries, (g) [reserved] and (h) any issuance or sale of Disqualified Stock.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following:  (a) a reportable event described in Section 4043(b) of ERISA (unless the 30-day notice requirement has been duly waived under the applicable regulations) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or

Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code to qualify thereunder; (j) the failure of any Title IV Plan to satisfy the minimum funding standards (within the meaning of Section 412 or 430 of the Code or Section 302 of ERISA) applicable to such Title IV Plan, whether or not waived, or a Title IV plan being in "at risk" status within the meaning of Section 430 of the Code or Section 303 of ERISA; (k) a Multiemployer Plan being in "endangered status" or "critical status" within the meaning of Section 432 of the Code or Section 305 of ERISA; (l) the existence with respect to any Benefit Plan of a material non-exempt prohibited transaction, within the meaning of Section 406 of ERISA or Section 4975 of the Code; (m) the failure of any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to withdrawal liability under Section 4201 of ERISA; (n) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent; or (o) with respect to any Benefit Plan that is not governed by the laws of the United States, (A) the failure to make or, if applicable accrue in accordance with normal accounting practices, any material employer or employee contributions required by applicable law or by the terms of such Benefit Plan; (B) the failure to register or loss of good standing with applicable regulatory authorities of any such Benefit Plan required to be registered; or (C) the failure of any such Benefit Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Benefit Plan.

"Event of Loss" means, with respect to any Property, any of the following:  (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"Excluded Subsidiary" means any Subsidiary of the Borrower that is:

(i) a controlled foreign corporation (a "CFC") as defined in Section 957 of the Code,

(ii) a Domestic Subsidiary that is owned, directly or indirectly, by a Foreign Subsidiary that is a CFC, or

(iii) any Subsidiary where substantially all of its assets consist solely of equity interests in one or more Foreign Subsidiaries that are CFCs and that conducts no business other than holding such equity interests.

"Excluded Accounts" means (a) trust accounts, (b) payroll accounts, (c) payroll taxes accounts, (d) employee wage and benefit accounts, (e) health savings accounts and worker's compensation accounts, (f) zero balance accounts, (g) any deposit account or securities account

for the sole purpose of holding cash that serves solely as collateral or security under any letter of credit or other obligation not prohibited hereunder or under the Credit Agreement, (h) any deposit account or securities account that is located outside the United States (excluding any territory thereof) and (i) deposit accounts and securities accounts with balances or assets which shall not at any time exceed $25,000 individually or $100,000 in the aggregate for all such accounts at any one time.

"Excluded Property" means (i) (i) any fee-owned Real Estate located outside of the U.S. and any fee-owned Real Estate with a fair market value of less than $3,000,000 and any leasehold interest in Real Estate; (ii) motor vehicles, airplanes and other assets subject to certificates of title; (iii) letter of credit rights (other than supporting obligations) and commercial tort claims, in each case, not in excess of $1,000,000 individually; (iv) any leases, contracts, instruments, licenses, license agreements or other documents (or any rights thereunder) or any property subject to a purchase money security interest, capital lease obligation or similar arrangements, to the extent (and only to the extent) that the grant of a security interest would (A) constitute a violation of a restriction in favor of a third party on such grant, (B) give any other party to such lease, contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (C) violate any law; provided that the limitation set forth in this clause (iv) above shall not affect, limit, restrict or impair the grant by a Credit Party of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code; (v) any direct or indirect interest in any Stock of any joint venture, partnership or other entity if and for so long as the grant of such security interest or Lien shall constitute a default under or termination pursuant to the terms of the joint venture agreement, partnership agreement or other organizational documents of, or contract or other agreement of (or covering or purporting to cover the assets of) such joint venture, partnership or entity or its direct or indirect parent, or require the payment of a fee, penalty or similar increased costs or result in the loss of economic benefit or the abandonment or invalidation of such Credit Party's or any Subsidiary's interest in such Stock or shall otherwise adversely impact such joint venture, partnership or other entity; provided that the limitation set forth in this clause (v) above shall not affect, limit, restrict or impair the grant by a Credit Party of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant (whether applicable to such Credit Party or to any parent company or Person owned by such Credit Party) is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code; (vi) more than sixty-five percent (65%) of any Excluded Subsidiary's outstanding voting interests in its Stock and Stock Equivalents, and (B) any assets of any Excluded Subsidiary (including any interests in the Stock and Stock Equivalents of any Subsidiary of an Excluded Subsidiary); (vii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower; (viii) any intent-to-use application trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, that, and solely during the period, in which, the grant of a security interest therein would impair the validity, registrability or enforceability of such intent-to-use trademark application under applicable federal law; (ix) any Excluded Accounts; (x) any property subject to a Lien that is permitted pursuant to Section 5.1(i) and 5.1(y) (only with respect to property subject to a capital lease or purchase money arrangement) of this Agreement, in each case, only for so long as such Permitted Lien is in place; and (xi) any non-U.S. assets or assets that require action under

the law of any non-U.S. jurisdiction to create or perfect a security interest in such assets, including any intellectual property registered in any non-U.S. jurisdiction; provided, that any such security interest and Lien shall attach immediately and automatically after any such disqualifying condition specified in clause (i), (ii) or (iii) of this paragraph shall cease to exist.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation under any Secured Rate Contract if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under any Secured Rate Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under any Secured Rate Contract (or any guarantee thereof) becomes effective.  If any Swap Obligation under any Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system approved by Agent in its reasonable discretion, including Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Flood Insurance" means Federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such

day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent in a commercially reasonable manner. Notwithstanding the foregoing, if the Federal Funds Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"Final DIP Order" means, collectively, the order of the Bankruptcy Court in the form acceptable to the Required Lenders (as may be modified in writing or on the record by the Required Lenders at the final hearing with respect to such order in the Case) entered in the Cases after notice and final hearing pursuant to the Bankruptcy Rules or such other procedures as approved by the Bankruptcy Court which, among other matters (but not by way of limitation), authorizes the Borrower to obtain credit and the Credit Parties to incur (or guaranty) the Obligations and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, grants adequate protection to the Pre-Petition Secured Parties and authorizes the use of cash collateral, as the same may be modified or supplemented from time to time after the Final Order Entry Date with the written consent of the Required Lenders in accordance with the terms hereof.

"Final Order Effective Date" means the date on which the conditions under Sections 2.2 and 2.3 are satisfied or waived as determined by the Required Lenders.

"Final Order Entry Date" means the date on which the Final DIP Order was entered on the docket of the Bankruptcy Court.

"Financial Consultant" means Huron or, to the extent that Huron is not available for such engagement, another financial consultant to counsel to the Agent that is acceptable to the Required Lenders with a substantially similar scope of engagement as that described in the Huron Engagement Letter (or such other scope that is reasonably acceptable to the Borrower).

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"Fiscal Quarter" means any of the quarterly accounting periods of the Credit Parties generally ending on the Saturday nearest to April 30, July 31, October 31 and January 31 of each year, as may be modified in accordance with the terms herein.

"Fiscal Year" means any of the annual accounting periods of the Credit Parties generally ending on the Saturday nearest to January 31 of each year, as may be modified in accordance with the terms herein.

"Flood Insurance" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets the requirements set forth by FEMA in its *Mandatory Purchase of Flood Insurance Guidelines*. Flood Insurance shall be in an amount equal to the full, unpaid balance of the Loans and any prior liens on the Real Estate up to the

maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Agent or Lenders, with deductibles not to exceed $50,000.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund Affiliate" means (i) any Affiliate of Holdings, including Holdings or any of its Subsidiaries, Sponsor, any limited partner of Sponsor and any Controlled Investment Affiliate of Sponsor, but excluding any natural person and (ii) MOLAGERS.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), including, without limitation, the FASB Accounting Standards Codification™, which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Guarantor" means any Person that has guaranteed any Obligations.

"Guaranty" means the guaranty of the Guaranteed Obligations made by the Guarantors as set forth in this Agreement.

"Guaranty Agreement" means Article XIII of this Agreement, and shall include any joinder agreement executed from time to time in connection therewith.

"Hazardous Materials" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"Impacted Lender" means any Lender (i) that fails promptly to provide Agent, upon Agent's reasonable request, reasonably satisfactory assurance that such Lender will not become a Non-Funding Lender, until such Lender provides satisfactory assurance or (ii) that becomes a Distressed Person or who has a Person that directly or indirectly controls such Lender who becomes a Distressed Person, and Agent has reasonably determined that such Lender is reasonably likely to become a Non-Funding Lender.  For purposes of this definition, (i) control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate and (ii) "Distressed Person" means any Person for which the following has occurred:   (a) a voluntary or involuntary case with respect to such Distressed Person has commenced under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian,

conservator, receiver or similar official is appointed for such Lender or any substantial part of such Lender's assets, or (c) such Lender makes a general assignment for the benefit of creditors, is liquidated or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Lender or its assets to be, insolvent or bankrupt, and Agent has reasonably determined that such Lender is reasonably likely to become a Non-Funding Lender.

"Indebtedness" of any Person means, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than (i) trade payables, (ii) obligations for the deferred purchase price (including earnouts) in connection with Acquisitions consummated prior to the Effective Date during such times as there shall be no required cash payments of interest or principal thereunder (including, but not limited to, Acquisitions consummated prior to the Effective Date) at any time prior to indefeasible payment in full of the Obligations in cash and the termination of all Commitments hereunder, (iii) accrued interest under the Management Agreement and (iv) to the extent the same is not deemed to be Indebtedness pursuant to any other clause of this definition, contingent post-closing purchase price adjustments or indemnification payments that may be due in connection with Acquisitions consummated prior to the Effective Date (including, but not limited to, (x) customary indemnification obligations and working capital adjustments in connection with any Acquisitions consummated prior to the Effective Date and (y) any deferred purchase price (whether contingent or non-contingent and including, without limitation, based on the income generated by the assets acquired in such Acquisitions consummated prior to the Effective Date after the consummation thereof) owing to sellers incurred in connection with Acquisitions consummated prior to the Effective Date, which Indebtedness under clause (y) is subordinated to the Obligations on terms and conditions reasonably acceptable to Lenders); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes (excluding notes issued pursuant to or otherwise satisfying the requirements of subclauses (b)(i), (b)(ii) or (b)(iv) of this definition), bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof) prior to the date that is 180 days after the Maturity Date (excluding any provisions requiring redemption upon a "change of control" or similar event, provided that such "change of control" or similar event would result in the prior payment in full of the Obligations, the termination of all commitments to Lenders hereunder and the termination of this Agreement), valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of

such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (a) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.

"Initial DIP Budget" means the DIP Budget delivered to the Agent and Lenders on the Effective Date, which shall be acceptable to the Required Lenders in their sole discretion.  The Initial DIP Budget is attached as Schedule II and is acceptable to the Required Lenders.

"Intellectual Property" means all rights, title and interests in and to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"Interest Payment Date" means, (a) with respect to any LIBOR Rate Loan the last day of each Interest Period applicable to such Loan and (b) with respect to Base Rate Loans the last day of each calendar month, commencing March 31, 2019.

"Interest Period" means, with respect to any LIBOR Rate Loan, the period commencing on the Business Day such Loan is disbursed or continued or on the Conversion Date on which a Base Rate Loan is converted to the LIBOR Rate Loan and ending on the date one month thereafter (in each case, subject to availability), as selected by the Borrower in its Notice of Borrowing or Notice of Conversion/Continuation; provided that:

(a)    if any Interest Period pertaining to a LIBOR Rate Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)    any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)    no Interest Period for the Term Loan shall extend beyond the last scheduled payment date therefor; and

(d)    no Interest Period applicable to the Term Loan or portion thereof shall extend beyond any date upon which is due any scheduled principal payment in respect of the Term Loan unless the aggregate principal amount of Term Loan represented by Base Rate Loans or by LIBOR Rate Loans having Interest Periods that will expire on or before such date is equal to or in excess of the amount of such principal payment.

"Interim DIP Order" means the order of the Bankruptcy Court substantially in the form of Exhibit A (except as may otherwise be agreed in writing or on the record by the Required Lenders at the interim hearing with respect to such order in the Cases) entered in the Cases after

an interim hearing pursuant to the Bankruptcy Rules, which, among other matters (but not by way of limitation), authorizes, on an interim basis, the Borrower to obtain credit and the Credit Parties to incur (or guaranty) the Obligations and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, grants adequate protection to the Pre-Petition Secured Parties and authorizes the use of cash collateral, as the same may be modified or supplemented from time to time after the Interim Order Entry Date, and before the Final Order Entry Date, with the written consent of the Required Lenders in accordance with the terms hereof.

"Interim Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Interim Term Loan" means a single draw term loan to be made on the Effective Date but prior to the Final Order Entry Date, in the aggregate amount not to exceed the Interim Term Loan Commitment.

"Interim Term Loan Commitment" means on the Effective Date, with respect to each Lender, the commitment of such Lender to make Term Loans, which commitment is in the amount set forth opposite such Lender's name on Schedule 1.1(a) under the caption "Interim Term Loan Commitment", as amended to reflect Assignments.  The aggregate amount of the Interim Term Loan Commitments on the Effective Date shall be the lesser of (a) $25,000,000 and (b) such amount as approved by the Bankruptcy Court pursuant to the Interim DIP Order.

"Internet Domain Name" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in and to Internet domain names.

"Inventory" means all of the "inventory" (as such term is defined in the UCC) of Holdings and its Subsidiaries, including, but not limited to, all merchandise, raw materials, parts, supplies, work-in-process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of Holdings' or such Subsidiary's custody or possession, including inventory on the premises of others and items in transit.

"Investment Property" means any investment property of any Credit Party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time.

"IP Ancillary Rights" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any license right in or to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Lease" means any lease or other agreement, no matter how styled or structured, pursuant to which the Borrower or any Subsidiary is entitled to the use or occupancy of any space.

"Lender-Related Distress Event" means, with respect to any Lender or any Person that directly or indirectly controls such Lender (each a "Distressed Person"), (a) a voluntary or involuntary case, action or proceeding with respect to such Distressed Person under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (c) such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including, without limitation, the nationalization or assumption of majority ownership or operating control by) of the U.S. government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise subject to composition, marshaling of assets for creditors or other similar arrangement in respect of its creditors generally or a substantial portion of its creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt.  For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of "Affiliate".

"Lending Office" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify the Borrower and Agent.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR" means, for each Interest Period, the greater of (a) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period and (b) one percent (1.00%) per annum.  If no offered rate exists under clause (a) above, such rate will be the rate of interest per annum, as determined by Agent, at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination. Notwithstanding the foregoing, in no event shall LIBOR be less than 0%.

"LIBOR Rate Loan" means a Loan that bears interest based on LIBOR.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"Loan" means an extension of credit by a Lender to the Borrower pursuant to Article I, and may be a Base Rate Loan or a LIBOR Rate Loan.

"Loan Documents" means the DIP Orders, this Agreement, the Notes, the Fee Letters and all documents delivered to Agent and/or any Lender in connection with any of the foregoing, other than Secured Rate Contracts.

"Management Agreement" means that certain Corporate Development and Administrative Services Agreement, dated as of October 8, 2014, by and among Parent, Borrower and Sponsor, as amended, restated, supplemented or otherwise modified from time to time and not in contravention of Section 5.15.

"Management Investors" means the collective reference to a Person who is an officer or otherwise a member of management of Holdings or any of its Subsidiaries on the Effective Date.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means:  (a) any event, change or condition that, individually or in the aggregate, has had, or could reasonably be expected to have (i) a material adverse effect on the business, assets, financial condition or results of operations of Holdings and its Subsidiaries, taken as a whole, (ii) a material and adverse effect on the material rights and remedies of the Agent and the Lenders under the Loan Documents or (iii) a material and adverse effect on the ability of the Borrower and Credit Parties to perform their payment obligations under the Loan Documents; provided that, for purposes of determining the existence or occurrence of a Material Adverse Effect when used in this Agreement with respect to any action event or circumstance that is subject to the Automatic Stay or the Safe Harbor Provisions, such action, event or circumstance could not have, or be expected to cause, a Material Adverse Effect for so long as such action, event or circumstance remains subject to the Automatic Stay or the Safe Harbor Provisions.

"Material Contracts" means any agreement or arrangement to which Holdings or a Subsidiary of Holdings is party (other than the Loan Documents) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the earlier of (1) the Scheduled Maturity Date, (2) the earlier of the date (a) Borrower enters into (or files a motion with the Bankruptcy Court or otherwise take

action to pursuant the Bankruptcy Court approval of) a purchase agreement, unless such purchase agreement is entered into in connection with the Auction conducted pursuant to the Bidding Procedures Order and (b) the Borrower files a motion or otherwise takes action to pursue the Bankruptcy Court for approval of a sale (other than an Auction conducted pursuant to the Bidding Procedures Order), (3) the consummation of a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise, (4) the effective date of a plan of reorganization or liquidation in the Case, (5) the date of filing of a Plan of Reorganization that (x) does not provide for indefeasible payment in full in cash of all Secured Obligations and (y) is not otherwise acceptable to the Required Lenders or (6) the date of termination of the Lenders' Commitments and the acceleration of any outstanding extensions of credit, in each case, under the Facility in accordance with the terms of the Loan Documents.

"Milestone" means the actions to be performed by the Borrower with respect to the Cases set forth on Schedule 7.1 hereto.

"MOLAGERS" means Missouri Local Government Employees Retirement System, in its capacity as a Lender.

"Moody's" means Moody's Investors Service, Inc. or any successor thereto.

"Mortgage" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on Real Estate or any interest in Real Estate.

"Multiemployer Plan" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"National Flood Insurance Program" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a Federal insurance program.

"Net Issuance Proceeds" means, in respect of any issuance of debt or equity, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of the Borrower.

"Net Proceeds" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition and insurance proceeds received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs, fees and expenses relating to such Disposition excluding amounts payable to the Borrower or any Affiliate of the Borrower, (ii) Taxes paid or reasonably estimated to be payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a

Lien on the asset which is the subject of such Disposition and (iv) reserves for indemnification obligations and purchase price adjustments and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs, fees and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments; provided, in the case of clauses (a) and (b), that, no such net cash proceeds shall constitute Net Proceeds in any Fiscal Year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $100,000.

"Non-Funding Lender" means any Lender (a) that has failed to fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due, until such time as such Lender funds such payments, (b) that has given oral or written notice to the Borrower, Agent or any Lender or has otherwise publicly announced that such Lender believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents or one or more syndicated credit facilities, (c) as to which Agent, after prior notice to the Borrower, has a good faith belief that such Lender or an Affiliate of such Lender is currently in default in fulfilling its obligations (as a lender or agent) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred and is continuing with respect to such Person or any Person that directly or indirectly controls such Lender has determined that such Lender may become a Non-Funding Lender. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"Non-U.S. Lender Party" means each of Agent and each Lender, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"Note" means any Term Note and "Notes" means all such Notes.

"Notice of Borrowing" means a notice given by the Borrower to Agent pursuant to Section 1.5, in substantially the form of Exhibit 11.1(c) hereto.

"Obligations" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent, any Secured Swap Provider, any Secured Cash Management Provider or any other Person required to be indemnified, that arises under any Loan Document, any Secured Rate Contract, or any agreement or document in connection with any treasury management services (including controlled disbursements, automated clearinghouse transactions, return items, overdrafts, and depository network systems) provided by any Secured Cash Management Provider as of any date of determination, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired; provided, that Obligations of any Guarantor shall not include any Excluded Swap Obligations of such Guarantor. Notwithstanding anything to the contrary contained herein or in any Loan Document, on the Effective Date the total outstanding amount of the Pre-Petition Indebtedness, including amounts committed to letter

of credit obligations thereunder, shall constitute Obligations hereunder with the outstanding amount of all Pre-Petition Indebtedness as of the Effective Date being refinanced as Term Loans hereunder as of the Effective Date.

"Ordinary Course of Business" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice (subject to reasonable changes consistent with the growth of such Person) and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, or (c) for any limited liability company, the operating agreement and articles or certificate of formation.

"Outstandings" means, as of any date of determination, the Dollar amount of the sum of the aggregate outstanding amount of all Loans.

"Outstanding Pre-Petition Facility Indebtedness" has the meaning ascribed to such term in the Interim DIP Order or upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Parent" means Z Gallerie Holdings, LLC, a Delaware limited liability company that is an indirect parent company of Borrower.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in and to letters patent and applications therefor.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"PBGC" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, notification, exemption, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Permitted Holders" means (i) Sponsor, (ii) any Controlled Investment Affiliate of Sponsor, (iii) any Management Investors, and (iv) any Permitted Transferee of any of the foregoing Persons.

"Permitted Store Closing" means Closure (i) of each of the [17] store locations, identified to the Agent and Lenders by the Borrower prior to the Effective Date, that the Borrower intends

to close, and (ii) additional store locations that the Borrower intends to close during the term of this Agreement, subject to the consent of the Required Lenders as contemplated by, and in accordance with, the applicable DIP Budget in effect at such time.

"Permitted Tax Distributions" means, so long as each of Parent, Holdings and Borrower is treated as a partnership or disregarded entity for U.S. federal income tax purposes, distributions to Parent to permit Parent to make distributions to its members pursuant to Section 4.1(a) of the Parent LLC Agreement as in effect on the date hereof.

"Permitted Transferee" means (a) in the case of the Sponsor, (i) any Controlled Investment Affiliate of either of them, (ii) any managing director, general partner, limited partner, director, officer or employee of such Person or any such Controlled Investment Affiliate (collectively, the "Sponsor Associates"), (iii) the heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of any Sponsor Associate and (iv) any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, an eighty percent (80.0%) or more controlling interest is held by a Sponsor Associate, his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants; and (b) in the case of any Management Investors, (i) his or her executor, administrator, testamentary trustee, legatee or beneficiaries, (ii) his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants or (iii) a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, an eighty percent (80.0%) or more controlling interest is held by a Management Investor and his or her spouse, parents, siblings, members of his or her immediate family (including adopted children) and/or direct lineal descendants.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"Petitions" means the voluntary petitions filed by the Credit Parties with the Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code.

"Plan of Reorganization" means a Chapter 11 plan of reorganization submitted by the Credit Parties or any of the Credit Parties to the Bankruptcy Court in connection with the Cases or any Case, as applicable.

"Pledged Certificated Stock" means all certificated securities (other than any securities issued with respect to any Excluded Subsidiary referenced in Section 4.13(c)(x)) and any other Stock or Stock Equivalent of any Person evidenced by a certificate, instrument or other similar document (each as defined in the UCC), in each case owned by any Credit Party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time.

"Pledged Stock" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"Pledged Uncertificated Stock" means any Stock or Stock Equivalent of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Credit Party as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Credit Party in, to and under any Organization Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time.

"Pre-Petition Collateral" means any and all collateral that any of the Credit Parties have pledged to secure the Pre-Petition Indebtedness.

"Pre-Petition Credit Agreement" means the Credit Agreement by and among Holdings (as defined therein), the Borrower (as defined therein), the Lenders (as defined therein), KeyBank National Association, as Agent (as defined therein) and KKR Credit Advisors (US) LLC, as Arranger (as defined therein), dated as of October 8, 2014 (as amended or otherwise modified by that certain Amendment No. 1 to Credit Agreement, dated as of September 29, 2017, that certain Waiver and Amendment No. 2 to Credit Agreement, dated as of June 18, 2018, and that certain Limited Waiver to Credit Agreement, dated as of July 6, 2018).

"Pre-Petition Facility" means the credit facility extended by the Pre-Petition Lenders to the Borrower, including the issuance of letters of credit, under the Pre-Petition Credit Agreement.

"Pre-Petition Indebtedness" means the Obligations (as defined in the Pre-Petition Credit Agreement) for which the Borrower and certain of its affiliates are indebted and jointly and severally liable to the Pre-Petition Lenders, in respect of amounts owed by the Borrower under the Pre-Petition Credit Agreement, which such Obligations are secured by the assets of each of the Credit Parties pursuant to the Collateral Documents (as defined in the Pre-Petition Credit Agreement).

"Pre-Petition Indebtedness Documents" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Pre-Petition Lenders" means KeyBank National Association, Corporate Capital Trust, Inc., KKR Credit Select Funding, LLC, KKR Lending Partners Funding LLC, KKRLP II Funding US LLC, Lincoln Investment Solutions, Inc., KKR-Violet California L.P., Sierra Income Corporation, SIC JV SPV Funding I LLC and Missouri Local Government Employees Retirement System, each in its capacity as the pre-petition lender under the Pre-Petition Credit Agreement and any subsequent holders thereof.

"Pre-Petition Liens" means the Liens securing the obligations of the Credit Parties to the Pre-Petition Secured Parties in respect of the Pre-Petition Indebtedness.

"Pre-Petition Secured Parties" means KeyBank National Association, Corporate Capital Trust, Inc., KKR Credit Select Funding, LLC, KKR Lending Partners Funding LLC, KKRLP II Funding US LLC, Lincoln Investment Solutions, Inc., KKR-Violet California L.P., Sierra Income Corporation, SIC JV SPV Funding I LLC and Missouri Local Government Employees

Retirement System, each in its capacity as secured creditors with respect to the Pre-Petition Indebtedness and any subsequent holders thereof.

"Professional Fees" shall mean all accrued and unpaid claims for fees and expense reimbursements of Professional Persons retained by the Credit Parties (but not any success or transaction fees).

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer, financial advisor, or other professional Person and who is retained with approval of the Bankruptcy Court by (a) any Credit Party pursuant to Section 327 of the Bankruptcy Code or (b) the Committee pursuant to Section 1103 of the Bankruptcy Code.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Qualified Stock" means Stock that is not Disqualified Stock.

"Rate Contracts" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"Real Estate" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"Related Transactions" means the execution and delivery of all the Loan Agreements and the transactions contemplated thereby and includes, without limitation, the (i) borrowing of the Loans and (ii) the payment of all fees, costs and expenses associated with all of the foregoing.

"Releases" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping or leaching of Hazardous Material into or through the environment.

"Remedial Action" means all actions required under Environmental Laws to (a) clean up, remove, treat or in any other way address any Hazardous Material in the environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"Required Lenders" means at any time there is more than one (1) Lender, two (2) or more Lenders (not affiliated with each other) who hold in the aggregate more than fifty percent (50.0%) of the sum of the aggregate unpaid principal amount of Loans then outstanding.

"Requirement of Law" means, as to any Person, any law (statutory or common), including without limitation Applicable Customs Law, ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" means the chief executive officer or the president of the Borrower, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with any financial covenants or delivery of financial information, the chief financial officer or the treasurer of the Borrower, or any other officer having substantially the same authority and responsibility.

"S&P" means Standard & Poor's Financial Services LLC or any successor thereto.

"Safe Harbor Provisions" means sections 546(e) and (g), 555, 556, 559, 560, 561 and 562 of the Bankruptcy Code.

"Sale Process" means the implementation of bidding and sale procedures in respect of all of the Credit Parties' assets and property, approved by an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders in all respects.

"Scheduled Maturity Date" means the date that is 120 days after the Effective Date.

"Secured Obligations" means the Obligations (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower or any other Credit Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) excluding, in each case, all Excluded Swap Obligations.

"Secured Party" means Agent, each Lender, each other Indemnitee and each other holder of any Obligation of a Credit Party including each Secured Swap Provider.

"Secured Rate Contract" means any Rate Contract between a Credit Party and the counterparty thereto, which (i) has been provided or arranged by a Person that was a Lender or Affiliate of a Lender, the Agent or Affiliate of the Agent at the time of execution thereof and prior written notice of the execution and delivery of such Rate Contract has been delivered by the Borrower to Agent, or (ii) Agent has acknowledged in writing (such acknowledgment not to be unreasonably withheld, conditioned or delayed) constitutes a "Secured Rate Contract" hereunder.

"Secured Rate Contract Priority Obligations" means any Obligations in respect of Rate Contracts covering a notional amount that equals no more than fifty percent (50.0%) of the aggregate principal amount of the Term Loans then outstanding.

"Secured Swap Provider" means a Person who has entered into a Secured Rate Contract with a Credit Party, and any assignee thereof.

"Secured Cash Management Provider" means any Lender, an Affiliate of a Lender, the Agent or any Affiliate of the Agent as of any date of determination that has entered into any

agreement or document to provide any treasury management services (including controlled disbursements, automated clearinghouse transactions, return items, overdrafts, and depository network systems).

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"Sponsor" means Brentwood Associates Private Equity V, L.P.

"Sponsor Group" means the Sponsor and its Controlled Investment Affiliates.

"SPV" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"Stock" means all shares of Stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Subordinated Indebtedness" means any Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Pre-Petition Indebtedness in accordance with the terms of a subordination agreement, to the extent outstanding on the Petition Date, as in effect on such date.

"Subsidiary" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Tax Affiliate" means, (a) each Credit Party and its Subsidiaries and (b) any Affiliate of a Credit party with which such Credit Party files or is required to file tax returns on a consolidated, combined, unitary or similar group basis.

"Term Lender" means each Lender with a Term Loan Commitment or who holds Term Loans.

"Term Loan" means amounts borrowed under Section 1.1(a) and 1.13 as a term loan.

"<u>Term Loan Commitment</u>" means, for each Lender, the Interim Term Loan Commitment and Delayed Draw Term Loan Commitment, as applicable.

"<u>Term Note</u>" means a promissory note of the Borrower payable to a Lender, in a form mutually agreeable to the Agent, Lender and the Borrower, evidencing the Indebtedness of the Borrower to such Lender resulting from the Term Loan made to the Borrower by such Lender or its predecessor(s).

"<u>Third Amendment Tranche 1 Unsecured Loan</u>" means a senior unsecured loan from the Sponsor (or its Controlled Investment Affiliates) to the Borrower, made on or prior to October 16, 2018 outstanding on the Petition Date (including any paid in kind interest thereon accrued after the Petition Date).

"<u>Third Amendment Tranche 1 Unsecured Loan Notes</u>" means the unsecured subordinated notes issued by the Borrower to the Third Amendment Tranche 1 Unsecured Loan Lenders evidencing the Third Amendment Tranche 1 Unsecured Loan.

"<u>Third Amendment Tranche 1 Unsecured Loan Lender</u>" means each lender of all or any portion of the Third Amendment Tranche 1 Unsecured Loan.

"<u>Third Amendment Tranche 2 Unsecured Loan</u>" means a senior unsecured loan from the Sponsor (or its Controlled Investment Affiliates) to the Borrower, made on October 12, 2018 outstanding on the Petition Date (including any paid in kind interest thereon accrued after the Petition Date).

"<u>Third Amendment Tranche 2 Unsecured Loan Notes</u>" means the senior unsecured notes issued by the Borrower to the Third Amendment Tranche 2 Unsecured Loan Lenders evidencing the Third Amendment Tranche 2 Unsecured Loan.

"<u>Third Amendment Tranche 2 Unsecured Loan Lender</u>" means each lender of all or any portion of the Third Amendment Tranche 2 Unsecured Loan.

"<u>Title IV Plan</u>" means any employee pension benefit plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA or Section 302 of ERISA or Section 412 or 430 of the Code, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"<u>Trade Secrets</u>" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"<u>Trademark</u>" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of [Illinois].

"United States" and "U.S." each means the United States of America.

"U.S. Lender Party" means each of Agent and each Lender, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned Subsidiary" means any Subsidiary in which (other than directors' qualifying shares required by law) one hundred percent (100%) of the Stock and Stock Equivalents, at the time as of which any determination is being made, is owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

14.2    Other Interpretive Provisions.

(a)    Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)    Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)    <u>Laws</u>.  References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

14.3    <u>Accounting Terms and Principles</u>  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Holdings shall be given effect for purposes of measuring compliance with any provision of <u>Article V</u> or <u>VI</u> unless the Borrower, Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in <u>Article V</u> and <u>Article VI</u> shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value."  A breach of any financial covenant contained in <u>Article VI</u> shall be deemed to have occurred as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

14.4    <u>Payments</u>.  Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party.  Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable *de minimis* payment thresholds.

14.5    <u>Divisions</u>.  Any restriction, condition or prohibition applicable to a merger, consolidation, amalgamation, assignment, restricted payment, investment, disposition, sale, transfer, or similar term set forth in the Loan Documents shall be deemed to apply to a division of or by a limited liability company or a limited partnership, or an allocation of assets to a series of a limited liability company or a limited partnership (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, restricted payment, investment, disposition, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company or a limited partnership shall constitute a separate Person under the Loan Documents (and (i) each division of any limited liability company or a limited partnership that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity and (ii) shall be subject to Section 4.13 (including any deadlines set forth therein) (and each similar covenant or exception in this Agreement and in each other Loan Document) to the same extent as such limited liability company or a limited

partnership, immediately prior to giving effect to such division).  For the avoidance of doubt, no Credit Party may undergo a "Division" or any other similar conversion or process, except pursuant to the terms hereof.  If any Credit Party becomes a "Dividing Company", each resulting "Division Company" of such Credit Party shall be a successor in interest to such Credit Party and automatically become a party to the Loan Documents, in the same capacity as such Credit Party and subject to the same rights and obligations of such Credit Party; *provided* that, if any Borrower becomes a "Dividing Company", each resulting "Division Company" of such Borrower, in addition to being subject to the provisions of the immediately preceding clause, shall also automatically become a party to the Loan Documents as a Guarantor.  For the purposes of this Section 14.5, the terms "Division", "Division Company", and "Dividing Company" shall have the meanings assigned to such terms in Section 18-217 of Title 6 of the Delaware Code or any other similar terms in the applicable statute(s) of any other jurisdiction, as applicable.

**[Signature Pages Follow.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**BORROWER:**

**Z GALLERIE, LLC**

By: _____
Name: _____
Title: _____

**CREDIT PARTIES:**

**Z GALLERIE HOLDING COMPANY, LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**KEYBANK NATIONAL ASSOCIATION**,
as Agent

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written

**KEYBANK NATIONAL ASSOCIATION**, as Lender

By: _____

Name: _____

Title: _____

Schedule I

<u>Cash Collateral Accounts</u>

*[Borrower to provide]*

Schedule II

Initial DIP Budget

*[Borrower to provide].*

Schedule 1.1(a)

<u>Term Loan Commitments</u>

| **<u>Lender</u>** | **<u>Interim Term Loan Commitments</u>** | **<u>Delayed Draw Term Loan Commitments</u>** |
|---|---|---|
| KeyBank National Association | $25,000,000 | $3,000,000 |
| **Total** | $25,000,000 | **$3,000,000** |

Schedule 7.1

<u>Milestones</u>

Within the time periods set forth below, Borrower shall perform each action with respect to the Cases of each of the Credit Parties as set forth below:

1. On the Petition Date the Credit Parties shall file a Plan of Reorganization, in form and substance acceptable to the Lenders, with such Plan of Reorganization providing for the indefeasible payment in full of the Term Loans through either (x) consummation of a sale or sales of substantially all of the Credit Parties' assets or (y) a going concern reorganization;

2. On or before March 25, 2019, the Credit Parties shall have filed a disclosure statement in connection with the Plan of Reorganization (the "<u>Disclosure Statement</u>");

3. On or before April 12, 2019, the Final DIP Order shall have been entered by the Bankruptcy Court;

4. On or before April 12, 2019, the Bidding Procedures Order shall have been approved by order of the Bankruptcy Court, in form and substance acceptable to the Lenders;

5. On or before April 19, 2019, the Credit Parties shall have delivered indicative term sheet(s) from potential bona fide buyer(s) with respect to the purchase of all or substantially all of the Credit Parties' assets, in form and substance reasonably acceptable to the Lenders;

6. In the event that the Credit Parties do not receive indications of interest sufficient to pay off the Loans, then the Credit Parties shall, on or before May 7, 2019, provide evidence, satisfactory in form and substance to the Lenders, of a commitment for exit financing to be provided under the Plan. It shall be an Event of Default if the Credit Parties are unable to or fail to provide such evidence ("<u>Sale Milestone Default</u>"). In the case of a Sale Milestone Default, the Credit Parties shall execute a business plan, satisfactory to the DIP Lenders, that significantly reduces the Loans outstanding by shuttering of underperforming stores and reducing store footprint to a scale of highly profitable store

7. On or before May 7, 2019, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

8. On or before May 20, 2019, an Auction (to the extent necessary) for the sale of all or substantially all of the Credit Parties' assets shall have occurred;

9.  On or before May 29, 2019, the Borrower shall have finalized an asset purchase agreement in form and substance acceptable to the Lenders; and

10. On or before June 17, 2019, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Lenders, confirming the Plan of Reorganization.

Schedule 9.2

<u>Notice Addresses</u>

[_____]

[_____]
Attention:
Telephone:
Facsimile:

with a copy to:

[_____]
[_____]
Attention:  [_____]
Telephone:  [_____]
Facsimile:  [_____]

Address for payments:

Bank Name:

Bank Address: _____

Account Number: _____

ABA #: _____

Account Name _____

Reference: _____

Lending office:

_____
_____
_____