## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Z GALLERIE, LLC, *et al.*,[1] | ) | Case No. 19-10488 (LSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JASON A. COHEN IN SUPPORT
## OF THE DEBTORS' MOTION SEEKING ENTRY OF INTERIM
## AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
## POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH
## COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION
## TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

I, Jason A. Cohen, hereby declare under penalty of perjury as follows:

1.      I submit this declaration in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion"),[2]  which seeks approval of the Debtors' $28 million in postpetition financing, including approximately $5 million of new money during the interim period and $3 million upon entry of the Final Order.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949).  The location of the Debtors' service address is: 1855 West 139th Street, Gardena, CA 90249.

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the Interim DIP Order, as applicable.

2.      The statements in this declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of Lazard Middle Market LLC ("LMM") working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses.  I am not being specifically compensated for this testimony other than through payments received by LMM as a professional retained by the Debtors, which payments include a fee for raising debtor-in-possession ("DIP") financing.  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.  I am authorized to submit this declaration on behalf of the Debtors.

## Professional Background and Qualifications

3.      I am a Managing Director in the Restructuring Group at LMM, an investment banking firm that has its principal office at 600 Fifth Avenue, New York, New York 10020. LMM is a wholly-owned subsidiary of Lazard Frères & Co. LLC ("Lazard Frères," and together with LMM, "Lazard"), the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm.  Lazard, together with its predecessors and affiliates, has been advising clients around the world for 150 years.  Lazard has dedicated professionals who provide restructuring services to its clients and the current managing directors, directors, vice presidents, and associates of Lazard have extensive experience working with financially troubled companies in complex financial restructurings out-of-court and in chapter 11 proceedings.  Lazard and its principals have been involved as advisor to debtor, creditor, and equity constituencies and government agencies in many reorganization cases.  Since 1990, Lazard and its affiliates have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

4.      Lazard's senior professionals have extensive experience providing strategic and financial advisory services to automotive supply companies and their investors, including restructuring, mergers and acquisitions, and capital-raising.  At Lazard, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling, or acquiring financially distressed businesses.

5.      I have over 21 years of experience in corporate finance and restructuring.  Prior to joining Lazard in 2007, I was Special Counsel in the Financial Restructuring department of the law firm of Cadwalader, Wickersham & Taft LLP, where I represented debtors, individual creditors, official creditors' committees, unofficial bondholder committees, and other parties' interest in numerous restructurings involving companies in multiple industries, including, the chapter 11 cases of  Solutia, Quigley Company, AmeriKing, Winstar Communications, Pathmark Stores, RSL Communications, Arch Wireless Communications, and Geneva Steel Company.

6.      I have advised companies, creditors, and investors in connection with numerous in-court and out-of-court restructurings and recapitalizations, including those of GST AutoLeather, Inc., Modular Space Corporation, Sidewinder Drilling, NewPage, IAP, LSP Batesville, American Safety Razor, Hayes-Lemmerz, and True Temper Sports.  I submitted declarations and/or affidavits or have had testimony proffered in Hayes-Lemmerz, LSP Batesville, and GST AutoLeather, Inc.

7.      I have a Juris Doctorate from Brooklyn Law School and a Bachelor of Arts from the University of Connecticut.  I hold FINRA Series 7 General Securities, Series 24 Principal, and Series 63 State Law licenses.  I am a member of the American Bankruptcy Institute.

## Advisor Retention

8.      Lazard was originally engaged as investment banker to the Debtors on January 29, 2019 to provide the Debtors with general financial and restructuring advice and to advise

them in connection with any sale transactions. Specifically, Lazard has rendered financial advisory services to the Debtors, including reviewing and analyzing the Company's business, operations, and financial projections, preparing for and commencing a sale process of the Debtors as a going concern, and assisting the Debtors in soliciting potential proposals for, and negotiating the terms of, debtor in possession financing. Lazard has worked closely with the Debtors' management and other professionals with respect to these chapter 11 cases and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## Prepetition DIP Solicitation Efforts

9.      In anticipation of its upcoming liquidity issues beginning in March 2019, and in an effort to support a marketing and sale process, the Debtors, with the assistance of Lazard, commenced negotiations with their Prepetition Secured Lenders in January 2019 to obtain financing on an out-of-court basis. While the Debtors and Lazard had many conversations and meetings with their Prepetition Secured Lenders regarding out-of-court funding, in early March it became clear that financing would only be available in connection with the filing of these chapter 11 cases. Based on the status of negotiations, and in light of the Debtors' liquidity position and expected shortfall, the Debtors and Lazard shifted their attention to obtaining financing for an in-court process. To that end, the Debtors, as part of their discussions with both the Prepetition Secured Lenders and the Agent for the Prepetition Credit Facility, KeyBank National Association ("KeyBank"), insisted that any chapter 11 financing support a going concern sale or reorganization process that would be accomplished through a chapter 11 plan.

10.      These negotiations with the Prepetition Secured Lenders had to take into account the structure of the Debtors' existing Prepetition Credit Facility. The Prepetition Credit Facility

provides for two lines of secured credit—a $19,250,000 secured revolving loan facility, provided by KeyBank (the "<u>Prepetition Secured Revolving Loan</u>"), with a contractual right of first recovery, and a junior $93,400,000 secured term loan facility, provided by the Prepetition Term Loan Lenders (the "<u>Prepetition Secured Term Loan</u>").  While both loans are secured by the same collateral, KeyBank is senior in priority to the Prepetition Secured Term Loans, entitling KeyBank to receive payment on the Revolving Loans first before any payment could be made to the Prepetition Term Loan Lenders.

11.    The Prepetition Term Loan Lenders indicated they would be willing to provide postpetition financing, but only on terms that primed KeyBank.  They were unwilling to provide new money subordinate to KeyBank.  While discussions were ongoing with the Prepetition Term Loan Lenders, the Debtors and Lazard also engaged in negotiations with KeyBank regarding its desire to provide financing rather than be primed by the Prepetition Term Loan Lenders.  After many conversations, KeyBank agreed to provide the necessary postpetition financing on substantially similar, and in a number of instances better, terms than the Prepetition Term Loan Lenders without a contested priming fight, but only on the condition that they receive a roll-up of their Prepetition Secured Revolving Loan on entry of the Interim Order.  As a result of these negotiations, the Debtors were able to secure two DIP financing proposals from their Prepetition Secured Lenders—one from their Prepetition Term Loan Lenders and one from KeyBank.

12.    In addition, the Debtors, with the assistance of their advisors, solicited proposals for alternative debtor-in-possession financing from eight financial institutions.  Although six of the potential sources indicated some interest in providing potential exit financing, no one was willing to provide the Debtors with DIP financing on any terms.

13.     After significant back and forth with their Prepetition Secured Lenders on the negotiation of their proposals, the Debtors selected the KeyBank DIP, which provides for $28 million in postpetition financing, including $5 million of new money during the interim period and $3 million upon entry of the Final Order, on the condition of a roll-up of their $19.25 million prepetition loans.

## The Proposed DIP Financing

14.     Due to the fact that substantially all of the Debtors' assets are encumbered under their existing Prepetition Credit Facility, and that the Debtors were unable to secure financing on an out-of-court basis, the Debtors concluded, in consultation with Lazard, that any workable financing would require the support of, or need to be provided by, the Prepetition Secured Lenders in connection with a chapter 11 filing.

15.     Accordingly, the Debtors and their advisors engaged in hard fought, arm's-length negotiations with the Prepetition Secured Lenders with respect to the two DIP financing proposals.  Ultimately, the Debtors and KeyBank came to an agreement regarding the terms and conditions of a $28 million senior secured DIP Facility.  The DIP Facility provides the Debtors with $5 million of new money on an interim basis, and an additional $3 million following entry of the Final Order, through a delayed-draw DIP Facility.  The DIP Facility also requires a roll-up of KeyBank's $19.25 million outstanding under the Prepetition Secured Revolving Loan into the DIP Facility upon entry of the Interim Order.  The repayment of the Prepetition Credit Facility pursuant to the terms of the DIP Facility is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.

16.     Based on the foregoing, it is my belief that the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and that the terms and

conditions of the DIP Facility are reasonable and appropriate under the circumstances. Specifically, the Debtors determined that the roll-up is necessary to obtain access to the liquidity necessary to preserve the value of their business.  Further, I believe the DIP Facility is a critical component of the Debtors' chapter 11 strategy.

17.     The DIP Credit Agreement contains certain milestones that the Debtors must meet throughout their chapter 11 cases, and failure to meet such milestones constitutes an Event of Default under the DIP Credit Agreement.  These milestones were negotiated and required by the DIP Lenders as a condition to the DIP Facility.

18.     The proposed DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized and value is maximized for the benefit of all parties in interest.  Obtaining DIP financing with the support of the Debtors' Prepetition Secured Lenders will send a strong, positive signal to the Debtors' employees and business partners regarding the Debtors' prospects, which will allow for the smooth administration and success of these chapter 11 cases.  The Debtors also believe that a well-supported DIP financing will provide comfort to the Debtors' vendors, suppliers, customers, and employees that the Debtors will be able to continue to meet their commitments while running a sale process and are not likely to languish in bankruptcy.  The DIP Facility also provides comfort to potential bidders that the business is adequately capitalized during the chapter 11 process and running appropriately.

**The Fees in Connection with the DIP Facility Are Reasonable**

19.     I understand that the Debtors have agreed, subject to Court approval, to pay certain costs, fees, and expenses to the DIP Agent and the DIP Lenders pursuant to the DIP Financing Documents.  Specifically, I believe the Debtors have agreed to pay an Unused Commitment Fee of 2.00% on the undrawn amount of the Delayed Draw Term Loan

Commitment, a Facility Fee equal to 2.0% of the new money approved by the Bankruptcy Court, and an Exit Fee equal to 2.00% of the Term Loan Commitments upon repayment in full of the Obligations.

20.     Based on my experience and under the circumstances of these cases, these types of fees and costs are reasonable, customary, and appropriate under the circumstances.

### The Debtors Do Not Have Readily Available Sources of Alternative Financing

21.     In the course of exploring and negotiating restructuring and financing alternatives, Lazard, on behalf of the Debtors, contacted eight alternative lenders (including specialty lenders and those that routinely provide debtor-in-possession financing) to solicit DIP financing, in addition to the Prepetition Lenders and current equity holders.  Of the eight alternative lenders contacted, no party was willing to provide a proposal for alternative financing on any terms. Importantly, six of the parties explained any DIP financing proposal would require nonconsensual priming of the Prepetition Secured Lenders, which the potential lenders were unwilling to do. Additionally, the potential lenders expressed concern with providing DIP financing because of, among other things, the Debtors' recent financial performance, and the lack of unencumbered assets.  Many of the potential lenders, however, expressed interest in providing exit financing.

22.     The Prepetition Secured Lenders were unwilling to consent to third-party priming DIP financing.  As a result, I believe it is highly unlikely that any lender would be willing to provide DIP financing on more attractive terms to the Debtors than the Prepetition Secured Lenders (let alone be willing to engage in a contested priming fight).

23.     For the foregoing reasons, I do not believe that alternative sources of financing with terms as favorable as those of the DIP Facility are readily available to the Debtors.

**Need for Interim Relief**

24.     The Debtors' businesses are cash intensive, with significant daily costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of cash collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing.  Absent funds available from the DIP Facility, access to cash collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses and lose support from parties on whom the Debtors' businesses depend.  Such an outcome would hinder the Debtors' ability to maximize the value of their estates, and would force them to curtail their operations significantly to the detriment of the Debtors, their estates, and their creditors.

**Conclusion**

25.     I believe that, given the circumstances, the process to obtain debtor in possession financing produced the best financing option available and that the terms of the DIP Facility are reasonable and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 11, 2019

/s/ Jason A. Cohen
Jason A. Cohen
Managing Director
Lazard Middle Market LLC

*Proposed Investment Banker to the Debtors*