**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Z GALLERIE, LLC, *et al.*,[1] | ) | Case No. 19-10488 (LSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT RELATING TO THE JOINT**
**PLAN OF REORGANIZATION OF Z GALLERIE, LLC AND Z GALLERIE**
**HOLDING COMPANY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE[2]**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in*
*Possession*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

Dated:  March 22, 2019

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]    The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949).  The location of the Debtors' service address is: 1855 West 139th Street, Gardena, CA 90249.

[2]    The Debtors have filed this Disclosure Statement and the Plan with certain key provisions omitted.  The Debtors continue to negotiate the terms of the Plan with their stakeholders including the DIP Lender, the Secured Credit Agreement Lenders, and the Committee.  The Disclosure Statement and Plan remain subject to material modification in all respects.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEADLINE TO VOTE ON THE PLAN IS
June 4, 2019,[3] at 5:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY
STRETTO ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF REORGANIZATION OF Z GALLERIE, LLC AND Z GALLERIE HOLDING COMPANY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.[4]

THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION

---

[3]    As of the date hereof, the Debtors have not obtained Court approval of the Confirmation Schedule. Accordingly, this Disclosure Statement will be revised after entry of an order approving such schedule.

[4]    The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, the Z Gallerie trademark. This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................................1

II.   PRELIMINARY STATEMENT .............................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      THE PLAN ............................................................................................................................3

      A.    What is chapter 11?.................................................................................................3
      B.    Why are the Debtors sending me this Disclosure Statement?.................................4
      C.    Am I entitled to vote on the Plan?..........................................................................4
      D.    What will I receive from the Debtors if the Plan is consummated? ........................4
      E.    What happens to my recovery if the Plan is not confirmed or does not go effective? ......................9
      F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
            Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
            "Consummation?"....................................................................................................9
      G.    What are the sources of Cash and other consideration required to fund the Plan?..........................9
      H.    Are there risks to owning the Reorganized Debtors Interests upon emergence from
            chapter 11? ..............................................................................................................9
      I.    Is there potential litigation related to Confirmation of the Plan? ...........................9
      J.    Will the final amount of Allowed Unsecured Claims [and Allowed Critical Trade Claims]
            affect the recovery of holders of Allowed Unsecured Claims under the Plan?.............................10
      K.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............10
      L.    What is the deadline to vote on the Plan? .............................................................11
      M.    How do I vote for or against the Plan?..................................................................11
      N.    Why is the Bankruptcy Court holding a Confirmation Hearing?...........................11
      O.    When is the Confirmation Hearing set to occur? ..................................................11
      P.    What is the purpose of the Confirmation Hearing?................................................11
      Q.    What is the effect of the Plan on the Debtors' ongoing businesses? ......................12
      R.    Who do I contact if I have additional questions with respect to this Disclosure Statement
            or the Plan? ............................................................................................................12
      S.    Could subsequent events potentially affect recoveries under the plan? ................12
      T.    Do the Debtors recommend voting in favor of the Plan?.......................................13

IV.   THE DEBTORS' PLAN .......................................................................................................13

      A.    The Plan ................................................................................................................13

V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........18

      A.    Z Gallerie's Corporate History..............................................................................18
      B.    The Debtors' Business Operations.........................................................................19
      C.    The Debtors' Cost Structure..................................................................................20
      (i)   Supply Chain.........................................................................................................20
      (ii)  Employee Compensation and Benefits ..................................................................20
      (iii) Real Estate Obligations.........................................................................................20
      D.    The Debtors' Prepetition Capital Structure ...........................................................20

VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS.......................................................21

      A.    Challenging Operating Environment and Operational Right-Sizing.......................21
      B.    Supply Chain and Borrowing Base Challenges .....................................................22
      C.    Exploration of Strategic Alternatives....................................................................22
      D.    Operational Right-Sizing Initiatives......................................................................22

| | | |
|---|---|---|
| **VII.** | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **23** |
| | A. First Day Relief | 23 |
| | B. Other Procedural and Administrative Motions | 23 |
| | C. Final Approval of Debtor-in-Possession Financing | 24 |
| | D. Schedules and Statements | 24 |
| | E. Appointment of Official Committee | 24 |
| | F. Litigation Matters | 25 |
| | G. Rejection and Assumption of Executory Contracts and Unexpired Leases | 25 |
| | H. Independent Investigation | 25 |
| | I. Marketing Process | 25 |
| **VIII.** | **RISK FACTORS** | **27** |
| | A. Bankruptcy Law Considerations | 27 |
| | B. Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 31 |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES** | **33** |
| | A. Holders of Claims Entitled to Vote on the Plan | 34 |
| | B. Voting Record Date | 34 |
| | C. Voting on the Plan | 34 |
| | D. Ballots Not Counted | 35 |
| **X.** | **CONFIRMATION OF THE PLAN** | **35** |
| | A. Requirements for Confirmation of the Plan | 35 |
| | B. Best Interests of Creditors/Liquidation Analysis | 35 |
| | C. Feasibility | 36 |
| | D. Acceptance by Impaired Classes | 36 |
| | E. Confirmation without Acceptance by All Impaired Classes | 37 |
| **XI.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **ERROR! BOOKMARK NOT DEFINED.** |
| | A. Introduction | **Error! Bookmark not defined.** |
| | B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 10 Interests | **Error! Bookmark not defined.** |
| | C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Term Loan New Tranche A Claims, Allowed Class 8 Critical Trade Claims and Allowed Class 7 General Unsecured Claims | **Error! Bookmark not defined.** |
| | D. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 Term Loan Tranche B Claims | **Error! Bookmark not defined.** |
| | E. Character of Gain or Loss | **Error! Bookmark not defined.** |
| | F. Accrued Interest | **Error! Bookmark not defined.** |
| | G. Market Discount | **Error! Bookmark not defined.** |
| | H. Ownership and Disposition of the Reorganized Debtors Interests | 44 |
| | I. Information Reporting and Backup Withholding | **Error! Bookmark not defined.** |
| **XII.** | **RECOMMENDATION** | **48** |

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

**EXHIBIT B**    Liquidation Analysis [TO COME]

**EXHIBIT C**    Financial Projections [TO COME]

## I.       INTRODUCTION

Z Gallerie, LLC and Z Gallerie Holding Company, LLC, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 22, 2019 (as may be amended, supplemented, or modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

Z Gallerie was the dream of three siblings —Joe, Carole, and Mike **Z**eiden—who started a small single-location poster and accessory store in 1979, using their parent's garage as a framing workshop at night.  From those humble beginnings, Z Gallerie has grown into a leading specialty retailer focused on fashion and art-conscious home décor with 76 stores across the United States.  The Zeiden's love for art ultimately became a driving force behind Z Gallerie's overall design aesthetic. Today, Z Gallerie's bright, upscale stores attract a loyal customer base that appreciates the company's curated, unique style and customizable experience focused on fashion- and art-inspired home décor and home furnishings. Customers can also browse inventory, develop their own style profile, and shop in-store and online.

Following a transaction in 2014 in which the Zeidens sold majority control of the company to Brentwood (as discussed in greater detail below), Z Gallerie's performance declined.  The downward trajectory of Z Gallerie's performance was largely driven by several key factors: (i) a store footprint expansion did not meet performance targets; (ii) the addition of the Atlanta distribution center disrupted operations and increased costs; and (iii) the failure to timely invest enough capital in Z Gallerie's e-commerce platform ultimately limited its growth.  These missteps were exacerbated by macroeconomic trends in the brick and mortar retail industry and lower housing starts.  As a result, net revenue and EBITDA declined significantly during fiscal years 2017 and 2018.  By the Petition Date, the Debtors lacked liquidity to continue operations.

Because Z Gallerie's declining performance was predominantly the result of operational missteps, management believes that it can execute a plan to turn the company around and, in fact, has already seen positive returns associated with its turnaround efforts, as discussed below.  Accordingly, the Debtors commenced the Chapter 11 Cases to right-size their capital structure and further implement both financial and operational restructuring initiatives that management believes will best position Z Gallerie for future success.

The Debtors have taken—and will continue to take—several significant steps to turn-around the business, including: (i) retaining A&G Realty Partners, LLC ("A&G") in October 2018 to engage in rent

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

reduction negotiations with landlords, resulting in an estimated savings of $3 million in annual lease expenses; (ii) enhancing the eCommerce platform and website to expand the company's omni-channel strategy; (iii) revamping operations in the Atlanta distribution center over the last 6 months to streamline processing and reduce expenses, contributing to the substantial improvement in operational performance; (iv) launching more targeted social media marketing campaigns; and (v) implementing in-store employee training and marketing programs to better communicate the brand's strong value proposition to customers. In addition, at the beginning of the Chapter 11 Cases, the Debtors obtained Court approval to wind down and close 17 unprofitable retail store locations during the first two months of the Chapter 11 Cases [Docket No. 74]. These stores collectively lost $7.2 million in 2018.

Due in large part to these initiatives undertaken to optimize the business and position the company for future success, Z Gallerie has seen marked improvements in the months prior to the Petition Date. From the sales perspective, February same store comparable sales are up 5% year-over-year, 2018 holiday ecommerce traffic was up 13% over 2017, and the average transaction amount is up significantly in the last two months. From an operations perspective, saleable inventory is up 11%, lead time is down 20%, and orders not shipped due to processing issues are down 40% (all as compared to recent historic averages). Taken together, the outlook is bright and Z Gallerie is not "just another retailer" facing market headwinds.

As contemplated by the Plan, the Debtors believe that a going-concern reorganization or going-concern sale of Z Gallerie is in the best interest of all creditors and will maximize the value of the estates for all creditors. Before the commencement of their chapter 11 cases, the Debtors initiated the sale process by commencing a marketing process for the Z Gallerie business. On the first day of the Chapter 11 Cases, the Debtors also filed a motion seeking Bankruptcy Court approval of procedures and a process (the "Bidding Procedures") for the Debtors to market and sell their assets under the Plan [Docket No. 22], which motion is scheduled to be heard by the Bankruptcy Court on April 10, 2019. As part of this process, the Debtors have reached out to approximately 180 potentially interested parties thus far. The Bidding Procedures establish that non-binding indications of interest are due on April 19, 2019 and the deadline for interested parties to submit Qualified Bids is May 16, 2019 by 5:00 p.m. (prevailing Eastern Time). The Auction to determine the Winning Bidder, if required, will be held on May 20, 2019.

Whether the Debtors sell their assets through the Bidding Procedures and Sale process or reorganize as a going-concern through a debt for equity conversion, the Debtors restructuring and conclusion of the Chapter 11 Cases will be implemented through the Plan. Specifically, the Plan contemplates each of these alternatives: (a) if there is a third-part Winning Bidder as part of the Sale Process, the third party Winning Bidder will purchase the Assets through the Plan and the Sale Transaction Proceeds will be distributed as recovery to the Prepetition Secured Lenders and (b) if there is no third-party Winning Bidder, the Prepetition Secured Lenders will take control of Z Gallerie through a a debt for equity exchange.

Specifically, under the terms of the Plan, holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- Secured Tax Claims, Other Secured Claims, and Other Priority Claims will be paid in full, in cash on the Effective Date or otherwise provided treatment as to render such Claims unimpaired.

- Allowed Secured Revolving Loan Claims will receive (a) if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to payment in full or (b) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro

Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date.

- Holders of Secured Term Loan Claims will receive (a) if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to payment in full or (b) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date.

- Holders of Critical Trade Claims will receive their Pro Rata share of [the General Unsecured Claims Recovery Pool].

- Holders of General Unsecured Claims will receive their [Pro Rata share of the Critical Trade Claims Recovery Pool, plus any excess distributable cash proceeds depending on the outcome of the Auction].

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative to a going-concern sale or reorganization would materially reduce recoveries to claim holders. Accordingly, the Debtors urge all holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Stretto,[2] the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by [June 10], 2019, at 5:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

---

[2]    The motion to retain Stretto as Administrative Agent and Solicitation Agent [Docket No. 91] is scheduled to be heard by the Bankruptcy Court on April 10, 2019.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|:---:|---|:---:|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Revolving Loan Claims | Impaired | Entitled to Vote |
| 5 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 6 | Critical Trade Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Interests in the Z Gallerie Holding Company, LLC | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

4

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the applicable Reorganized Debtor:<br><br>(i) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or<br><br>(ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | $[●] – $[●] | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Reorganized Debtor:<br><br>(i) payment in full in Cash of such Holder's Allowed Other Secured Claim;<br><br>(ii) the collateral securing such Holder's | $[●] – $[●] | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | Allowed Other Secured Claim;<br><br>(iii) Reinstatement of such Holder's Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | | |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash on account of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired | $[●] – $[●] | 100% |
| 4 | Secured Revolving Loan Claims | To the extent any Allowed Secured Revolving Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Revolving Loan Claim, each Holder of an outstanding Allowed Secured Revolving Loan Claim shall receive either:<br><br>(i) if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Revolving Loan Claim or such other treatment rendering such Holder's Allowed Secured Revolving Loan Claim Unimpaired; or<br><br>(ii) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date. | $[●] | [●] |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 5 | Secured Term Loan Claims | To the extent any Allowed Secured Term Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Term Loan Claim, each Holder of an outstanding Allowed Secured Term Loan Claim shall receive either:<br><br>(i)  if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Term Loan Claim or such other treatment rendering such Holder's Allowed Secured Term Loan Claim Unimpaired; or<br><br>(ii) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date. | $[●] | [●] |
| 6 | Critical Trade Claims | Except to the extent that a Holder of an Allowed Critical Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Critical Trade Claim, each Holder of an Allowed Critical Trade Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed Critical Trade Claim) of [TO COME]. | $[●] | [●] |

7

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 7 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of: <br><br> (i)   [TO COME.] | $[●] – $[●] | [●] |
| 8 | Intercompany Claims | Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.  On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by such Reorganized Debtors. | $0 | 0% |
| 9 | Intercompany Interests | Intercompany Interests shall be, at the option of the Debtors either: <br><br> (ii)  Reinstated in accordance with Article III.G of the Plan; or <br><br> (iii) Discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | 0%/100% |
| 10 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |
| 11 | Interests in the Z Gallerie Holding Company, LLC | Interests in Z Gallerie Holding Company, LLC shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in Z Gallerie Holding Company, LLC will not receive any distribution on account of such Interests. | N/A | 0% |

E.      **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit B**.

F.      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (c) commencement of distributions under the Plan.  Note that Holders of certain types of Claims, such as General Unsecured Claims and Critical Trade Claims, may not receive any distributions until the Debtors or Reorganized Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

G.      **What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by the following sources of consideration, as applicable:  (a) Cash on hand; (b) the Sale Proceeds; (c) the proceeds from the Exit Credit Agreement Facility; and (d) the issuance of the Reorganized Debtors Interests.

H.      **Are there risks to owning the Reorganized Debtors Interests upon emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors."

I.      **Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article VIII.B.5 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

If it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that

the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**J.    Will the final amount of Allowed Unsecured Claims and Allowed Critical Trade Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $[●] – $[●] and aggregate Critical Trade Claims is approximately $[●]. Each holder of an Allowed General Unsecured Claim will receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the General Unsecured Claims Recovery Pool. Each Holder of an Allowed Critical Trade Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed Critical Trade Claim) of the Critical Trade Claims Recovery Pool.

Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower) and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors or any official committees appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to holders of General Unsecured Claims, and such changes could be material.

**K.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors, Secured Credit Agreement Lenders, the DIP Lender, in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all stakeholders. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan, (b) all holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.8 of this Disclosure Statement, entitled "Releases."

**L.      What is the deadline to vote on the Plan?**

The Voting Deadline is June 4, 2019, at 4:00 p.m. (prevailing Eastern Time).

**M.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline,  which is [June 10], 2019, at 5:00 p.m. prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**N.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**O.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for June 11, 2019 at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than June 4, 2019, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**P.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain

limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Q.     What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.    Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan), and (3) the Debtors declare the Plan effective.    On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.    Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**R.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Stretto
> Re: Z Gallerie, LLC, et al.
> 8269 E. 23rd Avenue, Suite 275
> Denver, CO 80238
>
> *By electronic mail at:*
> TeamZGallerie@stretto.com
>
> *By telephone (toll free) at:*
> (855) 276-9008

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/zgallerie (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

**S.     Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.    As described in greater detail below, the Debtors are conducting a marketing and Auction process, seeking a potential purchaser for all or some of the Debtors' assets.    The Debtors anticipate that the Auction, if any, related to this marketing process will take place on [May 20], 2019. As is already contemplated by the Plan, the outcome of this sale process will determine the type and amount of recoveries for various Classes of Claims. Specifically, as set forth below, depending on the outcome, Secured Lenders may receive Cash (in the event of a sale to a third-party Winning Bidder) or Reorganized Debtor Interests (if there is no third-party Winning Bidder). In addition, the amount of recovery will vary depending on the Sale Transaction Proceeds.

Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached. Any number of subsequent events may interfere with Plan recovery.

**T.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.      THE DEBTORS' PLAN

**A.      The Plan**

As discussed in Article III herein, the Plan contemplates a going-concern sale or reorganization of the Debtors' business and provides for the Exit Facility to provide post Effective Date liquidity, in the event that such financing is required. .  The Plan contemplates the following key terms, among others described herein and therein:

### 1.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan will be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and will be final.

### 2.      Restructuring Transactions

On the Effective Date, the applicable Debtors or the Reorganized Debtors will enter into transactions and take all actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, including, as applicable, entry into  the Exit Facility, consummation of the Sale Transaction, and/or the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions.  The actions to implement the Restructuring Transactions may include:   (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or

articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 3.    Exit Facility

On the Effective Date, if required, the Reorganized Debtors shall execute and deliver the Exit Credit Agreement Documents to any applicable administrative agent for the Exit Credit Agreement Facility.  The Reorganized Debtors shall use the Cash proceeds provided under the Exit Credit Agreement Facility to fund ongoing operations and distributions under the Plan, and satisfy certain other Cash obligations under the Plan.

The Exit Credit Agreement Facility will consist of either a term loan facility, a revolving loan facility, an asset-based revolving facility, or some combination thereof. On the Effective Date, the Participating Exit Facility Lenders shall fund the Exit Facility.  The terms for the Exit Credit Agreement Facility will be determined in accordance with the Reorganized Debtors' contemplated post-Effective Date business plan following and depending on the results of the Auction (with may contemplate the continued ownership or operation of all or only some of the Debtors' assets), and otherwise in form and substance acceptable to the Participating Exit Facility Lenders in their discretion, and any documentation necessary to implement the Exit Credit Agreement Facility will be included in the Plan Supplement.

### 4.    Issuance of Reorganized Debtors Interests

All existing Interests in the Debtors shall be automatically cancelled on the Effective Date and Reorganized Debtors will issue the Reorganized Debtors Interests to Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan, as applicable.  The issuance of the Reorganized Debtors Interests, is authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable.  The New Organizational Documents, as applicable, will authorize the issuance and distribution on the Effective Date of the Reorganized Debtors Interests to the Disbursing Agent for the benefit of Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan.  All of the Reorganized Debtors Interests issued under the Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Debtors Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance.

### 5.    Sale Transaction

Continuing after the Petition Date, the Debtors will continue conducting a marketing and Auction process of some or all of the Debtors' assets in accordance with the Bidding Procedures to determine the Winning Bidder.  The Bidding Procedures will set forth the timeline and terms of the bidding process. The Debtors will seek to elicit the highest or otherwise best Sale Transaction offer pursuant to the process set forth in the Bidding Procedures.  The Sale Transaction will be consummated pursuant to the Plan in accordance with terms to be set forth in the Confirmation Order and Plan Supplement, as applicable, and the Prepetition Secured Lenders will receive the Secured Credit Agreement Distributable Cash as set forth in Article III of the Plan.

If no Entity submits a Qualified Bid, the Holders of Secured Revolving Loan Claims and Secured Term Loan Claims will receive the Reorganized Debtor Interests on the Plan Effective Date.

6.    **Recoveries to Certain Holders of Claims and Interests**

The recoveries to holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

7.    **Releases THESE NEED TO BE DIRECTLY COPIED FROM THE PLAN IF THEY HAVEN'T ALREADY**

The Plan contains certain releases, as described in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

(a)    **Release of Liens.**

**Except as otherwise provided in the Exit Credit Agreement Documents, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

(b)    **Releases by the Debtors.**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business**

or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; p*rovided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(c)        Releases by Holders of Claims and Interests.

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of

property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(d)    **Exculpation**

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(e)    **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection

with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Z Gallerie's Corporate History

For nearly 40 years, the Debtors have focused on making home décor fashion-focused, art-infused, and accessible for its local customer base. Z Gallerie delivers "fashion for the home," translating the latest fashion into home furnishings with an eye towards combining current trends and their complementary classics. After years of success and growth, the Debtors found themselves caught in a mixture of operational missteps and the rapid decline of brick-and-mortar retail in favor of online retail. Despite those headwinds, the Debtors maintain a loyal customer base. The Debtors believe that this, in conjunction with recently implemented initiatives aimed at operational improvement and social media and web-based customer engagement will enable them to achieve higher sales productivity by transitioning to more efficient operations while developing a robust online sales presence.

After its founding in 1979 as a single poster shop, Z Gallerie grew to 76 stores and expanded its offerings to include home furnishings and home décor. Currently, Z Gallerie operates stores across the United States in conjunction with an online eCommerce platform, generating over $200 million in combined sales in 2018.

The chart below depicts the Debtors' current corporate structure.



As of the date of this Disclosure Statement, the Debtors' senior management includes:  Mark Weinsten, Interim President and Chief Executive Officer, Rob Otto, Chief Financial Officer, Kerem Ozkay, Vice President of Marketing and eCommerce, Shelley Gardner, Vice President of Merchandising, Shin Kim, Vice President of Planning, and Mary Mckay Grbich, Vice President of Stores.

As of the date of this Disclosure Statement, the members of the board of managers of Z Gallerie are: Roger Goddu, Steve Moore, Lynn Kilbourne, Matthew Kahn, and Alan Miller.

**B.**      **The Debtors' Business Operations**

The Debtors generally specialize curated, unique style and customizable experience focused on fashion- and art-inspired home décor and home furnishings.  As of the Petition Date, Z Gallerie operated in 28 states, and its products were sold in 76 stores, comprised of 74 retail stores and two outlet stores, located in lifestyle centers, shopping malls, and street level shops.    Subsequent to the Petition Date, the Debtors initiated store closure sales and, as of the date hereof, are in the process of closing 17 stores.

In addition to its physical footprint, Z Gallerie maintains a significant online presence. Customers can seek out the latest home décor trends, explore customizable options for a vast array of different furniture and décor styles, and take a Style Personality Quiz to better guide their shopping journey on the Z Gallerie website.  Customers may also purchase merchandise via the Debtors' eCommerce platform.  Following recent updates, Z Gallerie maintains a user-friendly and well-curated eCommerce online platform that ensures a seamless customer experience.  In 2018, eCommerce accounted for over 20% of all sales.  The Debtors also operate two distribution centers, one in California and on in Georgia, to timely deliver goods to stores and direct to customers.

C.      **The Debtors' Cost Structure**

(i)      **Supply Chain**

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations and consumers.  Generally, the Debtors contract with various domestic and international vendors across eight countries to design, source, and produce the merchandise.  When product is ready to be delivered at international ports, the Debtors use UPS Supply Chain Solutions to handle all facets of transport to the Debtors' warehouses in Los Angeles and Atlanta. Domestic vendors contract with third-party delivery companies to transport the merchandise to the Debtors' distribution centers.  Once goods are to be delivered to a store or fulfill a customer order, the Debtors hire third-party common carriers to complete delivery from the distribution centers.

(ii)      **Employee Compensation and Benefits**

As of the Petition Date, the Debtors employed slightly over 1,000 employees across their retail and corporate operations.  The Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, is approximately $46.8 million in 2019.  The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs that are standard and competitive in the industry.

(iii)      **Real Estate Obligations**

22.      The Debtors lease all of their store locations, office space, and distribution centers.  The Debtors estimate that the aggregate occupancy costs for the Debtors' go-forward operations after implementing closings in these cases and negotiating lease modifications will be approximately $29 million in fiscal year 2019, excluding tenant amortization.  The Debtors anticipate 59 go-forward locations following the first round of store closures.  The remaining real estate footprint will likely be comprised of 55 stores, two outlets, and two distribution center.

D.      **The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $138 million.  The Debtors' prepetition capital structure is summarized as follows:

| Funded Debt | Maturity | | Principal Amount |
|---|---|---|---|
| **Senior Secured Revolving Loans** | October 2020 | | $19,368,708.30 |
| **Senior Secured Term Loans** | October 2021 | | $91,427,540.43 |
| **Senior Unsecured Notes** | March 2020 | | $10,639,588.40 |
| **Senior Unsecured Refinancing Notes** | January 2022 | | $17,220,783.57 |
| | | **Total:** | $138,656,620.70 |

1.      **Collateral of Debt Obligations**

The Senior Secured Credit Agreement obligations are secured by substantially all assets of Z Gallerie, LLC and Z Gallerie Holding Company, LLC (collectively, the "Credit Parties"), including, without limitation, a first priority lien on the Credit Parties' accounts (including receivables), inventory,

deposit and securities accounts (subject to certain exceptions), cash and cash equivalents, owned real property with a fair market value equal to or greater than $3,000,000, intellectual property, and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral").

Additionally, the Credit Parties have entered into deposit account control agreements in favor of KeyBank National Association (the "Agent") with respect to their bank accounts. Thus, substantially all of the Credit Parties' cash is subject to a perfected security interest in favor of the Agent. As of the Petition Date, the term loan facility is fully drawn and there is no availability under the revolving facility.

The Senior Unsecured Refinancing Notes comprise a different series of notes from the Senior Unsecured Notes but have identical terms (other than the maturity date of such Senior Unsecured Refinancing Note) and the same treatment and are *pari passu* with the Senior Unsecured Notes.

Under the terms of the DIP Facility, as set forth in the Interim DIP Order and the DIP Credit Agreement, obligations of the Debtors under the Prepetition Secured Revolver Facility have been partially refinanced and converted into DIP Claims. The Debtors do not anticipate that any amounts will remain outstanding under the Prepetition Secured Revolver Facility following the Confirmation Hearing.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Operational and Growth Challenges

A confluence of operational and strategic factors contributed to the Debtors' need to commence the Chapter 11 Cases. These factors are mostly self-imposed and include, among other things: (i) a store footprint expansion that did not meet expectations, (ii) the addition of the Atlanta distribution center that disrupted operations and increased costs, and (iii) the Debtor's failure to timely invest enough capital in their e-commerce platform. The macroeconomic trends impacting the retail industry generally were contributing factors, but not the main factors, behind the Debtors performance shortfalls. The Debtors did not timely respond to meet these challenges, and suffered diminished performance as a result. Over time, these factors have tightened the Debtors' liquidity position and complicated their relationship with their landlords and vendors. As of the Petition Date, the Debtors had insufficient liquidity to meet their operating obligations.

Nonetheless, the Debtors started making changes to improve operational performance prior to the Petition date. As discussed above, the Debtors conducted employee training to teach their employees to better position the brand for customers and fixed challenges at their Atlanta distribution center, among other initiatives. Same store comparable sales were up in February and the average ticket price is trending upward. In addition, the company has rectified challenges it faced in the Atlanta distribution center and operational benchmarks are trending in the right direction.

Over the last year, the Debtors have also endeavored to improve their online presence. Web traffic is up as the company has built out a stronger internal ecommerce team and focused on social media and innovative promotional and product programs. The Debtors also invested to enhance eCommerce capabilities and are implementing a truer omnichannel strategy to leverage the ecommerce platform and store footprint, such as giving customers the opportunity to buy on line and pick up in store. These initiatives took the form of (i) website optimization, including heatmap analysis (informing how customers utilize their platform), expected to lift revenue $3.8 million in fiscal year 2019; (ii) mobile reconfiguration, providing new functionality increasing mobile conversion 10% year over year; (iii) increased effectiveness of email capture of point of sale, up 101% year over year; and (iv) brought content design and production in-house to better leverage creative initiatives across print and digital. Year over year growth in the online channel has seen a significant increase, and now accounts for approximately 25% of overall revenue.

### B.    Supply Chain and Borrowing Base Challenges

As the Debtors' liquidity has tightened, supply chain vendors have begun to place pressure on the supply chain cost structure.  Some of the Debtors' inventory was stuck at port in California, with vendors unwilling to release the product absent payment in full.  This in turn worsened the Debtors' ability to generate revenue from sales, creating a negative feedback loop decreasing liquidity.

The DIP Facility provided the Debtors with the liquidity they needed to revive their supply chain and maintain the flow of inventory to their distribution centers. Since the Petition Date, the Debtors have made payments of approximately $[●] million for finished goods that are sold in stores.  Additionally, the Debtors have made payments of nearly $[●] million associated with the fulfillment of future purchase order commitments.

### C.    Corporate History

In April 2009, Z Gallerie filed for bankruptcy in the Central District of California.  Z Gallerie was able to successfully reorganize its business around its strongest performing stores and eliminate underperforming locations.

In October 2014, Brentwood purchased a 70% stake in Z Gallerie through Brentwood Associates Private Equity V LP (the "2014 Sale"). [3]  The Zeidens retained a 30% equity interest in the company.  As part of the transaction, Brentwood maintains two seats on the Board of Managers (the "Board") and the Zeidens retain one seat on the Board.  Prior to the chapter 11 filing, Mike Zeiden resigned from the Board.  The Debtors have also appointed two disinterested directors.

### D.    Exploration of Strategic Alternatives

As the Debtors recognized that they would soon run out of adequate cash to fund operations, they engaged their Prepetition Lenders regarding the terms of loans that would provide incremental liquidity without a chapter 11 filing.  The Debtors had no unencumbered assets, so any liquidity would have needed to be unsecured (absent consent of the senior lenders). Despite the Debtors' best efforts, no source of liquidity emerged that would lend outside of the chapter 11 context.

The Debtors retained Lazard to facilitate, among other things, a sale process for their assets.  In early March 2019, Lazard distributed a "teaser" to potential strategic and financial buyers.  Lazard has received interest from some parties, several of which have entered into confidentiality agreements with the Debtors and are analyzing a transaction.  As set out in the Bidding Procedures Motion filed contemporaneously herewith, Lazard is running a marketing process that will, the Debtors hope, result in a competitive auction for the purchase of the Debtors' assets.

### E.    Store Footprint Right-Sizing Initiatives

Recognizing the need to right-size the Debtors' store base while simultaneously creating much-needed liquidity, the Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores, evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each

---

[3]    While the Debtors have no reason to believe that they maintain any viable claims against either Brentwood or the Zeidans on account of the 2014 Sale or any activity since the 2014 Sale, the Debtors' Delaware co-counsel, Klehr Harrison Harvey Branzburg LLP, is conducting an investigation into any potential claims or causes of action at the direction of the independent directors.

store is located, the type of storefront in which each store is located, and specific operational circumstances related to each store's performance (the "Performance Evaluation").

Additionally, in late 2018 the Debtors, with the assistance of A&G Realty Partners, LLC began lease modification negotiations with many of the Debtors' landlords for rent concessions to reduce annual rent expenses (the "Lease Negotiations"), with the goal of improving the Debtors' overall financial performance. The Debtors filed a motion seeking to retain A&G in the Chapter 11 Cases at Docket No. 89, which motion is scheduled to be heard by the Bankruptcy Court on April 10, 2019.

As a result of the Performance Evaluations and Lease Negotiations, the Debtors sought authority to close 17 stores at the onset of the chapter 11 cases (the "Store Closures"). The Debtors have concluded that the cost of maintaining the Closing Stores outweighs any revenues that the Closing Stores currently generate or are likely to generate in the future. Additionally, the Debtors considered whether or not the leases could be economically monetized in the chapter 11 process. After considering the potential value of the leases, the costs of holding an auction and delaying rejection, and potential cost of litigation regarding assignment, the Debtors determined, in their business judgement, that the potential value of the leases does not justify the costs of pursuing a sale. The Debtors continue to evaluate the leases and reserve their right to remove any of the leases from the lease rejection schedule prior to a final hearing. The Debtors, in their business judgement, believed that in any restructuring outcome, closing these 17 stores would maximize value for the stakeholders.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Mark Weinstein, Interim President and Chief Executive Officer of Z Gallerie, LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 25], filed on March 11, 2019.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/zgallerie/firstdaypleadings.

### B.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Retention Applications of Debtor Professionals. On March 20, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327,328, and/or 363 of the Bankruptcy Code, including:

  o Kirkland & Ellis, LLP as legal counsel [Docket No. 93],

  o Klehr Harrison Harvey Branzburg LLP [Docket No. 88],

      o   Lazard Middle Market LLC as financial advisor [Docket No. 92],

      o   Berkeley Research Group, LLC as restructuring advisor [Docket No. 90], and

      o   A&G Realty Partners, LLC as real estate consultant [Docket No. 98] (collectively, the "<u>Retention Applications</u>").

- The Retention Applications are set for hearing on April 10, 2019 at 10:00 A.M. (prevailing Eastern Time). The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

- <u>Ordinary Course Professionals Motion</u>. On [●], 2019, the Debtors filed the Motion of Z Gallerie, LLC, et al., for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket No. [●]] (the "<u>OCP Motion</u>"). The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On [●], 2019, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. [●]].

**C.**      **Interim Approval of Debtor-in-Possession Financing**

On March 15, 2019, the Bankruptcy Court entered an interim order approving the Debtors' proposed debtor-in-possession financing (the "<u>DIP Financing</u>") on an interim basis (the "<u>Interim DIP Order</u>") [Docket No. 75]. Pursuant to the Interim DIP Order, Z Gallerie received authorization to obtain postpetition financing of up to $28,000,000, approximately $8,000,000 of which provides incremental liquidity. Of the DIP Financing, $5,750,000 is available pursuant to the Interim DIP Order and $3,000,000 will become available following final approval of the DIP Financing.

Pursuant to the Interim DIP Order, $5,750,000 of the aggregate principal amount of Prepetition Revolving Loans was immediately rolled-up and converted into the DIP Obligations upon entry of the Interim DIP Order. From and after entry of this Interim DIP Order, the Debtors draw down of such monies or disbursement of such monies results in additional amounts of the Prepetition Revolving Loans converting to up into DIP Obligations on a dollar-for-dollar basis. Following entry of the Final DIP Order, the Prepetition Revolving Loan Facility will be entirely converted into DIP Obligations

**D.**      **Schedules and Statements**

The Debtors anticipate filing their Schedules of Assets and Liabilities and Statement of Financial Affairs by [April 5, 2019].

**E.**      **Appointment of Official Committee**

On March 20, 2019, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 87], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "<u>Committee</u>") in the Chapter 11 Cases.

### F.      Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### G.      Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over one thousand Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.  The Debtors expect to file a motion seeking approval of procedures for the assumption or rejection of Executory Contracts and Unexpired Leases to be heard on April 10, 2019.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

### H.      Independent Investigation

Alan Miller and Matthew Kahn serve as two of the Debtors' independent managers to, among other things, review and determine the appropriateness of certain pre-Petition Date transactions of the Debtors and of the releases included in the Plan.  Klehr Harrison Harvey Branzburg LLP serves as Delaware co-counsel to the Debtors and is assisting the independent managers with the ongoing review and assessment of these issues.  Upon completion of this review and assessment, the Debtors will modify this Disclosure Statement as appropriate.

### I.      Marketing Process

As described above, the Debtors are conducting a marketing and Auction process for some or all of their assets or the equity interests in Reorganized Debtors.  The Debtors, working with Lazard, contacted approximately 180 potentially interested parties, including both financial and strategic counterparties.  More than 30 such interested parties executed, or are in the process of executing, non-disclosure agreements for purposes of accessing a confidential information memorandum and virtual data room in connection with the marketing and Auction process.  Each of these parties were also provided "teaser" materials.

Under the Bidding Procedures approved by the Bankruptcy Court, the deadline for interested parties to submit non-binding indications of interest is April 19, 2019.  The deadline for interested parties to submit Qualified Bids to participate in the Auction is May 16, 2019.  Pursuant to the Bidding

Procedures, Qualified Bids must satisfy the general Bid Requirements (as defined in the Bidding Procedures) set forth in the Bidding Procedures and provide for the following:

a.      <u>Purpose</u>.  Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets, and which Assets with reasonable specificity.

b.      <u>Purchase Price</u>:  Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, certain liabilities to be assumed by the Acceptable Bidder as part of the Plan (the "<u>Purchase Price</u>").

c.      <u>Deposit</u>:  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

d.      <u>Marked Agreement</u>:  Each Bid must include, at a minimum, draft asset purchase agreement (the form of which will be provided to any Acceptable Bidder prior to the Bid Deadline (the "<u>Asset Purchase Agreement</u>")  together with a redline version of the revised Asset Purchase Agreement to the form, including the exhibits and schedules related thereto and any related Transaction documents or other material documents integral to such Bid, pursuant to which the Acceptable Bidder proposes to effectuate the Transaction (collectively, the "<u>Transaction Documents</u>").

e.      <u>Committed Financing</u>:  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, after consultation with the Consultation Parties and the Committee, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.  For the avoidance of doubt, funding commitments for any Acceptable Bidder's Purchase Price may be provided by of the DIP Lender.

f.      <u>Contingencies; No Financing or Diligence Outs</u>:  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

g.      <u>Identity</u>:  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid.

h.      Authorization:  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

**i.**      As-Is, Where-Is:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Transaction Documents.

Upon entry of the Bidding Procedures Order and up until 2 days prior to the Auction, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, to (a) select one or more Acceptable Bidder to act as a stalking horse bidder  in connection with the Auction and (b) in connection with any staking horse agreement with a Stalking Horse Bidder, (x) provide a breakup fee (the "Breakup Fee"), (y) agree to reimburse the reasonable and documented out-of-pocket fees and expenses and/or (z) agree to pay a "work fee" or other similar cash fee (the "Work Fee"). The aggregate amount that may be paid to any or all stalking horse bidders on account of (x) - (z) shall not exceed three percent of the proposed Purchase Price.

## VIII.  RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them will ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors

believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.  Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.  The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12. The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to holders of Allowed General Unsecured Claims and Critical Trade Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 13. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 14. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

## B.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.    The Debtors May Not Receive a Qualified Bid or Secure Exit Financing.

The Debtors' ability to receive a Qualified Bid or Secure Exit Financing may affect the Debtors' compliance with terms of the DIP Facility.  Should the Debtors fail to receive a Qualified Bid or secure exit financing, such an occurrence would be deemed a default under the terms of the DIP Facility.

### 2.    The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Credit Agreement Facility upon emergence.

### 3.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors

cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

Additionally, a substantial portion of the value of the Debtors' businesses is its intellectual property. The chapter 11 cases may have a negative effect on the value of the Debtors' intellectual property, including if the intellectual property were to be deemed invalid or non-transferrable by an order of the Bankruptcy Court.

### 4. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 5. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial

Projections contained in **Exhibit C** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 6. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 8. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes 4, 5, 6, and 7 (collectively, the "Voting Classes"). The holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 3, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims or Interests in the Voting Classes, such as those holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is May 1, 2019**. The Voting Record Date is the date on which it will be determined which holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

### C.    Voting on the Plan

**The Voting Deadline is June 4, 2019, at 4:00 p.m. (prevailing Eastern Time)**. To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or to one of the below addresses.

> **If sent by hand delivery, or overnight mail**
>
> **Stretto**
> **Re: Z Gallerie, LLC, et al.**
> **8269 E. 23rd Avenue, Suite 275**
> **Denver, CO 80238**

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE SOLICITATION AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTPS://CASES.STRETTO.COM/ZGALLERIE**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 276-9008 OR VIA ELECTRONIC MAIL TO TEAMZGALLERIE@STRETTO.COM.**

    **D.**    **Ballots Not Counted**

    **No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

    **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

**X.**    **CONFIRMATION OF THE PLAN**

    **A.**    **Requirements for Confirmation of the Plan**

    Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

    At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

    **B.**    **Best Interests of Creditors/Liquidation Analysis**

    Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each

impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the Reorganized Debtors Interests to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

The U.S. federal income tax consequences of the implementation of the Plan will depend on, among other things, whether the Secured Credit Agreement Lenders are the Winning Bidder and, if so whether the Secured Credit Agreement Lenders' Claims are held by more than one entity for U.S. federal income tax purposes. If a party other than the Secured Credit Agreement Lenders is the Winning Bidder then the Debtors expect to treat the Sale Transaction as a taxable sale of assets (a "Taxable Sale"). Similarly, if the Secured Credit Agreement Lenders' Claims are held by a single entity for U.S. federal income tax purposes (while not free from doubt, including a pre-existing partnership) such that when that

entity acquires 100% of the Reorganized Debtors Interests, Reorganized Debtors becomes a disregarded entity for U.S. federal income tax purposes, then the Debtors also expect to treat such Sale Transaction as a Taxable Sale.  However, if the Secured Credit Agreement Lenders' Claims are held by more than one entity for U.S. federal income tax purposes and such Secured Credit Agreement Lenders are the Winning Bidders, and, at least one of such Secured Credit Agreement Lenders is also a holder of Interests in the existing Z Gallerie Holdings, LLC ("Parent") then the Debtors expect to treat the Sale Transaction as a continuation of the Parent partnership, with such Secured Credit Agreement Lenders treated as receiving the Reorganized Debtors Interests in exchange for their respective Claims under section 721 of the Tax Code (a "Partnership Continuation").

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Parent Interests

Immediately prior to the Consummation of the Plan the Debtors will each be treated as disregarded entities for U.S. federal income tax purposes. For U.S. federal income tax purposes, the respective assets of each of the Debtors will be treated as if they were owned by Parent, which is the sole owner of Interests in Z Gallerie Holding Company, LLC, ("Holdings") that is regarded for U.S. federal income tax purposes.  Moreover, because Parent is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but will be borne by the partners of Parent (the "Holders of the Parent Interests").

### 1.    COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the

adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity, such as Parent, that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level.  Accordingly, the Holders of Parent Interests will be treated as receiving their allocable share, if any, of the COD Income realized by Parent.

The Debtors, and accordingly, the Holders of the Parent Interests, expect to realize significant COD Income as a result of the consummation of the Plan.  The exact amount of any COD Income that will be realized by the Debtors and the Holders of the Parent Interests will not be determinable until the consummation of the Plan.

**2.        Recognition of COD Income and Gain on Sale Transaction.**

Pursuant to the Sale Transaction, the Debtors will transfer all or substantially all of their assets to the Winning Bidder, whereby the Cash received in such a Sale Transaction will be used to fund the applicable creditor recoveries pursuant to the Plan.    Subject to the Partnership Continuation considerations referenced above (and discussed further below), such transfer generally should be treated as a Taxable Sale or exchange of the assets of the Debtors for U.S. federal income tax purposes.

Accordingly, the Debtors may recognize gain upon the transfer of certain assets to the Winning Bidder.  As described above, because Parent is the only parent of the Debtors that is regarded for U.S. federal income tax purposes, such gain or loss will be allocated to the Holders of the Parent Interests. The amount of gain or loss allocable to any particular Holder of any Parent Interest depends, in part, on when and at what price such Holder paid for its Parent Interest and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets.   The Holders of the Parent Interests are urged to consult their tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of assets (including any other limitations that may be imposed by the tax law based on a holder's individual circumstances).

In a Taxable Sale, Parent (and in turn, the Holders of Parent Interests) should recognize gain or loss equal to the difference between the proceeds of the sale and Parent's adjusted basis in the property sold.  Recent IRS guidance indicates that because the Secured Credit Agreement Lenders' Claims are issued by Z Gallerie, LLC (which is disregarded as an entity separate from Parent for U.S. federal income tax purposes) but are not guaranteed by Parent, such Secured Credit Agreement Lenders' Claims will be treated as "non-recourse" debt of Parent. As a result, the transfer of the Debtors' assets to a third party buyer or to a single holder of the Secured Credit Agreement Lenders' Claims pursuant to a Taxable Sale would be treated as though Parent sold its assets in exchange for proceeds equal not only to the fair value

of such assets or the amount of Cash received, but for the entire adjusted issue price of the discharged Secured Credit Agreement Lenders' Claims. As a consequence Parent will realize less COD Income and more gain (or less loss) on the Taxable Sale than it would if the Secured Credit Agreement Lenders' Claims were guaranteed by Parent and thus were treated as recourse debt for U.S. federal income tax purposes.

Any such gain or loss recognized by Parent will be allocated to the Holders of Parent Interests. The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors including which assets of the Debtors are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization. Any such gain, and any related deductions, may be allocated among the partners in a different manner than any COD Income recognized by Parent would be allocated. Allocations of COD Income, gains and losses among the Holders of Parent Interests are based in part on which Holders of Parent Interests contributed property to Parent and which Holders of Parent Interests are allocated indebtedness that is cancelled as a result of the Sale Transaction. A Holder of Parent Interests that holds both debt and equity interests in Parent also likely receives allocations of gain, related deductions, and other items, in a manner different than Holders of Parent Interests that hold only equity interests in Parent.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Secured Revolving Loan Claims and Allowed Class 5 Secured Term Loan Claims.**

The treatment of Holders of Secured Revolving Loan Claims and Secured Term Loan Claims (for purposes of this Section 2(B), the "Credit Bid Claims") will vary depending upon whether (a) an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder and (b) whether the Sale Transaction is a Partnership Continuation (as discussed above). If the Secured Credit Agreement Lenders are the Winning Bidder and the Sale Transaction is not a Partnership Continuation, then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Credit Bid Claims, each Holder thereof will receive its *pro rata* share, based on the Allowed amount of its applicable Credit Bid Claim, of Interests in the Reorganized Debtors.

If the Secured Credit Agreement Lenders are the Winning Bidder and the Sale Transaction is not a Partnership Continuation, a Holder of a Credit Bid Claim should recognize gain or loss equal to (a) the sum of (i) any Cash received, (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (including Reorganized Debtors' Interests), minus (b) the Holder's adjusted tax basis in its applicable Credit Bid Claim. Such Holder should obtain a tax basis in the non-Cash consideration received, and the holding period for any such property should begin on the day following the receipt of such consideration.

If the Secured Credit Agreement Lenders are not the Winning Bidder and the Sale Transaction is not a Partnership Continuation, then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of its applicable Credit Bid Claim, each Holder thereof will receive its *pro rata* share, based on the Allowed amount of its applicable Credit Bid Claim, of (a) Cash and/or (b) the non-Cash consideration amount that would render such Holder's Allowed Credit Bid Claim Unimpaired. Such Holder will recognize gain or loss equal to the (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its applicable Credit Bid Claim.

In a Sale Transaction that *is* treated as a Partnership Continuation, Holders of Credit Bid Claims will generally not recognize gain or loss on the receipt of Reorganized Debtors Interests. Holders of Credit Bid Claims will have a tax basis in their applicable Reorganized Debtors Interests equal to their tax

basis in the obligation constituting the applicable exchanged Credit Bid Claim, and their tax basis in Interests in Parent, if such Holders also held a Parent Interest.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6 Critical Trade Claims.

Pursuant to the Plan, each Holder of an Allowed Class 6 Critical Trade Claim will receive its [pro rata share of Cash], to the extent the Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5 are paid in full. Such Holders should recognize gain or loss equal to (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its Critical Trade Claim.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 7 General Unsecured Claim.

Pursuant to the Plan, each Holder of an Allowed Class 7 General Unsecured Claim will receive its [pro rata share of Cash], to the extent the Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5 are paid in full. Such Holders should recognize gain or loss equal to (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

### E.    Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### F.    Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument

issued with "original issue discount" ("OID")  its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Section 451 of the IRC (as discussed below) generally would require accrual method Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018.  However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain.  Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes.  Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

     **G.**      **Accrued Interest.**

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC.  Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018.  Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

### H.    Limitation on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains  recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### I.    Ownership and Disposition of the Reorganized Debtors Interests.

Under the Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation.  Subject to the discussion of publicly traded partnerships below and the discussion of Reorganized Debtors becoming a disregarded entity of a sole Holder of Secured Credit Agreement Lenders' Claims above and assuming that neither of the Reorganized Debtors elects to be treated as a corporation for tax purposes, Reorganized Debtors will be treated as a partnership for U.S. federal income tax purposes.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  It is anticipated that the Reorganized Debtors limited liability company agreement will prohibit the transfer of membership interests in Reorganized Debtors if such transfer would jeopardize the status of Reorganized Debtors as a partnership for U.S. federal income tax purposes (prior to an actual conversion for U.S. federal income tax purposes to corporate status).  Any purported transfer in violation of such provisions will be null and void and would not be recognized by Reorganized Debtors.

This discussion of the U.S. federal income tax consequences of the Plan assumes that Reorganized Debtors will be treated as a partnership for U.S. federal income tax purposes. If Reorganized Debtors is treated as a disregarded entity for U.S. federal income tax purposes, its separate existence from its owner is ignored for U.S. federal income tax purposes.

As a partnership, Reorganized Debtors itself will generally not be subject to U.S. federal income tax.  Instead, Reorganized Debtors will file an annual partnership information return with the IRS, which form will report the results of Reorganized Debtors' operations. Each member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Debtors' income, gain, loss, deduction and credit for each taxable year of Reorganized Debtors ending with or within the member's taxable year.  Each item generally will have the same character as if the member had realized the item directly.  Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Debtors for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Debtors.

Reorganized Debtors' tax basis in the portion of each of its assets deemed transferred to the Holders of Secured Credit Agreement Lenders' Claims should equal such portion's fair market value on

44

the Effective Date as determined by the board of directors of Reorganized Debtors, and the holding period for such portion would begin on the day after the Effective Date. Reorganized Debtors' tax basis and holding period in the portion of each of its assets deemed transferred directly to Reorganized Debtors by the Debtors would be the same as the Debtors' basis and holding period with respect to such portion.

A member is allowed to deduct its allocable share of Reorganized Debtors' losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of Reorganized Debtors against other income.

Reorganized Debtors will provide each member with the necessary information to report its allocable share of the Reorganized Debtors' tax items for U.S. federal income tax purposes; however, no assurance can be given that Reorganized Debtors will be able to provide such information prior to the initial due date of the members' U.S. federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of directors of Reorganized Debtors will decide how items will be reported on Reorganized Debtors' U.S. federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of Reorganized Debtors are audited by the IRS, the tax treatment of Reorganized Debtors' income and deductions generally will be determined at the Reorganized Debtors level in a single proceeding, rather than in individual audits of the members. The tax matters partner and partnership representative will have considerable authority under the Tax Code and the limited liability company agreement for Reorganized Debtors to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Debtors (provided that the member is not treated as exchanging such member's share of Reorganized Debtors' "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized Debtors (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of Reorganized Debtors) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from Reorganized Debtors generally will be capital gain, but may be taxable as ordinary income under certain other circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such member makes to Reorganized Debtors, (ii) the member's allocable share of the income of Reorganized Debtors, and (iii) increases in the member's allocable share of the indebtedness of Reorganized Debtors, and reduced, but not below zero, by the sum of (iv) the member's allocable share of

the losses of Reorganized Debtors, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of Reorganized Debtors.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of Reorganized Debtors and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (reduced by any recognized gain which the member may have received on the exchange of an Allowed Secured Term Loan Claim for Reorganized Debtors Interests).  A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

The U.S. federal income tax treatment of a holder of Reorganized Debtors Interests that is a nonresident alien, non-U.S. corporation, non-U.S. partnership, non-U.S. estate or non-U.S. trust (a "Non-U.S. Partner") is complex and will vary depending on the circumstances and activities of such holder and Reorganized Debtors.  Each Non-U.S. Partner is urged to consult with its own tax advisor regarding the U.S. federal, state and local and non-U.S. income, estate and other tax consequences of holding interests in Reorganized Debtors.  The following discussion assumes that a Non-U.S. Partner is not subject to U.S. federal income taxes as a result of its presence or activities in the United States (other than as a holder of Interests in Reorganized Debtors).

A Non-U.S. Partner generally will be subject to U.S. federal withholding taxes at the rate of 30 percent (or such lower rate provided by an applicable tax treaty) on its share of Reorganized Debtors' income from dividends, interest (other than interest that constitutes portfolio interest within the meaning of the IRC), and certain other income that is not treated as "effectively connected with the conduct of a trade or business within the United States," as defined in section 864 of the Tax Code ("ECI").

The activities of Reorganized Debtors are likely to be treated as a U.S. trade or business, and to the extent that such activities are so treated, a Non-U.S. Partner would be deemed to be engaged in that underlying U.S. trade or business. A Non-U.S. Partner's share of Reorganized Debtors' ECI would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Partner is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax. In addition, some or all of the gain on a disposition of a Non-U.S. Partner's interest in Reorganized Debtors could be treated as ECI to the extent such gain is attributable to assets that generate ECI.  A Non-U.S. Partner generally will be required to file a U.S. federal income tax return if Reorganized Debtors is deemed to be engaged in a U.S. trade or business (even if no income allocated to the Non-U.S. Partner is ECI).  Reorganized Debtors would be required to withhold U.S. federal income tax with respect to the Non-U.S. Partner's share of income that is ECI.

Each holder of Reorganized Debtors Interests is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in Reorganized Debtors.

J.      **Information Reporting and Backup Withholding**

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In

general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank*]

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  March 22, 2019

Z Gallerie, LLC
on behalf of itself and its debtor affiliates

*/s/ Mark Weinsten*

Mark Weinsten
Interim President and CEO
Z Gallerie, LLC

COUNSEL:

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

**EXHIBIT A**

**Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Z GALLERIE, LLC, *et al.*,[1] | ) Case No. 19-10488 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**JOINT PLAN OF REORGANIZATION OF Z GALLERIE, LLC AND Z GALLERIE
HOLDING COMPANY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE[2]**

---

**NOTHING CONTAINED HEREIN SHALL
CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR
LEGALLY BINDING OBLIGATION OF THE DEBTORS, ANY OF THE SECURED
CREDIT AGREEMENT LENDERS, OR ANY OTHER PARTY IN INTEREST.  THE TERMS
OF THIS PLAN ARE SUBJECT TO MATERIAL REVIEW AND REVISION IN ALL RESPECTS.**

**YOU SHOULD NOT RELY ON
THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY
PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER
CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022

Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors
in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801

Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

Dated:  March 22, 2019

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Z Gallerie Holding Company, LLC (5949) and Z Gallerie, LLC (3816).  The location of the Debtors' service address is:  1855 West 139th Street, Gardena, CA 90249.

[2]   The Debtors have filed this Plan with certain key provisions omitted.  The Debtors continue to negotiate the terms of the Plan with their stakeholders including the DIP Lender, the Secured Credit Agreement Lenders, and the Committee.  The Plan remains subject to material modification in all respects.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
GOVERNING LAW ........................................................................................................................ 1

    A.    Defined Terms ................................................................................................. 1
    B.    Rules of Interpretation .................................................................................. 10
    C.    Computation of Time ..................................................................................... 11
    D.    Governing Law ............................................................................................... 11
    E.    Reference to Monetary Figures ..................................................................... 11
    F.    Reference to the Debtors or the Reorganized Debtors .................................. 11
    G.    Non-consolidated Plan ................................................................................... 11

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS ........................... 11

    A.    Administrative Claims .................................................................................... 12
    B.    Professional Fee Claims ................................................................................. 12
    C.    DIP Claims ...................................................................................................... 13
    D.    Priority Tax Claims ........................................................................................ 14

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................... 14

    A.    Classification of Claims and Interests ........................................................... 14
    B.    Treatment of Claims and Interests ................................................................ 15
    C.    Special Provision Governing Unimpaired Claims ......................................... 14
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 19
    E.    Subordinated Claims ...................................................................................... 19
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ............................. 19
    G.    Intercompany Interests ................................................................................... 19
    H.    Controversy Concerning Impairment ............................................................ 20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................... 20

    A.    General Settlement of Claims and Interests .................................................. 20
    B.    Restructuring Transactions ............................................................................ 20
    C.    Reorganized Debtors ...................................................................................... 20
    D.    Sources of Consideration for Plan Distributions ........................................... 21
    E.    Sale Transaction ............................................................................................. 22
    F.    Corporate Existence ....................................................................................... 22
    G.    Vesting of Assets in the Reorganized Debtors .............................................. 22
    H.    Cancellation of Securities and Agreements ................................................... 22
    I.    Corporate Action ............................................................................................ 23
    J.    New Organizational Documents ..................................................................... 23
    K.    Directors, Managers, and Officers of the Reorganized Debtors .................... 23
    L.    Effectuating Documents; Further Transactions ............................................. 23
    M.    Section 1146 Exemption ................................................................................ 24
    N.    Director and Officer Liability Insurance; Other Insurance ........................... 24
    O.    Employee and Retiree Benefits ...................................................................... 24
    P.    Preservation of Causes of Action ................................................................... 24
    Q.    Section 1145 Exemption ................................................................................ 25

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 25

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...................... 25
    B.    Indemnification Obligations ........................................................................... 26
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 26
    D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ................... 26
    E.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases ........... 27

F.    Insurance Policies. ...................................................................................................27
G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ..........27
H.    Reservation of Rights .................................................................................................27
I.    Nonoccurrence of Effective Date ...............................................................................27
J.    Contracts and Leases Entered Into After the Petition Date. ........................................28

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .....................................................28

A.    Timing and Calculation of Amounts to Be Distributed................................................28
B.    Disbursing Agent .......................................................................................................28
C.    Rights and Powers of Disbursing Agent .....................................................................28
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions....................29
E.    Compliance with Tax Requirements ...........................................................................29
F.    Allocations .................................................................................................................30
G.    No Postpetition Interest on Claims. ............................................................................30
H.    Foreign Currency Exchange Rate. ..............................................................................30
I.    Setoffs and Recoupment ............................................................................................30
J.    Claims Paid or Payable by Third Parties .....................................................................30

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS ....................................................................................................................31

A.    Allowance of Claims...................................................................................................31
B.    Claims Administration Responsibilities ......................................................................31
C.    Estimation of Claims ..................................................................................................31
D.    Adjustment to Claims Without Objection ....................................................................32
E.    Time to File Objections to Claims ..............................................................................32
F.    Disallowance of Claims ..............................................................................................32
G.    Amendments to Claims ...............................................................................................32
H.    No Distributions Pending Allowance ..........................................................................32
I.    Distributions After Allowance ....................................................................................32

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............33

A.    Discharge of Claims and Termination of Interests .......................................................33
**B.    Release of Liens** ..........................................................................................................33
**C.    Releases by the Debtors** ............................................................................................33
**D.    Releases by Holders of Claims and Interests.** ............................................................34
**E.    Exculpation** ...............................................................................................................35
**F.    Injunction**...................................................................................................................35
G.    Protections Against Discriminatory Treatment. ...........................................................36
H.    Document Retention. ..................................................................................................36
I.    Reimbursement or Contribution. .................................................................................36
J.    Term of Injunctions or Stays.......................................................................................36

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN..........................................................................................................................................36

A.    Conditions Precedent to the Confirmation of the Plan..................................................36
B.    Conditions Precedent to the Effective Date .................................................................37
C.    Waiver of Conditions ..................................................................................................38
D.    Effect of Failure of Conditions ...................................................................................38

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .....................38

A.    Modification and Amendments ....................................................................................38
B.    Effect of Confirmation on Modifications.....................................................................38
C.    Revocation or Withdrawal of Plan ..............................................................................38

ARTICLE XI. RETENTION OF JURISDICTION ..................................................................... 39

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................. 40
 A. Immediate Binding Effect ....................................................................................... 40
 B. Additional Documents ............................................................................................. 41
 C. Payment of Statutory Fees. ...................................................................................... 41
 D. Statutory Committee and Cessation of Fee and Expense Payment ......................... 41
 E. Reservation of Rights .............................................................................................. 41
 F. Successors and Assigns ............................................................................................ 41
 G. Notices .................................................................................................................... 41
 H. Entire Agreement .................................................................................................... 43
 I. Exhibits ................................................................................................................... 43
 J. Non-Severability of Plan Provisions ....................................................................... 43
 K. Votes Solicited in Good Faith ................................................................................. 43
 L. Closing of Chapter 11 Cases ................................................................................... 43
 M. Conflicts .................................................................................................................. 43

**INTRODUCTION**

Z Gallerie, LLC and Z Gallerie Holding Company, LLC, as debtors and debtors in possession, in the above-captioned Chapter 11 Cases propose this joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "***Administrative Claim Bar Date***" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

2.    "***Administrative Claim Objection Bar Date***" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (1) 60 days after the Effective Date and (2) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

3.    "***Administrative Claim***" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

4.    "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "***Allowed***" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be

1

expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

6.      "***Auction***" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

7.      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 100–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

8.      "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of Delaware.

9.      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

10.      "***Bar Date***" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

11.      "***Bidding Procedures***" means the procedures governing the Auction and sale of all or substantially all of the Debtors' assets, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

12.      "***Business Day***" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.      "***Cash***" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

14.      "***Causes of Action***" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise. Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

15.      "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

16.     "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

17.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

18.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

19.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on March 20, 2019, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 87].

20.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

21.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

22.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

23.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

24.     "*Confirmation Schedule*" means the dates and deadlines established by the *Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. [●]].

25.     "*Consummation*" means the occurrence of the Effective Date.

26.     "*Critical Trade Claim*" means any Claim held by an Entity that, in the Debtors' business judgement and in consultation with the Winning Bidder, is critical to the Debtors' contemplated post Effective-Date business plan, as described in Article IV.D of the Plan.

27.     "*Critical Trade Claims Recovery Pool*" [TO COME].

28.     "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

29.     "*Debtors*" means, collectively: (a) Z Gallerie, LLC; and (b) Z Gallerie Holding Company, LLC.

30.     "*DIP Agent*" means Key Bank, in its capacity as administrative agent under the DIP Credit Agreement, with its respective successors and assigns in such capacities.

31.     "*DIP Claims*" means all Claims arising under, derived from, or based on the DIP Credit Agreement or otherwise secured pursuant to the DIP Credit Agreement Documents.

32.     "*DIP Credit Agreement Documents*" means the DIP Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements

33.    "*DIP Credit Agreement*" means that certain senior secured debtor-in-possession credit agreement, dated as of March 11, 2019, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lender, and the DIP Agent.

34.    "*DIP Lender*" means Key Bank, N.A.

35.    "*DIP Order*" means any interim order (or orders) and the final order of the Bankruptcy Court, each in form and substance acceptable to the Debtors and the DIP Lender authorizing, among other things, the Debtors to enter into the DIP Credit Agreement and incur postpetition obligations thereunder.

36.    "*Disbursing Agent*" means the Debtors or the Reorganized Debtors (as applicable), or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

37.    "*Disclosure Statement*" means the *Disclosure Statement to the Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of March 22, 2019, as may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

38.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.    "*Distribution Record Date*" means the the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

40.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.C of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

41.    "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

42.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

43.    "*Excess Distributable Cash*" means, only in the event that the Winning Bidder is an Entity other than the Secured Credit Agreement Lenders, any Cash proceeds of a Sale Transaction in excess of amounts necessary to (a) satisfy all Claims senior in priority to General Unsecured Claims, including the DIP Claims, the Secured Revolving Loan Claims, and the Secured Term Loan Claims, in full, in Cash, as provided herein and (b) fund the Critical Trade Claims Recovery Pool.

44.    "*Exculpated Party*" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) any official committee appointed in the Chapter 11 Cases; and each of their respective members; (c) the Secured Credit Agreement Lenders; (d) the Secured Credit Agreement Agent; (e) the DIP Lender; (f) the DIP Agent; (g) the Secured Term Loan Participants; and (h) with respect to each of the foregoing entities in clauses (a) though (g), such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity Holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors,

partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

45.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

46.    "*Exit Credit Agreement Agent*" means the administrative agent under the Exit Credit Agreement, its successors, assigns, or any replacement agent.

47.    "*Exit Credit Agreement*" means that certain loan agreement memorializing the Exit Credit Agreement Facility, which shall be entered into among one or more of the Debtors or the Reorganized Debtors (as applicable) the Exit Credit Agreement Agent, and the Exit Credit Agreement Lenders, which shall be in form and substance acceptable to the Debtors or Reorganized Debtors.

48.    "*Exit Credit Agreement Documents*" means the Exit Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

49.    "*Exit Credit Agreement Lenders*" means the banks, financial institutions, and other lenders party to the Exit Credit Agreement from time to time, including, for the avoidance of doubt, the Participating Secured Revolving Loan Lenders and the Participating Secured Term Loan Lenders.

50.    "*Exit Credit Agreement Facility*" means the Exit Secured Term Loan Facility and Exit Secured Revolving Loan Facility to be arranged and provided by the Exit Credit Agreement Lenders on or before the Effective Date in a minimum amount of $[●] million, on terms acceptable to the Debtors or the Reorganized Debtors.

51.    "*Exit Secured Revolving Loan Facility*" means that new capital financing issued to the Reorganized Debtors on the Effective Date.

52.    "*Exit Secured Term Loan Facility*" means that new capital financing issued to the Reorganized Debtors on the Effective Date which may be in the form of a secured term loan, an exit credit facility, or an equity capital investment, to be made by the Participating Secured Term Loan Lenders, in accordance with IV.D of the Plan.

53.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

54.    "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

55.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

56.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Fee Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Term Loan Claim, a Secured Revolving Loan Claim, a DIP Claim, or a Critical Trade Claim.

57.      "*General Unsecured Claims Recovery Pool*" [TO COME]

58.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

59.      "*Holder*" means an Entity holding a Claim or an Interest in any Debtor.

60.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

61.      "*Initial Minimum Overbid*" has the meaning given to such term in the Bidding Procedures.

62.      "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

63.      "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor or non-Debtor subsidiary or Affiliate.

64.      "*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

65.      "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. [●]], entered by the Bankruptcy Court on [●], as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

66.      "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

67.      "*KeyBank*" means KeyBank, National Association.

68.      "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

69.      "*Management Incentive Plan*" means that certain management incentive plan that may be adopted by the New Board after the Effective date on terms to be determined by and at the discretion of the New Board (including with respect to allocation, timing and structure of such issuance and the Management Incentive Plan).

70.      "*New Board*" means the initial board of directors, members, or managers, as applicable, of the Reorganized Debtors, to be appointed by the Winning Bidder, in consultation with the Reorganized Debtors' management.

71.      "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be included in the Plan Supplement and which shall be in form and substance acceptable to the Debtors and the Winning Bidder in their discretion.

72.      "*Notice and Claims Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto in its capacity as notice and claims agent for the Debtors and any successor.

73.     "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

74.     "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, a Secured Revolving Loan Claim, a Secured Term Loan Claim, or a Secured Tax Claim.

75.     "*Participating Secured Term Loan Lenders*" means the Secured Term Loan Lenders that elect to participate in the funding of the Exit Secured Term Loan Facility.

76.     "*Participating Secured Revolving Loan Lenders*" means the Secured Revolving Loan Lenders that elect to participate in the funding of the Exit Secured Revolving Loan Facility.

77.     "*Person*" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

78.     "*Petition Date*" means March 11, 2019, the date on which each of the Debtors commenced the Chapter 11 Cases.

79.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) New Organizational Documents; (b) Exit Credit Agreement Documents; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Retained Causes of Action; (e) any Management Incentive Plan; and (f) any necessary documentation related to the Sale Transaction, as applicable.

80.     "*Plan*" means this *Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

81.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

82.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

83.     "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

84.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

85.     "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated pursuant to Article II.B.3 of the Plan.

86.     "*Professional*" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

87.     "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

88.     "***Proof of Interest***" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 cases.

89.     "***Reinstate***," "***Reinstated***," or "***Reinstatement***" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

90.     "***Released Party***" means collectively, and in each case in its capacity as such:  (a) the Secured Credit Agreement Lenders; (b) the Secured Credit Agreement Agent; (c) the DIP Lender; (d) the DIP Agent; (e) the Exit Credit Agreement Lenders; (f) the Exit Credit Agreement Agent; (g) the Secured Term Loan Participants; (h) the Winning Bidder; and (i) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (h), such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

91.     "***Releasing Parties***" means, collectively, (a) the Secured Credit Agreement Lenders; (b) the Secured Credit Agreement Agent; (e) the DIP Agent; (f) the DIP Lender; (g) the Exit Credit Agreement Lenders; (h) the Exit Credit Agreement Agent; (i) the Secured Term Loan Participants; (j) the Winning Bidder; (k) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (l) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) all holders of Claims or Interests that vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

92.     "***Reorganized Debtors***" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

93.     "***Reorganized Debtors Interests***" means the equity interests in the Reorganized Debtors.

94.     "***Restructuring Transactions***" means the transactions described in Article IV.B of the Plan.

95.     "***Sale Transaction Proceeds***" means, in the event that the Winning Bidder is an Entity other than the Secured Credit Agreement Lenders, any Cash proceeds of a Sale Transaction.

96.     "***Sale Transaction***" means and sale of all or substantially all of the Debtor's assets to the Winning Bidder consummated in accordance with the Bidding Procedures and the Plan.

97.     "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors with the consent of the Winning Bidder.

98.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors with the consent (such consent not to be unreasonably withheld) of the Winning Bidder.

99.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

100.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

101.    "*Secured Credit Agreement*" means that certain Credit Agreement dated as of October 8, 2014, by and among Z Gallerie, LLC as borrower, Z Gallerie Holding, LLC as guarantor, the lenders party thereto, the Secured Credit Agreement Agent, and Secured Credit Agreement Arranger as modified and amended on September 29, 2017, June 18, 2018, October 15, 2018, and as may be further amended, modified, restated, or supplemented from time to time.

102.    "*Secured Credit Agreement Agent*" means KeyBank National Association, in its capacity as administrative agent under the Secured Credit Agreement.

103.    "*Secured Credit Agreement Arranger*" means KKR Credit Advisors (US) LLC, in its capacity as joint lead arranger under the Secured Credit Agreement.

104.    "*Secured Credit Agreement Distributable Cash*" means, only in the event that the Winning Bidder is an Entity other than the Secured Credit Agreement Lenders, any Cash proceeds of a Sale Transaction in excess of amounts necessary to satisfy all Claims senior in priority to Secured Revolving Loan Claims, including the DIP Claims, in full, in Cash, as provided herein, plus Cash proceeds from the sale of the Debtors' other assets.

105.    "*Secured Credit Agreement Documents*" means the Secured Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

106.    "*Secured Credit Agreement Lenders*" means, collectively, the Secured Revolving Loan Lenders and the Secured Revolving Term Loan Lenders.

107.    "*Secured Revolving Loan*" means the senior secured revolving loan contemplated by (and as defined in) the Secured Credit Agreement.

108.    "*Secured Revolving Loan Claims*" means all Claims arising under, derived from, or based on the Secured Revolving Loan.

109.    "*Secured Revolving Loan Lenders*" means the lenders from time to time to the Secured Revolving Loan.

110.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including authority related Secured Claim for penalties.

111.    "*Secured Term Loan*" means the total Term Loan Commitments made pursuant to (and as defined in) the Secured Credit Agreement.

112.     ***"Secured Term Loan Claims"*** means all Claims arising under, derived from, or based on the Secured Term Loan.

113.     ***"Secured Term Loan Lenders"*** means the lenders from time to time to the Secured Term Loan.

114.     ***"Secured Term Loan Participants***" means any Person holding a participation in any loan or other obligation, arising under the Secured Term Loan.

115.     ***Section 510(b) Claim***" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

116.     "***Securities Act***" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

117.     "***Security***" means a security as defined in section 2(a)(1) of the Securities Act.

118.     "***U.S. Trustee***" means the Office of the United States Trustee for the District of Delaware.

119.     "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

120.     "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

121.     "***Voting Deadline***" means 4:00 p.m. (prevailing Eastern Time) on June 4, 2019.

122.     "***Winning Bidder***" means the Entity whose bid for some or all of the Debtors' assets, which for the avoidance of doubt may include the transaction contemplated under the Plan, is selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures.  For the avoidance of doubt, if there is no third-party purchaser of the assets, the Secured Credit Agreement Lenders shall be deemed to be the Winning Bidder.

B.     *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents

Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.       *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.       *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formulation of the applicable Debtor or the Reorganized Debtors, as applicable.

E.       *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.       *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.       *Non-consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.    *Professional Fee Claims*

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account

in any way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors.  The Debtors and Reorganized Debtors (as applicable) shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable) such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable).  If the Debtors or Reorganized Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, and expenses.  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder of an Allowed DIP Claim shall receive payment in full in Cash of such Holder's Allowed DIP Claim or such other treatment as agreed by Holder in such Holder's sole discretion.  Upon the indefeasible payment or satisfaction in full in Cash of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, on the Effective Date all Liens and security interests granted to secure

such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

D.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, except that: [Class 11 (Interests in Z Gallerie Holding Company, LLC) shall be vacant for Z Gallerie, LLC].[3]  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Revolving Loan Claims | Impaired | Entitled to Vote |
| 5 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 6 | Critical Trade Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept or |

---

[3]    The Debtors reserve the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| | | | Reject) |
|---|---|---|---|
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Interests in the Z Gallerie Holding Company, LLC | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**     *Treatment of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.     <u>Class 1 - Secured Tax Claims</u>

(a)     *Classification:*  Class 1 consists of all Secured Tax Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the applicable Reorganized Debtor:

(i)     payment in full in Cash of such Holder's Allowed Secured Tax Claim; or

(ii)     equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)     *Voting:*  Class 1 is Unimpaired under the Plan.  Holders of Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 - Other Secured Claims</u>

(a)     *Classification:*  Class 2 consists of all Other Secured Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Reorganized Debtor:

(i)      payment in full in Cash of such Holder's Allowed Other Secured Claim;

(ii)     the collateral securing such Holder's Allowed Other Secured Claim;

(iii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

(iv)     such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Other Priority Claims

(a)    *Classification*:  Class 3 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash on account of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Secured Revolving Loan Claims

(a)    *Classification*:  Class 4 consists of all Secured Revolving Loan Claims

(b)    *Treatment*:  To the extent any Allowed Secured Revolving Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Revolving Loan Claim, each Holder of an outstanding Allowed Secured Revolving Loan Claim shall receive either:

(i)      if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Revolving Loan Claim or such other treatment rendering such Holder's Allowed Secured Revolving Loan Claim Unimpaired;

(ii)     if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date.

(c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Secured Revolving Loan Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 – Secured Term Loan Claims

(a)     *Classification*:  Class 5 consists of the Secured Term Loan Claims.

(b)     *Treatment:*  To the extent any Allowed Secured Term Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Term Loan Claim, each Holder of an outstanding Allowed Secured Term Loan Claim shall receive either:

        (i)     if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Term Loan Claim or such other treatment rendering such Holder's Allowed Secured Term Loan Claim Unimpaired;

        (ii)    if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of [●] percent of the Reorganized Debtors Interests outstanding on the Effective Date.

(c)     *Voting:*  Class 5 is Impaired under the Plan.  Holders of Secured Term Loan Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 6 – Critical Trade Claims</u>

(a)     *Classification:*  Class 6 consists of all Critical Trade Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Critical Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Critical Trade Claim, each Holder of an Allowed Critical Trade Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed Critical Trade Claim) of [TO COME].

(c)     *Voting:*  Class 6 is Impaired under the Plan.  Holders of Critical Trade Claims are entitled to vote to accept or reject the Plan.

7.      <u>Class 7 – General Unsecured Claims</u>

(a)     *Classification:*  Class 7 consists of all General Unsecured Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of:

        (i)     [TO COME]

(c)     *Voting:*  Class 9 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.      Class 8 - Intercompany Claims

    (a)      *Classification*:  Class 8 consists of all Intercompany Claims.

    (b)      *Treatment*:  Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.  On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by such Reorganized Debtors.

    (c)      *Voting*:  Class 8 is Impaired under the Plan. Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.      Class 9 - Intercompany Interests

    (a)      *Classification:*  Class 11 consists of all Intercompany Interests.

    (b)      *Treatment*:  Intercompany Interests shall be, at the option of the Debtors either:

        (i)      Reinstated in accordance with Article III.G of the Plan; or

        (ii)      Discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

    (c)      *Voting*:  Class 9 is Impaired under the Plan.  Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10.      Class 10 - Section 510(b) Claims

    (a)      *Classification:*  Class 10 consists of all Section 510(b) Claims.

    (b)      *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

    (c)      *Treatment*:  Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

    (d)      *Voting:*  Class 10 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject the Plan.

11.  Class 11 – Interests in Z Gallerie Holding Company, LLC

    (a)      *Classification:*  Class 11 consists of all Interests in Z Gallerie Holding Company, LLC.

(b)     *Treatment*:  Interests in Z Gallerie Holding Company, LLC shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in Z Gallerie Holding Company, LLC will not receive any distribution on account of such Interests.

(c)     *Voting:*  Class 11 is Impaired under the Plan.  Holders of Interests in Z Gallerie Holding Company, LLC are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of the Reorganized Debtors Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to

certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the Holders of certain Allowed Claims.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    *Restructuring Transactions*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, including, as applicable, the  Exit Credit Agreement Facility, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "<u>Restructuring Transactions</u>").  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.    *Reorganized Debtors*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt its New Organizational Documents.  The Reorganized Debtors shall be authorized to implement the Restructuring Transactions and adopt any other agreements, documents, and instruments and to take any other actions

contemplated under the Plan as necessary or desirable to consummate the Plan, which actions, regardless of whether taken before, on, or after the Effective Date, shall be deemed to constitute a Restructuring Transaction.

D.      *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Reorganized Debtors, including Cash from operations, as well as the following sources of consideration.

1.      Exit Credit Agreement Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Credit Agreement Documents to any applicable administrative agent for the Exit Credit Agreement Facility. The Reorganized Debtors shall use the Cash proceeds provided under the Exit Credit Agreement Facility to fund ongoing operations and distributions under the Plan, and satisfy certain other Cash obligations under the Plan.

The Exit Credit Agreement Facility shall consist of the Exit Secured Term Loan Facility and the Exit Secured Revolving Loan Facility. On the Effective Date, the Participating Secured Term Loan Lenders shall fund the Exit Secured Term Loan Facility, and the Participating Secured Revolving Loan Lenders shall fund the Exit Secured Revolving Loan Facility.

The terms for the Exit Credit Agreement Facility will be determined in accordance with the Reorganized Debtors' contemplated post-Effective Date business plan following and depending on the results of the Auction (with may contemplate the continued ownership or operation of all or only some of the Debtors' assets), and otherwise in form and substance acceptable to the Participating Secured Term Loan Lenders and the Participating Secured Revolving Loan Lenders in their discretion, and any documentation necessary to implement the Exit Credit Agreement Facility will be included in the Plan Supplement. Any Reorganized Debtors Interests issued to Participating Secured Term Loan Lenders or Participating Revolving Loan Lender on account of the Exit Credit Agreement Facility shall dilute any Reorganized Debtors Interest issued pursuant to Article III of the Plan equally. The Reorganized Debtors shall use proceeds of the Exit Credit Agreement Facility, as applicable, to fund ongoing operations and distributions under the Plan, including Critical Trade Claims, DIP Claims, Secured Term Loan Claims, and Secured Revolving Loan Claims and satisfy certain other Cash obligations under the Plan. For the avoidance of doubt, any distribution to Participating Secured Term Loan Lenders or Participating Secured Revolving Loan Lenders on account of the Exit Credit Agreement Facility shall be in addition to (a) such Participating Secured Term Loan Lenders' recoveries set forth in Article III of the Plan on account of their Secured Term Loan Claims; (b) such Participating Secured Revolving Loan Lenders' recoveries set forth in Article III of the Plan on account of their Secured Revolving Loan Claims; and (c) such DIP Lender's recoveries set forth in Article II of the Plan on account of their DIP Claims.

2.      Issuance of the Reorganized Debtors Interests

All existing Interests in the Debtors shall be automatically cancelled on the Effective Date and the Reorganized Debtors shall issue the Reorganized Debtors Interests to Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan. The issuance of the Reorganized Debtors Interests, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable. The New Organizational Documents, as applicable, shall authorize the issuance and distribution on the Effective Date of the Reorganized Debtors Interests to the Disbursing Agent for the benefit of Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan. All of the Reorganized Debtors Interests issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Debtors Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*E.      Sale Transaction*

Continuing after the Petition Date, the Debtors will conduct a marketing and Auction process of some or all of the Debtors' assets in accordance with the Bidding Procedures to determine the Winning Bidder.  The Bidding Procedures will set forth the terms of any Initial Minimum Overbid.  The Debtors will seek to elicit a higher or better Sale Transaction offer, if any, pursuant to the process set forth in the Bidding Procedures.  If no Entity submits an Initial Minimum Overbid, the [●] will be deemed the Winning Bidder for purposes of the Plan.  If the Debtors are able to secure such a higher or better offer in accordance with the Bidding Procedures, and the Winning Bidder is an Entity other than the [●], the Holders of Secured Revolving Loan Claims and Secured Term Loan Claims will be paid the Secured Credit Agreement Distributable Cash as set forth in Article III of the Plan and the Sale Transaction will be consummated pursuant to the Plan in accordance with terms to be set forth in the Confirmation Order and Plan Supplement, as applicable.  If the Debtors are unable to secure such higher or better offer at the conclusion of the marketing and Auction process contemplated by the Bidding Procedures, the [●] will be deemed to be the Winning Bidder and (a) the Debtors will proceed to consummate the Sale Transaction, by and between the Debtors and the [●], as the Winning Bidder, on the terms set forth in Article III of the Plan and (b) the Sale Transaction will be deemed to be consummated on the Effective Date.

*F.      Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation and governance documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

*G.      Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*H.      Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Secured Credit Agreement Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no executory contract or unexpired lease that (i) has been, or will be, assumed

22

pursuant to Section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

I.    *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) selection of the directors and officers for the Reorganized Debtors; (2) the issuance of the Reorganized Debtors Interests; (3) implementation of the Restructuring Transactions; (4) consummation of the Sale Transaction, (5) execution of the Exit Credit Agreement and any and all other agreements, documents, securities, and instruments relating thereto; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Reorganized Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Credit Agreement and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.    *New Organizational Documents*

On or immediately prior to the Effective Date, the New Organizational Documents shall be amended in a manner acceptable to the Debtors and Winning Bidder in their discretion, as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

K.    *Directors, Managers, and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of managers of the Debtors shall expire, and the initial boards of directors, including the New Board, and the officers of each of the Reorganized Debtors shall be appointed by the Winning Bidder in accordance with the respective New Organizational Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of any of the Reorganized Debtors. To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors or managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.      *Section 1146 Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Credit Agreement Facility, as applicable; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Director and Officer Liability Insurance; Other Insurance*

On or before the Effective Date, the Debtors shall purchase (to the extent not already purchased) and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.  Reasonable directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Effective Date.

O.      *Employee and Retiree Benefits.*

Unless otherwise provided herein, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action**

24

**against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*Q.      Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of the Reorganized Debtors Interests as contemplated by the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, the Reorganized Debtors Interests are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) is the subject of a motion to assume such Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (3) is a contract, release, or other agreement or document entered into in connection with the Plan; or (4) is an insurance policy.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases identified in this Article V of the Plan and in the

Plan Supplement (i) to add or remove any Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date, and (ii) to remove any Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date. The Debtors or the Reorganized Debtors shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby.

B.    *Indemnification Obligations.*

Unless otherwise determined by the Debtors, all indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

D.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of

assumption.  **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

E.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

F.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*J.*        *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.*        *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*B.*        *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

*C.*        *Rights and Powers of Disbursing Agent*

1.        Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.        Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

      1.      <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

      2.      <u>Delivery of Distributions</u>

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Interests on the Effective Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

      3.      <u>Minimum Distributions</u>

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claims against the Debtors or their property.  No fractional shares or units of the Reorganized Debtors Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares or units of the Reorganized Debtors Interests that is not a whole number, the actual distribution of shares of the Reorganized Debtors Interests shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares or units of the Reorganized Debtors Interests to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

      4.      <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  For the avoidance of doubt, DIP Claims, Secured Revolving Loan Claims, and Secured Term Loan Claims will, in each case, accrue and be paid postpetition interest in accordance with the terms set forth in the agreements governing DIP Claims, Secured Revolving Loan Claims, and Secured Term Loan Claims, respectively.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Reorganized Debtors.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Reorganized Debtors

annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Allowance of Claims*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the applicable bar date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.    **Release of Liens**

**Except as otherwise provided in the Exit Credit Agreement Documents, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    **Releases by the Debtors**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or affiliates would have**

33

been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.     *Releases by Holders of Claims and Interests.*

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

## E.    Exculpation

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## F.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each

**Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.**

G.      *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

J.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Confirmation of the Plan*

It shall be a condition precedent to the confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed; and

2.      The Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

3.    the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the Debtors;

> (a)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

> (b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

> (c)      authorize the Debtors, as applicable or necessary, to: (i) implement the Restructuring Transactions, including the Exit Credit Agreement Facility, and Exit Secured Term Loan Facility and Exit Secured Revolving Loan Facility therewith, and the Sale Transaction; (ii) distribute the Reorganized Debtors Interests pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including Cash and the Reorganized Debtors Interests; and (iv) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

> (d)      authorize the implementation of the Plan in accordance with its terms; and

> (e)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

4.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

5.    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

6.    the Exit Credit Agreement Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Credit Agreement Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Credit Agreement Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

7.    all conditions precedent to the consummation of the Sale Transaction shall have been satisfied in accordance with the terms thereof, and the closing of the Sale Transaction shall be deemed to occur concurrently with the occurrence of the Effective Date;

8.    all conditions precedent to the issuance of the New Common Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

9.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors;

10.    all reasonable and documented fees and out-of-pocket professional fees and expenses of the Secured Credit Agreement Agent, the Secured Credit Agreement Lenders, the DIP Agent, the DIP Lender, the Exit Credit Agreement Agent, and the Exit Credit Agreement Lenders, as applicable, shall have been paid in full in cash by the Debtors; and

11.    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors.

C.    *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived by the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.    *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the

Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Accrued Professional Compensation Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the filing of applications for compensation.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

E.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices*

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

    1.   If to the Debtors, to:

        Z Gallerie, LLC
        1855 West 139th Street
        Gardena, California
        Attention:  Mark Weinsten
        E-mail address:  mweinsten@zgallerie.com

        with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C.
E-mail address:  joshua.sussberg@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Justin Bernbrock
E-mail address:  justin.bernbrock@kirkland.com

2.    <u>If to Secured Term Loan Lenders, to:</u>

KKR Credit Advisors (US) LLC
555 California Street, 50th Floor
San Francisco, California 94104
Attention: Scott Cullerton
E-mail address: scott.cullerton@kkr.com

with copies (which shall not constitute notice) to:

Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Attention:  Vincent Indelicato
          Chris Theodoridis
E-mail address:  vindelicato@proskauer.com
                 ctheodoridis@proskauer.com

3.    <u>If to Secured Revolving Loan Lenders, to:</u>

Keybank National Association
127 Public Square
Cleveland, Ohio 44114
Attention: [ ]
E-mail address: [ ]

with copies (which shall not constitute notice) to:

Buchanan Ingersoll & Rooney PC
919 N. Market St.
Wilmington, DE 19801
Attention:  Mary F. Caloway
E-mail address:  mary.caloway@bipc.com

After the Effective Date, the Reorganized Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement*Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice and Claims Agent at http://www.deb.uscourts.gov/ or the Bankruptcy Court's website at  [●]. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the [●], consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

*[Remainder of page intentionally left blank]*

Z Gallerie, LLC and Z Gallerie Holding Company, LLC


By:     /s/ Mark Weinsten
Name:   Mark Weinsten
Title:    Interim President and CEO




COUNSEL:


Dated:  March 22, 2019              /s/ Domenic E. Pacitti
Wilmington, Delaware               Domenic E. Pacitti (DE Bar No. 3989)
                                   Michael W. Yurkewicz (DE Bar No. 4165)
                                   **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                   919 N. Market Street, Suite 1000
                                   Wilmington, Delaware 19801
                                   Telephone:      (302) 426-1189
                                   Facsimile:      (302) 426-9193

                                   -and-

                                   Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   601 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:      (212) 446-4800
                                   Facsimile:      (212) 446-4900

                                   -and-

                                   Justin R. Bernbrock (admitted *pro hac vice*)
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   300 North LaSalle
                                   Chicago, Illinois 60654
                                   Telephone:      (312) 862-2000
                                   Facsimile:      (312) 862-2200

                                   *Proposed Co-Counsel for the Debtors and Debtors in Possession*

**EXHIBIT B**

**Liquidation Analysis**

**[TO COME]**

**<u>EXHIBIT C</u>**

**Financial Projections**

**[TO COME]**