**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Z GALLERIE, LLC, *et al.*,[1] | ) Case No. 19-10488 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND RULES 2002, 4001, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING INCURRENCE BY THE DEBTORS OF POSTPETITION SENIOR SECURED INDEBTEDNESS, (II) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) <u>SCHEDULING A FINAL HEARING</u>**

Upon consideration of the motion (the "<u>Motion</u>") of Z Gallerie, LLC ("<u>Z Gallerie</u>") and its affiliated debtor, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1, 4001-2 and 9013-1(m) of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), seeking, among other things:

**I.**     authorization for Z Gallerie (the "<u>Borrower</u>") to obtain postpetition financing (the "<u>Financing</u>") of up to $28,000,000 (the "<u>DIP Facility</u>" and the loans made thereunder, the "<u>DIP Loans</u>") on the terms and conditions set forth in the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361,362,363, and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of Postpetition Senior Secured*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949).  The location of the Debtors' service address is: 1855 West 139th Street, Gardena, CA 90249.

*Indebtedness, (II) Authorizing Use of Cash Collateral by the Debtors, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* (the "Interim Order", [Docket No. 75]), this Final Order, and the Senior Secured Superpriority Debtor in Possession Credit Agreement (substantially in the form attached to the Motion as Exhibit B, and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement,"[2] together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents"), among the Debtors, KeyBank National Association, acting as the administrative and collateral agent (in such capacities, the "DIP Agent"), and KeyBank National Association as lender (in such capacity, the "DIP Lender"), secured by the Collateral (as defined below), and authorization for each Debtor other than the Borrower to guarantee Borrower's obligations under the DIP Facility as a guarantor (collectively, with the Borrower, the "Credit Parties," as that term is defined in the DIP Credit Agreement) and for each Debtor to grant security interests in the Collateral;

      **II.**      authorization to use the proceeds of the DIP Facility extended to the Borrower as expressly provided in the DIP Documents and consistent with the Budget (as defined below) (A) to pay certain costs, fees, and expenses related to the Cases as provided for in the Interim Order, this Final Order and the DIP Documents, (B) providing for the aggregate principal amount of Prepetition Revolving Loans (as defined below) to be "rolled-up" into the DIP

---

[2]    Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or the DIP Credit Agreement, as applicable.

Obligations, (C) to cash collateralize the letter of credit Obligations under the Prepetition Credit Agreement (as defined below) (D) to provide working capital and for other general corporate purposes of the Debtors, and (E) to pay administration costs, fees and expenses of these Cases and claims or amounts approved by the Bankruptcy Court;

**III.**     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith, including the creation of the LC Cash Collateral Account (as defined below);

**IV.**     that the Court grant to the DIP Lender and the DIP Agent in respect of the DIP Loans, for the benefit of the DIP Agent, the DIP Lender and any other parties referred to in the DIP Credit Agreement with respect to the respective DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below, and subject and subordinate to the Carve Out (as defined below), the following:

    **a.**     pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority allowed administrative expense claim status in the Cases;

    **b.**     pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all assets of the Debtors, including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions, and substitutes thereof, that is not subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b);

    **c.**    pursuant to Bankruptcy Code section 364(d), a first priority, senior priming lien on and security interest in all of the Debtors' assets (other than Excluded Assets and subject to (i) Permitted Liens (other than the Prepetition Liens), and (ii) the Carve Out (each as defined in the DIP Documents)), including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions, and substitutions thereof, that is subject to (y) valid, perfected and non-avoidable liens in existence as of the Petition Date or (z) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b);

    **V.**    authorization for the DIP Agent to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) on terms specified herein and in the DIP Credit Agreement;

    **VI.**    subject to entry of this Final Order, authorization to grant liens to the DIP Lender on the proceeds of the Debtors' claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, 549 and 550 (collectively, the "Avoidance Actions");

    **VII.**    authorization for the Debtors to use, among other things, in accordance with the Budget, any cash collateral (as that term is defined in Bankruptcy Code section 363(a) and described below, the "Cash Collateral") in which the Prepetition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Prepetition Secured Parties with respect to any diminution in value of their interests in the Prepetition Collateral (as defined below) arising from, inter alia, the Debtors' use of the Prepetition Collateral (including

Cash Collateral), the imposition of the automatic stay of Bankruptcy Code section 362, and the priming of the liens of the Prepetition Secured Parties by the DIP Facility;

**VIII.**    Upon entry of this Final Order, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to Bankruptcy Code section 506(c) or otherwise;

**IX.**    the Court's modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order; and

**X.**    the Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

The Court having considered the certification of counsel [Docket No. ___]; and based upon all of the pleadings filed with this Court, the evidence presented in connection with the Motion and the entire record herein; and this Court having heard and resolved or overruled any objections to the final relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    **Jurisdiction.**    This Court has jurisdiction over these Cases, this Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of the Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy

Code sections 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 2002-1, 4001-2 and 9013-1(m).

2.    **Notice.**   The Debtors have provided sufficient notice of the Motion, this Court's entry of the Interim Order, and no other or further notice is necessary or required.

3.    **Debtors' Stipulations.**   Subject to the limitations thereon contained in paragraphs 16 and 17 below, the Debtors admit, stipulate and agree that:

a.   **The Prepetition Credit Agreement**

i.   The Borrower, Z Gallerie Holding Company, LLC ("Holdings"), KeyBank National Association (and its successors and assigns, the "Prepetition Agent"), as agent for the lenders party thereto, including KeyBank National Association as the revolving lender (the "Prepetition Revolving Lender") and the term loan lenders (the "Prepetition Term Loan Lenders"), are parties to that certain Credit Agreement, dated as of October 8, 2014 (as amended or otherwise modified by that certain Amendment No. 1 to Credit Agreement, dated as of September 29, 2017, that certain Waiver and Amendment No. 2 to Credit Agreement, dated as of June 18, 2018, that certain Limited Waiver to Credit Agreement, dated as of July 6, 2018 and that certain Limited Waiver and Amendment No. 3 to Credit Agreement, dated as of October 15, 2018, and as may be further amended, modified, extended, restated, replaced, or supplemented from time to time, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Revolving Lender made revolving loans (the "Prepetition Revolving Loans") and the Prepetition Term Loan Lenders made term loans (the "Prepetition Term Loans," and together with the Prepetition Revolving Loans, the "Prepetition Loans") available to the Borrower.

ii.   The Prepetition Loans were guaranteed by Holdings, as guarantor (together, with the Borrower, the "Prepetition Credit Parties").

       **iii.** As of the Petition Date, the outstanding aggregate principal amount of the Prepetition Revolving Loans (including accrued interest which may be paid in kind) was approximately $19,671,206.04 together with all other outstanding obligations, including all other interest, fees and expenses, the "Prepetition Revolving Loans Indebtedness") and the outstanding aggregate principal amount of the Prepetition Term Loans (including accrued interest which may be paid in kind) was approximately $91,427,540.43 (together with all other outstanding obligations, including all other interest, fees and expenses, the "Prepetition Term Loan Indebtedness," and together with the Prepetition Revolving Loans Indebtedness, the "Prepetition Indebtedness").

       **b.** **The Prepetition Collateral.**

       **i.** To secure the Prepetition Indebtedness, the Prepetition Credit Parties and Prepetition Agent, as collateral agent (in such capacity, the "Prepetition Collateral Agent") entered into that certain Guaranty and Security Agreement, dated as of October 8, 2014 (as amended, and together with any ancillary collateral documents, the "Prepetition Collateral Agreement"),[3] pursuant to which the Prepetition Credit Parties granted to the Prepetition Collateral Agent, for the benefit of the Prepetition Collateral Agent and the holders of Prepetition Indebtedness (collectively, the "Prepetition Secured Parties") valid, binding, perfected, security interests in and liens on substantially all of the Prepetition Credit Parties' property and assets (other than Excluded Property), including, without limitation, (a) all accounts, other payment intangibles, chattel paper, deposit accounts, securities accounts, documents (as defined in the UCC), equipment, general intangibles, instruments, inventory, investment property, letter of credit rights and any supporting obligations related to any of the foregoing; (b) the commercial

---

[3]    Capitalized terms used but not defined in this paragraph shall have the meanings given to them in the Prepetition Collateral Agreement.

tort claims described on Schedule 1 to the Prepetition Collateral Agreement and on any supplement thereto received by Prepetition Collateral Agent pursuant to Section 5.8 of the Prepetition Collateral Agreement; (c) all books and records pertaining to the other property described in Section 3.1 of the Prepetition Collateral Agreement; (d) all property of such Grantor held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash and Cash Equivalents; (e) all other goods (including but not limited to fixtures) and personal property of such Grantor, whether tangible or intangible and wherever located; (f) all Intellectual Property; (g) all Pledged Stock; and (h) to the extent not otherwise included, all proceeds of the foregoing (collectively, the "Prepetition Collateral").

c.  The Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Prepetition Credit Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from Bankruptcy Code section 362), and no portion of the Prepetition Indebtedness is subject to avoidance, recharacterization, reduction, set off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally liable to the Prepetition Revolving Lender on account of the Prepetition Revolving Loans and to the Prepetition Term Loan Lenders on account of the Prepetition Term Loans.

d.  The liens on the Prepetition Collateral securing the Prepetition Indebtedness (the "Prepetition Liens") constitute legal, valid, binding, enforceable (other than in

respect of the stay of enforcement arising from Bankruptcy Code section 362) and perfected security interests and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Prepetition Secured Parties, as applicable, for fair consideration and reasonably equivalent value and are not subject to defense, counterclaim, recharacterization, subordination or avoidance pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.

      **4.**        **<u>Findings Regarding the Financing and Use of Cash Collateral</u>.**

        **a.**      Good cause has been shown for the entry of this Final Order.

        **b.**      The Debtors have an immediate and critical need to obtain the Financing and to use Cash Collateral as well as other Collateral to continue the operation of their businesses.  Without such funds, the Debtors will not be able to meet their payroll obligations or to pay operating and other expenses during this critical period.  The ability of the Debtors to finance their operations through the incurrence of new indebtedness is vital to the preservation and maintenance of the going concern value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the estates.

        **c.**      The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3).

        **d.**      The DIP Agent and the DIP Lender are willing to provide the Financing, and the Prepetition Secured Parties are willing to consent to the use of their Cash Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions

of this Final Order, as applicable, including the roll up and conversion of the Prepetition Revolving Loans into the DIP Loans, and *provided* that the DIP Liens (as defined below), the Superpriority Claims and other protections granted by this Final Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Final Order or any other order, as provided in Bankruptcy Code section 364(e), which is applicable to the Financing and the Cash Collateral use approved by this Final Order.  The DIP Agent and the DIP Lender have acted in good faith in agreeing to provide the Financing approved by this Final Order and further evidenced by the DIP Documents, and the Prepetition Secured Parties have acted in good faith in consenting to the Debtors' use of their Cash Collateral pursuant to the terms of this Final Order, and their reliance on the assurances referred to above is in good faith.

e.     The conversion, or roll up, of the Prepetition Revolving Loans into the DIP Loans is compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Revolving Lenders to fund amounts under the DIP Credit Agreement, and not as payments under, adequate protection for, or otherwise on account of the Prepetition Revolving Loans. The roll up of the Prepetition Revolving Loans into DIP Obligations is subject to the reservation of rights in paragraphs 16 and 17 of this Final Order and will not prejudice the rights of any party in interest.

f.     Among other things, entry of this Final Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and estate professional fees.  The Financing and the use of Cash Collateral as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the Financing and to the use of Cash Collateral is not obtained.  Consummation of the Financing and the use of Cash

Collateral pursuant to the terms of this Final Order therefore are in the best interests of the Debtors' estates.

g.    The DIP Documents and the Financing contemplated thereunder, and the use of Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lender, and the Prepetition Secured Parties, respectively, among others, and the terms of the Financing and the use of Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.    All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including the Obligations (as defined in the DIP Credit Agreement, collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lender and their affiliates in good faith, as that term is used in Bankruptcy Code section 364(e), and in express reliance upon the protections offered by Bankruptcy Code section 364(e) in the event that this Final Order is reversed or modified on appeal.

h.    This Court concludes that entry of this Final Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets.

i.    To the extent necessary, the Prepetition Secured Parties have consented to the Financing and the Debtors' use of the Prepetition Collateral, including Cash Collateral. This Court concludes that the adequate protection provided to the Prepetition Secured Parties hereunder for, among other things, the Debtors' incurrence of the DIP Obligations on a priming

basis, as described herein, and the Debtors' use of Prepetition Collateral, including Cash Collateral, is consistent with and authorized by Bankruptcy Code sections 361, 362, 363, and 364.

5.       **Authorization of the Financing and the DIP Documents.**

a.       The Debtors are hereby authorized and directed to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Credit Agreement and the other DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith.

b.       In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, control agreements, and financing statements), and, without further application to the Court, to promptly pay all fees referred to in the Interim Order, this Final Order, the DIP Credit Agreement and the DIP Documents, including, without limitation, all reasonable fees and expenses paid, payable or incurred prior to the date hereof and/or the Petition Date and the reasonable fees and expenses of the professionals of the DIP Agent and the DIP Lender, Buchanan Ingersoll & Rooney, PC and Huron Consulting Services LLC (the "DIP Lender's Professional Fees and Expenses"). None of the DIP Lender's Professional Fees and Expenses shall be subject to further Court approval and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided, however*, that after the Petition Date, payment of the DIP Lender's Professional Fees and Expenses shall be made in accordance with the procedures described in paragraph 12(d).

c.       Subject to the provisions contained in paragraph 20 hereof, the Debtors are further hereby authorized to execute, deliver, and perform one or more amendments or

modifications to the DIP Documents for, among other things, the purpose of adding additional

financial institutions as DIP Lender and reallocating the commitments for the Financing among

the DIP Lender (but without in any manner limiting or altering the obligations of the DIP Lender

to the Debtors under this Final Order or the DIP Documents, or the rights of the Debtors

hereunder or thereunder), in each case in such form as the Debtors and the Required Lenders

may agree (it being understood that no further approval of this Court shall be required for non-

material amendments to the DIP Credit Agreement or modifications of the Budget pursuant to

the terms of paragraph 9 hereof).

      **d.**     From and after entry of this Final Order, any remaining amounts due

under the Prepetition Revolving Loans shall be rolled up and converted into DIP Obligations.

      **e.**     Upon execution and delivery of the DIP Documents, the DIP

Documents shall constitute valid and binding obligations of the Debtors, enforceable against

each Debtor party thereto in accordance with their terms subject to the terms of this Final Order.

      **6.**     **<u>Superpriority Claims</u>.**

      **a.**     Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP

Obligations shall constitute allowed claims against the Debtors with priority over any and all

administrative expenses, diminution claims (including all Adequate Protection Provisions

(defined below)) and all other claims against the Debtors, now existing or hereafter arising, of

any kind whatsoever, including, without limitation, all administrative expenses of the kind

specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative

expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331,

503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 (the "<u>Superpriority Claims</u>"), whether or not

such expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject to only to the Carve Out.

        **b.**    **Carve Out.**  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the

Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

    c. **Carve Out Reserves.**  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Delayed Draw Term Loan under the Delayed Draw Term Loan Commitments (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the

Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such Lenders having Delayed Draw Term Loan Commitments (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Delayed Draw Term Loan under the Delayed Draw Term Facility, any termination of the Delayed Draw Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each Delayed Draw Term Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Delayed Draw Term Lender's pro rata share with respect to such borrowing in accordance with the Delayed Draw Term Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in

clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP documents, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 6(c), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Secured Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP documents.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Term Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as

a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or the Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Obligations under and as defined in the Prepetition Credit Agreement.

      **d.**     **Payment of Allowed Professional Fees Prior to the Termination Declaration Date.**  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

      **e.**     **No Direct Obligation To Pay Allowed Professional Fees.**  None of the DIP Agent, DIP Lender, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lender, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

      **f.**     **Payment of Carve Out On or After the Termination Declaration Date.**  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled

to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

7.    **DIP Liens.**

a.    As security for the DIP Obligations, effective and perfected automatically upon the date of the Interim Order and this Final Order, and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the DIP Agent of any Collateral (as defined below), the following security interests and liens (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lender, pursuant to this Final Order and the DIP Documents, the "<u>DIP Liens</u>") are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lender (subject and subordinate to the Carve Out and Permitted Liens): (*provided, however*, that such claim, lien, and security interest shall not apply to (A) more than sixty-five percent (65%) of any Excluded Subsidiary's outstanding voting interests in its Stock and Stock Equivalents, and (B) any interest in the Stock and Stock Equivalents of any Subsidiary of an Excluded Subsidiary)  all tangible and intangible prepetition and postpetition property and interests in property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired (other than the Excluded Property), including, without limitation, (i) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, intellectual property, instruments, insurance, inventory, investment property, letter-of-credit rights, money and any supporting obligations related thereto; (ii) all commercial tort claims; (iii) all books and records pertaining to the Collateral; (iv) all property of any Credit Party held by the DIP Agent, the DIP Lender, or any Prepetition Secured Party, including all property of every description, in the

custody of or in transit to the DIP Agent, the DIP Lender or any Prepetition Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party or as to which such Credit Party may have any right or power, including, but not limited to cash; (v) all other goods (including, but not limited to fixtures) and personal property of the Credit Parties, whether tangible or intangible and wherever located; (vi) all owned or leased real estate and real property leaseholds (*provided*, *however*, that with respect to the Debtors' leases of non-residential real property, the DIP Liens shall attach only to proceeds of such leases); and (vii) all proceeds of the foregoing (the "Postpetition Collateral"), plus all Prepetition Collateral (collectively, the "Collateral"); *provided, however*, that the term Collateral shall exclude any deposit accounts, trust accounts escrow accounts or security deposits, and the funds therein, established pursuant to statutory obligations or for the payment of taxes or holding funds in trust for third parties, and any other Excluded Property as defined in the Prepetition Security Agreement.   The Postpetition Collateral shall include the proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.

     **b.**    The DIP Liens shall be senior priming liens on the Prepetition Collateral senior to all Prepetition Liens thereon and any Adequate Protection Liens (as defined below) thereon, but subject to (i) the Carve Out, and (ii) Permitted Liens that are valid, binding, perfected and unavoidable as of the Petition Date (other than the Prepetition Liens) and which are entitled to priority over the Prepetition Liens (iii) valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens, and (iv) valid liens in existence as of the Petition Date that are perfected thereafter to the extent

permitted by Bankruptcy Code section 546(b) which are entitled to priority over the Prepetition Liens.

8.    **Remedies.**

a.    The automatic stay provisions of Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the DIP Agent and DIP Lender to exercise, upon not less than three (3) Business Days' prior written notice (which can be by electronic mail or fax) to the Debtors, the Committee and the Office of the US Trustee (and their counsel) following the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), all rights and remedies hereunder and under the DIP Documents against the Debtors and/or the Collateral (including, without limitation, the right to set off monies of the Debtors in accounts maintained or controlled by the DIP Agent or any DIP Lender); *provided*, *however*, that the DIP Agent may only enter onto any leased premises of any Debtor after an Event of Default in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlords, (ii) in accordance with non-bankruptcy law, or (iii) a further order of this Court after notice and a hearing.

b.    In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors' rights to use Cash Collateral pursuant to this Final Order shall terminate upon the earlier to occur of (i) three (3) Business Days' written notice (that can be given by electronic mail or fax) provided by the DIP Agent to the Debtors (and their counsel) or provided by the Debtors to the DIP Agent of the occurrence and continuance of any Event of Default under the DIP Facility or (ii) repayment by the Debtors of all Obligations under the DIP Facility indefeasibly in full in cash (the "Cash Collateral Termination Date"). Notwithstanding the foregoing, the Debtors' rights to use Cash

Collateral shall immediately terminate (without notice from the DIP Agent) at the time that any Debtor has actual knowledge of an Event of Default if the Debtors fail to promptly notify the DIP Agent of such Event of Default.

**9.     Approved Budget and Access to Debtors.**

    **a.**    For purposes of this Final Order, the term "Budget" means the budget, attached to this Final Order as **Exhibit 1**, (the "Initial Budget," as such Initial Budget shall be amended, supplemented, and/or extended in the manner set forth herein and in the DIP Documents).

    **b.**    Each Tuesday, the Debtors shall deliver to counsel to the DIP Agent and counsel to the Prepetition Term Loan Lenders a variance report (the "Rolling Variance Report"). The Rolling Variance Report shall demonstrate that total disbursements (and, for the avoidance of doubt, not cash receipts) for the four-week rolling period (including fees paid to professionals) are no greater than 115% of the projected amounts for total disbursements set forth in the Budget for such period ("Permitted Variance").

    **c.**    Notwithstanding anything to the contrary contained herein, any reference in this Final Order to being "in compliance with the Budget", "subject to the Budget", "in accordance with the Budget" or other similar phrase or term, shall in all cases mean the Budget giving effect to DIP Credit Agreement § 4.1(j), and (l), and Article VI of the DIP Credit Agreement (collectively, the "Budget Covenant").

    **d.**    The Debtors shall be available, and cause their restructuring professionals, financial consultants and investment bankers to be available, for calls and meetings with the DIP Lender at its reasonable request, and in any event no less frequently than once in every two-week period, at which such meetings the Debtors and its professionals shall

provide regular updates to the DIP Lender with respect to the Credit Parties and their business and assets, including the Milestones (it being understood that the financial consultants and investor bankers shall not be required to disclose the identity of the potential buyers of the Company's assets or other confidential information).

e. Each Friday, the Committee shall deliver to counsel to the DIP Agent and counsel to the Prepetition Term Loan Lenders a report indicating the total amount of professional fees and expenses incurred during the Cases by the Committee through the previous Friday.

**10.** **Limitation on Charging Expenses Against Collateral.** Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Bankruptcy Code section 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent, the DIP Lender or the Prepetition Secured Parties, *provided, however*, the foregoing waiver shall not be effective with regard to any rental obligations under the Debtors' real property leases for the period March 11, 2019, through and including March 31, 2019, until the payment of such rental obligations, at which time the DIP Agent, the DIP Lender and the Prepetition Secured Parties shall receive a waiver pursuant to section 506(c) of the Bankruptcy Code on a dollar-for-dollar basis in accordance with the payment of such rental obligations.  In no event shall the DIP Agent, the DIP Lender, or the Prepetition Secured Parties be subject to (i) the "equities of the case" exception contained in

Bankruptcy Code section 552(b) or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

11.     **Cash Collateral.** Subject to the terms of this Final Order and the Budget, the Debtors are hereby authorized to use all "cash collateral" within the meaning of Bankruptcy Code section 363(a) in which the Prepetition Collateral Agent or any other Prepetition Secured Party has a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which the Prepetition Collateral Agent has control, and including any cash proceeds of Collateral (collectively, the "Cash Collateral"); *provided, however*, that the term Cash Collateral shall exclude any deposit accounts, trust accounts, escrow accounts or security deposits, and the funds therein, established pursuant to statutory obligations or for the payment of taxes or holding funds in trust for third parties.

12.     **The LC Cash Collateral Account.** The Debtors are authorized to create an account (the "LC Cash Collateral Account") to be held at KeyBank National Association, which account shall (i) be solely for the benefit of the DIP Lender and (ii) be used solely to hold proceeds of the DIP Loans sufficient to cash collateralize the existing letter of credit Obligations under the Prepetition Credit Agreement.

13.     **Prepetition Secured Parties' Adequate Protection.** The Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 361, 363(e) and 364(d)(1), to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, to the extent of any diminution in the value of their respective interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other actual consumption) of Cash Collateral and any other Prepetition Collateral,

the priming liens on the Prepetition Collateral granted to the DIP Agent and the DIP Lender pursuant to the DIP Documents and this Final Order, and the imposition of the automatic stay pursuant to Bankruptcy Code section 362, and in each case to the extent required by the Bankruptcy Code (each, a "Diminution Claim").  As adequate protection for such Diminution Claims, the Prepetition Collateral Agent is granted, for the benefit of the respective Prepetition Secured Parties, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "Adequate Protection Provisions"):

a. **Retention of Liens**.  The Prepetition Secured Parties will, subject to the terms of this Final Order, maintain the Prepetition Liens on the Collateral, which liens shall be junior and subordinate to (i) the DIP Liens, (ii) the Carve Out (iii) valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens, and (iv) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b) which are entitled to priority over the Prepetition Liens.

b. **Adequate Protection Liens**.  The Prepetition Collateral Agent, for itself and for the benefit of the Prepetition Secured Parties, is hereby granted valid and perfected replacement security interests in and liens on the Postpetition Collateral which liens shall be junior and subordinate to (i) the DIP Liens, (ii) the Carve Out (iii) valid, perfected and non-avoidable liens in existence as of the Petition Date or which are entitled to priority over the Prepetition Liens, and (iv) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by Bankruptcy Code section 546(b) which are entitled to priority over the Prepetition Liens (the "Adequate Protection Liens").  For the avoidance of

doubt, the foregoing is subject to and intended to comply in all respects with the priority and payment provisions of the Prepetition Credit Agreement.

        c.    **Section 507(b) Claim.**    To the extent that the Adequate Protection Liens and other forms of adequate protection granted pursuant to this Final Order are insufficient as adequate protection for a Prepetition Secured Party's Diminution Claim, and pursuant to Bankruptcy Code section 507(b), such Prepetition Secured Party is hereby granted, subject and subordinate to the payment of the Carve Out and DIP Claims, a Superpriority Claim.

        d.    **Fees and Expenses Paid as Adequate Protection to the Prepetition Term Loan Lenders.**    Without further application to this Court, the Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, pursuant to the procedures set forth in this paragraph 12(d), and in accordance with the Budget, all reasonable professional fees and expenses of the Prepetition Term Loan Lenders and the Prepetition Agent incurred in connection with the Cases (the "Prepetition Term Loan Lenders' Professional Fees and Expenses"), including, without limitation, all reasonable fees and expenses incurred prior to the date hereof and/or the Petition Date.  The Debtors shall pay the Prepetition Term Loan Lenders' Professional Fees and Expenses within ten (10) Business Days (if no written objection is received within such ten (10) Business Days' period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses (but in any event providing reasonable detail with respect to the fees and expenses incurred); *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoices delivered simultaneously to the DIP Agent, the United States Trustee for the District of Delaware (the "U.S. Trustee"), and the official committee of unsecured creditors (the "Committee"). Written objections to payment

of the Prepetition Term Loan Lenders' Professional Fees and Expenses, which may only be asserted by the Debtors, the DIP Agent, the U.S. Trustee and the Committee, must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced.  None of the Prepetition Term Loan Lenders' Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided, however,* if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute. All allowed claims payable in cash arising from the Adequate Protection Provisions must be indefeasibly paid in full in cash and satisfied on or before the effective date of any chapter 11 plan (except as may otherwise be provided in such chapter 11 plan).

14. **Credit Bid.**  Subject to any applicable challenge rights of the Committee in paragraph 17 below, the DIP Lender and the Prepetition Secured Parties shall have the right to credit bid in connection with any proposed sale of the Collateral, subject to and in accordance with Bankruptcy Code section 363(k), up to the full amount of the DIP Facility and the Prepetition Indebtedness.  Each of the DIP Agent, on behalf of the DIP Lender, and the Prepetition Secured Parties shall be considered a "Qualified Bidder" with respect to its rights to acquire any or all assets by credit bid.

15. **Perfection of DIP Liens.**

a. The DIP Agent, on behalf of the DIP Lender, is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages,

notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Final Order, but subject in all respects to the provisions of paragraph 17 of this Final Order.

**b.**    A certified copy of this Final Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

**c.**    The Debtors shall execute and deliver to the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

**16.    <u>Preservation of Rights Granted Under the Order</u>.**

**a.**    Except as expressly provided herein or in the DIP Credit Agreement, no claim or lien having a priority senior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agent or the DIP Lender shall be granted or allowed while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates

under Bankruptcy Code section 551 or subordinate to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

**b.**     Unless all DIP Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Credit Agreement if any of the Debtors seek, or if there is entered (i) any stay, vacatur, rescission, or modification of this Final Order without the prior written consent of the DIP Agent (not to be unreasonably withheld), and no such consent shall be implied by any other action, inaction, or acquiescence by the DIP Agent, or (ii) an order converting the Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of the Cases.  If an order dismissing any of the Cases under Bankruptcy Code section 1112 or otherwise is at any time entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that (x) the Superpriority Claims and other administrative claims granted under this Final Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and all Diminution Claims shall have been paid and satisfied in full (and that such Superpriority Claims, the other administrative claims granted under this Final Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

**c.**     If any or all of the provisions of this Final Order are hereafter reversed or modified on appeal, such reversal or modification shall not affect the validity of the DIP Loans or the priority of the DIP Liens or Adequate Protection Liens, unless a stay pending appeal has been obtained.  The DIP Agent, the DIP Lender, and the Prepetition Secured Parties

shall be entitled to all of the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e).

      **d.**      Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Provisions and all other rights and remedies of the DIP Agent, the DIP Lender or the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, or (ii) except as may otherwise be provided in the *Joint Plan of Reorganization of Z Gallerie and Its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 16] (as may be amended, modified, supplemented from time to time prior to entry of any order confirming such plan, the "Plan") with respect to any allowed claims for diminution, the entry of an order confirming a Plan in any of the Cases. The terms and provisions of this Final Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims and all other administrative claims granted pursuant to this Final Order and all other rights and remedies of the DIP Agent, the DIP Lender and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, all Diminution Claims, and all allowed claims payable in cash arising from the Adequate Protection Provisions are indefeasibly paid in full in cash.

17.    <u>**Effect of Stipulations On Third Parties**</u>.    The stipulations and admissions contained in paragraph 3 of this Final Order shall be binding on all parties in interest, including, without limitation, the Debtors and the Committee, unless, and solely to the extent that an adversary proceeding or other appropriate contested matter has been commenced against the Prepetition Secured Parties in connection with any matter related to the Prepetition Indebtedness Documents or the Prepetition Collateral (any such claim, a "<u>Challenge</u>"), (i) if by the Committee by no later than sixty (60) days from the date of formation of such Committee, and (ii) if by another party in interest, by no later than seventy-five (75) days from the date of entry of the Interim Order, subject to further extension by written agreement of the Debtors, DIP Agent, and the Prepetition Secured Creditors, each acting in their sole discretion (the "<u>Challenge Period</u>" and the date of expiration of the Challenge Period being the "<u>Challenge Period Termination Date</u>"),  *provided*, *however*, that if the Committee files a motion with the Court seeking requisite standing and authority to pursue a Challenge, with a draft complaint attached, prior to expiration of the Challenge Period (a "<u>**Standing Motion**</u>"), the Challenge Period shall be tolled for the Committee (and no other party) solely with respect to the Challenges asserted in the complaint attached to the Standing Motion until the day on which such Standing Motion is granted or denied by an order of the Court; *provided further*, *however*, that if the Committee identifies a basis to assert a Challenge, then it must notify the Debtors, DIP Agent, and the Prepetition Secured Parties in writing during the Challenge Period of its demand that the Debtors initiate a contested matter or an adversary proceeding in these Cases in respect of such Challenge.  From the date that the Debtors, DIP Agent, and Prepetition Secured Parties receive such written notice, Debtors will then have five (5) days to notify the Committee of whether Debtors intend to initiate any such action and ten (10) days to initiate any such action.  If Debtors notify the Committee

that Debtors do not intend to initiate a contested matter or an adversary proceeding, then the Committee will have ten (10) days from the receipt of such notice to file a motion with the Court for leave to initiate a contested matter or an adversary proceeding in respect of such Challenge. Nothing herein grants standing in favor of the Committee absent further order of this Court. Debtors, if timely notified of a potential Challenge, will retain authority to prosecute, settle, or compromise any such Challenge in the exercise of their business judgment and subject to any applicable further order of this Court.  If no such Challenge is timely filed, then (x) Prepetition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance (subject in all respects to the Prepetition Credit Agreement, including, without limitation, the subordination and priority provisions thereof), for all purposes in the Cases and any subsequent chapter 7 case, (y) the Prepetition Collateral Agent's liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance (subject in all respects to the Prepetition Credit Agreement, including, without limitation, the subordination and priority provisions thereof), and (z) the Obligations under the Prepetition Indebtedness Documents and the liens of the Collateral Agent on the Prepetition Collateral shall not be subject to any other or further challenge by the Debtors, any committee or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph 3 of this Final Order shall nonetheless remain

binding and preclusive (as provided in the second sentence of this paragraph) on the Debtors, any committee and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such timely filed adversary proceeding or contested matter.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Indebtedness Documents or the liens of the Prepetition Collateral Agent on the Prepetition Collateral.

18.    **Limitation on Use of Financing Proceeds and Collateral.**  Notwithstanding anything herein or in any other order by this Court to the contrary, without the prior written consent, as applicable, of the DIP Agent or the Prepetition Collateral Agent, none of the DIP Obligations, the Cash Collateral, Collateral, or the Carve Out may be used for the following purposes:  (i) to challenge or investigate the validity, perfection, priority, extent or enforceability of the DIP Credit Agreement or the Prepetition Indebtedness Documents or the liens or security interest securing the obligations under any of the foregoing or to pursue any causes of action of any kind against the DIP Agent or the DIP Lender (except that up to $50,000 of Cash Collateral may be used by the Committee for purposes of such investigation); or (ii) to object to, contest, delay, prevent or interfere with in any way the exercise of rights and remedies by the DIP Agent.

19.    **Priorities Among Prepetition Secured Lenders.**  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties, such priorities and rights shall continue to be governed by the Prepetition Credit Agreement and the Prepetition Indebtedness Documents to the extend applicable.

20.    **Milestones under the DIP Credit Agreement.**    Pursuant to the DIP Credit Agreement, failure of the Credit Parties to perform each action with respect to the Cases as set forth below within the time periods set forth below (the "Milestones") shall constitute an Event of Default (as defined in the DIP Credit Agreement) and result in the automatic termination of the Debtors' authority to use Cash Collateral under this Final Order and permits the DIP Agent, on behalf of the DIP Lender, subject to paragraph 8, to exercise the rights and remedies provided for in this Final Order and the DIP Documents:

   a.    On the Petition Date the Credit Parties shall file a Plan, in form and substance acceptable to the DIP Lender, with such Plan providing for the indefeasible payment in full of the DIP Loans through either (x) consummation of a sale or sales of substantially all of the Debtors' assets or (y) a going concern reorganization;

   b.    On or before March 25, 2019, the Credit Parties shall have filed a disclosure statement in connection with the Plan (the "Disclosure Statement");

   c.    On or before April 12, 2019, this Final Order shall have been entered by the Bankruptcy Court;

   d.    On or before April 12, 2019, the Bidding Procedures Order shall have been approved by order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender;

   e.    On or before April 19, 2019, the Credit Parties shall have delivered indicative term sheet(s) from potential bona fide buyer(s) with respect to the purchase of all or substantially all of the Credit Parties' assets, in form and substance acceptable to the DIP Lender, *provided, however*, that in the event the Credit Parties fail to deliver such indicative term sheet, then they shall be required to comply with the milestone set forth in subsection (f) below;

f.      In the event that the Credit Parties do not receive indications of interest sufficient to pay off the Loans, then the Credit Parties shall, on or before May 7, 2019, provide evidence, satisfactory in form and substance to the Lenders, of a commitment for exit financing to be provided under the Plan.  It shall be an Event of Default if the Credit Parties are unable to or fail to provide such evidence ("Sale Milestone Default").    In the case of a Sale Milestone Default, the Credit Parties shall execute a business plan, satisfactory to the DIP Lender, that significantly reduces the Loans outstanding by shuttering of underperforming stores and reducing store footprint to a scale of highly profitable store;

g.      On or before May 7, 2019, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

h.      On or before May 20, 2019, an Auction (to the extent necessary) for the sale of all or substantially all of the Credit Parties' assets shall have occurred;

i.      On or before May 29, 2019, the Borrower shall have finalized an asset purchase agreement in form and substance acceptable to the DIP Lender;

j.      On or before June 17, 2019, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, confirming the Plan;

k.      If the Borrower fails to satisfy any Milestone it shall be an Event of Default under the DIP Credit Agreement.

21.    **Modifications of DIP Documents.**  The Debtors, the DIP Agent and the DIP Lender are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications of the respective DIP Documents without further Order of this Court, or any other modifications to the respective DIP Documents; *provided, however*, that notice of any material modification or amendment to the respective DIP

Documents shall be provided to counsel to the Committee, the Prepetition Term Loan Lenders, and to the U.S. Trustee, each of whom shall have five (5) Business Days from the date of such notice within which to object in writing to such modification or amendment. If the Committee, the Prepetition Term Loan Lenders, or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court. The Debtors shall provide notice to the U.S. Trustee and the Committee within five (5) business days following the execution of any non-material modifications to the DIP Documents.

22.     **Final Order Governs.** In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

23.     **Binding Effect; Successors and Assigns.** The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agent, the DIP Lender, the Prepetition Secured Parties, the Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lender, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agent and the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the

operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. § 9601 *et seq*., as amended, or any similar federal or state statute).

24.     **Texas Ad Valorem Taxes.**  Notwithstanding any provisions of this Final Order, any valid liens currently held by Allen ISD, Bexar County, Clear Creek ISD, City of Houston, Dallas County, FBC LID 2, Fort Bend County, Fort Bend ISD, Harris County, Montgomery County, Spring Branch ISD, Tarrant County, Woodlands Metro MUD, and Woodlands RUD 1 (the "Local Texas Tax Authorities") shall neither be primed by nor subordinated to any liens granted hereby.  Subject to further order of this Court, up to a maximum of $86,271.88 of proceeds of the Sales of Store Closure Assets located in the state of Texas that are subject to a lien held by the Local Texas Tax Authorities, shall be deposited in a segregated account as adequate protection for the secured claims of the Local Texas Tax Authorities prior to the distribution of any such proceeds to any other creditor. Any valid liens of the Local Texas Tax Authorities shall attach to these proceeds to the same extent and with the same priority as such liens currently attach to the applicable property of the Debtors. The claims and liens of the Local Texas Tax Authorities shall remain subject to any objections any party (including the Debtors) would otherwise be entitled to raise as to the priority, validity, or extent of such liens.

25.     **Comenity Bank.**  Notwithstanding anything to the contrary in, or approved by, this Final Order:

> a.    Comenity Bank's ("Comenity") rights of setoff and/or recoupment with respect to the Private Label Credit Card Program Agreement between Comenity Bank and Z Gallerie, Inc. dated as of October 15, 2003, as amended (the "Program Agreement"): (i) shall not be affected, modified, waived, primed, subordinated or

impaired in any way, (ii) shall not be made subject to, subordinated by, or pari passu with any (x) secured financing, security interests, or liens and/or (y) super priority, administrative or adequate protection claims,

b.  Comenity's right to use the Debtors' trademarks, service marks and other rights pertaining to the Debtors' names as set forth in the Program Agreement:  (i) shall not be affected, modified, waived, primed, subordinated or impaired in any way, (ii) shall not be made subject to, subordinated by, or pari passu with any (x) secured financing, security interests, or liens and/or (y) super priority, administrative or adequate protection claims, and

c.  All of Comenity's rights, remedies, claims, defenses and other relief arising from or related to the Program Agreement (including, without limitation, those set forth in sections (a) and (b) are expressly preserved and reserved.

26.  **Effectiveness.**  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Final Order.

**Dated: April 9th, 2019**
**Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**