*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Z GALLERIE, LLC, *et al.*,[1] | ) | Case No. 19-10488 (LSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT RELATING TO THE FIRST AMENDED
JOINT PLAN OF REORGANIZATION OF Z GALLERIE, LLC AND Z GALLERIE
HOLDING COMPANY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE[2]**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:　　(212) 446-4800
Facsimile:　　(212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:　　(302) 426-1189
Facsimile:　　(302) 426-9193

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:　　(312) 862-2000
Facsimile:　　(312) 862-2200

Dated: ~~April 30~~May 1, 2019

*Co-Counsel for the Debtors and Debtors in
Possession*

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]　The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949).  The location of the Debtors' service address is:  1855 West 139th Street, Gardena, CA 90249.

[2]　~~The Debtors have filed this Disclosure Statement and the Plan with certain key provisions omitted.  The Debtors continue to negotiate the terms of the Plan with their stakeholders including the DIP Lender, the Secured Credit Agreement Lenders, and the Committee.  The Disclosure Statement and Plan remain subject to material modification in all respects.~~

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEADLINE TO VOTE ON THE PLAN IS
June 4, 2019,[3] at 5:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY
STRETTO ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF REORGANIZATION OF Z GALLERIE, LLC AND Z GALLERIE HOLDING COMPANY, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.[4]

THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

---

[3]    As of the date hereof, the Debtors have not obtained Court approval of the Confirmation Schedule. Accordingly, this Disclosure Statement will be revised after entry of an order approving such schedule.

[4]    The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, the Z Gallerie trademark. This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- **BUSINESS STRATEGY;**

- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**

- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**

- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................................1

II.    PRELIMINARY STATEMENT ...........................................................................................1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
       THE PLAN ...........................................................................................................................3

       A.    What is chapter 11?.......................................................................................................3
       B.    Why are the Debtors sending me this Disclosure Statement? .......................................4
       C.    Am I entitled to vote on the Plan?.................................................................................4
       D.    What will I receive from the Debtors if the Plan is consummated? ...............................5
       E.    What happens to my recovery if the Plan is not confirmed or does not go effective? ......9
       F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
             Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
             "Consummation?"..........................................................................................................9
       G.    What are the sources of Cash and other consideration required to fund the Plan?.........10
       H.    Are there risks to owning the Reorganized Debtors Interests upon emergence from
             chapter 11?..................................................................................................................10
       I.    Is there potential litigation related to Confirmation of the Plan? ...................................10
       J.    Will the final amount of Allowed Unsecured Claims and Allowed Critical Trade Claims
             affect the recovery of holders of Allowed Unsecured Claims under the Plan?...............10
       K.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............11
       L.    What is the deadline to vote on the Plan? .....................................................................11
       M.    How do I vote for or against the Plan?..........................................................................11
       N.    Why is the Bankruptcy Court holding a Confirmation Hearing? ...................................12
       O.    When is the Confirmation Hearing set to occur? ..........................................................12
       P.    What is the purpose of the Confirmation Hearing?........................................................12
       Q.    What is the effect of the Plan on the Debtors' ongoing businesses?...............................12
       R.    Who do I contact if I have additional questions with respect to this Disclosure Statement
             or the Plan? .................................................................................................................12
       S.    Could subsequent events potentially affect recoveries under the Plan? .........................13
       T.    Do the Debtors recommend voting in favor of the Plan? ...............................................13

IV.    THE DEBTORS' PLAN ......................................................................................................13

       A.    The Plan ......................................................................................................................13

V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW..........18

       A.    Z Gallerie's Corporate History.....................................................................................18
       B.    The Debtors' Business Operations ................................................................................19
       C.    The Debtors' Cost Structure .........................................................................................20
       (i)   Supply Chain ...............................................................................................................20
       (ii)  Employee Compensation and Benefits .........................................................................20
       (iii) Real Estate Obligations ...............................................................................................20
       D.    The Debtors' Prepetition Capital Structure ...................................................................20

VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS....................................................21

       A.    Operational and Growth Challenges .............................................................................21
       B.    Supply Chain and Borrowing Base Challenges .............................................................22
       C.    Corporate History ........................................................................................................22
       D.    Exploration of Strategic Alternatives ...........................................................................22
       E.    Store Footprint Right-Sizing Initiatives .......................................................................23

| VII. | MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 23 |
|------|------|------|
| | A. First Day Relief | 23 |
| | B. Other Procedural and Administrative Motions | 24 |
| | C. Approval of Debtor-in-Possession Financing | 24 |
| | D. Schedules and Statements | 24 |
| | E. Appointment of Official Committee | 24 |
| | F. Litigation Matters | 25 |
| | G. Rejection and Assumption of Executory Contracts and Unexpired Leases | 25 |
| | H. Cure of Defaults | 25 |
| | I. Claims Based on Rejection of Executory Contracts or Unexpired Leases | 27 |
| | J. Independent Investigation | 27 |
| | K. Marketing Process | 27 |
| **VIII.** | **RISK FACTORS** | **28** |
| | A. Bankruptcy Law Considerations | 28 |
| | B. Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 31 |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES** | **34** |
| | A. Holders of Claims Entitled to Vote on the Plan | 34 |
| | B. Voting Record Date | 34 |
| | C. Voting on the Plan | 35 |
| | D. Ballots Not Counted | 35 |
| **X.** | **CONFIRMATION OF THE PLAN** | **36** |
| | A. Requirements for Confirmation of the Plan | 36 |
| | B. Best Interests of Creditors/Liquidation Analysis | 36 |
| | C. Feasibility | 37 |
| | D. Acceptance by Impaired Classes | 37 |
| | E. Confirmation without Acceptance by All Impaired Classes | 37 |
| **XI.** | **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** | **38** |
| | A. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Parent Interests | 40 |
| | B. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Secured Revolving Loan Claims and Allowed Class 5 Secured Term Loan Claims. | 42 |
| | C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6 Critical Trade Claims. | 42 |
| | D. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 7 General Unsecured Claim. | 42 |
| | E. Character of Gain or Loss. | 43 |
| | F. Market Discount. | 43 |
| | G. Accrued Interest. | 44 |
| | H. Limitation on Use of Capital Losses | 44 |
| | I. Ownership and Disposition of the Reorganized Debtors Interests. | 45 |
| | J. Information Reporting and Backup Withholding | 47 |
| **XII.** | **RECOMMENDATION** | **49** |

i

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

**EXHIBIT B**    Liquidation Analysis

**EXHIBIT C**    Financial Projections

## I.      INTRODUCTION

Z Gallerie, LLC and Z Gallerie Holding Company, LLC, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *First Amended Joint Plan of Reorganization of Z Gallerie, LLC and Z* Gallerie Holding Company, LLC *Pursuant to Chapter 11 of the Bankruptcy Code*, dated ~~April 30~~May 1, 2019 (as may be amended, supplemented, or modified from time to time, the "Plan").[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

Z Gallerie was the dream of three siblings —Joe, Carole, and Mike **Z**eiden—who started a small single-location poster and accessory store in 1979, using their parent's garage as a framing workshop at night.  From those humble beginnings, Z Gallerie has grown into a leading specialty retailer focused on fashion and art-conscious home décor with 76 stores across the United States.  The Zeiden's love for art ultimately became a driving force behind Z Gallerie's overall design aesthetic. Today, Z Gallerie's bright, upscale stores attract a loyal customer base that appreciates the company's curated, unique style and customizable experience focused on fashion- and art-inspired home décor and home furnishings. Customers can also browse inventory, develop their own style profile, and shop in-store and online.

Following a transaction in 2014 in which the Zeidens sold majority control of the company to Brentwood (as discussed in greater detail below), Z Gallerie's performance declined.  The downward trajectory of Z Gallerie's performance was largely driven by several key factors: (i) a store footprint expansion did not meet performance targets; (ii) the addition of the Atlanta distribution center disrupted operations and increased costs; and (iii) the failure to timely invest enough capital in Z Gallerie's e-commerce platform ultimately limited its growth.  These missteps were exacerbated by macroeconomic trends in the brick and mortar retail industry and lower housing starts.  As a result, net revenue and EBITDA declined significantly during fiscal years 2017 and 2018.  By the Petition Date, the Debtors lacked liquidity to continue operations.

Because Z Gallerie's declining performance was predominantly the result of operational missteps, management believes that it can execute a plan to turn the company around and, in fact, has already seen positive returns associated with its turnaround efforts, as discussed below.  Accordingly, the Debtors commenced the Chapter 11 Cases to right-size their capital structure and further implement both financial and operational restructuring initiatives that management believes will best position Z Gallerie for future success.

The Debtors have taken—and will continue to take—several significant steps to turn-around the business, including: (i) retaining A&G Realty Partners, LLC ("A&G") in October 2018 to engage in rent

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

reduction negotiations with landlords, resulting in an estimated savings of $3 million in annual lease expenses; (ii) enhancing the eCommerce platform and website to expand the company's omnichannel strategy; (iii) revamping operations in the Atlanta distribution center over the last 6 months to streamline processing and reduce expenses, contributing to the substantial improvement in operational performance; (iv) launching more targeted social media marketing campaigns; and (v) implementing in-store employee training and marketing programs to better communicate the brand's strong value proposition to customers. In addition, at the beginning of the Chapter 11 Cases, the Debtors obtained Court approval to wind down and close 15 unprofitable retail store locations during the first two months of the Chapter 11 Cases [Docket No. 74]. These stores collectively lost $3.4 million in 2018.

Due in large part to these initiatives undertaken to optimize the business and position the company for future success, Z Gallerie has seen marked improvements in the months prior to the Petition Date. From the sales perspective, February and March 2019 same store comparable sales are up 4% year-over-year, 2018 holiday ecommerce traffic was up 13% over 2017, and the average transaction amount is up significantly in the last two months. From an operations perspective, saleable inventory is up 11%, lead time for custom products is down 20%, and orders not shipped due to processing issues are down 40% (all as compared to recent historic averages). Taken together, the outlook is bright and Z Gallerie is not "just another retailer" facing market headwinds.

As contemplated by the Plan, the Debtors believe that a going-concern reorganization or going-concern sale of Z Gallerie is in the best interest of all creditors and will maximize the value of the estates for all creditors. Before the commencement of their chapter 11 cases, the Debtors initiated the sale process by commencing a marketing process for the Z Gallerie business. On the first day of the Chapter 11 Cases, the Debtors also filed a motion seeking Bankruptcy Court approval of the Bidding Procedures pursuant to which the Debtors would market and sell their assets under the Plan. The Court approved the Bidding Procedures on April 11, 2019 [Docket No. 206] (the "Bidding Procedures Order"). As part of this process, the Debtors reached out to over 220 potentially interested parties. The Debtors received three non-binding indications of interests prior to the April 19, 2019 deadline. As set forth in the Bidding Procedures Order, the deadline for interested parties to submit Qualified Bids is May 16, 2019 by 5:00 p.m. (prevailing Eastern Time). The Auction to determine the Winning Bidder, if required, will be held on May 20, 2019.

Whether the Debtors sell their assets through the Bidding Procedures and Sale process or reorganize as a going-concern through a debt for equity conversion, the Debtors restructuring and conclusion of the Chapter 11 Cases will be implemented through the Plan. Specifically, the Plan contemplates each of these alternatives: (a) if there is a third-party Winning Bidder as part of the Sale Process, the third party Winning Bidder will purchase the Assets through the Plan and the Sale Transaction Proceeds will be distributed as recovery to creditors through a traditional waterfall and (b) if there is no third-party Winning Bidder, the Prepetition Secured Lenders will take control of Z Gallerie through a debt for equity exchange.

Specifically, under the terms of the Plan, holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- Secured Tax Claims, Other Secured Claims, and Other Priority Claims will be paid in full, in cash on the Effective Date or otherwise provided treatment as to render such Claims unimpaired.

- Allowed Secured Revolving Loan Claims will receive (a) if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to payment in full or (b) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata

share of the Reorganized Debtors Interests, as set forth in the Exchange Term Sheet, if applicable.

- Holders of Secured Term Loan Claims will receive (a) if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to payment in full or (b) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of the Reorganized Debtors Interests, as set forth in the Exchange Term Sheet, if applicable.

- Holders of Critical Trade Claims will receive their Pro Rata share of the Critical Trade Claims Recovery Pool.

- Holders of General Unsecured Claims will receive their Pro Rata share of any Excess Distributable Cash.

- Holders of Allowed Administrative Claims and Priority Tax Claims are paid in full.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative to a going-concern sale or reorganization would materially reduce recoveries to claim holders. Accordingly, the Debtors urge all holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Stretto,[2] the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by June 4, 2019, at 5:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

---

[2]    The Bankruptcy Court approved the Order to retain Stretto as Administrative Agent and Solicitation Agent on April 9, 2019 [Docket No. 170].

**B.    Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Revolving Loan Claims | Impaired | Entitled to Vote |
| 5 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 6 | Critical Trade Claims[3] | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Interests in Z Gallerie Holding Company, LLC | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[3]    Class 6 is currently vacant. To the extent any parties are moved from Class 7 to Class 6, such determination will be made in conjunction with the future holders of the Reorganized Debtor Interests.  To the extent any Holder of a Class 7 Claim voted to accept the Plan and is later moved to a Class 6 Claim, the Debtors will not resolicit such Holder's vote as treatment of Class 6 Claims will be better than treatment of Class 7 Claims. To the extent a Holder of a Class 7 Claim voted to reject the Plan and is later moved to a Class 6 Claim, the Debtors will resolicit such Holder's vote as soon as reasonably practicable prior to the Confirmation Hearing.

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery** |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the applicable Reorganized Debtor: <br><br>(i)  payment in full in Cash of such Holder's Allowed Secured Tax Claim; or<br><br>(ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | $0 – $100K | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed | $0 – $1M | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery** |
| | | Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Reorganized Debtor:<br><br>(i)  payment in full in Cash of such Holder's Allowed Other Secured Claim;<br><br>(ii)  the collateral securing such Holder's Allowed Other Secured Claim;<br><br>(iii) Reinstatement of such Holder's Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | | |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash on account of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $0 – $1M | 100% |
| 4 | Secured Revolving Loan Claims | To the extent any Allowed Secured Revolving Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Revolving Loan Claim, each Holder of an outstanding Allowed Secured Revolving Loan Claim shall receive either:<br><br>(i)  if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Revolving Loan Claim or such other treatment rendering such Holder's Allowed Secured Revolving Loan Claim Unimpaired; or<br><br>(ii)  if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of the Reorganized Debtors Interests, as set forth in the Exchange Term Sheet, if applicable. | $750K | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 5 | Secured Term Loan Claims | To the extent any Allowed Secured Term Loan Claims are outstanding on the Effective Date, except to the extent that a Holder of an Allowed Secured Revolving Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Term Loan Claim, each Holder of an outstanding Allowed Secured Term Loan Claim shall receive either:<br><br>(i)  if an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4, its Pro Rata share of payment from the Secured Credit Agreement Distributable Cash up to the full amount of the Allowed Secured Term Loan Claim or such other treatment rendering such Holder's Allowed Secured Term Loan Claim Unimpaired; or<br><br>(ii) if the Secured Credit Agreement Lenders are the Winning Bidder, its Pro Rata share of the Reorganized Debtors Interests, as set forth in the Exchange Term Sheet, if applicable. | $92M | 0 – 10% |
| 6 | Critical Trade Claims | Except to the extent that a Holder of an Allowed Critical Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Critical Trade Claim, each Holder of an Allowed Critical Trade Claim shall receive, after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed Critical Trade Claim) of the Critical Trade Claims Recovery Pool. | $0 | 0% |

7

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 7 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive:<br><br>(i)  after payment in full to Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5, its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the Excess Distributable Cash; and<br><br>(ii)  a complete waiver and release of any and all claims, Causes of Action, and other rights against the Holders of Allowed Class 7 Claims based on claims pursuant to chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law including fraudulent transfer laws from the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, subject to and in accordance with Article VIII of the Plan. | $60M – $80M | 0% |
| 8 | Intercompany Claims | Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.   On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by such Reorganized Debtors. | $0 | 0% |
| 9 | Intercompany Interests | Intercompany Interests shall be, at the option of the Debtors either:<br>(i)  Reinstated in accordance with Article III.G of the Plan; or<br><br>(ii)  Discharged,    canceled,    released,    and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | distribution on account of such Intercompany Interests. | | |
| 10 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |
| 11 | Interests in the Z Gallerie Holding Company, LLC | Interests in Z Gallerie Holding Company, LLC shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in Z Gallerie Holding Company, LLC will not receive any distribution on account of such Interests | N/A | 0% |

**E.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit B**.

**F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (c) commencement of distributions under the Plan.  Note that Holders of certain types of Claims, such as General Unsecured Claims and Critical Trade Claims, may not receive any distributions until the Debtors or Reorganized Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

**G.     What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by the following sources of consideration, as applicable:  (a) Cash on hand; (b) the Sale Proceeds; (c) the proceeds from the Exit Credit Agreement Facility (if any); and (d) the issuance of the Reorganized Debtors Interests.

**H.     Are there risks to owning the Reorganized Debtors Interests upon emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors."

**I.      Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article VIII.B.6 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

If it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**J.     Will the final amount of Allowed Unsecured Claims and Allowed Critical Trade Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $60M – $80M.  Each holder of an Allowed General Unsecured Claim will receive their Pro Rata share of any Excess Distributable Cash, if any.  There is a chance that there is no Excess Distributable Cash.  To the extent that the Debtors and the future owners of the Reorganized Debtor Interests determine that any General Unsecured Claims should be a Critical Trade Claim, Holders of Critical Trade Claims, if any, will receive their Pro Rata share of the Critical Trade Claims Recovery Pool.  As of the date hereof, the Debtors have made substantial payments to Critical Vendors pursuant to the Critical Vendors Order.

Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower) and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors or any official committees appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to holders of General Unsecured Claims, and such changes could be material.

**K.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors, Secured Credit Agreement Lenders, the DIP Lender, in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all stakeholders. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan, (b) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.7 of this Disclosure Statement, entitled "Releases."

**L.      What is the deadline to vote on the Plan?**

The Voting Deadline is June 4, 2019, at 4:00 p.m. (prevailing Eastern Time).

**M.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims or Interests that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline, which is June 4, 2019, at 5:00 p.m. prevailing Eastern Time**. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**N.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**O.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for June 11, 2019 at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than June 4, 2019, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**P.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Q.    What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan), and (3) the Debtors declare the Plan effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**R.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Stretto
Re: Z Gallerie, LLC, et al.
8269 E. 23rd Avenue, Suite 275
Denver, CO 80238

*By electronic mail at:*
TeamZGallerie@stretto.com

*By telephone (toll free) at:*
(855) 276-9008

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/zgallerie (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

**S.    Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes. As described in greater detail below, the Debtors are conducting a marketing and Auction process, seeking a potential purchaser for all or some of the Debtors' assets. The Debtors anticipate that the Auction, if any, related to this marketing process will take place on May 20, 2019. As is already contemplated by the Plan, the outcome of this sale process will determine the type and amount of recoveries for various Classes of Claims. Specifically, as set forth below, depending on the outcome, Secured Lenders may receive Cash (in the event of a sale to a third-party Winning Bidder) or Reorganized Debtor Interests (if there is no third-party Winning Bidder). In addition, the amount of recovery will vary depending on the Sale Transaction Proceeds.

Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached. Any number of subsequent events may interfere with Plan recovery.

**T.    Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    THE DEBTORS' PLAN

### A.    The Plan

As discussed in Article III herein, the Plan contemplates a going-concern sale or reorganization of the Debtors' business and provides for the Exit Facility to provide post Effective Date liquidity, in the event that such financing is required. . The Plan contemplates the following key terms, among others described herein and therein:

#### 1.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan will be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019,

as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and will be final.

### 2.    Restructuring Transactions

On the Effective Date, the applicable Debtors or the Reorganized Debtors will enter into transactions and take all actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, including, as applicable, entry into  the Exit Facility, consummation of the Sale Transaction, and/or the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions. The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 3.    Exit Facility

On the Effective Date, if required, the Reorganized Debtors shall execute and deliver the Exit Credit Agreement Documents to any applicable administrative agent for the Exit Credit Agreement Facility.  The Reorganized Debtors shall use proceeds of the Exit Credit Agreement Facility first to satisfy the DIP Claims and then, as applicable, to fund ongoing operations and other distributions under the Plan, including Critical Trade Claims, Secured Term Loan Claims, and Secured Revolving Loan Claims and satisfy certain other Cash obligations under the Plan.

The Exit Credit Agreement Facility will consist of either a term loan facility, a revolving loan facility, an asset-based revolving facility, or some combination thereof. On the Effective Date, the Participating Exit Facility Lenders shall fund the Exit Facility.  The terms for the Exit Credit Agreement Facility will be determined in accordance with the Reorganized Debtors' contemplated post-Effective Date business plan following and depending on the results of the Auction (with may contemplate the continued ownership or operation of all or only some of the Debtors' assets), and otherwise in form and substance acceptable to the Participating Exit Facility Lenders in their discretion, and any documentation necessary to implement the Exit Credit Agreement Facility will be included in the Plan Supplement.

### 4.    Issuance of Reorganized Debtors Interests

All existing Interests in the Debtors shall be automatically cancelled on the Effective Date and Reorganized Debtors will issue the Reorganized Debtors Interests to Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan, as applicable.  The issuance of the Reorganized Debtors Interests, is authorized without the need for any further corporate action and without any further action by

the holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable.  The New Organizational Documents, as applicable, will authorize the issuance and distribution on the Effective Date of the Reorganized Debtors Interests to the Disbursing Agent for the benefit of Entities entitled to receive the Reorganized Debtors Interests pursuant to the Plan.  All of the Reorganized Debtors Interests issued under the Plan will be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized Debtors Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance.

### 5.  Sale Transaction

Continuing after the Petition Date, the Debtors will continue conducting a marketing and Auction process of some or all of the Debtors' assets in accordance with the Bidding Procedures to determine the Winning Bidder.  The Bidding Procedures set forth the timeline and terms of the bidding process.  The Debtors believe that the Bidding Procedures allow the Debtors to seek and elicit the highest or otherwise best Sale Transaction offer.  The Sale Transaction will be consummated pursuant to the Plan in accordance with terms to be set forth in the Confirmation Order and Plan Supplement, as applicable, and the Prepetition Secured Lenders will receive the Secured Credit Agreement Distributable Cash as set forth in Article III of the Plan.

If no Entity submits a Qualified Bid, the Holders of Secured Revolving Loan Claims and Secured Term Loan Claims will receive the Reorganized Debtor Interests on the Plan Effective Date.

### 6.  Recoveries to Certain Holders of Claims and Interests

The recoveries to holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 7.  Releases

The Plan contains certain releases, as described in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

#### (a)    Release of Liens.

**Except as otherwise provided in the Exit Credit Agreement Documents, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with** Error! Reference source not found. **hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested**

by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

(b)    **Releases by the Debtors.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(c)    **Releases by Holders of Claims and Interests.**

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate

and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Exit Credit Agreement Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Exit Credit Agreement Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(d)        Exculpation

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for

actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(e)      **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, except to the extent such assertions are used as a defense to claims or Causes of Action by the Debtors arising prior to the Effective Date, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.      Z Gallerie's Corporate History

For nearly 40 years, the Debtors have focused on making home décor fashion-focused, art-infused, and accessible for its local customer base.  Z Gallerie delivers "fashion for the home," translating the latest fashion into home furnishings with an eye towards combining current trends and their complementary classics.  After years of success and growth, the Debtors found themselves caught in a mixture of

operational missteps and the rapid decline of brick-and-mortar retail in favor of online retail.  Despite those headwinds, the Debtors maintain a loyal customer base.  The Debtors believe that this, in conjunction with recently implemented initiatives aimed at operational improvement and social media and web-based customer engagement will enable them to achieve higher sales productivity by transitioning to more efficient operations while developing a robust online sales presence.

After its founding in 1979 as a single poster shop, Z Gallerie grew to 76 stores and expanded its offerings to include home furnishings and home décor.  Currently, Z Gallerie operates stores across the United States in conjunction with an online eCommerce platform, generating over $200 million in combined sales in 2018.

The chart below depicts the Debtors' current corporate structure.



As of the date of this Disclosure Statement, the Debtors' senior management includes:  Mark Weinsten, Interim President and Chief Executive Officer, Rob Otto, Chief Financial Officer, Kerem Ozkay, Vice President of Marketing and eCommerce, Shelley Gardner, Vice President of Merchandising, Shin Kim, Vice President of Planning, and Mary Mckay Grbich, Vice President of Stores.

As of the date of this Disclosure Statement, the members of the board of managers of Z Gallerie are: Roger Goddu, Steve Moore, Lynn Kilbourne, Matthew Kahn, and Alan Miller.

### B.    The Debtors' Business Operations

The Debtors generally specialize curated, unique style and customizable experience focused on fashion- and art-inspired home décor and home furnishings.  As of the Petition Date, Z Gallerie operated in 28 states, and its products were sold in 76 stores, comprised of 74 retail stores and two outlet stores,

located in lifestyle centers, shopping malls, and street level shops.   Subsequent to the Petition Date, the Debtors initiated store closure sales and, as of the date hereof, are in the process of closing 17 stores.

In addition to its physical footprint, Z Gallerie maintains a significant online presence.  Customers can seek out the latest home décor trends, explore customizable options for a vast array of different furniture and décor styles, and take a Style Personality Quiz to better guide their shopping journey on the Z Gallerie website.  Customers may also purchase merchandise via the Debtors' eCommerce platform.  Following recent updates, Z Gallerie maintains a user-friendly and well-curated eCommerce online platform that ensures a seamless customer experience.  In 2018, eCommerce accounted for over 20% of all sales.  The Debtors also operate two distribution centers, one in California and on in Georgia, to timely deliver goods to stores and direct to customers.

### C.    The Debtors' Cost Structure

#### (i)    Supply Chain

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations and consumers.  Generally, the Debtors contract with various domestic and international vendors across eight countries to design, source, and produce the merchandise.  When product is ready to be delivered at international ports, the Debtors use UPS Supply Chain Solutions to handle all facets of transport to the Debtors' warehouses in Los Angeles and Atlanta.  Domestic vendors contract with third-party delivery companies to transport the merchandise to the Debtors' distribution centers.  Once goods are to be delivered to a store or fulfill a customer order, the Debtors hire third-party common carriers to complete delivery from the distribution centers.

#### (ii)    Employee Compensation and Benefits

As of the Petition Date, the Debtors employed slightly over 1,000 employees across their retail and corporate operations.  The Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, is approximately $46.8 million in 2019.  The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs that are standard and competitive in the industry.

#### (iii)    Real Estate Obligations

22.    The Debtors lease all of their store locations, office space, and distribution centers.  The Debtors estimate that the aggregate occupancy costs for the Debtors' go-forward operations after implementing closings in these cases and negotiating lease modifications will be approximately $29 million in fiscal year 2019, excluding tenant amortization.  The Debtors anticipate 59 go-forward locations following the first round of store closures.  The Reorganized Debtors go-forward business plan and store footprint will ultimately be determined in conjunction with the new equity owners.

### D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $138 million.  The Debtors' prepetition capital structure is summarized as follows:

| Funded Debt | Maturity | Principal Amount |
|---|---|---|
| Senior Secured Revolving Loans | October 2020 | $19,368,708.30 |

| Senior Secured Term Loans | October 2021 | | $91,427,540.43 |
| Senior Unsecured Notes | March 2020 | | $10,639,588.40 |
| Senior Unsecured Refinancing Notes | January 2022 | | $17,220,783.57 |
| | | Total: | $138,656,620.70 |

### 1. Collateral of Debt Obligations

The Senior Secured Credit Agreement obligations are secured by substantially all assets of Z Gallerie, LLC and Z Gallerie Holding Company, LLC (collectively, the "Credit Parties"), including, without limitation, a first priority lien on the Credit Parties' accounts (including receivables), inventory, deposit and securities accounts (subject to certain exceptions), cash and cash equivalents, owned real property with a fair market value equal to or greater than $3,000,000, intellectual property, and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral").

Additionally, the Credit Parties have entered into deposit account control agreements in favor of KeyBank National Association (the "Agent") with respect to their bank accounts. Thus, substantially all of the Credit Parties' cash is subject to a perfected security interest in favor of the Agent. As of the Petition Date, the term loan facility is fully drawn and there is no availability under the revolving facility.

The Senior Unsecured Refinancing Notes comprise a different series of notes from the Senior Unsecured Notes but have identical terms (other than the maturity date of such Senior Unsecured Refinancing Note) and the same treatment and are *pari passu* with the Senior Unsecured Notes.

Under the terms of the DIP Facility, as set forth in the DIP Order and the DIP Credit Agreement, obligations of the Debtors under the Prepetition Secured Revolver Facility have been partially refinanced and converted into DIP Claims. At present, the only claims remaining under the Prepetition Secured Revolver Facility relate to undrawn standby letters of credit issued pursuant to the Prepetition Secured Revolver Facility and certain unpaid fees and charges related to the outstanding letters of credit.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Operational and Growth Challenges

A confluence of operational and strategic factors contributed to the Debtors' need to commence the Chapter 11 Cases. These factors are mostly self-imposed and include, among other things: (i) a store footprint expansion that did not meet expectations, (ii) the addition of the Atlanta distribution center that disrupted operations and increased costs, and (iii) the Debtor's failure to timely invest enough capital in their e-commerce platform. The macroeconomic trends impacting the retail industry generally were contributing factors, but not the main factors, behind the Debtors performance shortfalls. The Debtors did not timely respond to meet these challenges, and suffered diminished performance as a result. Over time, these factors have tightened the Debtors' liquidity position and complicated their relationship with their landlords and vendors. As of the Petition Date, the Debtors had insufficient liquidity to meet their operating obligations.

Nonetheless, the Debtors started making changes to improve operational performance prior to the Petition Date. As discussed above, the Debtors conducted employee training to teach their employees to better position the brand for customers and fixed challenges at their Atlanta distribution center, among other initiatives. Same store comparable sales were up in February and the average ticket price is trending upward. In addition, the company has rectified challenges it faced in the Atlanta distribution center and operational benchmarks are trending in the right direction.

Over the last year, the Debtors have also endeavored to improve their online presence. Web traffic is up as the company has built out a stronger internal ecommerce team and focused on social media and innovative promotional and product programs. The Debtors also invested to enhance eCommerce capabilities and are implementing a truer omnichannel strategy to leverage the ecommerce platform and store footprint, such as giving customers the opportunity to buy on line and pick up in store. These initiatives took the form of (i) website optimization, including heatmap analysis (informing how customers utilize their platform), expected to lift revenue $3.8 million in fiscal year 2019; (ii) mobile reconfiguration, providing new functionality increasing mobile conversion 10% year over year; (iii) increased effectiveness of email capture of point of sale, up 101% year over year; and (iv) brought content design and production in-house to better leverage creative initiatives across print and digital. Year over year growth in the online channel has seen a significant increase, and now accounts for approximately 25% of overall revenue.

### B.    Supply Chain and Borrowing Base Challenges

As the Debtors' liquidity has tightened, supply chain vendors have begun to place pressure on the supply chain cost structure. Some of the Debtors' inventory was stuck at port in California, with vendors unwilling to release the product absent payment in full. This in turn worsened the Debtors' ability to generate revenue from sales, creating a negative feedback loop decreasing liquidity.

The DIP Facility provided the Debtors with the liquidity they needed to revive their supply chain and maintain the flow of inventory to their distribution centers. Since the Petition Date, through April 19, 2019, the Debtors have made payments of approximately $1.9 million for finished goods that are sold in stores. Additionally, the Debtors have made payments of approximately $4.8 million associated with the fulfillment of future purchase order commitments.

### C.    Corporate History

In April 2009, Z Gallerie filed for bankruptcy in the Central District of California. Z Gallerie was able to successfully reorganize its business around its strongest performing stores and eliminate underperforming locations.

In October 2014, Brentwood purchased a 70% stake in Z Gallerie through Brentwood Associates Private Equity V LP (the "2014 Sale"). [4] The Zeidens retained a 30% equity interest in the company. As part of the transaction, Brentwood maintains two seats on the Board of Managers (the "Board") and the Zeidens retain one seat on the Board. Prior to the chapter 11 filing, Mike Zeiden resigned from the Board. The Debtors have also appointed two disinterested directors.

### D.    Exploration of Strategic Alternatives

As the Debtors recognized that they would soon run out of adequate cash to fund operations, they engaged their Prepetition Lenders regarding the terms of loans that would provide incremental liquidity without a chapter 11 filing. The Debtors had no unencumbered assets, so any liquidity would have needed to be unsecured (absent consent of the senior lenders). Despite the Debtors' best efforts, no source of liquidity emerged that would lend outside of the chapter 11 context.

---

[4]    While the Debtors have no reason to believe that they maintain any viable claims against either Brentwood or the Zeidans on account of the 2014 Sale or any activity since the 2014 Sale, the Debtors' Delaware co-counsel, Klehr Harrison Harvey Branzburg LLP, is conducting an investigation into any potential claims or causes of action at the direction of the independent directors.

The Debtors retained Lazard to facilitate, among other things, a sale process for their assets. In early March 2019, Lazard distributed a "teaser" to potential strategic and financial buyers. Lazard has received interest from some parties, several of which have entered into confidentiality agreements with the Debtors and are analyzing a transaction. As set out in the Bidding Procedures Motion filed contemporaneously herewith, Lazard is running a marketing process that will, the Debtors hope, result in a competitive auction for the purchase of the Debtors' assets.

### E.    Store Footprint Right-Sizing Initiatives

Recognizing the need to right-size the Debtors' store base while simultaneously creating much-needed liquidity, the Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores, evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the type of storefront in which each store is located, and specific operational circumstances related to each store's performance (the "Performance Evaluation").

Additionally, in late 2018 the Debtors, with the assistance of A&G Realty Partners, LLC began lease modification negotiations with many of the Debtors' landlords for rent concessions to reduce annual rent expenses (the "Lease Negotiations"), with the goal of improving the Debtors' overall financial performance. The Bankruptcy Court approved an Order authorizing the Debtors to retain A&G in the Chapter 11 Cases on April 9, 2019 [Docket No. 169].

As a result of the Performance Evaluations and Lease Negotiations, the Debtors sought authority to close 17 stores at the onset of the chapter 11 cases (the "Store Closures"). The Debtors have concluded that the cost of maintaining the Closing Stores outweighs any revenues that the Closing Stores currently generate or are likely to generate in the future. Additionally, the Debtors considered whether or not the leases could be economically monetized in the chapter 11 process. After considering the potential value of the leases, the costs of holding an auction and delaying rejection, and potential cost of litigation regarding assignment, the Debtors determined, in their business judgement, that the potential value of the leases does not justify the costs of pursuing a sale. The Debtors continue to evaluate the leases and reserve their right to remove any of the leases from the lease rejection schedule prior to a final hearing. The Debtors, in their business judgement, believed that in any restructuring outcome, closing these 17 stores would maximize value for the stakeholders.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Mark Weinsten, Interim President and Chief Executive Officer of Z Gallerie, LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 25], filed on March 11, 2019.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/zgallerie/firstdaypleadings.

**B.      Other Procedural and Administrative Motions**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- <u>Retention Applications of Debtor Professionals</u>. On March 20, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327,328, and/or 363 of the Bankruptcy Code, including:

  - Kirkland & Ellis, LLP as legal counsel [Docket No. 93],

  - Klehr Harrison Harvey Branzburg LLP [Docket No. 88],

  - Lazard Middle Market LLC as financial advisor [Docket No. 92],

  - Berkeley Research Group, LLC as restructuring advisor [Docket No. 90], and

  - A&G Realty Partners, LLC as real estate consultant [Docket No. 98] (collectively, the "<u>Retention Applications</u>").

- The Retention Applications were approved and orders were entered authorizing the Retention Applications on April 9, 2019. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

- <u>Ordinary Course Professionals Motion</u>.  On March 27, 2019, the Debtors filed the Motion of Z Gallerie, LLC, et al., for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket No. 120] (the "<u>OCP Motion</u>").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On April 9, 2019, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 187].

**C.      Approval of Debtor-in-Possession Financing**

On April 9, 2019, the Bankruptcy Court entered the DIP Order on a final basis [Docket No. 190]. Pursuant to the DIP Order, Z Gallerie received authorization to obtain postpetition financing of up to $28,000,000.  Following entry of the Final DIP Order, the Prepetition Revolving Loan Facility was entirely converted into DIP Obligations, other than the obligations relating to outstanding but undrawn letters of credit and related outstanding fees and charges.  Accordingly, approximately $8,000,000 of the DIP proceeds provide incremental liquidity.

**D.      Schedules and Statements**

The Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs on April 10, 2019 [Docket Nos. 202-205], which were amended in part on April 16, 2019 [Docket No. 213].

**E.      Appointment of Official Committee**

On March 20, 2019, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 87], notifying parties in interest that the U.S. Trustee had appointed a

statutory committee of unsecured creditors (the "<u>Committee</u>") in the Chapter 11 Cases.  The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on April 18, 2019.

### F.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### G.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into approximately two hundred Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.  The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.  The Debtors obtained approval of procedures for the assumption or rejection of Executory Contracts and Unexpired Leases on April 10, 2019 [Docket No. 192].  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases identified in this **Error! Reference source not found.** of the Plan and in the Plan Supplement to add or remove any Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time through and including the Confirmation Date (or such later date as agreed to by the counterparty to the Executory Contract or Unexpired Lease).

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

### H.    Cure of Defaults

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance"[5] (within the

---

[5]    Evidence of adequate assurance may include: (i) the specific name of the proposed assignee/tenant, if not the prospective purchaser, and the proposed name under which the assignee intends to operate the store if not a current trade-name of the Debtors; (ii) the potential assignee's intended use for the space if different from the present retail operation; (iii) audited financial statements and annual reports for the proposed assignee for the past three (3) years, including all supplements or amendments thereto; (iv) cash flow projections for the proposed assignee,

meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  As part of any cure of an Unexpired Lease of nonresidential real property, all rights of the parties under any such assumed Unexpired Lease or applicable law for setoff, recoupment, or subrogation shall survive, notwithstanding any term or condition of the Plan to the contrary.  At least fourteen days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing.  The Debtors (or Reorganized Debtors) may settle any cure amounts without any further notice to or action, order, or approval of the Bankruptcy Court.  If an objection to a proposed assumption or related cure amount is not withdrawn or resolved, the undisputed cure amount, if applicable, shall be paid on the Effective Date, and the disputed cure amount shall be deposited in an escrow account established in connection with the objection to be paid promptly following (a) an agreement between the Debtors and the objecting counterparty to the Executory Contract or Unexpired Lease or (b) the entry of a Final Order resolving the dispute and approving the assumption pursuant to which hearing shall occur not more than 30 days after the Confirmation Date or on such later date as set by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

Notwithstanding Article VIII of this~~e~~ Plan, with respect to any Unexpired Lease of nonresidential real property, nothing in the Plan or in the Confirmation Order shall modify the Debtors', Reorganized Debtors', or any assignee's obligation, as applicable, to pay: (1) amounts accruing or owed under the assumed Unexpired Lease of non-residential real property that are unbilled or not yet due as of the Confirmation Date, whether accruing prior to or after the effective date of assumption of such Unexpired Lease, such as for common area maintenance, insurance, taxes, and similar charges; and any regular or periodic ordinary course year-end adjustments and reconciliations of such charges provided for under the terms of the Unexpired Lease, whether accruing prior to or after the effective date of assumption of such Unexpired Lease, as such charges become due in the ordinary course in accordance with the terms of the Unexpired Lease; (2) any percentage rent that may come due under the assumed Unexpired Lease of non-residential real property; (3) any other obligations, including indemnification obligations (if any) that arise from third party claims asserted with respect to or arising from the Debtors' use and occupancy of the premises prior to the Effective Date for which the Debtors had a duty to indemnify such landlord pursuant

---

the proposed assignee's most recent business plan, all cash flow projections for the lease(s) subject to the assignment request, and any financial projections, calculations, and/or pro-formas prepared in contemplation of purchasing the lease(s); (v) all documents and other evidence of the potential assignee's retail experience and experience operating stores in a shopping center; and (vi) a contact person for the proposed assignee that landlords may directly contact in connection with the adequate assurance of future performance.

to any Unexpired Lease, or the Debtors', Reorganized Debtors', or any assignee's obligation to pay any postpetition expenses under such Unexpired Leases as they come due under the Unexpired Leases; and (4) any unpaid cure amounts or post-assumption obligations under the assumed Unexpired Lease of non-residential real property.  Further, notwithstanding the foregoing, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to an Unexpired Lease of non-residential real property to assert any right of setoff or recoupment that such counterparty may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, the ability, if any, of such counterparties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease with the Debtors or the Reorganized Debtors.  For the avoidance of doubt, any agreement entered into by the Debtors and a landlord that may alter the obligations above remain binding and are not modified by the Plan.

## I.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified ~~as General Unsecured Claims~~in accordance with the Bankruptcy Code.

## J.    Independent Investigation

Alan Miller and Matthew Kahn serve as two of the Debtors' independent managers to, among other things, review and determine the appropriateness of certain pre-Petition Date transactions of the Debtors and of the releases included in the Plan. Klehr Harrison Harvey Branzburg LLP serves as Delaware co-counsel to the Debtors and is assisting the independent managers with the ongoing review and assessment of these issues. This review and assessment, which included the review of substantial documents produced and the interview of numerous individuals who were familiar with the 2014 Sale and the Debtors' operations afterward, has been completed. The conclusion of the review and assessment is that any claims associated with certain pre-Petition Date transactions of the Debtors, including the 2014 Sale, have little or no merit and, therefore, the releases included in the Plan are appropriate.

## K.    Marketing Process

As described above, the Debtors are conducting a marketing and Auction process for some or all of their assets or the equity interests in Reorganized Debtors.  The Debtors, working with Lazard, contacted over 200 potentially interested parties, including both financial and strategic counterparties.  More than 30 such interested parties executed non-disclosure agreements for purposes of accessing a confidential information memorandum and virtual data room in connection with the marketing and Auction process.  Each of these parties were also provided "teaser" materials.

Under the Bidding Procedures approved by the Bankruptcy Court, the deadline for interested parties to submit non-binding indications of interest is April 19, 2019.  The Debtors received three indications of interests. The deadline for interested parties to submit Qualified Bids to participate in the

Auction is May 16, 2019.  Pursuant to the Bidding Procedures, Qualified Bids must satisfy the general Bid Requirements set forth in the Bidding Procedures.

Pursuant to the Bidding Procedures Order, the Debtors may determine to select any qualified bidder as a stalking horse bidder and file a Motion seeing Court approval of certain bid protections.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are waived or not met, the Effective Date will not take place.

#### 3.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes;

(b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.   Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.   Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12. The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to holders of Allowed General Unsecured Claims and Critical Trade Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 13. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 14. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

### B. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Debtors May Not Receive a Qualified Bid or Secure Exit Financing.

The Debtors' ability to receive a Qualified Bid or Secure Exit Financing may affect the Debtors' compliance with terms of the DIP Facility. Should the Debtors fail to receive a Qualified Bid or secure exit financing, such an occurrence would be deemed a default under the terms of the DIP Facility.

#### 2. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay

the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Credit Agreement Facility upon emergence.

### 3. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

Additionally, a substantial portion of the value of the Debtors' businesses is its intellectual property. The chapter 11 cases may have a negative effect on the value of the Debtors' intellectual property, including if the intellectual property were to be deemed invalid or non-transferrable by an order of the Bankruptcy Court.

### 4. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations.  If the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood

that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 5. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit C** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 6. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

8. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes 4, 5, 6, and 7 (collectively, the "Voting Classes"). The holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 3, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims or Interests in the Voting Classes, such as those holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is May 1, 2019**. The Voting Record Date is the date on which it will be determined which holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the

holder of a Claim or Interest; *provided, however,* that any party who did not file a claim prior to May 1, 2019 that files a claim in the Chapter 11 Cases on or prior to the Bar Date of May 17, 2019 shall be entitled to vote in the appropriate class and the Debtors shall issue a Solicitation Package to any such holders of any Claims or Interests who did not receive Solicitation Package prior to the Solicitation Bar Date as soon as reasonably practicable.

### C.    Voting on the Plan

**The Voting Deadline is June 4, 2019, at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) **promptly** in the enclosed reply envelope or to one of the below addresses.

> **If sent by hand delivery, or overnight mail**
>
> **Stretto**
> **Re: Z Gallerie, LLC, et al.**
> **8269 E. 23rd Avenue, Suite 275**
> **Denver, CO 80238**

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE SOLICITATION AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTPS://CASES.STRETTO.COM/ZGALLERIE**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 276-9008 OR VIA ELECTRONIC MAIL TO TEAMZGALLERIE@STRETTO.COM.**

### D.    Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was ~~timely~~ filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the Reorganized Debtors Interests to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may

be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

The U.S. federal income tax consequences of the implementation of the Plan will depend on, among other things, whether the Secured Credit Agreement Lenders are the Winning Bidder and, if so whether the Secured Credit Agreement Lenders' Claims are held by more than one entity for U.S. federal income tax purposes. If a party other than the Secured Credit Agreement Lenders is the Winning Bidder then the Debtors expect to treat the Sale Transaction as a taxable sale of assets (a "Taxable Sale"). Similarly, if the Secured Credit Agreement Lenders' Claims are held by a single entity for U.S. federal income tax purposes (while not free from doubt, including a pre-existing partnership) such that when that entity acquires 100% of the Reorganized Debtors Interests, Reorganized Debtors becomes a disregarded entity for U.S. federal income tax purposes, then the Debtors also expect to treat such Sale Transaction as a Taxable Sale. However, if the Secured Credit Agreement Lenders' Claims are held by more than one entity for U.S. federal income tax purposes and such Secured Credit Agreement Lenders are the Winning Bidders, and, at least one of such Secured Credit Agreement Lenders is also a holder of Interests in the existing Z Gallerie Holdings, LLC ("Parent") then the Debtors expect to treat the Sale Transaction as a continuation of the Parent partnership, with such Secured Credit Agreement Lenders treated as receiving the Reorganized Debtors Interests in exchange for their respective Claims under section 721 of the Tax Code (a "Partnership Continuation").

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners

(or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Parent Interests

Immediately prior to the Consummation of the Plan the Debtors will each be treated as disregarded entities for U.S. federal income tax purposes. For U.S. federal income tax purposes, the respective assets of each of the Debtors will be treated as if they were owned by Parent, which is the sole owner of Interests in Z Gallerie Holding Company, LLC, ("Holdings") that is regarded for U.S. federal income tax purposes. Moreover, because Parent is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but will be borne by the partners of Parent (the "Holders of the Parent Interests").

#### 1.    COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity, such as Parent, that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of Parent Interests will be treated as receiving their allocable share, if any, of the COD Income realized by Parent.

The Debtors, and accordingly, the Holders of the Parent Interests, expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be

realized by the Debtors and the Holders of the Parent Interests will not be determinable until the consummation of the Plan.

>    **2.        Recognition of COD Income and Gain on Sale Transaction.**

Pursuant to the Sale Transaction, the Debtors will transfer all or substantially all of their assets to the Winning Bidder, whereby the Cash received in such a Sale Transaction will be used to fund the applicable creditor recoveries pursuant to the Plan.   Subject to the Partnership Continuation considerations referenced above (and discussed further below), such transfer generally should be treated as a Taxable Sale or exchange of the assets of the Debtors for U.S. federal income tax purposes.

Accordingly, the Debtors may recognize gain upon the transfer of certain assets to the Winning Bidder.  As described above, because Parent is the only parent of the Debtors that is regarded for U.S. federal income tax purposes, such gain or loss will be allocated to the Holders of the Parent Interests. The amount of gain or loss allocable to any particular Holder of any Parent Interest depends, in part, on when and at what price such Holder paid for its Parent Interest and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets.   The Holders of the Parent Interests are urged to consult their tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of assets (including any other limitations that may be imposed by the tax law based on a holder's individual circumstances).

In a Taxable Sale, Parent (and in turn, the Holders of Parent Interests) should recognize gain or loss equal to the difference between the proceeds of the sale and Parent's adjusted basis in the property sold. Recent IRS guidance indicates that because the Secured Credit Agreement Lenders' Claims are issued by Z Gallerie, LLC (which is disregarded as an entity separate from Parent for U.S. federal income tax purposes) but are not guaranteed by Parent, such Secured Credit Agreement Lenders' Claims will be treated as "non-recourse" debt of Parent. As a result, the transfer of the Debtors' assets to a third party buyer or to a single holder of the Secured Credit Agreement Lenders' Claims pursuant to a Taxable Sale would be treated as though Parent sold its assets in exchange for proceeds equal not only to the fair value of such assets or the amount of Cash received, but for the entire adjusted issue price of the discharged Secured Credit Agreement Lenders' Claims. As a consequence Parent will realize less COD Income and more gain (or less loss) on the Taxable Sale than it would if the Secured Credit Agreement Lenders' Claims were guaranteed by Parent and thus were treated as recourse debt for U.S. federal income tax purposes.

Any such gain or loss recognized by Parent will be allocated to the Holders of Parent Interests.  The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors including which assets of the Debtors are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization.  Any such gain, and any related deductions, may be allocated among the partners in a different manner than any COD Income recognized by Parent would be allocated.  Allocations of COD Income, gains and losses among the Holders of Parent Interests are based in part on which Holders of Parent Interests contributed property to Parent and which Holders of Parent Interests are allocated indebtedness that is cancelled as a result of the Sale Transaction.  A Holder of Parent Interests that holds both debt and equity interests in Parent also likely receives allocations of gain, related deductions, and other items, in a manner different than Holders of Parent Interests that hold only equity interests in Parent.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Secured Revolving Loan Claims and Allowed Class 5 Secured Term Loan Claims.**

The treatment of Holders of Secured Revolving Loan Claims and Secured Term Loan Claims (for purposes of this Section 2(B), the "Credit Bid Claims") will vary depending upon whether (a) an Entity other than the Secured Credit Agreement Lenders is the Winning Bidder and (b) whether the Sale Transaction is a Partnership Continuation (as discussed above).  If the Secured Credit Agreement Lenders are the Winning Bidder and the Sale Transaction is not a Partnership Continuation, then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Credit Bid Claims, each Holder thereof will receive its *pro rata* share, based on the Allowed amount of its applicable Credit Bid Claim, of Interests in the Reorganized Debtors.

If the Secured Credit Agreement Lenders are the Winning Bidder and the Sale Transaction is not a Partnership Continuation, a Holder of a Credit Bid Claim should recognize gain or loss equal to (a) the sum of (i) any Cash received, (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (including Reorganized Debtors' Interests), minus (b) the Holder's adjusted tax basis in its applicable Credit Bid Claim.  Such Holder should obtain a tax basis in the non-Cash consideration received, and the holding period for any such property should begin on the day following the receipt of such consideration.

If the Secured Credit Agreement Lenders are not the Winning Bidder and the Sale Transaction is not a Partnership Continuation, then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of its applicable Credit Bid Claim, each Holder thereof will receive its *pro rata* share, based on the Allowed amount of its applicable Credit Bid Claim, of (a) Cash and/or (b) the non-Cash consideration amount that would render such Holder's Allowed Credit Bid Claim Unimpaired.  Such Holder will recognize gain or loss equal to the (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its applicable Credit Bid Claim.

In a Sale Transaction that *is* treated as a Partnership Continuation, Holders of Credit Bid Claims will generally not recognize gain or loss on the receipt of Reorganized Debtors Interests.  Holders of Credit Bid Claims will have a tax basis in their applicable Reorganized Debtors Interests equal to their tax basis in the obligation constituting the applicable exchanged Credit Bid Claim, and their tax basis in Interests in Parent, if such Holders also held a Parent Interest.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6 Critical Trade Claims.**

Pursuant to the Plan, each Holder of an Allowed Class 6 Critical Trade Claim will receive, its Pro Rata share (not to exceed the amount of such Holder's Allowed Critical Trade Claim) of the Critical Trade Claims Recovery Pool, to the extent the Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5 are paid in full.  Such Holders should recognize gain or loss equal to  (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its Critical Trade Claim.

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 7 General Unsecured Claim.**

Pursuant to the Plan, each Holder of an Allowed Class 7 General Unsecured Claim will receive (i) its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the

Excess Distributable Cash, and (ii) a complete waiver and release of any and all claims, Causes of Action, and other rights against the Holders of Allowed Class 7 Claims based on claims pursuant to chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law including fraudulent transfer laws from the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, subject to and in accordance with Article VIII of the Plan, to the extent the Holders of Allowed Secured Revolving Loan Claims in Class 4 and Holders of Allowed Secured Term Loan Claims in Class 5 are paid in full. Such Holders should recognize gain or loss equal to (a) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration (if any) minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

### E.    Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### F.    Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID") its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Section 451 of the IRC (as discussed below) generally would require accrual method Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items

43

of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

### G.    Accrued Interest.

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

### H.    Limitation on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains  recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains. A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years. For corporate Holders, capital losses recognized may only be used to offset capital gains recognized. A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused

capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### I.        Ownership and Disposition of the Reorganized Debtors Interests.

Under the Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation.  Subject to the discussion of publicly traded partnerships below and the discussion of Reorganized Debtors becoming a disregarded entity of a sole Holder of Secured Credit Agreement Lenders' Claims above and assuming that neither of the Reorganized Debtors elects to be treated as a corporation for tax purposes, Reorganized Debtors will be treated as a partnership for U.S. federal income tax purposes.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  It is anticipated that the Reorganized Debtors limited liability company agreement will prohibit the transfer of membership interests in Reorganized Debtors if such transfer would jeopardize the status of Reorganized Debtors as a partnership for U.S. federal income tax purposes (prior to an actual conversion for U.S. federal income tax purposes to corporate status).  Any purported transfer in violation of such provisions will be null and void and would not be recognized by Reorganized Debtors.

This discussion of the U.S. federal income tax consequences of the Plan assumes that Reorganized Debtors will be treated as a partnership for U.S. federal income tax purposes. If Reorganized Debtors is treated as a disregarded entity for U.S. federal income tax purposes, its separate existence from its owner is ignored for U.S. federal income tax purposes.

As a partnership, Reorganized Debtors itself will generally not be subject to U.S. federal income tax.  Instead, Reorganized Debtors will file an annual partnership information return with the IRS, which form will report the results of Reorganized Debtors' operations. Each member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Debtors' income, gain, loss, deduction and credit for each taxable year of Reorganized Debtors ending with or within the member's taxable year.  Each item generally will have the same character as if the member had realized the item directly.  Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Debtors for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Debtors.

Reorganized Debtors' tax basis in the portion of each of its assets deemed transferred to the Holders of Secured Credit Agreement Lenders' Claims should equal such portion's fair market value on the Effective Date as determined by the board of directors of Reorganized Debtors, and the holding period for such portion would begin on the day after the Effective Date. Reorganized Debtors' tax basis and holding period in the portion of each of its assets deemed transferred directly to Reorganized Debtors by the Debtors would be the same as the Debtors' basis and holding period with respect to such portion.

A member is allowed to deduct its allocable share of Reorganized Debtors' losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur.  In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of Reorganized Debtors against other income.

Reorganized Debtors will provide each member with the necessary information to report its allocable share of the Reorganized Debtors' tax items for U.S. federal income tax purposes; however, no assurance can be given that Reorganized Debtors will be able to provide such information prior to the initial due date of the members' U.S. federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of directors of Reorganized Debtors will decide how items will be reported on Reorganized Debtors' U.S. federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of Reorganized Debtors are audited by the IRS, the tax treatment of Reorganized Debtors' income and deductions generally will be determined at the Reorganized Debtors level in a single proceeding, rather than in individual audits of the members. The tax matters partner and partnership representative will have considerable authority under the Tax Code and the limited liability company agreement for Reorganized Debtors to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Debtors (provided that the member is not treated as exchanging such member's share of Reorganized Debtors' "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized Debtors (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of Reorganized Debtors) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from Reorganized Debtors generally will be capital gain, but may be taxable as ordinary income under certain other circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such member makes to Reorganized Debtors, (ii) the member's allocable share of the income of Reorganized Debtors, and (iii) increases in the member's allocable share of the indebtedness of Reorganized Debtors, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of Reorganized Debtors, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of Reorganized Debtors.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of Reorganized Debtors and such proceeds exceed the member's adjusted tax basis attributable to such

ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (reduced by any recognized gain which the member may have received on the exchange of an Allowed Secured Term Loan Claim for Reorganized Debtors Interests).  A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

The U.S. federal income tax treatment of a holder of Reorganized Debtors Interests that is a nonresident alien, non-U.S. corporation, non-U.S. partnership, non-U.S. estate or non-U.S. trust (a "Non-U.S. Partner") is complex and will vary depending on the circumstances and activities of such holder and Reorganized Debtors.  Each Non-U.S. Partner is urged to consult with its own tax advisor regarding the U.S. federal, state and local and non-U.S. income, estate and other tax consequences of holding interests in Reorganized Debtors.  The following discussion assumes that a Non-U.S. Partner is not subject to U.S. federal income taxes as a result of its presence or activities in the United States (other than as a holder of Interests in Reorganized Debtors).

A Non-U.S. Partner generally will be subject to U.S. federal withholding taxes at the rate of 30 percent (or such lower rate provided by an applicable tax treaty) on its share of Reorganized Debtors' income from dividends, interest (other than interest that constitutes portfolio interest within the meaning of the IRC), and certain other income that is not treated as "effectively connected with the conduct of a trade or business within the United States," as defined in section 864 of the Tax Code ("ECI").

The activities of Reorganized Debtors are likely to be treated as a U.S. trade or business, and to the extent that such activities are so treated, a Non-U.S. Partner would be deemed to be engaged in that underlying U.S. trade or business. A Non-U.S. Partner's share of Reorganized Debtors' ECI would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Partner is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax. In addition, some or all of the gain on a disposition of a Non-U.S. Partner's interest in Reorganized Debtors could be treated as ECI to the extent such gain is attributable to assets that generate ECI.  A Non-U.S. Partner generally will be required to file a U.S. federal income tax return if Reorganized Debtors is deemed to be engaged in a U.S. trade or business (even if no income allocated to the Non-U.S. Partner is ECI).  Reorganized Debtors would be required to withhold U.S. federal income tax with respect to the Non-U.S. Partner's share of income that is ECI.

Each holder of Reorganized Debtors Interests is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in Reorganized Debtors.

### J.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank*]

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  ~~April 30~~May 1, 2019

Z Gallerie, LLC
on behalf of itself and its debtor affiliates

*/s/ Mark Weinsten*

Mark Weinsten
Interim President and CEO
Z Gallerie, LLC

COUNSEL:

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel for the Debtors and Debtors in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

**EXHIBIT A**

**Chapter 11 Plan**

**EXHIBIT B**

**Liquidation Analysis**

## **EXHIBIT C**

**Financial Projections**

# Detail Report

May 1, 2019 5:29 PM

|  | Document | Location |
|---|---|---|
| Original | ZG - Disclosure Statement [Filing Version]_59864864_18 | KEDMS:LEGAL (59864864,18:) |
| Revised | ZG - Disclosure Statement [Solicitation Version]_59864864_21 | KEDMS:LEGAL (59864864,21:) |

|  | Number of Changes | Markup |
|---|---|---|
| Insertions | 6 | Sample Text |
| Deletions | 8 | Sample Text |
| Moves | 0 | Move From Move To |
| **Total** | **14** | |