# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Z GALLERIE, LLC, *et al.*,[1] | ) Case No. 19-10488 (LSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## NOTICE OF SUCCESSFUL BIDDER WITH
## RESPECT TO THE AUCTION OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that, on April 11, 2019, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 206] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (the "Debtors") to conduct a marketing and auction process for the sale of their Assets.

**PLEASE TAKE FURTHER NOTICE** that, following the completion of the marketing and auction process, the Debtors, in consultation with the Consultation Parties, have selected the Qualified Bid of joint bidders (i) DirectBuy Home Improvement, Inc. and certain of its affiliates, and (ii) KKR Credit Advisors (US) LLC, on behalf of funds and accounts constituting Required Lenders under the prepetition term loan credit agreement, as the Winning Bidder.

**PLEASE TAKE FURTHER NOTICE** that, the Debtors, KKR Credit Advisors (US) LLC (in its capacity as prepetition secured lender), the DIP Lender, the Winning Bidder, and the Creditors' Committee have entered into a plan support agreement (attached hereto as **Exhibit A**, the "PSA") to effectuate the Sale Transaction on the terms set forth in the agreed upon sale term sheet (attached to the PSA as Exhibit 1, the "Sale Term Sheet").

**PLEASE TAKE FURTHER NOTICE** that, the Sale Transaction will be consummated as part of the Plan.  In accordance with the *Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; (V) Granting Related Relief* [Docket No. 259]  (the "Disclosure Statement Order"), the Confirmation Hearing to consider approval of the Plan will be held before the Honorable Judge Laurie Selber Silverstein,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Z Gallerie, LLC (3816) and Z Gallerie Holding Company, LLC (5949).  The location of the Debtors' service address is:  1855 West 139th Street, Gardena, CA 90249.

[2]   Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Order.

at the Court, 824 North Market Street, 6th Floor, Courtroom No. 2, Wilmington, Delaware 19801, **on June 11, 2019, at 10:00 a.m. (prevailing Eastern Time)**.

      **PLEASE TAKE FURTHER NOTICE** that, the Debtors will file definitive documentation and certain modifications to the Plan to implement the Sale Transaction as soon as reasonably practical and consistent with the Disclosure Statement Order.

      **PLEASE TAKE FURTHER NOTICE** that, this Notice of Successful Bidder is subject to the terms and conditions of the Bidding Procedures Order, and the Debtors encourage parties in interest to review such documents in their entirety.

      **PLEASE TAKE FURTHER NOTICE** that, copies of the Bidding Procedures Order, the Plan, this Notice, and any other related documents can be obtained through the Court's website at https://ecf.deb.uscourts.gov, referencing Case No. 19-10488 (LSS), and on the website of the Debtors' notice and claims agent, Stretto, at http://cases.stretto.com/zgallerie. Further information may be obtained by calling (855) 276-9008 or emailing TeamZGallerie@stretto.com

*[Remainder of page intentionally left blank]*

2

Dated:  May 24, 2019
Wilmington, Delaware

*/s/ Domenic E. Pacitti*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

-and-

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Justin R. Bernbrock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Co-Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan Support Agreement**

*EXECUTION VERSION*

**THIS AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN OF THE DEBTORS IN THESE CHAPTER 11 CASES, WHICH SOLICITATION SHALL ONLY OCCUR PURSUANT TO THE DISCLOSURE STATEMENT ORDER (AS DEFINED HEREIN) ENTERED BY THE BANKRUPTCY COURT.   THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.  THE PLAN CONTEMPLATED BY THIS AGREEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT PRIOR TO SUCH APPROVAL BEING GRANTED.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS AGREEMENT FOR ANY PURPOSE BEFORE THE CONFIRMATION OF THE PLAN CONTEMPLATED BY THIS AGREEMENT BY THE BANKRUPTCY COURT.**

---

**Z GALLERIE, LLC**

**PLAN SUPPORT AGREEMENT**

**May 24, 2019**

---

This Plan Support Agreement (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"),[1] dated as of May 24, 2019, is entered into by and among:

(i)     Z Gallerie, LLC ("Z Gallerie") and Z Gallerie Holding Company, LLC (together with Z Gallerie, collectively, the "Debtors");

(ii)    The statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on March 20, 2019, as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 87] (the "Committee");

(iii)   KeyBank National Association ("KeyBank");

(iv)    KKR Credit Advisors (US) LLC ("KKR," and together with the Committee and KeyBank, the "Supporting Creditors"); and

(v)     DirectBuy Home Improvement, Inc. ("DBHI" and collectively with KKR, the Winning Bidder (as defined in the Plan)).

This Agreement collectively refers to the Committee, the Supporting Creditors, and the Winning Bidder as the "Plan Support Parties" and each individually as a "Plan Support Party." This Agreement collectively refers to the Debtors and the Plan Support Parties as the "Parties" and each individually as a "Party."

---

[1]     Unless otherwise noted, capitalized terms used herein but not defined shall have the meanings given to such terms elsewhere in this Agreement (including any exhibits thereto), the Plan, or the Bidding Procedures Order (as defined herein) as applicable.

## RECITALS

**WHEREAS**, on March 11, 2019 (the "Petition Date"), the Debtors commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on April 11, 2019, the Bankruptcy Court entered an order approving procedures pursuant to which the Debtors conducted a marketing, sale, and auction process for the Debtors' assets [Docket No. 206] (the "Bidding Procedures Order") and eventually received one Qualified Bid, which bid (the "Bid") is a joint bid from KKR and DBHI;

**WHEREAS**, on May 2, 2019 the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit votes on the *First Amended Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 255] (as may be amended, modified, or supplemented, the "Plan"), which Plan contemplates effectuating a sale of the Debtors Assets as approved by the Bidding Procedures Order;

**WHEREAS**, the Parties have engaged in good-faith, arm's-length negotiations regarding the terms of the Bid and have reached an agreement to name the Bid the Winning Bid and consummate the Sale Transaction substantially on the terms and conditions set forth in the term sheet attached hereto as **Exhibit 1** (as may be modified by agreement of the Parties, the "Sale Term Sheet") and the sources and uses attached thereto as Appendix 1 (as may be modified by agreement of the Parties, the "Sources and Uses"), which Sale Transaction is currently contemplated to be effectuated through the Plan; and

**WHEREAS**, the Parties have agreed to take certain other actions in support of the Restructuring Transactions (as defined in the Plan), as applicable, including the Sale Transaction, on the terms and conditions set forth in this Agreement, the Sale Term Sheet, and the Plan;

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.     PSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Plan Support Parties upon the first date (such date, the "PSA Effective Date") that this Agreement has been executed by each of the Parties hereto. The Debtors will continue to honor their obligations under the Disclosure Statement Order to effectuate the Plan (and thereby this Agreement).

2.     Exhibits and Schedules Incorporated by Reference.  Each of the exhibits attached hereto and any exhibits and schedules to such exhibits (collectively, the "Exhibits and Schedules") is expressly incorporated herein and made a part of this Agreement, and all references to this

Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between the terms of this Agreement (without reference to the Exhibits) and the Plan, the terms of the Plan shall govern.

      3.    <u>Definitive Documentation</u>.

      (a)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "<u>Definitive Documentation</u>") shall consist of all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Bidding Procedures Order and the Plan, including, without limitation, an asset purchase agreement for the Sale Transaction (and all exhibits and other documents and instruments related thereto) on terms consistent with the Sale Term Sheet, the documents comprising the Plan Supplement, and the Confirmation Order.

      (b)    The Definitive Documentation identified in <u>Section 3(a)</u> shall each be consistent in all material respects with, and shall otherwise conform to, the terms and conditions set forth in this Agreement (and the respective Exhibits and Schedules attached hereto and thereto, including the Plan and the Sale Term Sheet) and shall be in form and substance acceptable to the Debtors, the Supporting Creditors (other than the Committee), and the Winning Bidder.

      4.    <u>Commitment of the Supporting Creditors</u>.  The Supporting Creditors shall each (severally and not jointly), from the PSA Effective Date until the occurrence of the Termination Date (as defined in <u>Section 10</u>):

      (a)    use commercially reasonable efforts to support and cooperate with the Debtors in support of the Plan and the Restructuring Transactions, including taking all commercially reasonable actions necessary or appropriate to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement, including by:

      (i)    voting all of its claims against, or interests in, as applicable, the Debtors now or hereafter owned by the Supporting Creditor or for which the Supporting Creditor now or hereafter serve as the nominee, investment manager, or advisor for beneficial holder of such claims or interests;

      (ii)    timely returning a duly executed ballot in connection therewith, as applicable; and

      (iii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not "opting out" of any releases under the Plan;

      (b)    use commercially reasonable efforts to support, not object to, delay, or impede, or take any other action to interfere, directly or indirectly, with, and

make commercially reasonable efforts to complete the Restructuring Transactions (including the Sale Transaction) set forth in the Plan and this Agreement;

(c)    vote against and oppose any plan supporting an Alternative Transaction or any amendment or modification of the Plan to approve an Alternative Transaction;

(d)    negotiate in good faith and execute all Definitive Documentation that is subject to negotiation as of the PSA Effective Date and take such actions as may necessary and appropriate actions in furtherance of the Plan, the Sale Transaction, and this Agreement;

(e)    not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) any tender, consent, or vote with respect to the Plan; and

(f)    not initiate, solicit or knowingly encourage, facilitate or assist any inquiries or the making of any proposal or offer that would support an Alternative Transaction or negotiate any terms of a sale of assets or an Alternative Transaction.

5.    <u>Commitment of DBHI</u>.  DBHI shall, from the PSA Effective Date until the occurrence of the Termination Date (as defined in <u>Section 10</u>):

(a)    use commercially reasonable efforts to support and cooperate with the Debtors in support of the Plan and the Restructuring Transactions to take such commercially reasonable actions as may be necessary or appropriate to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement;

(b)    use commercially reasonable efforts to support, not object to, delay, or impede, or take any other action to interfere, directly or indirectly, with, and make commercially reasonable efforts to complete the Restructuring Transactions set forth in the Plan and this Agreement;

(c)    negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the PSA Effective Date and take such actions as may be necessary and appropriate in furtherance of the Plan, the Sale Transaction and this Agreement;

(d)    comply in all material respects with the terms and conditions of the Sale Term Sheet applicable to DBHI; and

(e)    not initiate, solicit or knowingly encourage, facilitate or assist any inquiries or the making of any proposal or offer that would support an Alternative Transaction.

6.      Commitment of the Debtors.

    (a)      Subject to Section 12 hereof, the Debtors shall, from the PSA Effective Date until the Termination Date (as defined in Section 10 hereof):

        (i)      implement the Restructuring Transactions in accordance with the Final DIP Order, Disclosure Statement Order, and Confirmation Order (when entered);

        (ii)      use commercially reasonable efforts to support and cooperate with the Plan Support Parties in support of the Plan and the Restructuring Transactions to take all commercially reasonable actions necessary or appropriate to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement;

        (iii)      unless the Plan Support Parties agree in writing otherwise, if (i) (a) the Sources and Uses attached to the Plan Support Agreement change prior to closing such that the Plan Support Parties are adversely impacted and (b) the Debtors are unable to remedy such adverse impact in a manner that is reasonably acceptable to the Winning Bidder within three (3) business days and close the Sale Transaction through the Plan by June 17, 2019 (or such later date as agreed by the Parties) or (ii) an order confirming the Plan has not been entered by June 17, 2019, effectuate the Sale Transaction pursuant to Bankruptcy Code section 363 with such sale to close no later than July 6, 2019 (and seek shortened notice to effectuate that timeline, as necessary);

        (iv)      negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the PSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Plan, the Sale Transaction, and this Agreement;

        (v)      timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

        (vi)      timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(vii)    (A) support and take such actions as are necessary or appropriate in furtherance of the solicitation, confirmation, and consummation of the Plan and the Restructuring Transactions in accordance with this Agreement or any of the Definitive Documentation; (B) not take any action that is inconsistent with, or that would delay or impede the solicitation, confirmation or consummation of the Plan; (C) perform its obligations under this Agreement and all of the Definitive Documentation; and (D) support the release, exculpation, and indemnification provisions set forth in the Definitive Documentation.

(b)    Subject to <u>Section 12</u> of this Agreement, from the PSA Effective Date until the Termination Date, the Debtors shall not, directly or indirectly:

(i)    initiate, solicit or knowingly encourage, facilitate or assist any inquiries or the making of any proposal or offer that constitutes, or may reasonably be expected to lead to, a dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity) or restructuring of the Debtors, other than the Restructuring Transactions (each, an "<u>Alternative Transaction</u>");

(ii)    enter into any other acquisition agreement, merger agreement or similar definitive agreement, letter of intent or agreement in principle with respect thereto or any other agreement relating to an Alternative Transaction (an "<u>Alternative Transaction Agreement</u>");

(iii)    otherwise knowingly facilitate any effort or attempt to make an Alternative Transaction proposal, other than, in each case, to request information from the person making any such Alternative Transaction proposal for the sole purpose of any Debtor or the board of directors, board of managers, directors, managers, or officers or any other fiduciary of any Debtor informing itself or themselves about the Alternative Transaction that has been made and the person that made it in order to discharge its fiduciary duties;

(iv)    amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; or

(v)    suspend or revoke the Restructuring Transactions.

(c)    From and after the PSA Effective Date, the Debtors shall provide the Plan Support Parties, as promptly as reasonably practicable, and in no event later than 24 hours after receipt thereof by the Debtors, a copy of each written Alternative Transaction proposal.

7.    <u>Plan Support Party Termination Events</u>.

(a)    Any Supporting Creditor may terminate this Agreement with respect to such Supporting Creditor's obligations hereunder upon delivery of written notice to the other Parties in accordance with <u>Section 22</u> hereof at any time after the occurrence of, and during the continuation of, any of the following events; <u>provided</u> that this Agreement may not be terminated in accordance with this <u>Section 7</u> by the Supporting Creditor if the Supporting Creditor is in material breach of this Agreement:

(i)    the Debtors have failed to meet the Milestones (as defined in the DIP Order); <u>provided</u> that the Debtors may extend a Milestone with the written consent of KeyBank, which consent may be given or withheld in KeyBank's sole discretion;

(ii)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iii)    the appointment of, a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(iv)    any Debtor (exercising its rights under Section 12 of this Agreement) (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; or (ii) suspends or revokes the Restructuring Transactions without the prior written consent of the Plan Support Parties, not to be unreasonably withheld;

(v)    the Bankruptcy Court enters an order denying confirmation of the Plan or confirming a plan of reorganization setting forth an Alternative Transaction;

(vi)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; <u>provided</u> that the Debtors shall have five (5) business days after issuance of such ruling or order to seek relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Plan Support Parties;

(vii)    a breach of this Agreement by any of the other Plan Support Parties or a termination of this Agreement by any of the other Plan Support Parties;

7

(viii)  unless the Plan Support Parties agree in writing otherwise, if (i) (a) the Sources and Uses attached to the Plan Support Agreement change prior to closing such that the Plan Support Parties are adversely impacted and (b) the Debtors are unable to remedy such adverse impact in a manner that is reasonably acceptable to the Winning Bidder within three (3) business days and close the Sale Transaction through the Plan by June 17, 2019 (or such later date as agreed by the Parties) or (ii) an order confirming the Plan has not been entered by June 17, 2019, the Sale Transaction is not effectuated pursuant to Bankruptcy Code section 363 with such sale closing no later than July 6, 2019;

(ix)  any Definitive Documentation (including any amendment or modification thereof) is filed with the Bankruptcy Court or has become effective that contains terms and conditions that are inconsistent with this Agreement or the Plan in an adverse manner to the Supporting Creditors (other than the Committee) or shall otherwise not be on terms reasonably acceptable to the Supporting Creditors (other than the Committee), and such inconsistency remains uncured for a period of five (5) days after the receipt by the Debtors from the Supporting Creditors (other than the Committee) of written (including e-mail) notice of such inconsistency; and

(x)  a pleading is filed in the Bankruptcy Court by the Committee that seeks to avoid, challenge, or adversely affect or impact the liens or claims of the Supporting Creditors.

(b)  DBHI may terminate this Agreement upon delivery of written notice to the other Parties in accordance with Section 24 hereof at any time after the occurrence of, and during the continuation of, any of the following events; provided that this Agreement may not be terminated in accordance with this Section 7 by DBHI if it is in material breach of this Agreement:

(i)  the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(ii)  the appointment of, a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(iii)  any Debtor (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; or (ii) suspends or revokes the Restructuring Transactions without the prior written consent of the Plan Support Parties, not to be unreasonably withheld;

(iv)     the Bankruptcy Court enters an order denying confirmation of the Plan or confirming a plan of reorganization setting forth an Alternative Transaction;

(v)      a breach of this Agreement by any of the other Plan Support Parties or a termination of this Agreement by any of the other Plan Support Parties;

(vi)     unless the Plan Support Parties agree in writing otherwise, if (i) (a) the Sources and Uses attached to the Plan Support Agreement change prior to closing such that the Plan Support Parties are adversely impacted and (b) the Debtors are unable to remedy such adverse impact in a manner that is reasonably acceptable to the Winning Bidder within three (3) business days and close the Sale Transaction through the Plan by June 17, 2019 (or such later date as agreed by the Parties) or (ii) an order confirming the Plan has not been entered by June 17, 2019, the Sale Transaction is not effectuated pursuant to Bankruptcy Code section 363 with such sale closing no later than July 6, 2019;

(vii)    any Definitive Documentation (including any amendment or modification thereof) is filed with the Bankruptcy Court or has become effective that contains terms and conditions that are inconsistent with this Agreement or the Plan in an adverse manner to DBHI or shall otherwise not be on terms reasonably acceptable to DBHI, and such inconsistency remains uncured for a period of five (5) days after the receipt by the Debtors from DBHI of written (including e-mail) notice of such inconsistency; and

(viii)   the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided that the Debtors shall have five (5) business days after issuance of such ruling or order to seek relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Plan Support Parties.

8.      The Debtors' Termination Events.  The Debtors may terminate this Agreement upon delivery of written notice to the Plan Support Parties in accordance with Section 22 hereof at any time after the occurrence of, and during the continuation of, any of the following events; provided that this Agreement may not be terminated in accordance with this Section 8, except for Section 8(d) by the Debtors if the Debtors are in material breach of this Agreement:

9

(a) a material breach by any Plan Support Party of any representation, warranty, covenant, or obligation of such Plan Support Party set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) consecutive business days after the receipt by such breaching Plan Support Party of written notice of such breach;

(b) the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided that the Debtors shall have five (5) business days after issuance of such ruling or order, and shall, to the extent practicable, within the foregoing period seek relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Plan Support Parties;

(c) subject to the Debtors' potential continuing obligations pursuant to Section 10 hereof, the Debtors reasonably believe that the proceeds of the Restructuring Transactions will be insufficient to satisfy (i) all administrative claims against the Debtors of a kind specified in sections 503(b) and 507(a) of the Bankruptcy Code required to be paid in conjunction with the Plan and (ii) all claims against the Debtors arising pursuant to the Final DIP Order; and

(d) the exercise by any Debtor or the board of directors, board of managers, directors, managers, or officers or any other fiduciary of any Debtor of its fiduciary obligations as set forth by Section 12 of this Agreement.

9.    Mutual Termination; Automatic Termination. This Agreement may be terminated by mutual written agreement by and among the Debtors and all of the Plan Support Parties. Notwithstanding anything in this Agreement to the contrary, this Agreement shall automatically terminate upon the occurrence of the Effective Date of the Plan.

10.    Effect of Termination. The date on which one or more of the Parties elect to terminate this Agreement in accordance with Sections 7, 8, or 9 hereof shall be referred to as the "Termination Date." Upon the occurrence of the Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Parties shall be released from their commitments, undertakings, and agreements hereunder, and any vote in favor of the Plan delivered by any Parties shall be immediately revoked and deemed void *ab initio*; provided that any claim for breach of this Agreement that arises prior to the Termination Date shall survive any such termination, and all rights and remedies with respect to such claim shall not be prejudiced in any way; and provided, further, no Party's election to terminate its obligations hereunder, other than if the Debtors terminate this Agreement pursuant to Section 8(c) of this Agreement, shall release the other Parties of their obligations hereunder until such time as the non-terminating Party elects to Terminate its obligations hereunder in accordance with Sections 8 or 9, as applicable; and provided, further, that if, at any time, the Debtors terminate this Agreement pursuant to

Section 8(c) of this Agreement, all Parties' obligations under this Agreement (other than the Debtors' obligations pursuant to Section 6(a)(iii) hereof) shall be terminated effective immediately, and such Parties shall be released from its or their commitments, undertakings, and agreements hereunder, and any vote in favor of the Plan delivered by any Parties shall be immediately revoked and deemed void *ab initio*.

11.    Cooperation and Support.  Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to, (i) all matters relating to their rights hereunder; (ii) all matters concerning the implementation of the Plan and the Restructuring Transactions; and (iii) the pursuit, approval and support of the Restructuring Transactions (including confirmation of the Plan). Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, or to effectuate the solicitation of the Plan and/or the Restructuring Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or instruments, and voting any claims against or interests in the Debtors in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

The Debtors shall use commercially reasonably efforts to provide to counsel for the Winning Bidder drafts of all material motions and other documents relating to the Plan and Sale Transaction the Debtors intend to file with the Bankruptcy Court no less than two (2) business days before the date that the Debtors intend to file any such document unless such advance notice is impossible or impracticable under the circumstances, in which case the Debtors shall notify counsel to the Winning Bidder telephonically or by electronic mail of the documents to be filed and the facts that make the provision of advance copies no less than two (2) business days before submission impossible or impracticable, and shall provide such copies as soon as reasonably practicable thereafter.

12.    Debtors' Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Debtor or the board of directors, board of managers, directors, managers, or officers or any other fiduciary of any Debtor to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations under applicable law.

13.    No Solicitation.  Each Party acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances or rejections of the Plan.  The Debtors solicited acceptance of the Plan pursuant to the Disclosure Statement Order.

14.    Representations and Warranties.

(a)    Each Plan Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)     it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(ii)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)   the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with or without due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party; and

(iv)    this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(b)     Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)     except as expressly provided in this Agreement or the Bankruptcy Code, it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement; and

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part.

15.     <u>Waiver</u>.  If the transactions contemplated herein are or are not consummated, or following the occurrence of the Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Sale Term Sheet, this Agreement, the Plan, any related

documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

16.    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Plan Support Parties, on the one hand, and the Debtors, on the other hand, arising under this Agreement shall be several, not joint.   No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.   No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.   The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Plan Support Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

17.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that irreparable damage may occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.   Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.   Nothing in this <u>Section 17</u> shall restrict or otherwise limit the Debtors' ability to terminate this Agreement pursuant to <u>Section 12</u> hereof.

18.    <u>Governing Law and Jurisdiction</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions that would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code.   By its execution and delivery of this Agreement, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.   By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

19.    <u>Waiver of Right to Trial by Jury</u>.   Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.   Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

20.    <u>Successors and Assigns</u>.   Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

21.    <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

22.    <u>Notices</u>.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)    If to any Debtor:

Z Gallerie, LLC
1855 West 139th Street
Gardena, CA 90249
Attention:  Mark Weinsten
E-mail Address: mweinsten@zgallerie.com

*With a copy to, which shall not constitute notice:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C.
Email Address: joshua.sussberg@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:  Justin R. Bernbrock
Email Address: justin.bernbrock@kirkland.com

- and -

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000,
Wilmington, Delaware 19801,
Attention:  Domenic E. Pacitti, Michael W. Yurkewicz
Email Address: dpacitti@klehr.com
Email Address: myurkewicz@klehr.com

(b)    If to the Committee:

Cooley LLP
55 Hudson Yards
New York, New York 10001
Attention:  Sarah A. Carnes
Email Address: scarnes@cooley.com

(c)    If to KeyBank National Association:

Keybank National Association
1675 Broadway, 4th floor | CO-02-WT-0400

15

Denver, CO  80202
Attention: Chong Street

*With a copy to, which shall not constitute notice:*

Buchanan Ingersoll & Rooney PC
919 N. Market St., Suite 990
Wilmington, DE 19801
Attention:  Mary F. Caloway
E-mail Address:  mary.caloway@bipc.com


(d)    If to KKR Credit Advisors (US) LLC:

KKR Credit Advisors (US) LLC
555 California Street, 50th Floor
San Francisco, California 94104
Attention:  Scott Cullerton
E-mail Address: scott.cullerton@kkr.com

*With a copy to, which shall not constitute notice:*

Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Attention:  Vincent Indelicato, Chris Theodoridis
E-mail Address: vindelicato@proskauer.com
E-mail Address: ctheodoridis@proskauer.com


(e)    If to DBHI:

DirectBuy Home Improvement, Inc.
8450 Broadway
Merrillville, Indiana 46410
Attention:  Justin Yoshimura, Preetam Shingavi
E-mail address: justin@cscgeneration.com
E-mail address: pshingavi@directbuy.com

*With a copy to, which shall not constitute notice:*

Morgan Lewis & Bockius LLP
101 Park Ave.
New York, New York 10178
Attention:  Craig Wolfe, Rachel Mauceri
E-mail Address: craig.wolfe@morganlewis.com
E-mail Address: rachel.mauceri@morganlewis.com

16

23.    <u>Entire Agreement</u>.    This Agreement (including the Exhibits, Schedules, and Definitive Documentation) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

24.    <u>Amendments</u>.    Except as otherwise provided herein, this Agreement (including the Exhibits and Schedules) may not be modified, amended, or supplemented without the prior written consent of the Debtors, the Supporting Creditors, and DBHI.

25.    <u>Reservation of Rights</u>.    Except as expressly provided in this Agreement or the Plan, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

26.    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

27.    <u>Headings</u>.    The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

28.    <u>Interpretation</u>.    This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

*[Signatures and Exhibits follow]*

17

**<u>Debtors</u>**

**Z Gallerie, LLC**

By: _____

Name:    MARK WEINSTEIN

Title:    INTERIM CEO


**Z Gallerie Holding Company, LLC**

By: _____

Name:    MARK WEINSTEIN

Title:    INTERIM CEO

**Official Committee of Unsecured Creditors**

By: _____

Name: Seth Van Aalten

Title: Counsel to Official Committee of Unsecured Creditors

**DirectBuy Home Improvement, Inc.**

By:_____
Name: Justin Yoshimura
Title:  Chairperson

**KeyBank National Association**

By: _____

Name:   Chong Street

Title:    Senior Vice President

KKR Credit Advisors (US) LLC


By:_____
Name:   Philip S. Davidson
Title: Authorized Signatory

## Exhibit 1

## Sale Term Sheet[1]

| General Terms | |
| --- | --- |
| **Purchase and Sale** | Winning Bidder ("Purchaser"), will purchase all of the assets of the Company (the "Acquired Assets"), free and clear of all liens, claims, interests, and encumbrances, including, without limitation, the following: <br><br> i.   all cash and cash equivalents, including cash in transit; <br> ii.   the executory contracts and unexpired leases to be assumed by and assigned to Purchaser, as selected by Purchaser (including post-closing to the extent permitted by law and/or court order) ("Designated Contracts"); <br> iii.   all tangible property, accounts, machinery, equipment, tenant improvements, software and computer programs, and hardware; <br> iv.   all inventory; <br> v.   all intellectual property, company names, product names, trade names, and goodwill; <br> vi.   all accounts receivable, prepaid expenses and deposits; <br> vii.   all books and records, any policies and procedures and all customer and patient lists; <br> viii.   all telephone and facsimile numbers and all email addresses; <br> ix.   all licenses and permits to the extent transferable; <br> x.   all Causes of Action (as defined in the Plan); and <br> xi.   all benefits, proceeds and other amounts payable under any policy of insurance, any rights, claims or causes of action of any Seller against third parties relating to the purchased assets or operations, and proceeds of all the foregoing assets. |

---

[1] This term sheet is subject to ongoing review and material revision by the Company in all respects. This term sheet is not binding, is subject to material change, and is being distributed for discussion purposes only. Capitalized Terms used but not defined herein have the meaning ascribed to such terms in the Plan Support Agreement, to which this Term Sheet is attached.

|  | The following are not included in the Acquired Assets and would not be sold to Purchaser:<br>i. contracts and leases that are not Designated Contracts;<br>ii. the purchase price consideration and all rights of Sellers under the APA;<br>iii. any claim, right or interest of the Company in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom;<br>iv. any director and officer insurance policies and all rights to recovery thereunder; and<br>v. any books and records relating to any of the foregoing. |
|---|---|
| **Chapter 11 Sale** | The Sale will be effectuated pursuant to the *First Amended Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 255] filed on May 1, 2019 (as may be amended, modified, or supplemented, the "Plan"); *provided*, *however*, unless the Plan Support Parties agree in writing otherwise, if (i) (a) the Sources and Uses attached to the Plan Support Agreement change prior to closing such that the Plan Support Parties are adversely impacted and (b) the Debtors are unable to remedy such adverse impact in a manner that is reasonably acceptable to the Winning Bidder within three (3) business days and close the Sale Transaction through the Plan by June 17, 2019 (or such later date as agreed by the Parties) or (ii) an order confirming the Plan has not been entered by June 17, 2019, then the Sale Transaction will be effectuated pursuant to Bankruptcy Code section 363 with such sale to close no later than July 6, 2019 (and the Debtors will seek shortened notice to effectuate that timeline, as necessary). |
| **Asset Purchase Agreement** | The Winning Bidder and the Debtors will finalize an APA so that it can be filed with the Bankruptcy Court on or prior to May 29, 2019, as required by the Bidding Procedures Order. |
| **Purchase Price** | |
| **Cash Sources** | The aggregate cash sources for the Purchased Assets will be approximately $20.3 million, comprised of: (i) cash in the amount of $7.7 million, provided by DBHI; and (ii) second lien debt provided by KKR and B. Riley in the amount of $12.6 million (with participation in such debt to be offered to the minority Term Loan Lenders in proportion to their holdings of Prepetition Secured Term Loan Claims). |

| | |
|---|---|
| **Treatment of KeyBank's DIP Claim** | On account of KeyBank's DIP claim, KeyBank will:<br><br>• receive: (i) pay down of DIP Claims in an amount of $15.3 million; (ii) new first lien senior secured debt in an amount of $10 million; and (iii) new third lien debt in an amount of $2.7 million (on the same terms (other than priority) as the term loan lenders' fourth lien debt).<br><br>• agree to waive the DIP Exit Fee in an amount of $0.2 million.<br><br>• receive any cash in excess of $250,000 from any source, with such cash to be applied to reduce the $2.7 million new third lien debt. |
| **Treatment of Prepetition Term Loan Lenders' Claims** | On account of the Prepetition Secured Term Loan Claims, the Term Loan Lenders will:<br><br>• rollover $5 million into a fourth lien debt facility issued by the Purchaser; and<br><br>• receive a 15% equity interest in the Purchaser on terms to be agreed between the Purchaser and the Term Loan Lenders. |
| **Assumed Obligations** | • Subject to the agreed caps (as applicable) set forth in the Sources and Uses attached hereto as **Appendix I**, the Purchaser will assume only the following administrative obligations:<br><br>    i.  the Company's liabilities for cure obligations for the Designated Contracts (which cap on the Sources and Uses shall be adjusted upward or downward based on the number of stores assumed by Purchaser);<br>    ii.  503(b)(9) claims (capped at $2.2 million);<br>    iii.  postpetition accounts payable related to inventory (capped at $1.1 million);<br>    iv.  accrued vacation liabilities at assumed stores (subject to applicable law); and<br>    v.  customer deposit liability, other than with respect to products (excluding custom products) that have been out of stock for more than four weeks prior to the Effective Date.<br><br>• The Company will covenant to use reasonable efforts to fulfill all outstanding customer orders for which there is any customer deposit liability arising prior to the Effective Date.<br><br>• The Purchaser will not assume any liabilities associated with refunds outside of the ordinary course of business. For the avoidance of doubt, ordinary course e-commerce refunds may take up to fourteen days to process, refunds |

3

| | |
|---|---|
| | will be processed **on a daily basis** (e.g., if a customer returns an item to a store, the refund will be immediately processed), **and the parties will reconcile any obligations with the Company reimbursing the Purchaser for any refunds that are outside the ordinary course of business.** |
| | • The Company will satisfy the following obligations:<br>　　i.　non-inventory related postpetition accounts payable;<br>　　ii.　accrued and unpaid payroll and benefits;<br>　　iii.　sales tax/remittance;<br>　　iv.　vacation liability for employees at closed stores; and<br>　　v.　other additional administrative expenses not assumed. |
| **Adjustments of Purchase Price** | |
| **Inventory True Up** | To the extent inventory levels are above or below $34 million at the time of close, purchase price will be adjusted on a dollar-for-dollar basis (in either direction) to $34 million.<br><br>Purchaser will deposit a to-be-agreed amount into an escrow account with a third party escrow agent to fund any potential upward inventory adjustment. The APA will contain customary adjustment mechanisms for calculating inventory and releasing the escrow, with payments being made as soon as reasonably practicable following reconciliation of amounts. |
| **Cash in Transit True Up** | The Purchaser will receive cash in transit.<br><br>To the extent in-transit receivables are below $3.3 million at the time of close, purchase price will be adjusted on a dollar-for-dollar basis. |
| **Operations** | |
| **Stores, Offices and Facilities** | **Continued Operation.** Except as set forth herein or as agreed to by the Parties, the Company will continue to operate all stores in the ordinary course until the Effective Date of the Plan or Sale closing.<br><br>**Assumed Facilities**. The Purchaser will assume up to 31 stores leases and two additional facilities' leases: (i) the Gardena facility and (ii) Berkeley Buying Office.<br><br>**Atlanta Distribution Center.** The Company will file a notice of rejection with respect to the Atlanta Distribution Center and facilitate beginning to move product to Purchaser's warehouse as soon as reasonably practicable. Prior to the Effective Date, |

| | |
|---|---|
| | Purchaser agrees to cooperate with Company to not inhibit, delay, or impede Company's ability to fulfill its outstanding orders that are distributed from the Atlanta Distribution Center. |
| | The Rejection Date on the Atlanta Distribution Center will be June 30, 2019. To the extent that Purchaser is unable to move all inventory out of the Atlanta Distribution Center prior to the Effective Date, Purchaser will cover any incremental obligations associated therewith, including but not limited to, personnel, security, and insurance. To the extent that Purchaser is unable to move all inventory out of the Atlanta Distribution Center prior to June 30, 2019, Purchaser will cover all of the foregoing obligations plus any additional lease obligations. For the avoidance of doubt, all property transferred to Purchaser's warehouse will remain property of the Company until the Effective Date of the Plan or Sale closing. |
| | Following, the Effective Date of the Plan or Sale closing, the Purchaser will close any other stores and facilitate store closings, using Great American to conduct the liquidations. The Company will add a provision to the Plan to implement these store closings and allow for Great American to conduct the store closings. The Company and Great American will collaborate to seek consent of landlords to this implementation mechanism, as necessary. The store closings will remain subject to jurisdiction of the Bankruptcy Court. |
| **Employee Matters** | The Purchaser intends to employ employees at the Gardena facility in the following functions: warehousing, IT, regional store managers and loss prevention personnel.<br>• Purchaser will conduct interviews of the Company's employees and determine which employees they seek to employ. During the process of conducting such interviews and until a final determination has been made, Purchaser will not make conclusory comments to any employees (aside from the CEO and CFO) with respect to future employment in order to best maintain employee morale and operational stability.<br><br>The Company will seek approval of a KEIP/KERP consistent with the DIP Budget and all Parties will support such program. |
| **Integration and Migration** | Following the execution of the APA, the Company will give the Purchaser's employees access to the Company's facilities and systems, subject to applicable law, confidentiality agreements, and any reasonable constraints, so that Purchaser can prepare for the Sale Closing; *provided* that Purchaser shall not go live with any integration or data migration in production |

| | |
|---|---|
| | environments until after the Effective Date; *provided further* that any costs associated with integration shall be paid by Purchaser. |
| **Assumption and Rejection of Executory Contract and Unexpired Leases** | The Company will seek approval of as expansive designation rights as possible in the Plan.<br><br>With respect to Executory Contracts:<br>• Purchaser will make a preliminary determination by May 28, 2019 **as to any executory contracts it <u>may</u> want to assume so that the Company can provide appropriate notice.**<br>• **Company will seek authority to determine to remove such contracts from the assumption list within 90 days of the Effective Date.**<br>• Purchaser will cooperate with Company to resolve objections to such procedures (in some cases by making a final determination prior to the Effective Date).<br>• **Purchaser will cooperate with Company to resolve any cure disputes related thereto.**<br><br>With respect to Unexpired Leases:<br>• Purchaser will to make a preliminary determination by May 28, 2019 **as to any unexpired leases it <u>may</u> want to assume so that the Company can provide appropriate notice.**<br>• **Purchaser will provide Adequate Assurance information as provided in the Bid Procedures to be shared with landlords subject to assumption.**<br>• **Purchaser will provide a *final* list of unexpired leases it wants to assume by June 9, 2019.**<br>• **Purchaser will cooperate with Company to resolve any cure disputes related thereto.** |
| **Gift Cards** | The Company will stop selling gift cards upon execution of the APA.<br><br>Following the Effective Date, the Purchaser will continue to honor the Company's gift card liabilities that existed as of the Effective Date for the 12 month period following the Effective Date. |

## **Appendix I**

Sources and Uses

**DirectBuy / KKR Bid - Illustrative Sources & Uses**
*$ in Millions*

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Cash Equity | $ | 7.7 | DIP Paydown | $ | 15.3 |
| 2L New Money Term Loan - KKR/BR | | 12.6 | | | |
| | | | | | |
| 1L DIP Rollover - KeyBank | | 10.0 | 1L DIP Rollover - KeyBank | | 10.0 |
| 3L DIP Rollover - KeyBank | | 2.7 | 3L DIP Rollover - KeyBank | | 2.7 |
| 4L Term Loan Rollover - KKR | | 5.0 | 4L Term Loan Rollover - KKR | | 5.0 |

| **Assumed Admin. Expenses** | | | **Assumed Admin. Expenses** | | |
|---|---|---|---|---|---|
| Expected Real Estate Lease Cure Costs | 0.5 | Expected Real Estate Lease Cure Costs | 0.5 |
| 503(b)(9) | 2.2 | 503(b)(9) | 2.2 |
| Vacation Liability Assumed Stores | 1.0 | Vacation Liability Assumed Stores | 1.0 |
| Cure Costs For Executory Contracts | TBD | Cure Costs For Executory Contracts | TBD |
| Post Petition AP Related to Inventory | 1.1 | Post Petition AP Related to Inventory | 1.1 |

**Non-Assumed Admin. Expenses**
Vacation Liability For Gardena — 0.4

WARN Exposure - Atlanta — 0.1
WARN Exposure - Gardena — 0.2

**Closing Price Adjustments**
True Up Cash In-Transit — 1.3
Inventory True Up — 3.0

| **Total Sources** | **$** | **42.8** | **Total Uses** | **$** | **42.8** |
|---|---|---|---|---|---|

| Pro Forma Capital Structure | | |
|---|---|---|
| 1L DIP Rollover - KeyBank | $ | 10.0 |
| 2L New Money Term Loan - KKR/BR | | 12.6 |
| 3L DIP Rollover - KeyBank | | 2.7 |
| 4L Term Loan Rollover - KKR | | 5.0 |
| **Total Debt** | | **30.3** |